PAUL HASTINGS LLP
Rudy Kim (SB# 199426)
rudykim@paulhastings.com
1117 S. California Avenue
Palo Alto, CA 94304
Tel: (650) 320-1800
Fax: (650) 320-1900

Michael F. Murray (*pro hac vice pending*)
Nafeesah Attah (*pro hac vice pending*)
michaelmurray@paulhastings.com
nafeesahattah@paulhastings.com
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700
Fax: (202) 551-0460

Steven S. Baik (SB# 184622)
sbaik@whitehat.legal
White Hat Legal, PC
Box 382
San Jose, CA 95002

*Attorneys for Plaintiff Realtek Semiconductor Corp.*

Additional Counsel on Signature Page

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALTEK SEMICONDUCTOR CORP., | No.: _____ |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| MEDIATEK INC.; IPVALUE MANAGEMENT INC.; and FUTURE LINK SYSTEMS, LLC, | |
| Defendants. | |

Plaintiff Realtek Semiconductor Corp. ("Realtek"), for its complaint against defendants MediaTek Inc. ("MediaTek"), IPValue Management Inc. ("IPValue"), and Future Link Systems, LLC ("Future Link") (jointly, "Defendants"), alleges the following based upon personal knowledge, investigation, and information and belief.

**INTRODUCTION**

1.     Semiconductors provide for the movement of massive volumes of data at lightning fast speed—facilitating unprecedented growth and industry.  Semiconductor devices, such as integrated circuit chips, drive nearly every facet of modern life, including today's smart devices and wireless networking.  Without the continuing advances in semiconductor technology driven by relentless (and free) competition, everyday life would be bereft of the conveniences people take for granted today, such as smartphones, tablet computers, and smart TVs.

2.     Within the semiconductor industry, Defendant MediaTek is one of the largest companies in the world.  Indeed, MediaTek is the fourth largest designer of integrated circuits ("Chips") in the world, and for some types, the largest.

3.     Plaintiff Realtek has risen through innovation, providing quality products, and fair competition, to become the eighth largest integrated Chip design house from its inception in the 1980s.

4.     Unfortunately, part of competing in the semiconductor industry today is fighting off countless frivolous lawsuits brought by patent assertion entities ("PAEs"), also known as patent trolls. PAEs invent nothing, and instead acquire patents that are often abandoned by their original assignees because the technology is outdated or they otherwise lack value—*i.e.*, they are not novel, useful inventions.  PAEs nonetheless try to exploit such patents to pursue royalties or extortionary litigation. These lawsuits are often extremely expensive to defend against, take years to resolve, and potentially end in the payment of settlements or damages to PAEs who typically pay out to wealthy investors. When innovative companies, such as Realtek, have to incur such costs, hire outside attorneys and pay unwarranted royalties for patents that never should have been granted, it ultimately increases costs to consumers.  Lawsuits brought by PAEs were associated with *half a trillion dollars* of lost wealth for

litigation targets from 1990 to 2010.[1]  The most litigated PAE patents, defined as those asserted a minimum of eight times or more, lose in court more than 90% of the time.[2]  Research has also shown that patent trolls harm innovation by draining companies' resources that otherwise could have been invested in further research.[3]  The money more often than not goes to wealthy investors, not to further innovation, resulting in a net loss to society and everyday consumers.

5.     As part of its efforts to compete fairly, and to protect the public interest, Realtek has taken the costly position of fighting such frivolous lawsuits brought by PAEs.  The background of this case began in a way similar to that of many such frivolous cases brought against Realtek—by a PAE, Future Link, that was asserting invalid patents.  However, as discussed further below, Future Link, and its parent PAE, IPValue, not only engaged in the typical pattern of attempting to hold up Realtek for pure monetary gain, it did so as part of an unprecedented and unseemly conspiracy with a company that Realtek had previously believed was similarly plagued by PAEs.

6.     This competitor, MediaTek, has instead resorted to a multifaceted scheme with the aim of destroying competition and securing for itself monopoly spoils in a critical industry, like the robber barons of the Industrial Age.  One aspect of the scheme was significantly increasing Future Link's incentives to bring patent cases against MediaTek competitors.  As alleged herein, MediaTek conspired with Future Link, paying it a secret "bounty" to file meritless patent claims to harass Realtek, manipulating the court system to increase Realtek's costs and divert Realtek's attention away from product development and innovation.

7.     Future Link's anticompetitive conduct has not gone unnoticed.  Upon being made aware of the secret agreement, an Administrative Law Judge at the International Trade Commission called the product of the scheme—a secret bounty—"alarming" such that it is "difficult to imagine how it could

---

[1] See Feng Chen, Yu Hou, Jiaping Qiu, and Gordon Richardson, *Chilling Effects of Patent Trolls*, 52 Research Policy, issue 3 (Apr. 2023), https://www.sciencedirect.com/science/article/abs/pii/S0048733322002232.

[2] See John R. Allison, Joshua H. Walker, and Mark A. Lemley, *Patent Quality and Settlement Among Repeat Patent Litigants*, 99 Geo. L.J. 677 (2011).

[3] See Kenneth G. Huang, Mei-Xuan Li, Carl Hsin-han Shen, and Yanzhi Wang, *Escaping the Patent Trolls: The Impact of Non-Practicing Entity Litigation on Firm Innovation Strategies*, 2022 Academy of Management Journal, no. 1 (Aug. 1, 2022), https://journals.aom.org/doi/abs/10.5465/AMBPP.2022.141.

possibly be lawful," and a federal district judge said the scheme was "improper" and "should be discouraged as a matter of public policy."  Realtek felt compelled to bring this case to stop Defendants' further abuse of the patent system, which, as unredacted portions of court decisions have made public, included the following:

> a.  Future Link brought not one, but three separate meritless patent infringement actions against Realtek, and sought to keep Realtek products off the market.
>
> b.  Realtek's motions to dismiss in those matters demonstrated the deficiencies of Future Link's complaints.
>
> c.  After the secret bounty conspiracy surfaced, Future Link quickly dismissed its claims against Realtek.
>
> d.  Future Link's irrational litigation conduct made clear that the whole point of pursuing the meritless litigation was the secret bounty conspiracy designed to harass Realtek and impose a costly and burdensome distraction.
>
> e.  Future Link's patent infringement allegations focused on technology, components and functions incorporated into integrated circuits made by Realtek that are essential for providing smart TV functionality, and through these litigations Future Link sought to block Realtek from using key components and technologies essential to making Chips that are incorporated into smart TVs or provide smart TV functionality, as well as many other types of Chips, which would hinder Realtek's ability to compete.

8.      On information and belief, MediaTek used Realtek's involvement in patent litigation as a basis to coerce at least one customer, and perhaps more, not to use Realtek products.  On information and belief, MediaTek, for example, took steps to compel their loyalty.  Such steps, on information and belief, included bundled product offerings.

9.      With this action, Realtek seeks to stop a modern robber baron and its hired henchmen, protect itself from ongoing injury, and guard against the destruction of competition in the critical semiconductor industry by holding Defendants accountable for their conspiracy.

10.     The integrity of the patent system benefits consumers by ensuring that innovation is rewarded rather than by promoting spurious assertions of meritless claims by shell entities.  Because

Realtek seeks to protect the public interest with this action, Realtek will donate the amount of damages that it recovers to charity.

## PARTIES

11.     Plaintiff Realtek is a corporation organized under the laws of Taiwan, with its principal place of business at No. 2 Innovation Road II, Hsinchu Science Park, Hsinchu 300, Taiwan.

12.     On information and belief, Defendant MediaTek is a corporation organized under the laws of Taiwan, with its principal place of business at No. 1, Dusing 1st Rd., Hsinchu Science Park, Hsinchu City 300, Taiwan.  Upon information and belief, MediaTek has two U.S. subsidiaries, MediaTek USA, Inc. and MediaTek North America, Inc., which are both headquartered in San Jose, California.  On information and belief, each of MediaTek's subsidiaries has its principal place of business at 2840 Junction Avenue, San Jose, California.

13.     On information and belief, defendant IPValue is a Delaware corporation headquartered in Santa Clara, California.  On information and belief, IPValue's principal place of business is at 2880 Lakeside Dr., Ste. 320, Santa Clara, CA 95054.

14.     On information and belief, defendant Future Link is a Delaware limited liability company headquartered in Santa Clara, California.  On information and belief, Future Link and IPValue share a common registered address as well as a common principal place of business.

15.     Future Link is a PAE.  Future Link is not an inventor.  On information and belief, it does not manufacture any product that requires patent protection.  Instead, on information and belief, Future Link acquires patents, and uses its patent portfolio to extract licensing payments from manufacturers through litigation.

16.     On information and belief, Future Link is a wholly owned subsidiary of IPValue, and Future Link operates under the direction and control, and for the benefit of, IPValue.  On information and belief, IPValue is the principal of numerous PAE subsidiaries (like Future Link) that operate as agents of IPValue in furtherance of IPValue's business objectives of monetizing patents through serial licensing and litigation.  Additionally, upon information and belief, IPValue serves as an agent for its PAE subsidiaries in negotiating royalties with their targets.

**JURISDICTION AND VENUE**

17.     This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 15 (antitrust), 15 U.S.C. § 26 (injunctive relief), and 28 U.S.C. § 1367 (state law claims).

18.     This Court has personal jurisdiction over Defendants because IPValue and Future Link are each corporations with their principal place of business in this District and, upon information and belief, each has other sufficient minimum contacts in the District.  Their co-conspirator, MediaTek, is subject to this Court's personal jurisdiction because, upon information and belief, MediaTek's conduct that forms the basis of this lawsuit occurred within this District and because MediaTek has other sufficient minimum contacts in the District.  For example, because both IPValue and Future Link operate their headquarters in the District, the improper litigation bounty agreement was likely negotiated and executed, at least in part, in the District.  Furthermore, Defendants issued press releases from Santa Clara, California, about the license agreement[4] that gave rise to public court decisions that cited the secret bounty provision.[5]  The meritless patent litigation that Future Link subsequently commenced against Realtek following the illegal bounty agreement was also, on information and belief, conceived and directed from Future Link's and IPValue's headquarters in the District.  On information and belief, MediaTek conducts its business in the United States through its subsidiaries headquartered in San Jose, California.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have an agent, can be found in this District, and a substantial part of the events giving rise to these civil antitrust claims occurred in this judicial district.

---

[4] *See, e.g.*, Press Release, *MediaTek Licenses Patent Portfolio From IPValue Management*, Business Wire (May 21, 2019), https://www.businesswire.com/news/home/20190521005412/en/MediaTek-Licenses-Patent-Portfolio-From-IPValue-Management; *see also* https://www.bloomberg.com/press-releases/2019-05-21/mediatek-licenses-patent-portfolio-from-ipvalue-management (last visited May 24, 2023).

[5] *See Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-0363-ADA (W.D. Tex. Oct. 10, 2022), ECF No. 88 at 5.

20.     The conduct complained of herein has occurred in and had a substantial effect on interstate trade and commerce.

## FACTUAL ALLEGATIONS

### I.     Future Link and IPValue Initiated A Seemingly Typical (Frivolous) Patent Troll Action Against Realtek

*Patent assertion entities provide no value and merely impose costs on innovators that in turn raise costs to consumers.*

21.     PAEs like defendants IPValue and Future Link operate in what the Supreme Court has observed is "an industry [that] has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees."  *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 646 (2015) (internal quotation marks omitted).  On information and belief, IPValue and Future Link do not produce or sell goods; rather, they operate in this industry by acquiring patents solely to obtain licensing fees, by engaging in what are known as "ex post" patent transactions, *i.e.*, they purchase and enforce patent rights after practicing entities have heavily invested in creating, developing, and commercializing technologies.[6]  IPValue's and Future Link's "ex post" transactions occur after all major market players have invested billions of dollars in the design and fabrication of semiconductors that are manufactured and incorporated into downstream products.

22.     As the U.S. Federal Trade Commission ("FTC") stated in a March 2011 report, "ex post licensing" by PAEs like IPValue and Future Link can "distort competition in technology markets and deter innovation."  According to the FTC, the activities of PAEs in the information technology industry have "amplified concerns about the effects of ex post patent transactions on innovation and competition."  And as the FTC points out, even if in some cases "PAEs arguably encourage invention, they can deter innovation by raising costs and risks without making a technological contribution."

---

[6] IPValue and Future Link have reportedly acquired a very large portfolio of roughly 600 patents.  *See, e.g.*, *IPValue Management Subsidiary Future Link Systems Filed ITC Patent Infringement Complaint*, Business Wire (Dec. 30, 2021), https://www.businesswire.com/news/home/20211230005016/en/IPValue-Management-Subsidiary-Future-Link-Systems-Files-ITC-Patent-Infringement-Complaint (last visited on May 23, 2023).

23.      Studies have shown the extraordinary toll that PAEs take on innovation.  One study showed PAEs create $29 billion in direct, out-of-pocket costs from their targets.[7]  Additional researchers found that targets of PAE enforcement suffer **three times** the average market value loss as a tech peer sued for enforcement by a practicing entity.[8]  The same researchers observed that "[p]atent troll litigation has a chilling effect on at-risk firms," citing the expense involved in research and development specifically to "work around" patents held by PAEs, the potential need to exit product lines, or paying royalties to PAEs.[9]

24.      The risks that a PAE's actions will distort competition and deter innovation are particularly acute with respect to PAEs that the FTC has termed "patent aggregators," that is, entities that "build very large portfolios of purchased patents and implement a licensing strategy to earn returns for investors."  Even when their patents individually have no material value, by aggregating hundreds of patents directed to a particular technology, PAEs can credibly threaten to impose substantial costs on innovators through serial litigation.  PAEs can drive up costs for industry participants, raising prices to the end consumer.

25.      Aggregation of patents by IPValue and Future Link leaves innovators like Realtek with a choice between two undesirable alternatives: either paying unwarranted royalties that raise innovators' costs and undermine their competitiveness, or defending against burdensome litigation.[10]

---

[7] *See* James Bessen, *The Evidence Is In: Patent Trolls Do Hurt Innovation*, Harv. Bus. Rev. (Nov. 2014), https://hbr.org/2014/07/the-evidence-is-in-patent-trolls-do-hurt-innovation.

[8] *See* Alan Morantz, *Patent Trolls Are Worse Than You Think*, Smith Bus. Insight (July 8, 2019), https://smith.queensu.ca/insight/content/patent_trolls_are_worse_than_you_think.php.

[9] *See id.*

[10] *See, e.g.*, Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition*, (March 2011),  www.ftc.gov/sites/default/files/documents/reports/evolving-ip-marketplace-aligning-patent-notice-and-remedies-competition-report-federal-trade/110307patentreport.pdf at 9 ("[PAEs] can deter innovation by raising costs and risks without making a technological contribution.").

*In 2021, IPValue and Future Link initiated a meritless patent litigation campaign against Realtek.*

26.     On April 13, 2021, in the midst of the global semiconductor shortage triggered by the pandemic, Future Link sued Realtek for alleged patent infringement in the U.S. District Court for the Western District of Texas, Case No. 6:21-cv-00363-ADA (W.D. Tex.) (the "363 Case").  Future Link accused Realtek of directly infringing U.S. Patent No. 7,917,680 (the "'680 patent").  According to Future Link's complaint, the '680 Patent supposedly "relates to improvements in electronic circuitry in computing devices and processors."

27.     Future Link accused a broad swath of Realtek products of infringement, including both unspecified products "that use processors supporting ARM AMBA AXI4 or newer," as well as products that "operate in substantially the same way."[11]

28.     Future Link's complaint sought "an injunction prohibiting further infringement of the '680 patent, and, specifically, enjoining further manufacture, use, sale, importation, and/or offers for sale that come within the scope of the patent claims."  The complaint sought to take Realtek products off the market not just for the specifically identified products, but also for the vast majority of Realtek's products that include Chips essential for providing smart TV functionality ("TV Chips").[12]

29.     Future Link's claims in the 363 Case quickly unraveled.  There were multiple fatal defects with Future Link's case: (a) there was no personal jurisdiction; (b) the complaint was not properly served; (c) Future Link failed to plausibly allege that Realtek engaged in any act of direct

---

[11] *See* Compl. Ex. 2, *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-0363-ADA, (W.D. Tex. Apr. 13, 2021) ('680 patent infringement chart), ECF Nos. 1-2.

[12] *See* Compl., *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-01353-ADA, (W.D. Tex. Dec. 22, 2021) (requesting various remedies), ECF No. 1 at 8.  *See also* Compl., (Public) *In re Certain Integrated Circuit Prods. and Devices Containing the Same*, ITC Inv. No. 337-TA-1295, Dkt. 3589 at *46 (Dec. 29, 2021) (requesting a permanent limited exclusion order).

infringement; and (d) Future Link relied on optional features without any showing that such features were actually included in the accused products.

30.     Confronted with these defects, Future Link attempted to amend its complaint on July 15, 2021, but failed to cure its deficiencies.  The first amended complaint even expanded the scope of accused products to encompass additional Realtek products—this time even more broadly accusing products that "use processors supporting ARM AMBA AXI4 or newer and/or ARM AMBA CHI" including "without limitation" Realtek's RTD1295, RTD 1296, RTD1395, RTD1315, RTD1319, and RTD1619.  However, the amended complaint, like the original complaint, again wrongly accused Realtek of engaging in directly infringing acts within the United States.  The amended complaint also repeated Future Link's reliance on optional features without identifying any basis for believing that such features were actually present in the accused products.

31.     Future Link's meritless action relating to the '680 patent was just the beginning.  As Realtek sought to dismiss Future Link's meritless suit, Future Link doubled down on its meritless litigation campaign, initiating two additional actions against Realtek.  In particular, on December 22, 2021, Future Link filed another lawsuit in the Western District of Texas, alleging infringement of two other patents Future Link purportedly purchased, and a week later, on December 29, 2021, Future Link alleged infringement of the same two patents in a complaint before the United States International Trade Commission (ITC).  The patents Future Link asserted were U.S. Patent No. 7,685,439 (the "'439 patent") and U.S. Patent No. 8,099,614 (the "'614 patent").  Future Link sought an exclusion order excluding from entry into the United States certain Realtek integrated circuit products (including the same Realtek Chips identified in the prior litigation in addition to others) and devices containing the same.

32.     Although the infringement theories advanced in Future Link's new actions were also meritless, Realtek was still forced to incur substantial legal costs associated with defending against Future Link's multiple, meritless actions.

33.     Not only did Future Link advance unfounded infringement allegations, but it also disregarded the patentees' actual or constructive knowledge that the patents were invalid.  Indeed, IPValue and Future Link have a history of asserting invalid patents, then canceling claims or settling cases to avoid an adjudication of invalidity (or non-infringement).  For example, on April 13, 2021, Future Link asserted claim 1 of the '680 patent against Realtek, and on June 25, 2021, Realtek filed an *inter partes* review ("IPR") petition with the Patent Trial and Appeal Board ("PTAB") at the U.S. Patent and Trademark Office challenging the patentability of claim 1 and other claims of the '680 patent. Future Link then asserted claims 15 and 20 against Realtek, and on March 14, 2022, Realtek filed a second IPR petition against the '680 patent, challenging the patentability of claims 15 and 20.  On September 9, 2022, to avoid a finding of unpatentability, Future Link simply **cancelled claims** 3-6 and 15-20 of the '680 patent, leading to the PTAB denying institution (*i.e.*, not holding a trial) of the second IPR petition on September 14, 2022, on the basis that the challenged claims had been cancelled. Unsurprisingly, on January 4, 2023, the PTAB found unpatentable claim 1 and all other claims of the '680 patent challenged in Realtek's first IPR.

34.     IPValue and Future Link followed a similar pattern with the later-asserted '439 and '614 patents.  On December 22, 2021, Future Link accused Realtek of infringing these patents, even though the '439 patent was previously the subject of an *instituted* IPR petition by Intel.  Future Link was able to avoid a finding of unpatentability in that IPR through a settlement agreement, which ended the IPR proceedings before the PTAB could render a final determination.  As for the '614 patent, on June 8, 2022, Realtek filed an IPR petition challenging all claims of the '614 patent.  On September 9, 2022,

Future Link voluntarily cancelled all claims of the '614 patent, and on December 19, 2022, as before, the PTAB denied institution on the basis that the challenged claims stood cancelled.

35.     That same year, Future Link also brought costly patent claims against another Chip competitor, Amlogic Holdings, Ltd.[13]

**Defendants' conspiracy began to surface in April 2022.**

36.     Throughout this course of litigation, Future Link failed to disclose that it had entered into an improper bounty conspiracy that was motivating it in bringing these meritless cases.

37.     On or about May 21, 2019, IPValue publicly announced that its subsidiary Future Link had entered into a patent license agreement with MediaTek.  In April 2022, there was a shocking revelation regarding that seemingly innocuous agreement.  Discovery revealed that before the litigation against Realtek began, the license agreement among MediaTek, IPValue, and Future Link included a secret litigation "bounty" provision previously hidden from the public and Realtek.  Prior to the production of the agreement, Realtek had no knowledge about the true nature of the relationship between MediaTek and IPValue or Future Link.  Specific details of this scheme remain hidden from the public even today because Future Link has managed to keep the arrangement buried under confidentiality obligations and protective orders.  However, certain information about the arrangement has been disclosed publicly and confirms its illegality:

- On April 12, 2022, an Administrative Law Judge ("ALJ") at the ITC entered an order regarding a motion for sanctions in *In re Certain Integrated Circuit Products and Devices Containing the Same*, ITC Inv. No. 337-TA-1295, in which Future Link was the complainant. As reflected in the unredacted portion of a public order, the ALJ noted the following:

---

[13] *See* Compl., *Future Link Sys., LLC v. Amlogic Holdings, Ltd.*, No. 1-21-cv-00634-RGA (D. Del. Apr. 30, 2021), ECF No. 1; Compl., *Future Link Sys., LLC v. Amlogic Holdings, Ltd.*, No. 1-21-cv-01790-LPS (D. Del. Dec. 22, 2021), ECF No. 1.

- o "The complained-of provision is found in a license between Future Link and a third party: [Redacted] [¶  This provision is alarming. It is difficult to imagine how it could possibly be lawful or enforceable.  ***At a minimum it would seem to warrant an action by Realtek against either Future Link or its counterparty for unfair competition***, and it is possible such an action would fall within the jurisdiction of the Commission."  (Emphasis added.)

- On May 31, 2022, the ALJ entered an initial determination granting-in-part Realtek's motion to declassify documents designated as "Confidential Business Information."

  - o As reflected in the unredacted portion of a public order, the ALJ noted that "[i]t is publicly known that Future Link and MediaTek entered into the license agreement at issue. In fact, both parties to the license agreed to issue a press release publicly announcing it, and that press release can be found on the internet."  (Citations omitted.)

  - o In reference to a paragraph of the license agreement, the ALJ observed that "what the Paragraph memorializes may well be ***untoward and actionable***," and the ALJ referenced "five words describing the triggering event" in the paragraph.  (Emphasis added.)

- On October 10, 2022, the U.S. District Court for the Western District of Texas publicly filed a redacted version of an order resolving certain discovery disputes in *Future Link Systems, LLC v. Realtek Semiconductor Corp.*, Case No. 6:21-cv-00363-ADA.  The unredacted portion of that order included the following assertions by Realtek's counsel in that litigation:

  - o " … Realtek does not agree to redacting information referencing the improper contract (and why it was improper), which by its very nature—being an ***'improper contract' that the Court found 'should be discouraged as a matter of public policy'***—cannot constitute trade secret business information."  (Emphasis added.)

- o "Having sanctioned [Future Link] because the contract was an *'improper contract' that 'should be discouraged as a matter of public policy,'* the wrongful terms of the contract must be made public to advance the public interest."  (Emphasis added.)

- o In reference to the "FLS License Agreement": "FLS cannot meet its burden of proving that its *improper litigation bounty provisions* are worthy of trade secret protection."

- On October 18, 2022, Realtek's counsel in the district court litigation publicly filed a redacted version of a motion for reconsideration.  In reference to an earlier sealed order dismissing the case with prejudice,[14] the motion noted that the district court "granted in part Realtek's fees motion. … The Court went on … to change the original dismissal without prejudice to a dismissal with prejudice, in an exercise of the Court's inherent authority to sanction [Future Link] for its ... *'improper motive.'* … As the Court explained, '[p]ublic policy cuts directly against an agreement of this kind. … The contract, the Court concluded, '*should be discouraged*,' and '*warrants sanctions*.'"  (Emphasis added and citations omitted.)

38.     The existence of this improper litigation bounty agreement appears to be the motivator behind Future Link's otherwise irrational litigation conduct.  For example, although Future Link's first lawsuit was obviously and fatally defective, Future Link made strenuous efforts to avoid or delay dismissal, including falsely claiming that a process server served Realtek with papers relating to the case.  Future Link's insistence on pursuing meritless patent claims, on information and belief, was driven by MediaTek's commercial imperative—to harm its Chip rivals.  To wit, in the same lawsuit, Future Link filed a first amended complaint to buttress its meritless infringement theory, but in an

---

[14] On September 12, 2022, the district court entered a sealed order.  Although the order is sealed, the public docket entry text for this order states that Future Link's case was "DISMISSED WITH PREJUDICE."

illogical departure from customary practice and procedural rules, never actually submitted to the court verified claim charts for its new (and equally meritless) infringement theory.

39.     Additionally, soon after the ITC ALJ issued the April 2022 order quoted above, including its shocking language about the litigation bounty's likely illegality, Future Link hurriedly resolved more than a dozen pending patent infringement claims against ten different technology companies, including its claims against Amlogic.[15]  The terms of those resolutions have not been disclosed.  On information and belief, Future Link resolved those matters to avoid further disclosure of the illegal conspiracy.

40.     Through discovery related proceedings in the Western District of Texas litigation, Future Link and its parent company IPValue have been on notice that Realtek would seek to expose the full extent of their misconduct through this present action.  In an apparent pre-emptive retaliatory move, however, IPValue has recently initiated what appears to be yet another meritless litigation in Japan, accusing some of the same Realtek products of infringement, this time through another one of its PAE subsidiaries, Monterey Research LLC.  Despite this apparent retaliatory action, Realtek remains undeterred in bringing IPValue's improper conduct to light.

## II.     The Improper Bounty is Just One Example of MediaTek's Anticompetitive Behavior

41.     While additional MediaTek anticompetitive acts are believed to have occurred, but remain concealed, upon information and belief, MediaTek has engaged in at least the following acts.

42.     On information and belief, MediaTek coerced at least one TV Chip customer not to incorporate Realtek TV Chips into its products due to Realtek's involvement in patent litigation.

---

[15] *See* Order Granting Joint Mot. to Dismiss with Prejudice, *Future Link Sys., LLC v. Amlogic Holdings, Ltd.*, No. 1-21-cv-00634-RGA (D. Del. May 4, 2022), ECF No. 51; Order Granting Joint Mot. to Dismiss with Prejudice, *Future Link Sys., LLC v. Amlogic Holdings, Ltd.*, No. 1-21-cv-01790-LPS (D. Del. May 4, 2022), ECF No 12.

43.     On information and belief, MediaTek has used illegal bundling to maintain or grow its market share in one or more Chip market segments, including through its dominance in the TV Chip market.

44.     On information and belief, MediaTek undertook these acts with the specific aim of restricting the growth of its rivals, including Realtek, to the detriment of customers and the public.

***MediaTek's anticompetitive attacks were felt by Realtek and other competitors within various business lines, but were experienced acutely in TV Chips, where MediaTek has significant market share.***

45.     The Chip manufacturing industry can be divided into design and related companies upstream, chip manufacturers midstream, and packaging and testing suppliers downstream.  Chip product design occurs at the upstream level, with design houses working in consultation with customers.  MediaTek is known as a "fabless" Chip design house because, once a product design is ready, MediaTek commissions wafer foundries at the midstream level to complete manufacturing.  Finished wafers are sent to a downstream assembly house for packaging.  Packaged products then go through final testing before they are provided to customers, typically distributors or original equipment manufacturers (OEMs) and original device manufacturers (ODMs).

46.     Chips are incorporated into consumer electronics by OEMs and ODMs.  OEMs and ODMs incorporate packaged Chips with other components to create end products such as smart TVs.[16] A dedicated team, on information and belief, integrates TV Chips into smart TVs.  OEMs and ODMs and the end user TV brands distribute the end products throughout the world, including in the United States.

---

[16] Other products incorporating Chips include connected media products, multimedia products, and computer peripheral products such as laptop and desktop computers, mobile devices, printers, and game consoles.

47.     According to MediaTek's 2022 annual report, it generated more than $18 billion in revenue in 2021.  MediaTek states that it powers "more than 2 billion devices a year … in 20 percent of homes and nearly 1 of every 3 mobile phones globally."[17]

48.     MediaTek has roughly a 60 percent share of the global market for TV Chips.[18]  Reports suggest the TV Chip market is highly concentrated, with the top three players accounting for roughly an 85% share as of 2022.[19]  Upon information and belief, Realtek is a top three player in TV Chips, and a primary rival of MediaTek in various Chip segments.

49.     Like MediaTek, Realtek is a fabless Chip design house, and it competes with MediaTek to sell Chips to the same customer base, across a number of business lines, including in the market for Chips that are incorporated into smart TVs that are sold in the United States.

50.     Realtek earned approximately $3.4 billion in revenue in 2021.[20]

51.     The customers and end users of Realtek and MediaTek Chips demand timely and reliable access to Chips for use in the end products, including TV Chips that can be imported into and sold in the United States.  Given the quick product lifecycles of consumer electronics products, a delay in access to acceptable Chips can substantially disrupt an end user's ability to sell its products to consumers in the United States.  Accordingly, competitors in Chips compete on price and quality, but also, and critically,

---

[17] About MediaTek, https://www.mediatek.com/who-we-are (last visited May 24, 2023).

[18] MediaTek has boasted the figure is even higher, writing that it "owns 70 percent market share and is the No. 1 chipset provider for digital and smart TVs."  MediaTek Press Release, *MediaTek Introduces Highly Integrated Chipset for Feature-Rich 4K UHD Smart TVs* (Sept. 25, 2019), https://corp.mediatek.com/news-events/press-releases/mediatek-introduces-highly-integrated-chipset-for-feature-rich-4k-uhd-smart-tvs.

[19] *See* Kelly Lee, *High Industry Penetration of the Top Three TV SoC Vendors and Leading New TV Product Features Expected in 2023*, Omdia (Feb. 16, 2023), https://omdia.tech.informa.com/OM029624/High-industry-penetration-of-the-top-three-TV-SoC-vendors-and-leading-new-TV-product-features-expected-in-2023.

[20] *See* Realtek Semiconductor Corp. 2021 Annual Report at *120, https://www.realtek.com/en/investor-relations/financial-information/annual-reports.

on supply certainty.  For example, an end user seeking to sell a new smart TV model in the United States would not be able to do so if its supply of TV Chips were disrupted.  Thus, customers and end users are unlikely to purchase or incorporate Chips from a Chip design house if there is a risk that the design house will be unable to reliably supply Chips.

**III.    The Relevant Antitrust Market is TV Chips**

52.    For millions of Americans, the TV is a central feature of our home.  Modern so-called "smart" TVs provide stunning video featuring millions of pixels, crystal-clear sound, and internet connectivity allowing for digital streaming and interactive content.  In many ways, today's smart TVs have more in common with smartphones or computers than with their legacy cathode ray tube TV predecessors.

53.    Smart TVs today derive much of their capability from TV Chips.  TV Chips are integrated circuits that incorporate a processor, memory, audio and video decoding, internet connectivity, and other functions in a single, integrated circuit that receives and processes digital information and delivers TV content to the viewer.

54.    TV Chips comprise a distinct relevant product market.

55.    TV Chips are optimized for a particular purpose: to perform critical functions of smart TVs.  TV Chips enable decoding of audio and video, offer Internet Protocol connectivity, and support some software applications.  TV Chips require advanced processing capabilities.  They are specialized to be very fast for the particular purpose of receiving and displaying a video and audio signal while avoiding latency.  Ultra-high efficiency processors are thus critical.

56.    The processor speed of TV Chips is typically lower than that of personal computers, and TV Chips also feature (or are paired with) much less storage, as the apps available for usage on a smart TV are limited in comparison.  To illustrate, the memory available for storage in a TV Chip is often a

fraction of that within the average smartphone.  TV Chips thus incorporate the features particularly important to smart TVs, while omitting some unnecessary features in order to manage cost.

57.    Other types of Chips are not functional or economic substitutes for TV Chips.  As a result, a small but significant sustained increase in the price of TV Chips would not cause any significant number of customers to purchase other types of Chips in place of TV Chips.  Thus, such a price increase for TV Chips would result in higher profits.

58.    OEMs and ODMs, on information and belief, typically have a separate team that works to integrate TV Chips into smart TVs, *i.e.*, TV Chips have a distinct supply chain.

59.    Industry players and observers view TV Chips (sometimes alternatively referred to as TV system-on-chips or SoCs) as distinct from other types of chips.

60.    The relevant geographic market is worldwide.

61.    At all relevant times, MediaTek held a market share of roughly 60 percent in the worldwide market for TV Chips.

62.    There are high barriers to entry in the TV Chip market, including sophisticated technology design expertise that is expensive and time-consuming to develop; experience designing Chips that must meet the exacting specifications of makers of smart TVs; meeting technological standards that may vary by region or country; and intellectual property and trade secrets.

**IV.    Defendants' Anticompetitive Conduct Harmed Realtek**

63.    MediaTek's multifaceted scheme targeted rival chipmakers, including Realtek, and caused anticompetitive harm.

64.    Consumer electronics like smart TVs are built in a carefully choreographed global supply chain where all parts need to come together on time and on specification.  Because Chips are a high-technology product, one aspect of supply certainty is the ability to sell products clear of intellectual property claims that could jeopardize the right to sell or import into the United States.

65.     Future Link's patent infringement allegations were focused on the high efficiency processors in Realtek's TV Chips, and Future Link sought to block Realtek from using key components and technologies essential to making TV Chips, as well as many other types of Chips.  To MediaTek's benefit, Future Link sought injunctions and an exclusion order limiting Realtek's ability to make and sell Chips that incorporated the allegedly infringing technologies, including its TV Chips, and prohibiting outright Realtek's end users from importing into the United States devices that include the accused technologies within Realtek's TV Chips.[21]

66.     Even if the remedy in an ITC proceeding or U.S. patent case were limited in scope to the United States, such a result would cause larger commercial harm to Realtek as customers and end users (e.g., TV brands) often seek the flexibility of importing the same product and design to multiple regions. Defendants' conspiracy appears to include among its targets, "without limitation," Realtek products that include specialized processors supporting ARM AMBA AXI4 or newer and/or ARM AMBA CHI protocols,[22] and even purports to reach products that "operate in substantially the same way."[23]  The

---

[21] *See, e.g.*, First Amended Compl., *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-00363-ADA (W.D. Tex. July 15, 2021), ECF No. 18, ¶ 27a (requesting "A permanent injunction prohibiting [Realtek] from further acts of infringement of the '680 Patent"); Compl., *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-01353-ADA (W.D. Tex. Dec. 22, 2021), ECF No. 1, ¶ 22 ("[Realtek]'s infringing activities have injured and will continue to injure Plaintiff, unless and until this Court enters an injunction prohibiting further infringement of the '439 Patent, and, specifically, enjoining further manufacture, use, sale, importation, and/or offers for sale that come within the scope of the patent claims"); *id.*, ¶ 33 (same allegation as to '614 patent); Compl., ITC Inv. No. 337-TA-1295, ¶ 156(c) (seeking issuance of "a permanent limited exclusion order … excluding from entry into the United States certain integrated circuit products and devices containing the same that are imported, sold for importation, or sold after importation by the Respondents [including Realtek] … that infringe one or more claims of the Asserted Patents").

[22] Arm Limited, a semiconductor company, offers an Advanced Microcontroller Bus Architecture ("AMBA"), an open-standard that outlines how to connect and manage the different components in system-on-chip ("SoC") designs.

[23] *See* Compl. Ex. 2, *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-0363-ADA, (W.D. Tex. Apr. 13, 2021) ('680 patent infringement chart), ECF Nos. 1-2 ; Compl. Exs. 2, 4, *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-01353-ADA, (W.D. Tex. Dec. 22, 2021) ('439 patent infringement chart and '614 patent infringement chart), ECF No. 1.

accused features are the same features found in Realtek TV Chips.  Future Link effectively sought to block Realtek from using these specialized processors—and the purportedly infringing protocols and technologies contained therein—that are critical components of TV Chips.

67.     Most, if not all, of Realtek's TV Chip products include a multi-core ARM processor that has an AXI based interface.  By broadly and indiscriminately alleging that virtually every Realtek product including a multi-core ARM processor having an AXI interface infringed its patents, Future Link sought to bar Realtek from selling its TV Chips and in essence shut Realtek out of the TV Chip market, presumably at the behest of MediaTek.

68.     On information and belief, IPValue and Future Link also sought to extract money from Realtek through threats of never-ending litigation, by harassing customers and end users, and by creating the harmful illusion of supply chain uncertainties in an already constrained industry.  Upon information and belief, IPValue and Future Link initiated these threats and actions with the goal of undermining Realtek's relationships with its customers, harming its reputation with end users, and denying access to key technologies from cutting-edge vendors (e.g., ARM), such as those implicated in the prior Future Link litigations, thus harming Realtek's ability to compete effectively in the market.

69.     On information and belief, MediaTek directed the actions of Future Link and IPValue in targeting technologies critical to design and sell TV Chips to obtain unfair competitive advantage in the relevant market segment.  Indeed, MediaTek appears to be taking full advantage of the meritless cases brought by its co-conspirator involving Realtek's TV Chips.  Upon information and belief, MediaTek attempted to persuade a large TV brand that includes Realtek TV Chips in their products to stop designing Realtek products into their TVs on the basis that there was pending litigation involving those products.  On information and belief, it is likely that MediaTek employed similar tactics after Future Link's filing of the lawsuits against Realtek by telling Realtek's existing and potential customers and end users about Future Link's lawsuits to suggest that Realtek might be an unreliable supplier.  In the

past, customer and/or end user representatives have expressed concerns about cases involving Realtek's TV Chips, and Realtek believes it lost business as a result.  On information and belief, MediaTek is engaged in a conspiracy to cement its dominance in TV Chips, including by driving Realtek out of the market by limiting its access to key technologies.

70.     IPValue's and Future Link's demands for royalties and meritless litigation have imposed significant time and monetary burdens on Realtek since April 2021.  Likewise, upon information and belief, IPValue's and Future Link's actions disrupted Realtek's relationships with customers and end users and threatened Realtek's reputation as a reliable supplier of TV Chips.

71.     Defendants' conspiracy had no conceivable consumer benefit.  The Defendants' conspiracy harmed not only Realtek, but also competition in the market for TV Chips.  Even if Defendants could explain their secret bounty agreement, the purported benefits could be accomplished through less restrictive means.

## COUNT I

**UNFAIR COMPETITION
IN VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,
CAL. BUS. & PROF. CODE §§ 17200 *et seq.*
(ASSERTED AGAINST ALL DEFENDANTS)**

72.     Realtek incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

73.     California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

74.     Defendants' conduct as alleged herein constitutes unlawful, unfair, and fraudulent activity in violation of California's Unfair Competition Law ("UCL"), as codified in California Business and Professions Code §§ 17200 *et seq.*

75.     Defendants are subject to the UCL because both IPValue and Future Link operate their headquarters in California, the improper litigation bounty agreement was likely negotiated and executed

1   in California, and Defendants issued press releases from Santa Clara, California, about the license

2   agreement that included the secret bounty provision.[24]  The meritless patent litigation that Future Link

3   subsequently commenced against Realtek following the illegal bounty agreement was also, on

4   information and belief, conceived and directed from Future Link's and IPValue's headquarters in

5   California.  On information and belief, MediaTek also conducts its business in the United States through

6   its subsidiaries headquartered in California.

7          76.     Defendants' conduct is unlawful in violation of the UCL because it violates federal

8   antitrust law, including the laws cited in this Complaint.

9          77.     Defendants' conduct also violates the UCL because it constitutes unlawful and unfair

10   activity under section 5 of the Federal Trade Commission Act. 15 U.S.C. § 45; *see* FTC Policy

11   Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade

12   Commission Act, Commission File No. P221202 (Nov. 10, 2022),

13   https://www.ftc.gov/system/files/ftc_gov/pdf/p221202sec5enforcementpolicystatement_002.pdf ("FTC

14   Policy Statement").  As reflected in the FTC Policy Statement (p. 1), Section 5 encompasses "various

15   types of unfair conduct that tend to negatively affect competitive conditions."  The "most significant

16   general principles concerning whether conduct is an unfair method of competition under Section 5 of the

17   FTC Act" are: (1) the conduct "must be a method of competition" (2) that is "unfair."  *Id.* at 8.

18   IPValue's and Future Link's aggregation of patents and meritless assertion of those patents for the

19   purpose of extorting licensing fees is a method of competition, and MediaTek's agreement to a litigation

20   bounty with IPValue and Future Link is a method of competition.  The methods of competition are

21   unfair because they go beyond competition on the merits.  The methods of competition go beyond

22   competition on the merits because they are coercive, exploitative, collusive, abusive, deceptive,

23   predatory, or involve the use of economic power of a similar nature, and because IPValue's and Future

24   Link's meritless assertion of aggregated patents is restrictive or exclusionary.  The conduct negatively

25

26   [24] *See, e.g.*, Press Release, *MediaTek Licenses Patent Portfolio From IPValue Management*, Business
     Wire (May 21, 2019), https://www.businesswire.com/news/home/20190521005412/en/MediaTek-

27   Licenses-Patent-Portfolio-From-IPValue-Management (last visited on May 24, 2023); *see also*
     https://www.bloomberg.com/press-releases/2019-05-21/mediatek-licenses-patent-portfolio-from-

28   ipvalue-management (last visited on May 24, 2023).

affected competition by jeopardizing Realtek's participation in the TV Chip market and reducing the likelihood of potential or nascent competition in this and other market segments.

78.     Defendants' conduct additionally violates the UCL because it threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law or otherwise significantly threatens or harms competition.  IPValue and Future Link unfairly aggregated a very large portfolio of patents, without economic justification or any public benefit, to position themselves as a barrier to entry to firms investing in the TV Chip market and other market segments dominated by MediaTek.  Then, defendant MediaTek unfairly and unlawfully entered into a secret litigation bounty agreement with IPValue and Future Link, which appears to have motivated Future Link to thereafter file a series of meritless patent infringement actions against MediaTek's competitor, Realtek, thereby raising Realtek's costs. MediaTek's conduct is also unfair and unlawful because, on information and belief, it sought to create doubt regarding the availability of TV Chips from Realtek that could be imported into, and sold, in the United States.  On information and belief, this conduct unfairly limited customers' and end users' ability to rely on Realtek for TV Chips and thus harmed competition for TV Chips.  IPValue's and Future Link's behavior for implementing the Defendants' conspiracy—*e.g.*, Future Link's false claims regarding effecting service on Realtek—was also fraudulent.

79.     Realtek has been harmed as a result of Defendants' unlawful, unfair, and fraudulent conduct.  For example, Realtek was forced to needlessly incur litigation costs and fees.  In addition, Realtek continues to be threatened by Defendants' unlawful, unfair, and fraudulent conduct.  For example, Realtek continues to sell TV Chips in competition with MediaTek, and on information and belief, MediaTek's co-conspirators IPValue and Future Link own patents that they have not licensed to Realtek.  Future Link has sued Realtek habitually, asserting meritless infringement claims as part of a litigation campaign following its secret litigation bounty agreement with MediaTek.  MediaTek has not indicated that it will refrain from further litigation bounty agreements with IPValue and Future Link, and neither IPValue nor Future Link has indicated that they will stop suing Realtek pursuant to the litigation bounty agreement or stop entering into additional litigation bounty agreements with MediaTek. Additional meritless patent infringement lawsuits by IPValue or Future Link against Realtek will further

reduce competition for TV Chips and further undermine customers' and end users' confidence in Realtek's ability to reliably supply such products for importation into the United States.  Money damages are inadequate to address this continuing risk of future harm to Realtek.

80.     Realtek is entitled to (a) recover restitution, and (b) an injunction restraining Defendants from engaging in further acts of unfair competition.

## COUNT II

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (ASSERTED AGAINST ALL DEFENDANTS)

81.     Realtek incorporates by reference and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

82.     Under California common law, "a plaintiff's interest in prospective economic advantage may be protected against injury occasioned by negligent as well as intentional conduct."  *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979).

83.     Defendants' conduct as alleged herein constitutes an intentional and/or negligent interference with Realtek's prospective economic advantage.

84.     Defendants were aware of Realtek's relationships and prospective relationships with buyers of TV Chips.  For example, upon information and belief, MediaTek is aware of these relationships at least because MediaTek attempts to sell its TV Chips to those same buyers in competition with Realtek.  Similarly, IPValue and Future Link are aware of those relationships.  Further, Defendants' secret bounty arrangement, and Future Link's serial litigation that followed, were intentional acts designed to induce a breach or disruption of Realtek's relationships and prospective relationships.  Indeed, Future Link intentionally and knowingly asked the U.S. District Court for the Western District of Texas and the U.S. International Trade Commission for injunctions prohibiting importation of Realtek TV Chips and devices containing the same into the United States.  Moreover, upon information and belief, Defendants' actions were intended to increase Realtek's costs and thereby limit resources available to Realtek for innovation, for example.  Furthermore, upon information and belief, Defendants' foregoing actions had the predictable and intended effect of straining and disrupting Realtek's relationships and prospective relationships.  Upon information and belief, absent Defendants'

tortious conduct, Realtek would have sold additional TV Chips during the pendency of Future Link's meritless lawsuits.

85.     Realtek is therefore entitled to compensation for damages it suffered as a result, including for lost sales and costs of repairing its relationships with current and potential customers.

## COUNT III

**CONSPIRACY TO MONOPOLIZE THE MARKET FOR TV CHIPS IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2 (ASSERTED AGAINST ALL DEFENDANTS)**

86.     Realtek incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

87.     Defendants IPValue and Future Link conspired with Defendant MediaTek for MediaTek to unlawfully gain a monopoly over the TV Chip market.  MediaTek, IPValue, and Future Link entered into an anticompetitive agreement containing an improper litigation bounty, which appears to have motivated IPValue and Future Link to initiate a campaign of meritless litigation to harm Realtek and destroy competition in the market for TV Chips.

88.     MediaTek, IPValue, and Future Link engaged in the conspiracy willfully, knowingly, and with the specific intent for MediaTek to gain a monopoly over TV Chips so as to collect monopoly profits for Defendants by ensuring MediaTek could price TV Chips above the competitive level.

89.     As a direct, foreseeable, and proximate result of the conspiracy to monopolize, Realtek has been harmed by having to pay to defend meritless litigation, and by lost sales and the harm to its business due to the uncertainty that such meritless litigation nevertheless creates.

90.     Realtek is entitled to damages and an injunction that terminates the Defendants' violations alleged.

**COUNT IV**

**ATTEMPTED MONOPOLIZATION OF THE MARKET FOR TV CHIPS
IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2
(ASSERTED AGAINST MEDIATEK)**

91.     Realtek incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

92.     MediaTek entered into an anticompetitive agreement with IPValue and Future Link, apparently pursuant to which Future Link initiated a campaign of meritless litigation to harm Realtek and destroy competition in the market for TV Chips.

93.     MediaTek acted willfully, knowingly, and with the specific intent to gain a monopoly over TV Chips so as to collect monopoly profits by ensuring that MediaTek could price TV Chips above the competitive level.

94.     There is a dangerous probability that, if MediaTek's conduct is not enjoined, MediaTek will succeed in its attempt to monopolize the market for TV Chips.

95.     There is no legitimate business justification for MediaTek's conduct.

96.     As a direct, foreseeable, and proximate result of MediaTek's anticompetitive conduct, Realtek has been harmed, including by having to pay to defend meritless litigation, and by lost sales and the harm to its business due to the uncertainty that such meritless litigation nevertheless creates.

97.     Realtek is entitled to damages and an injunction that terminates MediaTek's violations alleged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby respectfully requests:

A.     The unlawful conduct and conspiracy alleged herein be adjudged and decreed in violation of Section Two of the Sherman Act;

B.     A declaration that the Defendants violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

C.     A declaration that the Defendants' conduct constituted tortious interference with prospective economic advantage;

D.     An award of damages as compensation in an amount to be proven at trial;

E.     Punitive and exemplary damages;

F.     Disgorgement of all amounts of money wrongfully obtained by Defendants;

G.     Restitution of all amounts of money wrongfully taken from Realtek as a result of Defendants' unlawful conduct;

H.     Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from the Defendants' conspiracy to monopolize;

I.     Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing the Defendants from continuing their conspiracy to monopolize;

J.     Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from MediaTek's attempted monopolization of the TV Chip market;

K.     Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing MediaTek from continuing its attempt to monopolize the TV Chip market;

L.     A permanent injunction enjoining Future Link and IPValue from enforcing any of the patents in their portfolios against Realtek;

M.     A permanent injunction enjoining and restraining Defendants, individually and collectively, from engaging in exclusionary, anticompetitive conduct, including, but not limited to, the inclusion of any monetary incentives in any intellectual property agreement to bring legal action against a third party;

N.     Appointment of a monitor for each Defendant to ensure compliance with the foregoing permanent injunctions;

O.     Pre-judgment and post-judgment interest at the maximum legal rate;

P.     Plaintiff's costs, expenses, and reasonable attorneys' fees in bringing this action, as provided by law; and

Q.     Such further relief, in law or in equity, as the Court may deem just and proper.

### REQUEST FOR JURY TRIAL

98.     Realtek demands a trial by jury for all issues so triable.

June 6, 2023

Respectfully submitted,

By:    /s/ Rudy Kim

*Attorneys for Realtek Semiconductor Corp.*

PAUL HASTINGS LLP
Rudy Kim (SB# 199426)
rudykim@paulhastings.com
1117 S. California Avenue
Palo Alto, CA 94304
Tel: (650) 320-1800
Fax: (650) 320-1900

Michael F. Murray (*pro hac vice pending*)
Nafeesah Attah (*pro hac vice pending*)
michaelmurray@paulhastings.com
nafeesahattah@paulhastings.com
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700
Fax: (202) 551-0460

Noah Pinegar (*pro hac vice pending*)
noahpinegar@paulhastings.com
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6000
Fax: (212) 319-4090

Abigail H. Wald (SB# 309110)
abigailwald@paulhastings.com
101 California Street, 48th Floor
San Francisco, CA 94111
Tel: (415) 856-7000
Fax: (415) 856-7100

Steven S. Baik (SB# 184622)
sbaik@whitehat.legal
White Hat Legal, PC
Box 382
San Jose, CA 95002