1  RUDY Y. KIM (SB# 199426)
   rudykim@paulhastings.com
2  PAUL HASTINGS LLP
   1117 S. California Avenue
3  Palo Alto, California  94304-1106
   Telephone:  (650) 320-1800
4  Facsimile:  (650) 320-1900

5  MICHAEL F. MURRAY (*pro hac vice*)
   michaelmurray@paulhastings.com
6  PAUL HASTINGS LLP
   2050 M Street NW
7  Washington, DC 20036
   Tel: (202) 551-1700
8  Fax: (202) 551-0460

9  *Attorneys for Plaintiff Realtek Semiconductor Corp.*

10 Additional Counsel on Signature Page

11

12                UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14

15 REALTEK SEMICONDUCTOR CORP.,          Case No. 5:23-cv-02774-PCP

16            Plaintiff,                  **PLAINTIFF REALTEK
                                          SEMICONDUCTOR CORP.'S
17    vs.                                 OPPOSITION TO DEFENDANT
                                          MEDIATEK INC.'S MOTION TO
18 MEDIATEK INC.; IPVALUE                 DISMISS COMPLAINT**
   MANAGEMENT, INC.; AND FUTURE LINK
19 SYSTEMS, LLC,                          Judge:  Honorable P. Casey Pitts

20            Defendants.                 **[REDACTED VERSION OF
                                          DOCUMENT SOUGHT TO BE
21                                        SEALED]**

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................... 3

     A.   Defendants Enter Into a Secret Anticompetitive Litigation Bounty ...... 3

     B.   The Meritless Litigation Campaign Against Realtek .............................. 3

     C.   Defendants' Conspiracy Comes to Light ................................................ 4

III. LEGAL ARGUMENT ........................................................................................ 5

     A.   Legal Standard ....................................................................................... 5

     B.   Defendants' Anticompetitive Scheme Is Not Immunized by *Noerr-Pennington* ............................................................................................... 6

          1.   *Noerr-Pennington* Does Not Apply to Non-Litigation Conduct ..... 7

          2.   Realtek Has Plausibly Alleged a Sham Litigation Exception Applies ...................................................................................... 9

          3.   MediaTek's Improper Attempt to Judicially Notice Irrelevant And Extraneous "Facts" Does Not Immunize Its Conduct .............. 12

          4.   Litigation Can Be Considered As Part of an Anticompetitive Scheme ...................................................................................... 14

     C.   Realtek Plausibly Alleges Defendants Violated Section 2 of the Sherman Act ........................................................................................... 15

          1.   Realtek Plausibly Alleges Antitrust Injury ................................. 15

          2.   Realtek Plausibly Alleges the Threat of Monopoly Power .......... 17

               a.   The Claims Make Economic Sense; Specific Intent Is Alleged .............................................................................. 17

               b.   MediaTek Has or Would Obtain Monopoly Power .......... 18

     D.   Realtek Plausibly Alleges a UCL Claim ............................................... 19

          1.   Realtek Satisfies the Unlawful Prong of the UCL ...................... 20

          2.   Realtek Satisfies the Unfair Prong of the UCL .......................... 20

          3.   The Patent Act Does Not Bar Realtek's UCL Claim .................. 21

          4.   Realtek Has Plausibly Alleged Its Injury under the UCL ........... 21

     E.   Realtek Alleged Tortious Interference With Prospective Economic Advantage ............................................................................................... 23

     F.   Realtek Is Entitled to Amend Its Complaint ......................................... 25

IV.  CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) ........................................................................................... 7

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) ..................................................................... 15, 16

*Arista Networks, Inc. v Cisco Sys. Inc.*,
    No. 16-cv-00923-BLF, 2018 WL 11230167 (N.D. Cal. May 21, 2018) ....................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 6

*B&G Foods N. Am., Inc. v. Embry*,
    29 F.4th 527 (9th Cir. 2022) ............................................................................ 25

*Balt. Scrap Corp. v. David J. Joseph Co.*,
    237 F.3d 394 (4th Cir. 2001) .............................................................................. 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 6, 19

*Cal. Ass'n of Rural Health Clinics v. Douglas*,
    738 F.3d 1007 (9th Cir. 2013) ........................................................................... 23

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ..................................................................................... 20

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991) ........................................................................................... 9

*Cnty. of Monterey v. Blue Cross of Cal.*,
    No. 17-CV-04260-LHK, 2019 WL 343419 (N.D. Cal. Jan. 28, 2019) ..................... 6

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) .............................................................................. 7

*CollegeNET, Inc. v. Common App., Inc.*,
    711 F. App'x 405 (9th Cir. 2017) ...................................................................... 16

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
    411 F.3d 1030 (9th Cir. 2005) ........................................................................... 18

*De La Torre v. CashCall, Inc.*,
    5 Cal. 5th 966 (2018) ....................................................................................... 20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) .................................................................................................. 1, 19

*F.T.C. v. AbbVie Inc*,
    976 F.3d 327 (3d Cir. 2020) .................................................................................... 12

*F.T.C. v. Actavis, Inc.*,
    570 U.S. 136 (2013) ................................................................................................... 7

*F.T.C. v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .................................................................................... 17

*Funai Elec. Co. v. LSI Corp.*,
    No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ............................... 15

*Glen Holly Entm't Inc. v. Tektronix, Inc.*,
    352 F.3d 367 (9th Cir. 2003) .................................................................................... 16

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
    No. 5:11-CV-03613 EJD, 2012 WL 2711040 (N.D. Cal. July 6, 2012) ................................ 16

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ........................................................................... 10, 11, 20

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ....................................................................... 14

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) ................................................................... 6, 14

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    No. 19-CV-07651-EMC, 2020 WL 6390499 (N.D. Cal. July 15, 2020) ....................... 2, 6, 15

*IPtronics Inc. v. Avago Techs. U.S., Inc.*,
    No. 14-CV-05647-BLF, 2015 WL 5029282 (N.D. Cal. Aug. 25, 2015) ......................... 13, 14

*Killian Pest Control, Inc. v. HomeTeam Pest Def., Inc.*,
    No. 14-CV-05239-VC, 2015 WL 13385918 (N.D. Cal. Dec. 21, 2015) ............................... 22

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) ....................................................................... 17

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ........................................................................................... 23

*Lee v. City of L.A.*,
    250 F.3d 668 (9th Cir. 2001) .................................................................................... 12

*Liberty Lake Invs. v. Magnuson*,
    12 F.3d 155 (9th Cir. 1993) ..................................................................................... 7, 8

*Luxul Tech. Inc. v. Nectarlux, LLC,*
    78 F. Supp. 3d 1156 (N.D. Cal. 2015) ............................................................................ 20

*Magnetar Techs. Corp. v. Intamin, Ltd.,*
    No. SACV071052DOCANX, 2008 WL 11338443 (C.D. Cal. Feb. 11, 2008) .................... 13

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
    519 F.3d 1025 (9th Cir. 2008).......................................................................................... 6

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
    933 F.3d 1136 (9th Cir. 2019).......................................................................................... 6

*Ni-Q, LLC v. Prolacta Bioscience, Inc.,*
    No. 3:17-CV-000934-SI, 2019 WL 637703 (D. Or. Feb. 14, 2019)............................ 12, 13

*Oracle Am., Inc. v. CedarCrestone, Inc.,*
    No. 12-CV-04626 NC, 2013 WL 3243885 (N.D. Cal. June 26, 2013)................................ 25

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.,*
    81 F. Supp. 3d 1 (D.D.C. 2015) ...................................................................................... 18

*Palmer v. Dynamic Recovery Sols., LLC,*
    No. 6:15-CV-59-ORL-40KRS, 2016 WL 2348704 (M.D. Fla. May 4, 2016) ...................... 7

*Q-Pharma, Inc. v. Andrew Jergens Co.,*
    360 F.3d 1295 (Fed. Cir. 2004)........................................................................................ 21

*Reid-Ashman Mfg, Inc. v. Swanson Semiconductor Serv., L.L.C.,*
    No. C-06-4693 JCS, 2007 WL 1394427 (N.D. Cal. May 10, 2007) ................................ 23

*Relevant Grp., LLC v. Nourmand,*
    No. 2:19-CV-05019-ODW, 2022 WL 2916860 (C.D. Cal. July 25, 2022) ..................... 10, 12

*Robinson v. U-Haul Co. of Cal.,*
    4 Cal. App. 5th 304 (2016) ........................................................................................ 21, 22

*Sosa v. DIRECTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006)........................................................................................ 7, 8

*Sybersound Recs., Inc. v. UAV Corp.,*
    517 F.3d 1137 (9th Cir. 2008).......................................................................................... 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    No. 13-cv-6001 SI, 2014 WL 2527221 (N.D. Cal. June 4, 2014) ........................................ 22

*Toyo Tire & Rubber Co. v. Atturo Tire Corp.,*
    No. 14 C 0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017) ................................................ 7

*U.S. v. Concentrated Phosphate Exp. Ass'n,*
    393 U.S. 199 (1968)........................................................................................................ 22

*U.S. v. W. T. Grant Co.*,
    345 U.S. 629 (1953) ................................................................................................ 22

*United States v. Singer Mfg. Co.*,
    374 U.S. 174 (1963) ............................................................................................. 2, 7

*USS-POSCO Indus. v. Contra Costa Cnty. Building & Construction Trades*
    *Council, AFL-CIO*,
    31 F.3d 800 (9th Cir. 1994) .................................................................................. 6, 9

*W. Air Charter, Inc. v. Schembari*,
    No. 2:17-CV-00420-AB, 2017 WL 7240775 (C.D. Cal. Dec. 14, 2017) ............... 21

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
    728 F.3d 354 (4th Cir. 2013) ................................................................. 8, 9, 11, 13

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
    555 F. Supp. 3d 829 (N.D. Cal. 2021) ........................................................ 2, 10, 12

**Statutes and Rules**

Patent Act .................................................................................................................... 21

Sherman Act § 2 .......................................................................................................... 15

First Amendment of the U.S. Constitution .................................................................... 2

Federal Rules of Civil Procedure
    Rule 8 ................................................................................................................. 5, 6
    Rule 11 ........................................................................................................... 12, 13
    Rule 12 .................................................................................................................. 6

# I.     INTRODUCTION

The antitrust laws forbid monopolists from conspiring "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992). Plaintiff, Realtek Semiconductor Corporation ("Realtek") alleges that MediaTek Inc. ("MediaTek") hired henchmen to attack ███████████████. MediaTek admits this in its motion (although euphemistically characterizing this misconduct as leveling the "playing field"). In doing so, Defendants cherry pick documents to reveal to the court, providing an incomplete and lopsided picture.[1] Nonetheless, MediaTek admits the key fact that Defendants entered into a bounty agreement, with MediaTek committing to pay IPValue Management, Inc. ("IPValue") and Future Link Systems, LLC ("Future Link") (together with IPValue, "PAE Defendants") ███████████████ to initiate litigation against ███████████ ████████, regardless of outcome and without regard to the merits:

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████ Dkt. 47-3.

Under this provision, hereinafter referred to as the "Anticompetitive Litigation Bounty," MediaTek hired PAE Defendants as its henchmen, enticing them with ████████████ to file patent litigation (regardless of its success or merits) against ████████████████████ ███████████████. The Anticompetitive Litigation Bounty permitted PAE Defendants to get their payday regardless of whether the litigation was voluntarily dismissed, wholly unsuccessful, or even frivolous. All that mattered was that MediaTek's ███████ ███ so that MediaTek could encumber and slow ███ down and capitalize on the increased costs, business disruption, and inherent uncertainty that even meritless litigation creates. Once the litigation had been filed, MediaTek was able to use the fact of litigation to further harm its competition and increase its already commanding market share, by disparaging Realtek to steal its customers. Compl. ¶¶ 8, 42.

---

[1] Defendants have spent years fighting to hide this information through protective order designations and motions to seal and again, here, seek to avoid public scrutiny. *See* Dkt. 55.

    PLAINTIFF'S OPPOSITION TO MEDIATEK INC.'S MOTION TO DISMISS

Unable to deny what they did or why they did it, MediaTek tries to argue that hiring a hitman to ████████ is protected by the First Amendment because that hitman filed patent litigation that has not (yet) led to sanctions for such misconduct (ignoring a judge's observation that such behavior likely "warrants sanctions"). But, "the mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct," including that in settlement agreements. *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-CV-07651-EMC, 2020 WL 6390499, at *15 (N.D. Cal. July 15, 2020); *see United States v. Singer Mfg. Co.*, 374 U.S. 174, 196-97 (1963) (holding anticompetitive a settlement agreement that prompted party to litigate claims). Rather, the relevant legal test, which MediaTek does not even bother to recite, is whether the protected conduct is "incidental" to litigation, such as a discovery dispute or a demand letter. MediaTek cites no precedent that has held that standard is satisfied when a company incentivizes a patent assertion entity ("PAE") to bring litigation against the ████████, regardless of outcome or merit (in stark contrast to the litigation funding arrangements that MediaTek tries to rely on).

Even if MediaTek's conduct is eligible for First Amendment protection due to subsequent patent litigation, it would lose that protection because it involved a series of lawsuits filed without regard to the merits. Anticipating this flaw in its defense, MediaTek attempts to argue that various (and often appealed) rulings in the offending ***patent*** litigation somehow foreclosed Realtek's ***antitrust*** claims in this separate litigation, but courts have rebuffed such maneuvers, given that a First Amendment inquiry is fundamentally different than the issues resolved in the patent litigation. MediaTek also tries to portray the patent litigation as one or two cases, to try to lower its defense burden, but conveniently omits ████████. "Courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage,"[2] and this Court should follow course.

Throughout their motions, Defendants have resorted to selectively quoting certain filings from other patent proceedings (including, in PAE Defendants' case, sealed information in non-public filings) in an attempt to improperly inject disputed facts in their pleadings challenge. But even without an amendment to correct the skewed record Defendants have put forward, Realtek has plausibly stated its claims. Defendants' motions to dismiss should therefore be denied.

---

[2] *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 877 (N.D. Cal. 2021).

## II. FACTUAL BACKGROUND

### A. Defendants Enter Into a Secret Anticompetitive Litigation Bounty

PAE Defendants are Patent Assertion Entities ("PAEs"). Compl. ¶ 21. PAEs do not make or sell goods; rather, they acquire patents solely to obtain licensing fees by purchasing and enforcing patent rights once practicing entities have invested billions of dollars in developing and commercializing technologies in downstream products. *Id.* Patent aggregators, like PAE Defendants, who aggregate hundreds of patents, pose an even higher risk to competition and innovation, due to the credible threat of imposing large costs through litigation. Compl. ¶ 24.

On May 21, 2019, PAE Defendants publicly announced that they entered into a patent license agreement with MediaTek. Compl. ¶ 37. What the press release failed to disclose was that the licensing agreement contained a secret Anticompetitive Litigation Bounty ███████████ ████████████████████████████████████████████████ Dkt. 47-3.

### B. The Meritless Litigation Campaign Against Realtek

On April 13, 2021, amid the global chip shortage due to the pandemic, PAE Defendants sued Realtek in the Western District of Texas for alleged patent infringement of U.S. Patent No. 7,917,680 (the "363 Case" and "'680 patent"). Compl. ¶ 26. The lawsuit accused a broad range of Realtek products of infringement, including *unspecified* products "that use processors supporting ARM AMBA AXI4 or newer," as well as products that "operate in substantially the same way." Compl. ¶ 27. The complaint sought an injunction in an attempt to take the vast majority of Realtek products off the market (*i.e.*, Realtek's TV Chips). Compl. ¶ 28.

There were several obvious flaws to PAE Defendants' complaint in the 363 Case. Compl. ¶ 29. For example, there was no personal jurisdiction, the complaint was not properly served, and failed to plausibly allege that Realtek engaged in any act of direct infringement. *Id.* On July 15, 2021, PAE Defendants attempted to amend their complaint, and expanded the scope of accused products, but was still unsuccessful in curing its deficiencies. Compl. ¶ 30.

Meanwhile, just weeks prior, on June 25, 2021, Realtek filed an *inter partes* review ("IPR") petition with the Patent Trial and Appeal Board ("PTAB") at the U.S. Patent and Trademark Office

challenging the patentability of certain claims of the '680 patent. Compl. ¶ 33. While Realtek sought to dismiss the 363 Case, and while the IPR petition for the '680 patent was pending, on December 22, 2021, PAE Defendants filed another suit in the Western District of Texas alleging infringement of two additional patents, U.S. Patent No. 7,685,439 (the "'439 patent") and U.S. Patent No. 8,099,614 (the "'614 patent"), and a week later, on December 29, 2021, PAE Defendants alleged infringement of the same two patents before the United States International Trade Commission ("ITC"). Compl. ¶ 31. PAE Defendants sought an exclusion order excluding from entry into the U.S. certain Realtek integrated circuit products (including the same Chips identified in the prior litigation in addition to others) and devices containing the same. *Id.* In response, on June 8, 2022, Realtek filed an IPR petition challenging all claims of the '614 patent.

Highlighting the PAE Defendants' apparent lack of regard to the merits of its case prior to asserting its patents against Realtek and others, rather than defending the patentability of its patents, Future Link instead chose to quickly cancel many of its asserted claims (or settle with the entities who challenged their patentability) to avoid having them declared unpatentable by the Patent Office. For example, on September 9, 2022, to avoid a finding of unpatentability by the Patent Office, Future Link instead preemptively *cancelled all* claims of the '614 patent as well as half of the claims of the '680 patent. Compl. ¶¶ 33-34. As for the remaining claims of the '680 patent that Future Link chose not to preemptively cancel, those claims were indeed found to be unpatentable by the PTAB in a final written decision issued on January 4, 2023. Compl. ¶ 33. The '439 patent was previously the subject of an IPR petition by Intel, which the PTAB instituted after finding a reasonable likelihood of unpatentability for at least one claim. Compl. ¶ 34. Future Link, however, was able to avoid a finding of unpatentability in that IPR by entering into a settlement agreement with Intel before the PTAB could issue a final written decision. *Id.*

Realtek was ███████████████████████████████████████ Compl. ¶ 35.
████████████████████████████████████████████████████████████
████████████████████████████████████████████████ *Id.*

C. **Defendants' Conspiracy Comes to Light**

In April 2022, discovery for the above-referenced proceedings revealed that, before any

litigation against Realtek began, the license agreement announced in May 2019 between MediaTek and Future Link contained an "untoward and actionable" secret litigation "bounty" provision. Compl. ¶¶ 36, 37. While specific details regarding this Anticompetitive Litigation Bounty remain veiled from the public to this day at Defendants' insistence, the Courts that have seen it have deep concern over its illegality. Compl. ¶ 37. For example, an ITC Administrative Law Judge ("ALJ") noted, "[t]his provision is alarming…[a]t a minimum it would seem to warrant an action by Realtek…for unfair competition;" a District Court order called it, "an improper contract that the Court found should be discouraged as a matter of public policy"; and stated that the provision had an "improper motive," "should be discouraged," and "warrants sanctions." *Id.*

The existence of this Anticompetitive Litigation Bounty appears to be the motivator behind PAE Defendants' otherwise irrational litigation against Realtek ██████████████. Indeed, soon after the ITC ALJ issued the order quoted above, Future Link resolved more than a dozen pending patent infringement claims against ten different technology companies, including its claims against Amlogic. Compl. ¶ 39. However, IPValue has continued to retaliate against Realtek through another PAE subsidiary, Monterey Research LLC, which initiated another patent suit in Japan, accusing many of the same Realtek products of infringement. Compl. ¶ 40.

Defendants' conspiracy targeted virtually every Realtek product and therefore sought to bar Realtek from selling its TV Chips shutting Realtek out of the market, all at MediaTek's behest. *Id*.

In conjunction with entering into the Anticompetitive Litigation Bounty with PAE Defendants, MediaTek engaged in other anticompetitive conduct targeting Realtek ██████████. *See* Compl. ¶¶ 6-8, 42-44, 70. For example, MediaTek coerced at least one TV Chip customer to not incorporate Realtek TV Chips due to patent litigation. Compl. ¶¶ 8, 42. MediaTek also used illegal bundling to maintain and grow its market share in the TV Chip market. Compl. ¶¶ 8, 43. These actions have disrupted Realtek's relationships with customers and Chip end-users and have called into question Realtek's reputation as a reliable supplier of TV Chips. Compl. ¶ 70.

## III.   LEGAL ARGUMENT

### A.   Legal Standard

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, a complaint must include "a

short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The complaint must only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In considering dismissal based on a Rule 12(b)(6) motion, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the [Plaintiff]." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008). Courts are limited to the "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Cnty. of Monterey v. Blue Cross of Cal.*, No. 17-CV-04260-LHK, 2019 WL 343419, at *4 (N.D. Cal. Jan. 28, 2019). Plaintiffs are to be given "full benefit of their proof without tightly compartmentalizing the various factual components[.]" *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019).

## B.     Defendants' Anticompetitive Scheme Is Not Immunized by *Noerr-Pennington*

The crux of MediaTek's argument for dismissal is that their conspiracy utilized litigation to harm competition, therefore they cannot be held accountable, regardless of the litigation's merit. However, the mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct. *Intel Corp.*, No. 2020 WL 6390499, at *15. Rather, the non-litigation conduct must be "incidental" to litigation activity and settlement agreements—like the licensing agreement containing the Anticompetitive Litigation Bounty—and Mediatek's other conduct do not meet that test.

In addition, it is well-settled in the Ninth Circuit that *Noerr-Pennington* does not protect defendants who file multiple lawsuits for an improper purpose regardless of merit. *See USS-POSCO Indus. v. Contra Costa Cnty. Building & Construction Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994). And, even if PAE Defendants' litigation were not a sham, it could still be considered as part of Defendants' overall scheme, where, as here, the other non-litigation conduct within the scheme is independently unlawful – *i.e.*, the Anticompetitive Litigation Bounty itself. *See Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1096-98 (N.D. Cal. 2007).

### 1. *Noerr-Pennington* Does Not Apply to Non-Litigation Conduct

"*Noerr–Pennington* immunizes only litigation activity, not other forms of threats or harassment." *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010). MediaTek cannot claim *Noerr-Pennington* immunity for its non-litigation conduct—namely, entering into an agreement to provide a bounty payment to induce a private party to file litigation (regardless of outcome or merit), and its disparagement of Realtek based on the litigation campaign that followed. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) (conduct directed at persuading a private standard setting organization to act was not protected by *Noerr-Pennington* even though the organization's standards were routinely adopted into law by state and local governments). While MediaTek argues that *Noerr-Pennington* may insulate certain pre-suit demand letters and third party funding for litigation, presumably because they are "incidental" to litigation (the relevant legal test), *id*. at 499, MediaTek's conduct is neither.

*First*, courts regularly *reject* that settlement agreements are "incidental" to litigation and thus immunized from antitrust liability. For example, the Supreme Court held in *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013) that a reverse payment patent settlement could be subject to antitrust scrutiny. *See also Singer*, 374 U.S. at 196-97 (holding anticompetitive a settlement agreement that prompted party to litigate claims); *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14 C 0206, 2017 WL 1178224, at *7 (N.D. Ill. Mar. 30, 2017) (boycott agreement included in settlement agreement was "not incidental to petitioning activity"). Here, MediaTek entered into an agreement to pay a ▮▮▮▮▮ bounty if PAE Defendants filed litigation ▮▮▮▮▮▮▮▮▮▮▮, even if that litigation was unsuccessful, non-meritorious, or frivolous. This is not protected, and MediaTek has not cited any case that indicates courts have ever found otherwise.[3]

MediaTek's reliance on *Liberty Lake Invs. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), and *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 937 (9th Cir. 2006), does not change this result. Neither case found that offering a large incentive payment to a third party to sue ▮▮▮▮▮▮ is lawful

---

[3] Even in class action litigation, courts reject incentive payments to class representatives that are unseemly. *See Palmer v. Dynamic Recovery Sols., LLC*, No. 6:15-CV-59-ORL-40KRS, 2016 WL 2348704, at *10 (M.D. Fla. May 4, 2016) (finding that a $2,000 payment to named plaintiff would "project[] the unseemly appearance that Plaintiff has been purchased at the expense of the class.")

or protected under *Noerr-Pennington*. Unsurprisingly, <u>none</u> of the cases cited by Defendants stand for such a proposition. In *Liberty Lake*, the Ninth Circuit reached the unremarkable conclusion that a party who provides funding for litigation to enforce rights similar to its own may also be immunized under *Noerr-Pennington*. 12 F.3d at 156-58. In *Sosa*, the Ninth Circuit found that pre-suit demand letters could be immunized under *Noerr-Pennington*. 437 F.3d at 937. In reaching this conclusion, it noted in dicta that it was consistent with the conclusion in *Liberty Lake* that a party who provides funding for litigation may also be immunized.[4] The Anticompetitive Litigation Bounty goes far beyond simply reimbursing legal expenses to assist another seeking legitimate recourse, and does not fall within any protection *Liberty Lake* or *Sosa* might provide.

Since *Liberty Lake* and *Sosa* were decided, the Fourth Circuit further clarified how third-party financed litigation may be viewed in the sham litigation context in *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 365–67 (4th Cir. 2013). In denying dismissal of a series-based sham litigation claim, the *Waugh Chapel* Court noted that many of the lawsuits at issue were withdrawn "under suspicious circumstances" and it was alleged that several suits were voluntarily dismissed to avoid revealing that the unions were secretly "directing and paying for the litigation." *Id*. While the *Waugh Chapel* Court reiterated that "third-party financing of legal proceedings does not *itself* demonstrate an illegal purpose or render those suits sham," it nonetheless made clear that "a reasonable factfinder could credit this evidence in deciding whether 'the administrative and judicial processes have been abused.'" *Id*. (emphasis added). Defendants' Anticompetitive Litigation Bounty, which incentivizes litigation regardless of merit or outcome, should likewise be credited as significant evidence of such abuse.

***Second***, MediaTek's disparaging communications with Realtek's customers concerning litigation against Realtek also are not protected. In *Wisk Aero LLC v. Archer Aviation Inc.*, for example, a defendant countersued the plaintiff for tortious interference, defamation, and unfair competition after the plaintiff made disparaging remarks about defendant in press releases and blog posts concerning the parties' litigation. No. 3:21-CV-02450-WHO, 2021 WL 4932734, at *7–9

---

[4] The *Sosa* opinion also cites *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 397-99 (4th Cir. 2001) for the same proposition that litigation funding may be protected by *Noerr-Pennington*.

(N.D. Cal. Sept. 14, 2021). In denying a motion to dismiss and strike those claims, the Court held that plaintiff's blog posts and press releases were not protected under *Noerr-Pennington*. *Id*. The Court found such communications were not "incidental to the prosecution of the lawsuit" because such communications "did not, in any manner, affect [the lawsuit] or advance [its] interests in [the lawsuit]."[5] *Id*.; *see also Arista Networks, Inc. v Cisco Sys. Inc.*, No. 16-cv-00923-BLF, 2018 WL 11230167 at *11 (N.D. Cal. May 21, 2018) (blog posts about lawsuit not protected). MediaTek's communications are likewise not protected by *Noerr-Pennington* for the same reasons; in fact, such communications are even more divorced from the litigation at issue given MediaTek was not even a party to the litigation. MediaTek has no basis for claiming *Noerr-Pennington* immunity.

### 2. Realtek Has Plausibly Alleged a Sham Litigation Exception Applies

Even assuming that the expansion of *Noerr-Pennington* immunity to third parties who fund litigation applies to MediaTek here (which it does not), the sham litigation exception to *Noerr-Pennington* nonetheless precludes such immunization as to PAE Defendants' vexatious and anticompetitive litigation campaign, because Realtek plausibly alleges that it was filed "without regard to the merits" and the contrary argument raises disputed questions of fact.

"The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (emphasis in original). One such sham situation arises when a defendant has filed multiple lawsuits for an improper purpose. In that situation, courts do not look to "whether any one [case] has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *USS-POSCO Industries*, 31 F.3d at 811. In other words, the court asks "[w]ere the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id*.

---

[5] The *Wisk Aero* court further distinguished communications about litigation from "public pressure campaigns" such as the ones MediaTek cites, noting that "[l]itigation, unlike legislation, is not influenced by public pressure campaigns, so the idea that publicity is incident to prosecuting a lawsuit makes still less sense." 2021 WL 4932734, at *9.

In evaluating whether successive litigation constitutes harassment, "a more flexible standard is appropriate" than when assessing one lawsuit. *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) (sham exception met where 4 petitions were filed to obstruct plaintiff from approvals to break ground on a competing supermarket). This is because cases involving multiple lawsuits "often involve more complex fact sets" and present "a greater risk of antitrust harm." *Id*. In particular, "even if a small number of the petitions turn out to have some objective merit, that should not automatically immunize defendants from liability." *Id*. Rather, in determining whether a series of litigation was brought without regard to the merits, courts look "retrospectively at the success rate." *E.g.*, *Relevant Grp., LLC v. Nourmand*, No. 2:19-CV-05019-ODW (KSx), 2022 WL 2916860, at *14 (C.D. Cal. July 25, 2022). "A high percentage of meritless…proceedings…will tend to support a finding that the filings were not brought to redress any actual grievances." *Id*. In addition, "[c]ourts should also consider other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity[.]" *Id*.

As the foregoing indicates, "'[t]he Ninth Circuit has held that whether something is a genuine effort to influence government action, or a mere sham for *Noerr-Pennington* purposes, is a question of fact.'" *In re Xyrem*, 555 F. Supp. 3d at 877–81 (sham litigation exception sufficiently pled where defendant filed serial patent litigation against multiple manufacturers to delay generic entry of a drug, with the intent to burden rivals and obtain the automatic 30-month stay of any FDA ANDA approval). Consequently, "courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage," even though other judicial resolutions often are involved. *Id*.

This court should do likewise, because Realtek has more than plausibly alleged that PAE Defendants filed a series of at least six (possibly up to a dozen)[6] lawsuits pursuant to their unlawful conspiracy with MediaTek, without regard to the merit of such lawsuits. Compl. ¶¶ 26, 28, 35, 40.[7]

---

[6] *See* Compl. ¶ 39 (Future Link "hurriedly resolved" over a dozen "infringement claims against ten different technology companies…to avoid further disclosure of the illegal conspiracy.")

[7] Namely, PAE Defendants filed two lawsuits against Realtek in the Western District of Texas, one lawsuit against Realtek in the ITC, and one lawsuit against Realtek in Japan through one of IPValue's other PAE subsidiaries, Monterey Research LLC. Compl. ¶¶ 26, 28, n. 12, 40. PAE Defendants also filed two cases against Amlogic in the District of Delaware. Compl. ¶ 35, n. 13.

There is no evidence that any of the *six* lawsuits obtained any redress. Five of the six lawsuits were dismissed shortly after the discovery of the Anticompetitive Litigation Bounty, though one retaliatory lawsuit is still pending. Compl. ¶ 39.[8] Notably, none of the lawsuits resulted in a jury award or any other judgment in PAE Defendants' favor. And, none of the lawsuits against Realtek resulted in any payment by Realtek to PAE Defendants (neither Motion to Dismiss alleges ███████████████████████). PAE Defendants' litigation campaign was not a legitimate effort to seek redress; it was to obtain a ██████████ bounty. This readily satisfies the sham litigation exception.

Because MediaTek cannot seriously argue that any of these proceedings were successful, it instead points to minimal indications that the cases may not have been frivolous, such as the settlement of a related patent case with a third party (which case is not presently alleged to be brought pursuant to the Anticompetitive Litigation Bounty), as sufficient to immunize their entire litigation campaign. However, even if PAE Defendants can show that some of their cases had some merit (which Realtek disputes), that would not immunize their litigation conduct under *Noerr-Pennington*. One potentially acceptable act cannot immunize a plethora of bad acts.

Courts regularly refuse to dismiss series-based sham litigation claims where there are some indications of success. In *Hanover 3201 Realty*, for example, the Third Circuit evaluated whether Defendants' four petitions, which were allegedly intended to slow the development of a site to be used as a competing grocery store, satisfied the series-based exception for sham litigation. In determining it did, the court held that although defendants could point to some "victorious moments" and "partial success" in their petitioning conduct, defendants overall were not successful. 806 F.3d at 182. The Fourth Circuit held similarly in *Waugh Chapel*, and reversed the dismissal of a complaint after finding the series-based sham exception sufficiently pled. *Waugh Chapel*, 728 F.3d at 365–67. The court in *Waugh Chapel* specifically noted that some of the fourteen legal proceedings at issue may have been justifiable; indeed, there was even one successful appeal. *Id.* at 365. However, "the fact that there may be moments of merit within a series of lawsuits is not inconsistent with a campaign of sham litigation, for 'even a broken clock is right twice a day.'" *Id.*

---

[8] Two of the three asserted patents in three of the cases were found invalid by the patent office, further confirming PAE Defendants filed the cases without regard to merit. Compl. ¶¶ 33-34.

1  Likewise, in *Relevant Group*, the court denied summary judgment on the sham litigation exception

2  where two cases in the series settled and one was remanded. 2022 WL 2916860, at *14-17.

3  Here, the only "victorious moments" Defendants point to is PAE Defendants avoiding Rule

4  11 sanctions, and settling a case (not alleged to be part of the series) with an entirely different party.

5  However, failing to be sanctioned under Rule 11 does not preclude a finding that the lawsuit was a

6  sham. *See Ni-Q, LLC v. Prolacta Bioscience, Inc.*, No. 3:17-CV-000934-SI, 2019 WL 637703, at

7  *9 (D. Or. Feb. 14, 2019). A case settling likewise does not preclude a sham litigation finding. *See*

8  *F.T.C. v. AbbVie Inc,* 976 F.3d 327, 367–68 (3d Cir. 2020) (district court did not err in finding

9  litigation was objectively baseless where the case had settled). Accordingly, Defendants' *de*

10  *minimis* indications of merit are insufficient to defeat a sham litigation claim.

11  ### 3. MediaTek's Improper Attempt to Judicially Notice Irrelevant And Extraneous "Facts" Does Not Immunize Its Conduct

13  MediaTek improperly seeks judicial notice of certain opinions (and "facts" within them)[9]

14  in prior patent proceedings between Realtek and PAE Defendants to argue that the sham exception

15  cannot be met as a matter of law. However, as noted above, MediaTek cannot defeat a series-based

16  sham litigation claim by pointing to minimal indications that cases may not have been frivolous.

17  Moreover, none of the holdings nor "facts" that MediaTek relies on are even sufficient to preclude

18  a finding of objective baselessness with respect to sham litigation not involving multiple lawsuits.[10]

19  First, the fact that PAE Defendants sued other parties has no bearing on the legitimacy of

20  the PAE Defendants' lawsuits against Realtek                    . *See In re Xyrem*, 555 F. Supp. 3d at

21  878 (success of related FDA petition did not preclude finding of objective baselessness). Nor does

22  a settlement or license preclude a finding of objective baselessness. *See AbbVie,* 976 F.3d at 368.

23  Second, none of the orders that MediaTek relies on preclude Realtek's sham litigation

24  argument, because none evaluated PAE Defendants' overall litigation conduct and motives. The

25

26  [9] Courts may take judicial notice of the existence of a court opinion, but not the truth of the facts stated within. *See Lee v. City of L.A.*, 250 F.3d 668, 689–90 (9th Cir. 2001).

27  [10] The Complaint also, at minimum, alleges the three patent cases brought by Future Link against Realtek were objectively baseless, and with the bad faith purpose of fulfilling the anticompetitive bounty agreement, and are in themselves sham lawsuits. *See AbbVie,* 976 F.3d at 346.

Rule 11 Order addressed Future Link's *attorneys'* motives and conduct in filing one complaint on behalf of Future Link. *See* Fed. R. Civ. P. 11(b). The ITC Order only evaluated whether Future Link's complaint "contain[ed] a 'showing' of infringement of independent claims 'by appropriate allegations, and when practicable, by [claim] chart[s].'" Dkt. 49-6, at 2 (quoting 19 C.F.R. § 210.12(a)(9)(viii)). In finding that the "showing" had been made to satisfy the pleading standard, the Order further noted, "[n]o degree of particularity is specified, and given the availability of discovery once the investigation is instituted, a high degree of particularity would not be 'appropriate.'" *Id*. The ITC Order then declined to award sanctions based on the Anticompetitive Litigation Bounty due to the insufficient availability of evidence. *Id*. at 3. These *de minimis* indications of merit are insufficient to defeat a sham litigation finding. *See* Section III.B.2.

In addition, these orders also do not preclude a finding that litigation is objectively baseless. Indeed, other courts in this Circuit have declined to find that a party is estopped from asserting sham litigation on the basis of a prior Rule 11 order. In *Ni-Q, LLC v. Prolacta Bioscience, Inc.*, for example, the District of Oregon denied summary judgment on sham litigation, rejecting the argument that Plaintiff was estopped from arguing sham litigation based on a prior Rule 11 order. No. 3:17-CV-000934-SI, 2019 WL 637703, at *9 (D. Or. Feb. 14, 2019). The court noted that the Rule 11 judge "had broad discretion to impose, or decline to impose, Rule 11 sanctions and had numerous factors to consider," and the factors relied upon in denying sanctions were "not coextensive with the factors relevant to a consideration of objective baselessness." *Id*.; *see also Magnetar Techs. Corp. v. Intamin, Ltd.*, No. SACV071052DOCANX, 2008 WL 11338443 (C.D. Cal. Feb. 11, 2008) (Rule 11 finding does not preclude the issue of whether the Infringement Action was "objectively baseless" as applied to sham litigation). The *Waugh Chapel* court also rejected defendants' arguments that their failure to be sanctioned or subject to an abuse of process tort would somehow preclude the sham litigation exception from applying. 728 F.3d at 365-66.

Courts are similarly skeptical about the probative value of the ITC's decision to institute an investigation on whether a patent claim has any merit. *See IPtronics Inc. v. Avago Techs. U.S., Inc.*, No. 14-CV-05647-BLF, 2015 WL 5029282, at *7 (N.D. Cal. Aug. 25, 2015) (ITC's finding that a party "complied with its filing requirements" and "voted to open an investigation" nonetheless

"says nothing of the actual merits of the infringement theory asserted against IPtronics.").[11]

Accordingly, none of the "facts" that MediaTek purports to judicially notice preclude a finding of sham litigation, no less a finding that a case is objectively baseless.

### 4. Litigation Can Be Considered As Part of an Anticompetitive Scheme

Even if this Court were to conclude that no sham exception applies to the litigation that PAE Defendants filed, which it should not, such conduct could still be considered as part of Defendants' anticompetitive scheme. In *Hynix*, this District established a two-part test for including conduct that might otherwise be protected as part of an anticompetitive scheme:

> "The court must first find that the other aspects of the scheme independently produce anticompetitive harms. Once…established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms. If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme." 527 F. Supp. 2d at 1096-98.

In other words, "if the gravamen of the action centers on non-petitioning activity, the fact that petitioning activity is employed to further that conduct is not sufficient to implicate the *Noerr-Pennington* doctrine." *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1146 (N.D. Cal. 2020) (finding *Noerr-Pennington* did not bar inclusion of pre-suit letters as part of antitrust claims). Additionally, "a plaintiff that can prove an antitrust violation without the use of protected petitioning can recover damages caused by that petitioning as well as damages by the conduct that proved the violation." Herbert Hovenkamp, et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 11.04[F]; *see also hiQ Labs*, 485 F. Supp. 3d at 1147 (same); *Hynix*, 527 F. Supp. 2d at 1088 (same).

Here, Defendants engaged in a multi-faceted scheme, consisting of an unlawful conspiracy whereby MediaTek hired PAE Defendants as its henchmen to file a campaign of sham litigation ███████████████████████████████████████████████████. MediaTek was then able to capitalize on the business disruption of litigation and the inherent uncertainty that even meritless litigation creates in order to harm competition and increase its market share, through its own campaign of disparaging Realtek and stealing its customers. Compl. ¶¶ 6-8, 42-44, 63, 65-

---

[11] "Even an ALJ's initial determination of infringement does not conclusively establish that the action is not a sham." *IPtronics*, 2015 WL 5029282, at *7 (internal quotations removed).

71, 77-79, 84-85, 87-89, 92-96. The crux of the scheme—entering into an Anticompetitive Litigation Bounty ████████████████████████—along with other misconduct, such as disparaging a competitor, constitutes actionable conduct not protected under *Noerr-Pennington*.[12] *See Wisk Aero*, 2021 WL 4932734, at *7–9.

### C. Realtek Plausibly Alleges Defendants Violated Section 2 of the Sherman Act

#### 1. Realtek Plausibly Alleges Antitrust Injury

At the center of Defendants' scheme is an Anticompetitive Litigation Bounty in which MediaTek agreed to pay PAE Defendants to initiate patent litigation ████████████ ████████████████████████████████████████████ Compl. ¶ 6. MediaTek admits that ████████████████████████████████████████████████████████ ████████ *See* Dkt. 47-2 at 3-4 (████████ ████████████████████████. This is alone sufficient.

Even putting aside Mediatek's explicit admissions, Realtek has alleged a number of plausible bases sufficient to establish antitrust injury. Courts recognize "a variety of anticompetitive effects" as establishing antitrust injury, including: "(1) restrictions that prevent consumers from making free choices between market alternatives, (2) stymied innovation, (3) decreased product quality, and (4) supracompetitive prices." *Arista*, No. 2018 WL 11230167, at *20 (internal citations removed). Antitrust injury can occur where even a single "[competitor] was either driven out of business or suffered reduced profits because of the alleged anticompetitive acts of the attempted monopolist." *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996), *as amended* (Jan. 15, 1997). The "threat" or risk of harm to competition can likewise establish antitrust injury. *See, e.g., Funai Elec. Co. v. LSI Corp.*, No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) (antitrust injury adequately alleged where defendant "brought about and continues to threaten to bring about a significant threat of injury for downstream price, quality, and innovation," and "threatened injuries include the inevitable passing on to consumers of improper royalties

---

[12] In addition, the aggregation of patents itself is not conduct protected under *Noerr-Pennington*, and can be anticompetitive. *See, e.g., Intel Corp.*, 2020 WL 6390499 (granting motion to dismiss, but holding "liability can be based on non-petitioning activity only (such as aggregation of patents)" and noting that "injury can be related to petitioning activity (i.e., patent infringement litigation).")

demanded by Defendants and decreases in innovation and quality"). Courts have also held that "competition has been harmed" when "customers have been denied the benefits of innovation and product development and lower prices." *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-03613 EJD, 2012 WL 2711040, at *7 (N.D. Cal. July 6, 2012); *see also Glen Holly Entm't Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (recognizing as antitrust harm "coercive activity that prevents its victims from making free choices between market alternatives").

Realtek has adequately pleaded antitrust injury. Realtek has alleged the following:[13]

- Defendants' conduct forced Realtek "to needlessly incur litigation costs and fees" and "thereby limit[ing] resources available to Realtek for innovation." Compl. ¶¶ 79, 84.

- Defendants' conduct "disrupted Realtek's relationships with customers and end users and threatened Realtek's reputation as a reliable supplier of T.V. chips." Compl. ¶ 70.

- MediaTek leveraged PAE Defendants' sham litigation to coerce Realtek customer(s) and "compel[] their loyalty" through "bundled product offerings," Compl. ¶ 8.

- MediaTek attempted to persuade "a large TV brand" to stop using Realtek TV Chips "on the basis that there was pending litigation involving those products." Compl. ¶ 69.

- PAE Defendants' "demands for royalties and meritless litigation have imposed significant time and monetary burdens on Realtek[.]" Compl. ¶ 70.

The plausibility of these alleged harms is further bolstered by the unique features of the TV Chips market, such as customers' prioritization of supply reliability and the negative economic consequences of interruptions to that supply. *See* Compl. ¶ 51. Realtek has thus alleged facts showing "that [Defendants'] conduct restricted the customers from making free choices between different products"; and "[s]uch a restriction results in antitrust injury." *Arista*, 2018 WL 11230167, at *20 (denying defendant's motion for summary judgment where its "fear, uncertainty, and doubt" campaign conducted in connection with patent litigation could cause antitrust injury from "lost sales due to customers' concern" about the legal status of the underlying technology).

Moreover, Defendants' anticompetitive scheme did not just harm one competitor, as

---

[13] Given MediaTek's large share in the TV Chips market (Compl. ¶ 35), Defendants' scheme thus created a substantial risk of "leaving one dominant provider" in the market with accordingly "limited [product] choice," stymied "price competition," difficult "entry to the market," and "reduc[ed] overall market satisfaction." *CollegeNET, Inc. v. Common App., Inc.*, 711 F. App'x 405 (9th Cir. 2017). Antitrust injury can also occur even where a single "[competitor] was either driven out of business or suffered reduced profits[.]" *Amarel*, 102 F.3d 1494.

MediaTek suggests, it harmed competition. As a threshold matter, the Anticompetitive Litigation Bounty targeted ███████████████████ the TV Chip market; accordingly, much of the harm stemming from Defendants' anticompetitive scheme applies with equal force to █████ The market is also highly concentrated, with the top three players together accounting for roughly 85% market share. Compl. ¶ 35. Taking into account MediaTek's roughly 60% share of the market, harm to Realtek ███████ is likely to produce outsized harm to competition.

MediaTek also provides no compelling authority requiring Realtek to plead detailed facts proving anticompetitive harm to survive dismissal; *e.g.*, that purchasers *actually* "lost the ability to buy chips from other TV chip makers," and "that non-Realtek competitors increased their prices or limited their offerings in any way due to the alleged scheme," among other alleged deficiencies. Dkt. 48 at 12. Courts find those kinds of "complicated factual disputes…cannot be resolved at the pleading stage." *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 828–29 (N.D. Cal. 2022) (denying dismissal where "there [wa]s no evidence that Google had the capability to peel customers away from Facebook"). Realtek's allegations have "raised a reasonable expectation that discovery will reveal evidence of an injury to competition." *Id.* That is sufficient.

Finally, *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020) does not change this result. In *Qualcomm*, the Ninth Circuit reasoned that Qualcomm's licensing fee was not an improper "artificial surcharge" on rivals' chip sales because the fee was for Qualcomm technology that was indeed necessary for every phone regardless of chipmaker. *Id.* at 1000. The decision in no way endorsed offering or entering into an Anticompetitive Litigation Bounty to "even [the] playing field." Dkt. 48 at 4. Indeed, the decision explicitly noted the illegality of a royalty fee that "impose[s] a naked tax on rivals' software" regardless of whether the company imposing the fee had added value to the software. *Qualcomm*, 969 F.3d at 1000. If anything, Defendants' scheme constitutes such a "naked tax" on MediaTek's rivals.

### 2. Realtek Plausibly Alleges the Threat of Monopoly Power

#### a. The Claims Make Economic Sense; Specific Intent Is Alleged

Realtek's allegations that Mediatek specifically intended to monopolize the market are straightforward (and largely admitted by Mediatek): MediaTek, as the most dominant competitor

PLAINTIFF'S OPPOSITION TO MEDIATEK INC.'S MOTION TO DISMISS

in the TV Chip market, entered into an agreement designed to drive up the cost to compete in the market ███████████████████████████. *See* Compl. ¶¶ 47-48, 63-71. Realtek also alleges numerous other facts which further substantiate MediaTek's specific intent to monopolize, including: MediaTek's roughly 60% share in the already concentrated TV Chip market, with the top three players together accounting for roughly 85% market share; that the litigation targeted "technology, components, and functions" that were "essential for providing smart TV functionality"; and MediaTek's apparent readiness to "tak[e] full advantage of the meritless cases," including by attempting to persuade "a large TV brand" to stop using Realtek TV Chips "on the basis that there was pending litigation involving those products," as well as suggesting to "Realtek's existing and potential customers and end users" that "Realtek might be an unreliable supplier." Compl. ¶¶ 3, 4, 14, 15, 35, 69. These contentions adequately alleged MediaTek's specific intent. *See, e.g.*, *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1042 (9th Cir. 2005) (citation omitted) ("Anticompetitive conduct alone" can satisfy specific intent "if the 'conduct…is 'clearly threatening to competition or clearly exclusionary.'"); *Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 81 F. Supp. 3d 1, 14 (D.D.C. 2015) (conduct which "has no legitimate business justification but to destroy or damage competition" satisfies specific intent).

MediaTek tries to argue otherwise by claiming that the Anticompetitive Litigation Bounty had to explicitly spell out that MediaTek wanted to monopolize the TV Chip market. *See* Dkt. 48 at 14-15. But, MediaTek admits TV Chips were included in the Anticompetitive Litigation Bounty. *Id*. at 14. MediaTek's intent was otherwise obvious—it targeted Realtek ████████████████████ ██████████████████████████████████████████████████████████. *Id*. at 3-4.

### b. MediaTek Has or Would Obtain Monopoly Power

Realtek also adequately alleges MediaTek had a dangerous probability of success in its attempt to monopolize. MediaTek's alleged starting 60% market share, when combined with the market realities of the TV Chip market, and MediaTek's predatory conduct in connection with the Anticompetitive Litigation Bounty, establish the likelihood that it would achieve at least a 65% market share. *Arista*, 2018 WL 11230167, at *18 (even a 50% market share is not precluded by law from supporting an inference of monopoly power when warranted by market realities)

Realtek has alleged that MediaTek had roughly a 60% share in the TV Chips market, with the top three players together accounting for roughly 85% of the market. Compl. ¶ 35. MediaTek is thus already dangerously close to the typical 65% threshold for a *prima facie* showing of monopoly power, *see Image Tech*., 125 F.3d at 1206, even before it entered the Anticompetitive Litigation Bounty and hired PAE Defendants to engage in a campaign targeting Realtek's ███ ███████████████ Realtek alleges numerous examples of such anticompetitive conduct by MediaTek that could take it across the 65% line. *See* Section III.C.1. *supra*.[14]

Commercial realities of the TV Chip market further substantiate the dangerous probability of MediaTek obtaining monopoly power. Realtek alleges "high barriers to entry" including "sophisticated technology design expertise that is expensive and time-consuming to develop"; "experience designing Chips that must meet the exacting specifications"; "technological standards that may vary by region or country"; and "intellectual property and trade secrets." Compl. ¶ 62. Realtek also alleges various technical aspects in which "TV Chips are optimized for a particular purpose," (Compl. ¶ 55), reinforcing the need for specialized knowledge.

MediaTek argues incorrectly that Realtek cannot plausibly allege monopoly power without explaining why other competitors "would be unable to expand output or enter the TV chip market," or why current competitors "cannot constrain MediaTek's pricing power or fill any vacuum created by Realtek's market exit." Dkt. 48 at 16. That is not required, let alone at the pleading stage. A plaintiff need not "show direct evidence" that defendant has "the ability 'to control prices or exclude competition' in order to show monopoly power." *Arista*, 2018 WL 11230167, at *18. Realtek has raised a reasonable expectation that discovery will reveal evidence of MediaTek's monopoly power or substantial likelihood of achieving such power. *See Twombly*, 550 U.S. at 556.

### D.    Realtek Plausibly Alleges a UCL Claim

Realtek's Complaint plausibly alleges that Defendants violated both the unlawful and the unfair prong of the UCL. Realtek does not allege a separate claim under the fraudulent prong of the UCL, but includes PAE Defendants' deceitful litigation conduct for context, demonstrating

---

[14] For example, MediaTek was sewing doubt about Realtek's reliability in light of litigation, and "compel [customers'] loyalty" through "bundled product offerings." Compl. ¶¶ 8, 69.

1    Defendants' intent. *See, e.g., Hanover 3201 Realty*, 806 F.3d at 181 (Defendants' litigation tactics
2    "suggest[ed] they were more interested in delay than in redressing any grievances.").

3    **1.    Realtek Satisfies the Unlawful Prong of the UCL**

4        As explained in Section III.B.-C., Realtek has plausibly alleged a violation of antitrust law.
5    Accordingly, Realtek has sufficiently stated a claim under the unlawful prong of the UCL. *See*
6    *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) ("By
7    proscribing 'any unlawful' business practice, [the UCL] 'borrows' violations of other laws and
8    treats them as unlawful practices" that the unfair competition law makes independently actionable").

9    **2.    Realtek Satisfies the Unfair Prong of the UCL**

10        Realtek also adequately alleges that Defendants' conspiracy violated the unfair prong of the
11   UCL. Unfair conduct is defined as "conduct that threatens an incipient violation of an antitrust law,
12   or violates the policy or spirit of one of those laws because its effects are comparable to or the same
13   as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20
14   Cal. 4th at 186–87. Coverage of the UCL is "sweeping" and a business practice "does not need to
15   be unlawful to be unfair." *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1174 (N.D.
16   Cal. 2015); *see also De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 986–87 (2018) (An action is not
17   barred "merely because some other statute on the subject does not, itself, provide for the action or
18   prohibit the challenged conduct."). In *Luxul*, for example, the Court found the "unfair" prong met
19   where the plaintiff alleged the defendant "wrongfully and unfairly represented to third parties that
20   [Plaintiff's] business and/or products are affected by legal issues that do not exist" and which
21   "resulted in lost customers and damaged the value of Plaintiff's brand." 78 F. Supp. 3d at 1174.

22        Realtek has adequately alleged that Defendants engaged in anticompetitive conduct, which
23   includes Defendants' entering into an Anticompetitive Litigation Bounty, pursuant to which PAE
24   Defendants filed a series of patent litigation ███████████████████████████████████
25   ████████████████████████████████████████████████████████████████ Compl. ¶¶ 4-7. And,
26   as in *Luxul*, MediaTek was thereafter able to capitalize on the false perception of uncertainty
27   surrounding Realtek's ability to compete to disparage Realtek and convince at least one of its
28   customers not to use Realtek products. Compl. ¶ 8. The FTC policy statement further confirms

the adequacy of Realtek's unfairness allegations, as this conduct "tends to cause potential harm similar to an antitrust violation." The unfair prong of the UCL is thus met.

### 3.     The Patent Act Does Not Bar Realtek's UCL Claim

Patent litigation may subject the patent holder to liability where the enforcement was a sham. *See* Section III.B.2. *supra*. MediaTek's cited authority does not hold differently. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304–05 (Fed. Cir. 2004) ("[a] patent owner may be subject to antitrust liability…if the accused infringer proves…the infringement suit was a mere sham to cover…an attempt to interfere directly with the business relationships of a competitor.") (quotations omitted). Realtek adequately alleged that PAE Defendants are enforcing their patents in bad faith, namely, by filing a series of lawsuits without regard to the merits and for an anticompetitive purpose. *See* Section III.B.2. *supra*.

Realtek has likewise adequately alleged that PAE Defendants' patent assertion is actionable as part of a broader anticompetitive scheme. *See* Section III.B.3. *supra*. Defendants cannot avail themselves of the "safe harbor" for lawful conduct.

### 4.     Realtek Has Plausibly Alleged Its Injury under the UCL

Realtek has adequately alleged its injury under the UCL. Realtek alleges an ongoing conspiracy between Defendants, pursuant to which Realtek continues to suffer harm in the form of unnecessary attorney's fees, and in the loss of customers and goodwill based on MediaTek's strategic use of its co-conspirators anticompetitive litigation to disparage Realtek in order to increase its market power. *See* Compl. ¶¶ 77-79. This is sufficient to state an injury under the UCL. *See Robinson v. U-Haul Co. of Cal.*, 4 Cal. App. 5th 304, 318 (2016) (former franchisee, who was previously sued by franchisor to enforce an illegal contractual provision, and had incurred fees and costs as a result, was sufficiently injured to have standing to bring a UCL claim for injunctive relief); *See also W. Air Charter, Inc. v. Schembari*, No. 2:17-CV-00420-AB (KSx), 2017 WL 7240775, at *5 (C.D. Cal. Dec. 14, 2017) (employee who incurred costs in defending against former-employer's enforcement of unlawful contractual provision had standing to bring UCL claim).

MediaTek is also wrong that Realtek is not continuing to suffer harm based on Defendants' anticompetitive scheme. While MediaTek claims that the Anticompetitive Litigation Bounty

██████████████████████ MediaTek does not actually argue that its conspiracy with PAE Defendants is over; MediaTek argues that it never existed. Dkt. 48 at 2-4. Realtek has been harmed and continues to be harmed by Defendants' conspiracy. Realtek has incurred and continues to incur costs from PAE Defendants' meritless litigation,[15] which MediaTek continues to benefit from, as a means to disparage Realtek and steal Realtek's customers by creating a false sense of uncertainty around Realtek's business. MediaTek has already utilized PAE Defendants' meritless litigation for this purpose at least once before.[16] *See* Compl. ¶¶ 8, 42, 84. Realtek, accordingly, has standing to seek injunctive relief. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 13-cv-6001 SI, 2014 WL 2527221, at *2 (N.D. Cal. June 4, 2014) (standing to pursue injunctive relief met where there was "the possibility of a continuing anticompetitive conspiracy" given the past price-fixing agreement between competitors in an industry with high barriers to entry).

Under the UCL, there also "is no hard-and-fast rule that a party's discontinuance of illegal behavior makes injunctive relief against him or her unavailable." *Robinson*, 4 Cal. App. 5th at 315. Indeed, where "a company has not taken action to bind itself legally to a violation-free future, there may be reason to doubt the bona fides of its newly established law-abiding policy." *Id*. at 316; *see also U.S. v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (When defendants have "entered into a conspiracy violative of antitrust laws, courts will not assume that it has been abandoned without clear proof"). Here, none of the Defendants have denounced litigation bounties, nor conclusively shown they cannot engage in such conduct again.[17] To the contrary, Defendants claim the Anticompetitive Litigation Bounty is "commonsense", "procompetitive", and "promoted an even playing field." Dkt. 48 at 2-4. This validates Realtek's ability to seek injunctive relief. *See Killian*

---

[15] Realtek continues to be harmed by PAE Defendants' litigation campaign, with litigation ongoing in Japan, and the need for appeal(s) to recover attorneys' fees from the cases that were dropped.

[16] Moreover, the depth of misconduct is not yet fully known. For example, the bounty agreement could have been altered or extended, or other bounty agreements may exist. PAE Defendants also rapidly disposed of a dozen other lawsuits shortly after the Anticompetitive Litigation Bounty was discovered, further indicating that their unlawful conduct is likely much wider ranging than presently known. It is also unknown whether the bounty has been paid out yet.

[17] *See, e.g., U.S. v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203–04 (1968) ("appellees' own statement that it would be uneconomical for them to engage in any further joint operations…standing alone, cannot suffice to satisfy [mootness].")

1  *Pest Control, Inc. v. HomeTeam Pest Def., Inc.*, No. 14-CV-05239-VC, 2015 WL 13385918, at *3

2  (N.D. Cal. Dec. 21, 2015) (injunctive relief available where defendant left the market, but "could

3  easily return" using "the same improper tactics as before").[18]

4      **E.**     **Realtek Alleged Tortious Interference With Prospective Economic Advantage**

5      Realtek sufficiently alleges claims for both intentional and negligent interference with

6  prospective economic advantage. Compl. ¶¶ 81-85. MediaTek argues two elements—wrongful

7  conduct and disruption—are insufficiently pleaded. Dkt. 48 at 24-25. Mediatek is wrong.

8      **1.**     **Independently Wrongful Act**

9      Realtek alleges that Defendants engaged in a multi-faceted scheme, consisting of an

10  unlawful conspiracy whereby MediaTek hired PAE Defendants as its henchmen to file a campaign

11  of litigation (regardless of its success or merits) █████████████████████████████

12  ████████████████████████, among other anticompetitive acts, in violation of federal

13  antitrust and California unfair competition law. Compl. ¶¶ 26-37, 72-97. MediaTek then

14  capitalized upon the disruption it manufactured by disparaging Realtek to customers. *See, e.g.,*

15  Compl. ¶¶ 8, 42, 84. This conduct is independently wrongful. *See Korea Supply Co. v. Lockheed*

16  *Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003) ("[A]n act is independently wrongful" if proscribed

17  by law, or some "other determinable legal standard"); *see also Reid-Ashman Mfg, Inc. v. Swanson*

18  *Semiconductor Serv., L.L.C.*, No. C-06-4693 JCS, 2007 WL 1394427, at *12 (N.D. Cal. May 10,

19  2007) ("independently wrongful" element was sufficiently pleaded by allegation of sham litigation).

20      The Complaint also does not allege that MediaTek made only truthful statements to

21  Realtek's customers. To the contrary, Realtek alleges that MediaTek used the sham litigation it

22

---

23  [18] Defendants' unlawful conspiracy is also the type of conduct that is capable of repetition but can

24  evade review. *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1017 (9th Cir. 2013).
Realtek has also shown that "(1) the duration of the challenged action is too short to be fully

25  litigated before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be
subjected to the same action again." *Id*. Because licensing agreements are shrouded in secrecy,

26  the bounty was inherently difficult to discover. While the bounty was entered into in May 2019, it
was not discovered until April 2022, a full year into PAE Defendants' meritless litigation. The

27  bounty also allowed PAE Defendants to quickly drop suits upon its discovery to prevent the filing
of any counterclaims. And, Realtek still competes with MediaTek, who considers the bounty

28  "commonsense." Realtek is likely to again be subject to such a bounty.

induced to give Realtek's customers the false impression that Realtek was an unreliable supplier. Compl. ¶ 69. Such conduct easily qualifies as wrongful under state law. *See Wisk Aero*, 2021 WL 4932734, at *12 (denying dismissal because making false representations publicly is an independent wrong). The Complaint also alleges that MediaTek used sham litigation "to increase Realtek's costs and thereby limit resources available to Realtek for innovation, for example," in an effort to destroy competition for TV Chips. Compl. ¶¶ 84, 87-88. These allegations are sufficient even without MediaTek's statements to Realtek's customers.

### 2. Realtek Adequately Alleged Disruption to Customer Relationships

The Complaint also alleges that MediaTek intentionally or negligently disrupted Realtek's relationships with its customers, and at a minimum—"allow[s] the inference of actual disruption to [those] relationship[s]." *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008).

Among other things, the Complaint describes (1) competition to supply TV Chips for use in smart TVs; (2) TV Chip buyers' sensitivities to the supply-chain uncertainties implied by patent litigation; (3) that MediaTek "sought to create doubt regarding the availability of TV Chips from Realtek" which "unfairly limited customers' and end users' ability to rely on Realtek for TV Chips"; (4) that "MediaTek used Realtek's involvement in patent litigation as a basis to coerce at least one customer, and perhaps more, not to use Realtek products"; (5) MediaTek's highlighting litigation against Realtek to "a large TV brand that includes Realtek TV Chips in their products" to convince that brand "to stop designing Realtek products into their TVs"; (6) Realtek's belief that it has lost business in the past due to concerns about patent cases involving Realtek's TV Chips; (7) MediaTek's agreement to pay PAE Defendants to bring meritless litigation against Realtek; and (8) that, but for Defendants' conduct, "Realtek would have sold additional TV Chips during the pendency of Future Link's meritless lawsuits." Compl. ¶¶ 8, 37-38, 48-49, 51, 64, 69, 78, 84.

These allegations are much more detailed than the allegations in *Sybersound*, which asserted simply that the plaintiff "ha[d] been harmed because its ongoing business and economic relationships with Customers ha[d] been disrupted." *Sybersound*, 517 F.3d at 1151. MediaTek is also wrong to suggest the Complaint must name specific customers. It is enough to allege "a limited group of customers whose identities should be in [MediaTek]'s possession, or could be obtained

through discovery." *Oracle Am., Inc. v. CedarCrestone, Inc.*, No. 12-CV-04626 NC, 2013 WL 3243885, at *4 (N.D. Cal. June 26, 2013).

## B. *PG&E* Does Not Bar Realtek's Claim.

The Complaint sufficiently alleges that PAE Defendants, at MediaTek's behest, brought litigation against Realtek that lacked probable cause and terminated in Realtek's favor. *See* Compl. ¶¶ 29-34, 37-39. MediaTek is wrong that Realtek "alleges neither of these elements" because the district court in Texas and the International Trade Commission ("ITC") denied Realtek's motions for sanctions (Dkt. 48 at 23) for the reasons discussed in Section III.B.4, *supra*.

In any event, *PG&E* does not apply to the allegation that MediaTek wrongfully used PAE Defendants' litigation as a tool to persuade Realtek's customers to change suppliers. *See* Compl. ¶¶ 8, 69, 78. In *PG&E*, the plaintiff's claim was limited to the defendant's inducement of litigation and to the litigation costs that resulted. 50 Cal.3d at 1130. The court took pains to note that no other conduct—such as the defendant's "marketing campaign"—was at issue. *Id.* Moreover, the only disruption to the relationship would result from the outcome of the litigation itself. *Id.* That is not the case here. Consequently, the Complaint's allegations are sufficient.

## F. Realtek Is Entitled to Amend Its Complaint

"Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 541 (9th Cir. 2022). MediaTek argues that amendment would be futile because *Noerr-Pennington*'s sham exception could not apply. As discussed in Section III.B., this is incorrect, and in any event, *Noerr-Pennington* would not preclude a claim based on a broader anticompetitive scheme. Defendants' selective inclusion of confidential documents also provides the Court with an incomplete and distorted record. Due to protective orders, Defendants can attach favorable confidential documents, while preventing Realtek from attaching confidential documents that may be harmful. If the Court orders dismissal, Realtek should be granted leave to amend, and the Court should order cross use of all documents in the prior patent proceedings involving PAE Defendants.

## IV. CONCLUSION

For the foregoing reasons, MediaTek's Motion to Dismiss should be denied in its entirety.

| | |
|---|---|
| 1 | DATED:  September 28, 2023 |

Respectfully submitted,

By:   */s/ Rudy Y. Kim*

*Attorneys for Plaintiff Realtek Semiconductor Corp.*

RUDY Y. KIM (SB# 199426)
rudykim@paulhastings.com
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
Tel: (650) 320-1800
Fax: (650) 320-1900

MICHAEL F. MURRAY *(pro hac vice)*
michaelmurray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700
Fax: (202) 551-0460

NOAH B. PINEGAR *(pro hac vice)*
noahpinegar@paulhastings.com
ERIC W. LIN *(pro hac vice)*
ericlin@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6000
Fax: (212) 319-4090

ABIGAIL H. WALD (SB# 309110)
abigailwald@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA  94111
Tel: (415) 856-7000
Fax: (415) 856-7100