1    RUDY Y. KIM (SB# 199426)
     rudykim@paulhastings.com
2    PAUL HASTINGS LLP
     1117 S. California Avenue
3    Palo Alto, California  94304-1106
     Telephone:  (650) 320-1800
4    Facsimile:   (650) 320-1900

5    MICHAEL F. MURRAY (*pro hac vice*)
     michaelmurray@paulhastings.com
6    PAUL HASTINGS LLP
     2050 M Street NW
7    Washington, DC 20036
     Tel: (202) 551-1700
8    Fax: (202) 551-0460

9    *Attorneys for Plaintiff Realtek Semiconductor Corp.*

10   Additional Counsel on Signature Page

11

12                    UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14

15   REALTEK SEMICONDUCTOR CORP.,          Case No. 5:23-cv-02774-PCP

16              Plaintiff,                 **PLAINTIFF REALTEK
                                           SEMICONDUCTOR CORP.'S
17       vs.                               OPPOSITION TO DEFENDANT
                                           FUTURE LINK SYSTEMS, LLC AND
18   MEDIATEK INC.; IPVALUE                IPVALUE MANAGEMENT, INC'S
     MANAGEMENT, INC.; AND FUTURE LINK     NOTICE OF MOTION AND MOTION
19   SYSTEMS, LLC,                         TO DISMISS AND STRIKE
                                           COMPLAINT**
20              Defendants.
                                           Judge:  Honorable P. Casey Pitts
21
                                           **[REDACTED VERSION OF
22                                         DOCUMENT SOUGHT TO BE
                                           SEALED]**
23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................. 1

II.    FACTUAL BACKGROUND .................................................. 3

       A.    Defendants Enter Into a Secret Anticompetitive Litigation Bounty ..... 3

       B.    The Meritless Litigation Campaign Against Realtek ........................ 3

       C.    Defendants' Conspiracy Comes to Light ....................................... 4

III.   LEGAL ARGUMENT ........................................................... 5

       A.    Legal Standard ............................................................................ 5

       B.    Defendants' Anticompetitive Scheme Is Not Immunized by *Noerr-Pennington* ...................................................................................... 6

             1.    *Noerr-Pennington* Does Not Apply to Non-Litigation Conduct ..... 7

             2.    Realtek Has Plausibly Alleged a Sham Litigation Exception Applies ................................................................................... 9

             3.    Litigation Can Be Considered As Part of an Anticompetitive Scheme ................................................................................. 12

             4.    Realtek Is Not Estopped from Asserting Sham Litigation ....... 13

                   a.    The Issues Are Not Identical .................................... 13

                   b.    Realtek Did Not Have a "Full and Fair Opportunity" to Litigate .................................................................... 14

                   c.    Issues Were Not "Actually Litigated" or "Necessarily Decided" ................................................................... 15

       C.    Realtek Plausibly Alleges Defendants Violated Section 2 of the Sherman Act ............................................................................................. 15

             1.    PAE Defendants' Status as a Competitor Is Irrelevant .............. 15

             2.    Realtek Plausibly Alleges a Conspiracy and Specific Intent ..... 16

             3.    Realtek Plausibly Alleges Antitrust Injury ............................... 18

       D.    Realtek's State Law Claims Should Not Be Dismissed or Stricken ....... 20

             1.    Realtek's State Law Claims Do Not Arise From Protected Conduct ....... 20

             2.    The Litigation Privilege Does Not Bar Realtek's Claims ............ 21

             3.    Realtek Plausibly Pleads a UCL Claim .................................... 21

                   a.    Realtek Satisfies the Unlawful Prong of the UCL .......... 21

                   b.    Realtek Satisfies the Unfair Prong of the UCL .............. 22

                   c.    Realtek Has Plausibly Alleged Its Injury under the UCL ..... 22

             4.    Realtek Has Plausibly Alleged Its Tortious Interference Claim ....... 23

       E.    Realtek Is Entitled to Amend Its Complaint ................................... 25

IV.    CONCLUSION .................................................................. 25

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) ............................................................................................ 7

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) ......................................................................... 18

*Amwest Mortg. Corp. v. Grady*,
    925 F.2d 1162 (9th Cir. 1991) .................................................................. 13, 15

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
    7 Cal. 4th 503 (1994) ....................................................................................... 25

*Arista Networks, Inc. v Cisco Sys. Inc.*,
    No. 16-cv-00923-BLF, 2018 WL 11230167 (N.D. Cal. May 21, 2018) ......................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 6

*B&G Foods N. Am., Inc. v. Embry*,
    29 F.4th 527 (9th Cir. 2022) ........................................................................... 25

*Balt. Scrap Corp. v. David J. Joseph Co.*,
    237 F.3d 394 (4th Cir. 2001) ............................................................................. 8

*Baral v. Schnitt*,
    1 Cal. 5th 376 (2016) ....................................................................................... 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 6

*Cataphote Corp. v. DeSoto Chem. Coatings*,
    450 F.2d 769 (9th Cir. 1971) ........................................................................... 17

*Catch Curve, Inc. v. Venali, Inc.*,
    519 F. Supp. 2d 1028 (C.D. Cal. 2007) ......................................................... 21

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ..................................................................................... 22

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991) ........................................................................................... 9

*City of Montebello v. Vasquez*,
    1 Cal.5th 409 (2016) ........................................................................................ 21

*Cnty. of Monterey v. Blue Cross of Cal.*,
  No. 17-CV-04260-LHK, 2019 WL 343419 (N.D. Cal. Jan. 28, 2019)....................................6

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010)....................................................................................................7

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
  411 F.3d 1030 (9th Cir. 2005)................................................................................................17

*De La Torre v. CashCall, Inc.*,
  5 Cal. 5th 966 (2018) .............................................................................................................22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)...................................................................................................................1

*F.T.C. v. AbbVie Inc.*,
  976 F.3d 327 (3d Cir. 2020)...........................................................................................11, 13

*F.T.C. v. Actavis, Inc.*,
  570 U.S. 136 (2013)...................................................................................................................7

*Faigin v. Kelly*,
  184 F.3d 67 (1st Cir.1999) .....................................................................................................14

*Funai Elec. Co. v. LSI Corp.*,
  No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ........................18, 19

*Glen Holly Entm't Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003)............................................................................................19, 20

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
  No. 5:11-CV-03613 EJD, 2012 WL 2711040 (N.D. Cal. July 6, 2012)................................19

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
  806 F.3d 162 (3d Cir. 2015)...............................................................................9, 11, 16, 21

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  485 F. Supp. 3d 1137 (N.D. Cal. 2020) ................................................................................12

*Howard v. City of Coos Bay*,
  871 F.3d 1032 (9th Cir. 2017)................................................................................................13

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
  527 F. Supp. 2d 1084 (N.D. Cal. 2007) .......................................................................6, 12, 21

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  No. 19-CV-07651-EMC, 2020 WL 6390499 (N.D. Cal. July 15, 2020).......................2, 6, 12

*Intel Corp. v. Seven Networks, LLC*,
  562 F.Supp.3d 454 (N.D. Cal. 2021) .....................................................................................20

*IPtronics Inc. v. Avago Techs. U.S., Inc.*,
   No. 14-CV-05647-BLF, 2015 WL 5029282 (N.D. Cal. Aug. 25, 2015) .......................... 14, 15

*Klayman v. Barmak*,
   602 F. Supp. 2d 110 (D.D.C. 2009) .................................................................. 15

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) .................................................................................. 25

*Kraly v. Nat'l Distillers*,
   502 F.2d 1366 (7th Cir. 1974) ........................................................................ 17

*Lee v. City of L.A.*,
   250 F.3d 668 (9th Cir. 2001) .................................................................... 11, 13

*Liberty Lake Invs. v. Magnuson*,
   12 F.3d 155 (9th Cir. 1993) .......................................................................... 7, 8

*Lightning Lube, Inc. v. Witco Corp.*,
   4 F.3d 1153 (3d Cir. 1993) ............................................................................ 14

*Luxul Tech. Inc. v. Nectarlux, LLC*,
   78 F. Supp. 3d 1156 (N.D. Cal. 2015) ............................................................ 22

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
   No. SA CV 07-1052 DOC, 2008 WL 11338443 (C.D. Cal. Feb. 11, 2008) .......................... 15

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ......................................................................... 6

*Monex Deposit Co. v. Gilliam*,
   680 F. Supp. 2d 1148 (C.D. Cal. 2010) ............................................................ 24

*Nat. Immunogenics Corp. v. Newport Trial Grp.*,
   No. SACV 15-02034 .................................................................................... 21

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) ............................................................ 6, 16, 17

*Nelson v. Tucker Ellis, LLP*,
   48 Cal. App. 5th 827 (2020) .......................................................................... 24

*Ni-Q, LLC v. Prolacta Bioscience, Inc.*,
   No. 3:17-CV-000934-SI, 2019 WL 637703 (D. Or. Feb. 14, 2019) .............. 11, 14, 15

*Oracle Am., Inc. v. CedarCrestone, Inc.*,
   No. 12-CV-04626 NC, 2013 WL 3243885 (N.D. Cal. June 26, 2013) .................................. 24

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R.*,
   81 F. Supp. 3d 1 (D.D.C. 2015) ............................................................. 16, 17

*Palmer v. Dynamic Recovery Sols., LLC,*
No. 6:15-CV-59-ORL-40KRS, 2016 WL 2348704 (M.D. Fla. May 4, 2016) ........................ 7

*PG&E v. Bear Stearns,*
50 Cal. 3d 1118 (1990) ................................................................................ 25

*Pro. Real Est. Invs. v. Columbia Pictures,*
508 U.S. 49 (1993) ...................................................................................... 14

*Q-Pharma, Inc. v. Andrew Jergens Co.,*
360 F.3d 1295 (Fed. Cir. 2004) ..................................................................... 14

*Rebel Oil Co. v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) ......................................................................... 16

*Reid-Ashman Mfg, Inc. v. Swanson Semiconductor Serv., L.L.C.,*
No. C-06-4693 JCS, 2007 WL 1394427 (N.D. Cal. May 10, 2007) ...................... 25

*Relevant Grp., LLC v. Nourmand,*
No. 2:19-cv-05019-ODW, 2022 WL 2916860 (C.D. Cal. July 25, 2022).......... 9, 10, 11

*Robinson v. U-Haul Co. of Cal.,*
4 Cal. App. 5th 304 (2016) ........................................................................... 23

*Sosa v. DIRECTV, Inc.,*
437 F.3d 923 (9th Cir. 2006)........................................................................ 7, 8

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. 13-cv-6001 SI, 2014 WL 2527221 (N.D. Cal. June 4, 2014) ........................ 23

*Toyo Tire & Rubber Co. v. Atturo Tire Corp.,*
No. 14 C 0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017) ............................... 7

*Truck-Rail Handling v. Burlington N.,*
244 F. App'x 130 (9th Cir. 2007) ................................................................... 18

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare
Fund v. Teikoku Pharma USA, Inc.,*
74 F. Supp. 3d 1052 (N.D. Cal. 2014) ............................................................. 16

*United States v. Singer Mfg. Co.,*
374 U.S. 174 (1963)................................................................................... 2, 7

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-
CIO,*
31 F.3d 800 (9th Cir. 1994).......................................................................... 6, 9

*W. Air Charter, Inc. v. Schembari,*
No. 2:17-cv-00420-AB, 2017 WL 7240775 (C.D. Cal. Dec. 14, 2017)................. 23

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27,*
    728 F.3d 354 (4th Cir. 2013) .......................................................................... 8, 9, 11

*In re Wellbutrin XL Antitrust Litig.,*
    2009 WL 678631 (E.D. Pa. Mar. 13, 2009) .......................................................... 16

*In re Xyrem (Sodium Oxybate) Antitrust Litig.,*
    555 F. Supp. 3d 829 (N.D. Cal. 2021) ............................................................... 2, 10

**Statutes and Rules**

Cal. Civ. Code § 47(b) ......................................................................................... 21

Cal. Code Civ. Proc. § 425.16(a) ......................................................................... 20

Sherman Act § 2 ............................................................................................. 15, 16

First Amendment of U.S. Constitution ..................................................................... 2

Federal Rules of Civil Procedure
    Rule 8 ................................................................................................................. 5
    Rule 11 .......................................................................... 11, 13, 14, 15
    Rule 12 ............................................................................................................. 6

## I. INTRODUCTION

The antitrust laws forbid monopolists from conspiring "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992). Plaintiff, Realtek Semiconductor Corporation ("Realtek") alleges that MediaTek Inc. ("MediaTek") hired henchmen IPValue Management, Inc. ("IPValue") and Future Link Systems, LLC ("Future Link") (together with IPValue, "PAE Defendants") to attack ██████████████████████████ The PAE Defendants admit this in their motion, protesting primarily that they did not care about the bounty (although notably they do not disclaim they sought payment of the bounty after filing suit). In doing so, Defendants cherry pick documents to reveal to the court, providing an incomplete and lopsided picture (and creating factual disputes).[1]

But what is clear and indisputable is that Defendants entered into a bounty agreement, with MediaTek committing to pay PAE Defendants ████████████ to initiate litigation against ████████████████████ regardless of outcome and without regard to the merits:

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████ *See* Dkt. 57-9.

Under this provision, hereinafter referred to as the "Anticompetitive Litigation Bounty," MediaTek hired PAE Defendants as its henchmen, enticing them with ████████ to file patent litigation (regardless of its success or merits) against ████████████████████████ ██████████████ The Anticompetitive Litigation Bounty permitted PAE Defendants to get their payday regardless of whether the litigation was voluntarily dismissed, wholly unsuccessful, or even frivolous. All that mattered was that MediaTek's ████████ ██ so that MediaTek could encumber and slow them down and capitalize on the increased costs, business disruption, and inherent uncertainty that even meritless litigation creates. Once the litigation had been filed, MediaTek was able to use the fact of litigation to further harm its competition and increase its already commanding market share, by disparaging Realtek to steal its

---

[1] PAE Defendants have spent years fighting to hide this information through protective order designations and motions to seal and again, here, seek to avoid public scrutiny. *See* Dkt. No. 55.

customers. Compl. ¶¶ 8, 42. The Anticompetitive Litigation Bounty is the crux of this case, no matter how many times PAE Defendants try to argue the "core" is the subsequent litigation.

Unable to deny what they did or why they did it, Defendants try to argue that hiring a hitman to ███████████ is protected by the First Amendment because that hitman filed patent litigation that has not (yet) led to sanctions for such misconduct (ignoring a judge's observation that such behavior likely "warrants sanctions"). But, "the mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct," including that in settlement agreements. *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-CV-07651-EMC, 2020 WL 6390499, at *15 (N.D. Cal. July 15, 2020); *see United States v. Singer Mfg. Co.*, 374 U.S. 174, 196–97 (1963) (holding anticompetitive a settlement agreement that prompted party to litigate claims). Rather, the relevant legal test is whether the protected conduct is "incidental" to litigation. PAE Defendants cite no precedent that has held that standard is satisfied when a PAE has been paid to bring litigation ████████ ███████████, regardless of outcome or merit (in stark contrast to the litigation funding arrangements PAE Defendants try to rely on).

Moreover, PAE Defendants' patent litigation does not qualify for *Noerr-Pennington* protection because it involved a series of lawsuits filed without regard to the merits. Anticipating this flaw in its defense, PAE Defendants attempt to argue that various (and often appealed) rulings in the offending ***patent*** litigation somehow foreclosed Realtek's ***antitrust*** claims in this separate litigation, but courts have previously rebuffed such maneuvers, given that a First Amendment inquiry is fundamentally different than the issues resolved in the patent litigation. PAE Defendants also try to portray their litigation as one or two cases, to try to lower their defense burden, but conveniently omit ███████████████████████. "Courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage,"[2] and this Court should follow course.

PAE Defendants have also resorted to selectively quoting certain filings from other patent proceedings (including sealed information in non-public filings) in an attempt to improperly inject disputed facts in their pleadings challenge. But even without correcting that skewed record, Realtek has plausibly stated its claims. Defendants' motions to dismiss should therefore be denied.

[2] *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 877 (N.D. Cal. 2021).

## II.  FACTUAL BACKGROUND

### A.  Defendants Enter Into a Secret Anticompetitive Litigation Bounty

PAE Defendants are Patent Assertion Entities ("PAEs").  Compl. ¶ 21.  PAEs do not make or sell goods; rather, they acquire patents solely to obtain licensing fees by purchasing and enforcing patent rights once practicing entities have invested billions of dollars in developing and commercializing technologies in downstream products.  *Id.*  Patent aggregators, like PAE Defendants, who aggregate hundreds of patents, pose an even higher risk on competition and innovation, due to the credible threat of imposing large costs through litigation.  Compl. ¶ 24.

On May 21, 2019, PAE Defendants publicly announced that they entered into a patent license agreement with MediaTek.  Compl. ¶ 37.  What the press release failed to disclose was that the licensing agreement contained a secret Anticompetitive Litigation Bounty ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Dkt. 57-9.

### B.  The Meritless Litigation Campaign Against Realtek

On April 13, 2021, amid the global chip shortage due to the pandemic, PAE Defendants sued Realtek in the Western District of Texas for alleged patent infringement of U.S. Patent No. 7,917,680 (the "363 Case" and "'680 patent").  Compl. ¶ 26.  The lawsuit accused a broad range of Realtek products of infringement, including *unspecified* products "that use processors supporting ARM AMBA AXI4 or newer," as well as products that "operate in substantially the same way."  Compl. ¶ 27.  The complaint sought an injunction in an attempt to take the vast majority of Realtek products off the market (*i.e.*, Realtek's TV Chips).  Compl. ¶ 28.

There were several obvious flaws to PAE Defendants' complaint in the 363 Case.  Compl. ¶ 29.  For example, there was no personal jurisdiction, the complaint was not properly served, and failed to plausibly allege that Realtek engaged in any act of direct infringement.  *Id.*  On July 15, 2021, PAE Defendants attempted to amend their complaint, and expanded the scope of accused products, but was still unsuccessful in curing its deficiencies.  Compl. ¶ 30.

Meanwhile, just weeks prior, on June 25, 2021, Realtek filed an *inter partes* review ("IPR") petition with the Patent Trial and Appeal Board ("PTAB") at the U.S. Patent and Trademark Office

challenging the patentability of certain claims of the '680 patent. Compl. ¶ 33. While Realtek sought to dismiss the 363 Case, and while the IPR petition for the '680 patent was pending, on December 22, 2021, PAE Defendants filed another suit in the Western District of Texas alleging infringement of two additional patents, U.S. Patent No. 7,685,439 (the "'439 patent") and U.S. Patent No. 8,099,614 (the "'614 patent"), and a week later, on December 29, 2021, PAE Defendants alleged infringement of the same two patents before the United States International Trade Commission ("ITC"). Compl. ¶ 31. PAE Defendants sought an exclusion order excluding from entry into the U.S. certain Realtek integrated circuit products (including the same Chips identified in the prior litigation in addition to others) and devices containing the same. *Id.* In response, on June 8, 2022, Realtek filed an IPR petition challenging all claims of the '614 patent.

Highlighting the PAE Defendants' apparent lack of regard to the merits of its case prior to asserting its patents against Realtek and others, rather than defending the patentability of its patents, Future Link instead chose to quickly cancel many of its asserted claims (or settle with the entities who challenged their patentability) to avoid having them declared unpatentable by the Patent Office. For example, on September 9, 2022, to avoid a finding of unpatentability by the Patent Office, Future Link *cancelled all* claims of the '614 patent, as well as half of the claims of the '680 patent. Compl. ¶¶ 33–34. As for the remaining claims of the '680 patent that Future Link chose not to preemptively cancel, those claims were indeed found to be unpatentable by the PTAB in a final written decision issued on January 4, 2023. Compl. ¶ 33. The '439 patent was previously the subject of an IPR petition by Intel, which the PTAB instituted after finding a reasonable likelihood of unpatentability for at least one claim. Compl. ¶ 34. Future Link, however, was able to avoid a finding of unpatentability in that IPR by entering into a settlement agreement with Intel before the PTAB could issue a final written determination. *Id.*

Realtek was ███████████████████████████████████ Compl. ¶ 35.

████████████████████████████████████████████

███████████████████████████████████ *Id.*

## C. Defendants' Conspiracy Comes to Light

In April 2022, discovery for the above-referenced proceedings revealed that, before any

- 4 -

PLAINTIFF'S OPPOSITION TO PAE
DEFENDANTS' MOTION TO DISMISS

litigation against Realtek began, the license agreement announced in May 2019 between MediaTek and Future Link contained an "untoward and actionable" secret litigation "bounty" provision. Compl. ¶¶ 36, 37. While specific details regarding this Anticompetitive Litigation Bounty remain veiled from the public to this day at Defendants' insistence, the Courts that have seen it have deep concern over its illegality. Compl. ¶ 37. For example, an ITC Administrative Law Judge ("ALJ") noted, "[t]his provision is alarming . . . [a]t a minimum it would seem to warrant an action by Realtek…for unfair competition;" a District Court order called it, "an improper contract that the Court found should be discouraged as a matter of public policy"; and that the provision had an "improper motive," "should be discouraged," and "warrants sanctions." *Id.*

The existence of this Anticompetitive Litigation Bounty appears to be the motivator behind PAE Defendants' otherwise irrational litigation against Realtek ██████████████. Indeed, soon after the ITC ALJ issued the order quoted above, Future Link resolved more than a dozen pending patent infringement claims against ten different technology companies, including its claims against Amlogic. Compl. ¶ 39. However, IPValue has continued to retaliate against Realtek through another PAE subsidiary, Monterey Research LLC, which initiated another patent suit in Japan. Compl. ¶ 40. Defendants' conspiracy targeted virtually every Realtek product and therefore sought to shut Realtek out of the market, all at MediaTek's behest. *Id.*

In conjunction with entering into the Anticompetitive Litigation Bounty with PAE Defendants, MediaTek engaged in other anticompetitive conduct targeting Realtek ██████████. *See* Compl. ¶¶ 6-8, 42-44, 70. For example, MediaTek coerced at least one TV Chip customer to not incorporate Realtek TV Chips due to patent litigation. Compl. ¶¶ 8, 42. MediaTek also used illegal bundling to maintain and grow its market share in the TV Chip market. Compl. ¶¶ 8, 43. These actions have disrupted Realtek's relationships with customers and Chip end-users and has called into question Realtek's reputation as a reliable supplier of TV Chips. Compl. ¶ 70.

## III. LEGAL ARGUMENT

### A. Legal Standard

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

P. 8(a). The complaint must only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In considering dismissal based on a Rule 12(b)(6) motion, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the [Plaintiff]." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Courts are limited to the "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Cnty. of Monterey v. Blue Cross of Cal.*, No. 17-CV-04260-LHK, 2019 WL 343419, at *4 (N.D. Cal. Jan. 28, 2019). Plaintiffs are to be given "full benefit of their proof without tightly compartmentalizing the various factual components[.]" *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019).

**B.     Defendants' Anticompetitive Scheme Is Not Immunized by *Noerr-Pennington***

The crux of PAE Defendants' argument for dismissal is that because their conspiracy utilized litigation to harm competition, therefore they cannot be held accountable, regardless of the litigation's merit. However, the mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct. *Intel Corp.*, 2020 WL 6390499, at *15. Rather, the non-litigation conduct must be "incidental" to litigation activity and settlement agreements—like the licensing agreement containing the Anticompetitive Litigation Bounty and other conduct in this case—do not meet that standard. *Id.*

It is likewise well-settled in the Ninth Circuit that *Noerr-Pennington* does not protect defendants who file multiple lawsuits for an improper purpose regardless of merit. *See USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994). And, even if PAE Defendants' litigation was not a sham, it could still be considered as part of Defendants' overall scheme, where, as here, the other non-litigation conduct within the scheme is independently unlawful – *i.e.*, the Anticompetitive Litigation Bounty itself. *See Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1096–98 (N.D. Cal. 2007).

1           **1.**     ***Noerr-Pennington* Does Not Apply to Non-Litigation Conduct**

2         "*Noerr–Pennington* immunizes only litigation activity, not other forms of threats or

3 harassment." *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir.

4 2010). Defendants cannot claim *Noerr-Pennington* immunity for non-litigation conduct—namely,

5 entering into an agreement to provide a bounty payment to induce a private party to file litigation

6 (regardless of outcome or merit), and MediaTek's disparagement of Realtek based on the litigation

7 campaign that followed. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492

8 (1988) (conduct directed at persuading a private standard setting organization to act was not

9 protected by *Noerr-Pennington* even though the organization's standards were routinely adopted

10 into law by state and local governments). While *Noerr-Pennington* may insulate certain pre-suit

11 demand letters and third party funding for litigation, when they are "incidental" to litigation, *id.* at

12 499, the non-litigation conduct at issue here is neither.

13         ***First,*** courts regularly ***reject*** that settlement agreements are "incidental" to litigation and

14 thus immunized from antitrust liability. For example, the Supreme Court held in *F.T.C. v. Actavis,*

15 *Inc.*, 570 U.S. 136 (2013) that a reverse payment patent settlement could be subject to antitrust

16 scrutiny. *See also Singer*, 374 U.S. at 196-97 (holding anticompetitive a settlement agreement that

17 prompted party to litigate claims); *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14 C 0206,

18 2017 WL 1178224, at *7 (N.D. Ill. Mar. 30, 2017) (boycott agreement included in settlement

19 agreement was "not incidental to petitioning activity"). Here, MediaTek entered into an agreement

20 to pay a ▮▮▮▮▮ bounty if PAE Defendants filed litigation ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 even if that litigation was unsuccessful, non-meritorious, or even frivolous. This is not protected,

22 and PAE Defendants have not cited any case that indicates courts have ever found otherwise.[3]

23         Neither *Liberty Lake Invs. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), nor *Sosa v. DIRECTV,*

24 *Inc.*, 437 F.3d 923, 937 (9th Cir. 2006), changes this result. Neither case found that offering a large

25 incentive payment to a third party to sue ▮▮▮▮▮▮▮▮▮▮ is lawful or protected under *Noerr-*

26

---

[3] Even in class action litigation, courts reject incentive payments to class representatives that are

27 unseemly. *See Palmer v. Dynamic Recovery Sols., LLC*, No. 6:15-CV-59-ORL-40KRS, 2016 WL

28 2348704, at *10 (M.D. Fla. May 4, 2016) (finding that a $2,000 payment to named plaintiff would "project[] the unseemly appearance that Plaintiff has been purchased at the expense of the class.")

*Pennington*. Unsurprisingly, <u>none</u> of the cases cited by Defendants stand for such a proposition. In *Liberty Lake*, the Ninth Circuit reached the unremarkable conclusion that a party who provides funding for litigation to enforce rights similar to its own may also be immunized under *Noerr-Pennington*. 12 F.3d at 156-58. In *Sosa*, the Ninth Circuit found that pre-suit demand letters could be immunized under *Noerr-Pennington*. 437 F.3d at 937. In reaching this conclusion, it noted in dicta that it was consistent with the conclusion in *Liberty Lake* that a party who provides funding for litigation may also be immunized.[4] The Anticompetitive Litigation Bounty goes far beyond simply reimbursing legal expenses to assist another seeking legitimate recourse, and does not fall within any protection *Liberty Lake* or *Sosa* might provide.

Since *Liberty Lake* and *Sosa* were decided, the Fourth Circuit further clarified how third-party financed litigation may be viewed in the sham litigation context in *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 365–67 (4th Cir. 2013). In denying dismissal of a series-based sham litigation claim, the *Waugh Chapel* Court noted that many of the lawsuits at issue were withdrawn "under suspicious circumstances" and it was alleged that several suits were voluntarily dismissed to avoid revealing that the unions were secretly "directing and paying for the litigation." *Id*. While the *Waugh Chapel* Court reiterated that "third-party financing of legal proceedings does not *itself* demonstrate an illegal purpose or render those suits sham," it nonetheless made clear that "a reasonable factfinder could credit this evidence in deciding whether 'the administrative and judicial processes have been abused.'" *Id*. (emphasis added). Defendants' Anticompetitive Litigation Bounty, which incentivizes litigation regardless of merit or outcome, should likewise be credited as significant evidence of such abuse.

***Second***, MediaTek's disparaging communications with Realtek's customers concerning litigation against Realtek also are not protected. In *Wisk Aero LLC v. Archer Aviation Inc.*, for example, a defendant countersued the plaintiff for tortious interference, defamation, and unfair competition after the plaintiff made disparaging remarks about defendant in press releases and blog posts concerning the parties' litigation. No. 3:21-CV-02450-WHO, 2021 WL 4932734, at *7–9

---

[4] The *Sosa* opinion also cites *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 397-99 (4th Cir. 2001) for the same proposition that litigation funding may be protected by *Noerr-Pennington*.

(N.D. Cal. Sept. 14, 2021). In denying a motion to dismiss and strike those claims, the Court held that plaintiff's blog posts and press releases were not protected under *Noerr-Pennington*. *Id*. The Court found such communications were not "incidental to the prosecution of the lawsuit" because such communications "did not, in any manner, affect [the lawsuit] or advance [its] interests in [the lawsuit]." *Id*.; *see also Arista Networks, Inc. v Cisco Sys. Inc.*, No. 16-cv-00923-BLF, 2018 WL 11230167 at *11 (N.D. Cal. May 21, 2018) (blog posts about lawsuit not protected). MediaTek's communications are likewise not protected by *Noerr-Pennington* for the same reasons.

### 2. Realtek Has Plausibly Alleged a Sham Litigation Exception Applies

The sham litigation exception to *Noerr-Pennington* also precludes immunization as to PAE Defendants' vexatious and anticompetitive litigation campaign, because Realtek plausibly alleges that it was filed "without regard to the merits" and the contrary argument raises disputed questions of fact. "The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991). One such sham situation arises when a defendant has filed multiple lawsuits for an improper purpose. In that situation, courts do not look to "whether any one [case] has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *USS-POSCO Indus.*, 31 F.3d at 811. In other words, the court asks "[w]ere the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id*. In evaluating whether successive litigation constitutes harassment, "a more flexible standard is appropriate" than when assessing one lawsuit. *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) (sham exception met where four petitions were filed to obstruct plaintiff from approvals to break ground on a competing supermarket). This is because cases involving multiple lawsuits "often involve more complex fact sets" and present "a greater risk of antitrust harm." *Id*. In determining whether a series of litigation was brought without regard to the merits, courts look "retrospectively at the success rate." *E.g., Relevant Grp., LLC v. Nourmand,* No. 2:19-cv-05019-ODW (KSx), 2022 WL

2916860, at *14 (C.D. Cal. July 25, 2022). "A high percentage of meritless . . . proceedings . . . will tend to support a finding that the filings were not brought to redress any actual grievances." *Id*. In addition, "[c]ourts should also consider other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity[.]" *Id*.

As the foregoing indicates, "[t]he Ninth Circuit has held that whether something is a genuine effort to influence government action, or a mere sham for *Noerr-Pennington* purposes, is a question of fact." *In re Xyrem*, 555 F. Supp. 3d at 877–81 (sham litigation exception sufficiently pled where defendant filed serial patent litigation against multiple manufacturers to delay generic entry of a drug, with the intent to burden rivals and obtain the automatic 30-month stay of any FDA ANDA approval) (quotations omitted). Consequently, "courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage," even though other judicial resolutions often are involved. *Id*.

This court should do likewise, because Realtek has more than plausibly alleged that PAE Defendants filed a series of at least six (possibly up to a dozen)[5] lawsuits pursuant to their unlawful conspiracy with MediaTek, without regard to the merit of such lawsuits. Compl. ¶¶ 26, 28, 35, 40.[6] There is no evidence that any of the *six* lawsuits have been successful in obtaining redress. Five of the six lawsuits were dismissed shortly after the discovery of the Anticompetitive Litigation Bounty, though one retaliatory lawsuit is still pending. Compl. ¶ 39.[7] Notably, none of the lawsuits resulted in PAE Defendants obtaining a jury award or any other judgment in its favor. And, none of the lawsuits against Realtek resulted in any payment by Realtek to PAE Defendants (neither Motion to Dismiss alleges ▮▮▮▮▮▮▮▮▮▮▮▮). PAE Defendants' litigation campaign was not a legitimate effort to seek redress; it was to obtain a ▮▮▮▮ bounty.

Because PAE Defendants cannot seriously argue that any of these proceedings were successful, they instead point to minimal indications that the cases may not have been frivolous,

---

[5] *See* Compl. ¶ 39 (Future Link "hurriedly resolved" over a dozen "infringement claims against ten different technology companies…to avoid further disclosure of the illegal conspiracy.")

[6] Namely, PAE Defendants filed two lawsuits against Realtek in the Western District of Texas, one lawsuit against Realtek in the ITC, and one lawsuit against Realtek in Japan through one of IPValue's other PAE subsidiaries, Monterey Research LLC. Compl. ¶¶ 26, 28, n. 12, 40. PAE Defendants also filed two cases against Amlogic in the District of Delaware. Compl. ¶ 35, n. 13.

[7] Two of the three asserted patents in three of the cases were found invalid by the patent office, further confirming PAE Defendants filed the cases without regard to merit. Compl. ¶¶ 33-34.

such as the settlement of a related patent case with a third party (who does not appear to be a target of the Anticompetitive Litigation Bounty), as sufficient to immunize their entire litigation campaign. However, even if PAE Defendants can show that some of their cases had some merit (which Realtek disputes), that would not immunize their litigation conduct under *Noerr-Pennington*. One potentially acceptable act cannot immunize a plethora of bad acts.

Courts regularly refuse to dismiss series-based sham litigation claims where there are some indications of success. In *Hanover 3201 Realty*, for example, the Third Circuit evaluated whether Defendants' four petitions, which were allegedly intended to slow the development of a site to be used as a competing grocery store, satisfied the series-based exception for sham litigation. In determining it did, the court held that although defendants could point to some "victorious moments" and "partial success" in their petitioning conduct, defendants overall were not successful. 806 F.3d at 182. The Fourth Circuit held similarly in *Waugh Chapel*. 728 F.3d at 365–67. The court specifically noted that some of the fourteen legal proceedings at issue may have been justifiable; indeed, there was even one successful appeal. *Id*. at 365. However, "the fact that there may be moments of merit within a series of lawsuits is not inconsistent with a campaign of sham litigation, for 'even a broken clock is right twice a day.'" *Id*. Likewise, in *Relevant Group*, the court denied summary judgment on the sham litigation exception where two cases in the series settled and one was remanded. 2022 WL 2916860, at *14–17.

Here, the only "victorious moments" PAE Defendants point to is avoiding Rule 11 sanctions, and dicta in a court order noting Future Link's claim that ███████████████████ ████████████████████████████████████████████████████████████████ [8] Failing to be sanctioned under Rule 11 does not preclude a finding that the lawsuit was a sham. *See Ni-Q, LLC v. Prolacta Bioscience, Inc.*, No. 3:17-CV-000934-SI, 2019 WL 637703, at *9 (D. Or. Feb. 14, 2019). Settling a case is likewise insufficient. *See F.T.C. v. AbbVie Inc.*, 976 F.3d 327, 367–68 (3d Cir. 2020) (finding litigation was objectively baseless where the case had settled). These *de minimis* indications of merit are insufficient to defeat a sham litigation claim.

---

[8] Moreover, this is not an undisputed "fact" capable of judicial notice, and should be disregarded. *See Lee v. City of L.A.*, 250 F.3d 668, 689–90 (9th Cir. 2001).

### 3. Litigation Can Be Considered As Part of an Anticompetitive Scheme

Even if this Court were to conclude that no sham exception applies to the meritless litigation that PAE Defendants filed, which it should not, such conduct could still be considered as part of Defendants' anticompetitive scheme. In *Hynix*, this District established a two-part test for including conduct that might otherwise be protected as part of an anticompetitive scheme:

> "the court must first find that the other aspects of the scheme independently produce anticompetitive harms. Once…established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms. If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme." 527 F. Supp. 2d 1084, 1096–98.

In other words, "if the gravamen of the action centers on non-petitioning activity, the fact that petitioning activity is employed to further that conduct is not sufficient to implicate the *Noerr-Pennington* doctrine." *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1146 (N.D. Cal. 2020) (finding *Noerr-Pennington* did not bar inclusion of pre-suit letters as part of antitrust claims). Additionally, "a plaintiff that can prove an antitrust violation without the use of protected petitioning can recover damages caused by that petitioning as well as damages by the conduct that proved the violation." Herbert Hovenkamp, et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 11.04[F]; *see also hiQ Labs*, 485 F. Supp. 3d at 1147 (same); *Hynix*, 527 F. Supp. 2d at 1088 (same).

Here, Defendants engaged in a multi-faceted scheme, consisting of an unlawful conspiracy whereby Mediatek hired PAE Defendants as its henchmen to file a campaign of sham litigation ████████████████████████████████████████████████████████. Mediatek was then able to capitalize on the business disruption of litigation and the inherent uncertainty that even meritless litigation creates in order to harm competition and increase its market share, through its own campaign of disparaging Realtek and stealing its customers. Compl. ¶¶ 6-8, 42-44, 63, 65-71, 77-79, 84-85, 87-89, 92-96. The crux of the scheme—entering into an Anticompetitive Litigation Bounty ██████████████████████—along with other misconduct, such as disparaging a competitor, constitutes actionable conduct not protected under *Noerr-Pennington*.[9]

---

[9] The aggregation of patents itself also is not conduct protected under *Noerr-Pennington*, and can be anticompetitive. *See, e.g., Intel Corp.*, 2020 WL 6390499 at *15 (granting motion to dismiss,

*See Wisk Aero*, 2021 WL 4932734, at *7–9.

### 4. Realtek Is Not Estopped from Asserting Sham Litigation

In order to adequately allege estoppel, PAE Defendants must demonstrate all four elements of issue preclusion are met, namely, (1) the issue "was identical in both proceedings;" (2) the issue "was actually litigated and decided;" (3) "there was a full and fair opportunity to litigate the issue;" and (4) "the issue was necessary to decide the merits." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017) (citation omitted). Failure to establish any element precludes issue preclusion. *See, e.g.*, *Amwest Mortg. Corp. v. Grady*, 925 F.2d 1162, 1165 (9th Cir. 1991). PAE Defendants fail to establish these required factors for a non-series-based sham litigation claim, let alone a series-based claim. Indeed, the Complaint, at minimum, alleges three patent cases brought by Future Link against Realtek were objectively baseless, and with the bad faith purpose of fulfilling the anticompetitive bounty agreement, and are in themselves sham lawsuits. *See AbbVie*, 976 F.3d at 346. And, as noted above, PAE Defendants cannot defeat a series-based sham litigation claim by pointing to minimal indications that cases may not have been frivolous.[10] Estoppel is not met.

#### a. The Issues Are Not Identical

For issues to be identical for purposes of estoppel, they must be identical *as litigated* or reasoned by the judge in the two proceedings—not in a generic sense. *See Howard*, 871 F.3d at 1039. Here, neither of the orders that PAE Defendants rely on determined whether defendant brought multiple lawsuits pursuant to a policy of starting legal proceedings without regard to the merits for an improper purpose, or even evaluated PAE Defendants' overall litigation conduct and motives. The Rule 11 Order focused on Future Link's *attorneys'* motives and conduct in filing one complaint on behalf of Future Link. *See* Fed. R. Civ. P. 11(b). The ITC Order only evaluated

---

[10] but holding "*liability* can be based on non-petitioning activity only (such as aggregation of patents)" and noting that "*injury* can be related to petitioning activity (i.e., patent infringement litigation).") PAE Defendants' improper reliance on dicta that ████████████████████████ also does not save its arguments. For avoidance of doubt, this is not a "fact" capable of judicial notice, and should therefore be disregarded. *See Lee*, 250 F.3d at 689–90 (courts may only take judicial notice of the existence of a court opinion, not the truth of the facts stated within). The import of Future Link's settlement █████ is a disputed fact that is irrelevant to determining whether Realtek sufficiently pled PAE Defendants brought a series of lawsuits without regard to the merits against Realtek █████ for an improper purpose.

whether Future Link's Complaint "contain[ed] a 'showing' of infringement of independent claims 'by appropriate allegations, and when practicable, by [claim] chart[s].'" Dkt. 51-11, at 2 (quoting 19 C.F.R. § 210.12(a)(9)(viii)). In finding that the "showing" had been made, the Order further noted, "[n]o degree of particularity is specified, and . . . a high degree of particularity would not be 'appropriate.'" *Id*. The ITC Order then declined to award sanctions based on the Anticompetitive Litigation Bounty due to the insufficient availability of evidence. *Id*. at 3. These *de minimis* indications of merit are insufficient to defeat a sham litigation finding. *See* Section III.B.2.

Moreover, other courts in this Circuit have declined to find that a party is estopped from asserting sham litigation on the basis of a prior Rule 11 order. In *Ni-Q*, for example, the District of Oregon denied summary judgment on sham litigation, rejecting the argument that Plaintiff was estopped from arguing sham litigation based on a prior Rule 11 order, because the factors relied upon in denying sanctions were "not coextensive with the factors relevant to a consideration of objective baselessness." 2019 WL 637703, at *9. Courts are also skeptical about the probative value of an ITC decision to institute an investigation on whether a patent claim has any merit. *IPtronics Inc. v. Avago Techs. U.S., Inc.*, No. 14-CV-05647-BLF, 2015 WL 5029282, at *7 (N.D. Cal. Aug. 25, 2015) (The ITC's finding that a party "voted to open an investigation" nonetheless "says nothing of the actual merits of the infringement theory asserted against IPtronics.")[11]

### b. Realtek Did Not Have a "Full and Fair Opportunity" to Litigate

None of the orders at issue provided a "fair and full opportunity" for Realtek to be heard on whether PAE Defendants' overall litigation conduct could fall within a sham litigation exception. The Ninth Circuit has previously held that a Rule 11 finding did not preclude a malicious prosecution claim, because "the limited scope of Rule 11 proceedings" does not present a plaintiff with "a full and fair opportunity to litigate" whether "probable cause" existed to bring a case. *Id*.[12]

---

[11] PAE Defendants' preferred authorities do not support finding otherwise. *Pro. Real Est. Invs. v. Columbia Pictures*, 508 U.S. 49 (1993) makes no findings about issue preclusion. *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295 (Fed. Cir. 2004) also does not involve issue preclusion—the Federal Circuit merely reviewed both a Rule 11 motion and a sham litigation claim concurrently, and made fact-intensive findings specific to that case, which the Court noted had a degree of overlap.

[12] Courts in other circuits have held similarly. *See, e.g., Faigin v. Kelly*, 184 F.3d 67, 79 (1st Cir.1999) ("The scope of a Rule 11 hearing is generally much more circumscribed than that of a trial or comparable proceeding."); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1196–97 (3d

Here too, Realtek did not previously have the occasion "to conduct discovery," to "present and cross-examine witnesses," or otherwise fully develop the facts and arguments surrounding *any* of the lawsuits that PAE Defendants brought pursuant to their Anticompetitive Litigation Bounty with Mediatek. *See Amwest*, 925 F.2d at 1165. PAE Defendants made sure of that by hastily dismissing over a dozen cases, including its cases against Realtek, once the Anticompetitive Litigation Bounty was discovered. Compl. ¶ 39. The Rule 11 proceedings were also subject to highly different stakes and remedies, and were in a different procedural stance than the current action. These differences strongly counsel against issue preclusion. *See, e.g.*, *Amwest*, 925 F.2d at 1165 (noting that Rule 11 motion was done without discovery or other aspects afforded of trials).

### c. Issues Were Not "Actually Litigated" or "Necessarily Decided"

Finally, not all factors relevant to whether a sham litigation exception applies were "actually litigated" or "necessarily decided" in the Parties' prior Rule 11 proceedings. Rule 11 is not coextensive with objective baselessness, and is certainly not coextensive with determining whether a defendant filed a series of lawsuits for an improper purpose without regards to the merits. *See Ni-Q, LLC*, 2019 WL 637703, at *9 (the Rule 11 factors were "not 'identical'" to finding defendant's conduct "was not objectively baseless" and did not result in the issue being "necessarily decided"). [13] Moreover, "[e]ven an ALJ's initial determination of infringement," *which PAE Defendants do not have*, "does not conclusively establish that the action is not a sham." *IPtronics*, 2015 WL 5029282, at *7 (internal quotations removed). Here too, the ITC's consideration of Realtek's sanctions motions do not constitute a decision on the merits of PAE Defendants' litigation.

### C. Realtek Plausibly Alleges Defendants Violated Section 2 of the Sherman Act

### 1. PAE Defendants' Status as a Competitor Is Irrelevant

It is well settled that a co-conspirator under Section 2 of the Sherman Act cannot avoid

---

Cir. 1993) (rejecting that two failed Rule 11 motions precluded the jury from inferring "malice" because "Rule 11 proceedings were limited in scope and did not constitute a full and fair litigation of the issues presented to the jury"); *Klayman v. Barmak*, 602 F. Supp. 2d 110, 117 (D.D.C. 2009) (sanctions motion does not provide "an opportunity to litigate fully—conduct discovery, present and cross-examine witnesses").

[13] *See also Magnetar Techs. Corp. v. Intamin, Ltd.*, No. SA CV 07-1052 DOC (ANx), 2008 WL 11338443 (C.D. Cal. Feb. 11, 2008) (denying issue preclusion because Rule 11 finding does not preclude the issue of whether patent case was "objectively baseless" for sham litigation).

antitrust liability because it is not a horizontal participant in the relevant market. *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995). Conspiracy to monopolize only requires "specific intent by Defendants to empower *one of them* with monopoly power." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1077 (N.D. Cal. 2014) (emphasis added). It does not require a finding that all co-conspirators are competitors when only one of them can be the alleged monopolist. For example, in *Curtin Maritime Corp v. Santa Catalina Island Co.*, the Ninth Circuit found that a Section 2 claim was adequately alleged where co-conspirators were a competing freight shipper and a vertically related seaport monopolist. 786 F. App'x 675 (9th Cir. 2019).[14]

### 2. Realtek Plausibly Alleges a Conspiracy and Specific Intent

Realtek has sufficiently alleged conduct to satisfy that PAE Defendants entered into a conspiracy with the specific intent to monopolize. To satisfy "specific intent", a plaintiff must only allege conduct which "has no legitimate business justification but to destroy or damage competition . . . ." *Oxbow Carbon & Mins. LLC v. Union Pac. R.R.*, 81 F. Supp. 3d 1, 14 (D.D.C. 2015). Realtek alleges that PAE Defendants entered into an Anticompetitive Litigation Bounty, which provided PAE Defendants with ██████████ in exchange for filing lawsuits ████████ ██████████, without regard to the merits of such actions. This agreement is, itself, evidence of anticompetitive intent, as numerous court orders have stated. Compl. ¶¶ 12-14.

In furtherance of Defendants' conspiracy, PAE Defendants brought multiple meritless patent infringement actions against Realtek, seeking to keep Realtek products off the market. PAE Defendants also filed two cases against another Mediatek competitor, Amlogic. Once the Anticompetitive Litigation Bounty was revealed, PAE Defendants quickly dismissed the claims. PAE Defendants' "irrational litigation conduct" also made clear that the litigation was not intended to seek legitimate redress; but rather was initiated to harass and impose costly burdens on Realtek. *See, e.g.*, *Hanover 3201 Realty*, 806 F.3d at 181 (Defendants' litigation tactics "suggest[ed] they

---

[14] *See also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1159 (reversing dismissal of claims where defendants included vertical and horizontal co-conspirators); *In re Wellbutrin XL Antitrust Litig.*, 2009 WL 678631, at *9 (E.D. Pa. Mar. 13, 2009) (conspiracy claim adequately pleaded where only one member was a participant in the market).

were more interested in delay than in redressing any grievances."). PAE Defendants' litigation also targeted "technology, components, and functions…essential for providing smart TV functionality." Compl. at 3-4. Realtek further alleges that PAE Defendants' insistence on pursuing meritless patent claims was driven by MediaTek's commercial imperative—██████████████ Compl. at 14.

These allegations are sufficient to show that PAE Defendants engaged in conduct that "has no legitimate business justification but to destroy or damage competition," thus sufficiently alleging specific intent. *Oxbow Carbon & Mins.*, 81 F. Supp. 3d at 14; *see also Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1042 (9th Cir. 2005), *vacated on other grounds*, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ("Anticompetitive conduct alone can satisfy the specific intent requirement if the 'conduct … is 'clearly threatening to competition or clearly exclusionary.'").[15]

PAE Defendants cannot sanitize their improper Anticompetitive Litigation Bounty by claiming (without basis) that such agreements are not "uncommon." *See* Dkt. 51 at 15-16. Notably, and unsurprisingly, neither of the cases PAE Defendants cite involved (nor condone) providing a large incentive payment to a third party for suing a competitor, and instead evaluated exclusive patent licenses that required the licensor to be the entity to sue potential infringers. In *Cataphote Corp. v. DeSoto Chem. Coatings*, 450 F.2d 769, 774 (9th Cir. 1971), the Ninth Circuit considered the assignment of a duty to enforce patents in an *exclusive* license agreement, finding that "the patentee would be in a much better position to handle the intricacies of patent litigation than would…the licensee." The Court also noted that an exclusive license would lose value if the underlying rights were not enforced against infringers. *Id.* The other case, *Kraly v. Nat'l Distillers*, 502 F.2d 1366, 1372 (7th Cir. 1974), likewise involved an exclusive license agreement that required the licensor to abate alleged infringement, if and when it arose. Both cases are wholly inapposite.

As a last ditch effort, PAE Defendants argue that they could not possibly have the specific

---

[15] Alternatively, for the same reasons, Realtek has also sufficiently alleged that the Anticompetitive Litigation Bounty was devised *for the purpose of* assisting MediaTek's attempt to monopolize, which is independently sufficient to allege IPVFL's specific intent. *See, e.g., In re Nat'l Football League's*, 933 F.3d at 1159 (9th Cir. 2019) ("agreements… designed to maintain market power" were "sufficient to allege defendants' specific intent.")

intent to monopolize because it is economically illogical for a PAE to want fewer competitors. Dkt. 51 at 16. However, this argument is belied by the fact that filing litigation would earn PAE Defendants ███████, regardless of outcome. It is easily plausible that this ██████████ ███████ was deemed better than the highly speculative lost licensing fees if Realtek ███████ were to go out of business before infringing one of PAE Defendants' patents.[16]

### 3. Realtek Plausibly Alleges Antitrust Injury

At the center of Defendants' scheme is an Anticompetitive Litigation Bounty in which MediaTek agreed to pay PAE Defendants to initiate patent litigation ████████████████ ████████████████████████████████████████ Compl. ¶ 6. MediaTek admits that ████████████████████████████████ *See* Dkt. 47-2 at 3-4 (████████████████████ ██████████████████). This is alone sufficient.

Moreover, Realtek has alleged a number of plausible bases sufficient to establish antitrust injury. Courts recognize "a variety of anticompetitive effects" as establishing antitrust injury, including: "(1) restrictions that prevent consumers from making free choices between market alternatives, (2) stymied innovation, (3) decreased product quality, and (4) supracompetitive prices." *Arista*, 2018 WL 11230167, at *20 (internal citations removed). Antitrust injury can occur where even a single "[competitor] was either driven out of business or suffered reduced profits because of the alleged anticompetitive acts of the attempted monopolist." *Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996), *as amended* (Jan. 15, 1997). The "threat" or risk of harm to competition can likewise establish antitrust injury. *See, e.g.*, *Funai Elec. Co. v. LSI Corp.*, No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) (antitrust injury adequately alleged where defendant "brought about and continues to threaten to bring about a significant threat of injury for downstream price, quality, and innovation competition," and "threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Defendants and decreases in innovation and quality competition for end products"). Courts have also held that "competition has been harmed"

---

[16] *Truck-Rail Handling v. Burlington N.*, 244 F. App'x 130, 132 (9th Cir. 2007), involved a determination on summary judgment based on the evidence specific to that case, and is inapposite.

when "customers have been denied the benefits of innovation and product development and lower prices." *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-03613 EJD, 2012 WL 2711040, at *7 (N.D. Cal. July 6, 2012); *see also Glen Holly Entm't Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (recognizing as antitrust harm "coercive activity that prevents its victims from making free choices between market alternatives").

Realtek has adequately pleaded antitrust injury through allegations of both actual and threatened harms to competition. Realtek alleges, for example, that PAE Defendants' sham litigation or the threat of it diverts resources for innovation by "increas[ing] Realtek's costs." Compl. ¶ 84.[17] Such conduct impacts not only consumer choice between competitors, but innovation and downstream costs; these impacts constitute antitrust injury. *See, e.g., Arista*, 2018 WL 11230167, at *20 (antitrust injury from conduct in connection with patent litigation included "diverted R&D resources," both from addressing "patent workarounds" and "drop in [plaintiff's] sales," which "interfered with [plaintiff's] ability to innovate and denied customers the benefits of innovation in the market") (internal quotations removed).[18] The Anticompetitive Litigation Bounty also targeted ███████████████████ the TV Chip market, accordingly, much of the harm stemming from Defendants' anticompetitive scheme applies with equal force to ████

The plausibility of these alleged harms is further bolstered by the unique features of the TV Chips market, such as customers' prioritization of supply reliability and the negative economic consequences of interruptions to that supply. *See* Compl. ¶ 51. Realtek has thus alleged facts showing "that [Defendants'] conduct restricted the customers from making free choices between different products"; and "[s]uch a restriction results in antitrust injury." *Arista*, 2018 WL 11230167, at *20 (denying defendant's motion for summary judgment where its "fear, uncertainty, and doubt"

---

[17] Realtek also alleges, for example, that Defendants' conduct "disrupted Realtek's relationships with customers and end users and threatened Realtek's reputation as a reliable supplier of chips." Compl. ¶ 70. And, that MediaTek leveraged PAE Defendants' sham litigation to coerce Realtek customer(s) and "compel[] their loyalty" through "bundled product offerings," Compl. ¶ 8.

[18] *See also Funai Elec.*, 2017 WL 1133513 ("threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Defendants and decreases in innovation and quality competition for end products"); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-03613 EJD, 2012 WL 2711040, at *7 (N.D. Cal. July 6, 2012) (competition harmed when customers are denied "benefits of innovation and product development and lower prices")

PLAINTIFF'S OPPOSITION TO PAE DEFENDANTS' MOTION TO DISMISS

campaign conducted in connection with patent litigation could cause antitrust injury from "lost sales due to customers' concerns" about the legal status of the underlying technology).  The market is also highly concentrated, with the top three players together accounting for roughly 85% market share.  Compl. ¶ 48.  Taking into account MediaTek's roughly 60% share of the market, ███████ ███████████ is likely to produce outsized harm to competition.

Realtek was also harmed by the disruption of Realtek's actual and prospective customer relationships from the sham litigation, which Mediatek has used to disparage Realtek.  Compl. ¶¶ 41-44, 69, 84.  Such "coercive activity that prevents its victims from making free choices between market alternatives" constitutes competitive harm. *Glen Holly*, 352 F.3d at 374; *Arista*, 2018 WL 11230167 (antitrust injury included "lost sales due to customers' concern" stemming from competitor's "fear, uncertainty, and doubt" campaign, alongside patent litigation).

### D.   Realtek's State Law Claims Should Not Be Dismissed or Stricken

#### 1.   Realtek's State Law Claims Do Not Arise From Protected Conduct

PAE Defendants' anti-SLAPP motion cannot succeed because none of Realtek's state law claims are meritless, for the reasons stated herein.  *See* Cal. Code Civ. Proc. § 425.16(a); *Baral v. Schnitt*, 1 Cal. 5th 376, 384 (2016) (the anti-SLAPP statute "only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.").

PAE Defendants' anti-SLAPP motion should additionally be denied because neither of Realtek's state law claims "arise from" protected conduct.  Allegations "that are merely incidental or collateral are not subject to an anti-SLAPP motion." *Baral*, 1 Cal. 5th at 394 (quotations omitted). "Allegations of protected activity that merely provide context, without supporting a claim for recovery," also "cannot be stricken under the anti-SLAPP statute." *Id*.

The Complaint alleges Defendants conspired to monopolize the market for chips used in smart TVs.  Defendants' conduct in furtherance of their anticompetitive scheme includes: entering into a secret Anticompetitive Litigation Bounty, Mediatek coercing customers to drop Realtek, and illegal bundling, among other conduct.  *E.g.*, Compl. ¶¶ 4-8, 43.  While PAE Defendants' sham litigation is a piece of the scheme, the gravamen of the wrongs complained of are based on unprotected conduct.  *See Intel Corp. v. Seven Networks, LLC*, 562 F.Supp.3d 454, 468 (N.D. Cal.

2021) (denying anti-SLAPP motion where "the heart of the suit was about the aggregation of patents, and the patent infringement suits were, in effect, secondary.").

Petitioning conduct also will not be protected where it is "illegal as a matter of law." *City of Montebello v. Vasquez*, 1 Cal.5th 409, 423 (2016). For example, if an "action meets the requirements for sham litigation . . . an Anti–SLAPP motion . . . will fail." *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1040 (C.D. Cal. 2007). Because Defendants' meritless litigation campaign constitutes sham litigation, it is likewise not protected conduct for anti-SLAPP purposes.

### 2. The Litigation Privilege Does Not Bar Realtek's Claims

Realtek's state law claims also are not barred by California's litigation privilege. Cal. Civ. Code § 47(b). Realtek's UCL claim under the unlawful prong is not subject to the litigation privileged because "the underlying unlawful conduct is not protected by the litigation privilege." *Nat. Immunogenics Corp. v. Newport Trial Grp.*, No. SACV 15-02034 JVS (JCGx), 2016 WL 11520711, at *15 (C.D. Cal. Aug. 1, 2016). California's litigation privilege is inapplicable to Realtek's federal antitrust claims, and therefore does not bar Realtek's UCL claim. *Id*.

The litigation privilege also does not bar Realtek's other state law claims, because those claims are based on Defendants' anticompetitive scheme, and PAE Defendants' meritless litigation campaign can therefore "be introduced as evidence of an overall course of anti-competitive conduct." *See Hynix*, 2006 WL 1883353 at *2; *see also Arista*, 2018 WL 11230167 at *9 (non-sham litigation considered as part of Defendant's broader anticompetitive conduct under UCL.)

### 3. Realtek Plausibly Pleads a UCL Claim

Realtek's Complaint plausibly alleges that Defendants violated both the unlawful and the unfair prong of the UCL. Realtek does not allege a separate claim under the fraudulent prong of the UCL, but includes PAE Defendants' deceitful litigation conduct for context, demonstrating Defendants' intent. *See, e.g.*, *Hanover 3201 Realty*, 806 F.3d at 181 (Defendants' litigation tactics "suggest[ed] they were more interested in delay than in redressing any grievances.").

### a. Realtek Satisfies the Unlawful Prong of the UCL

As explained in Section III.B., Realtek has plausibly alleged a violation of the federal antitrust laws, and has thus sufficiently stated a claim under the unlawful prong of the UCL. *See*

1  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

2                                    **b.    Realtek Satisfies the Unfair Prong of the UCL**

3          Realtek also adequately alleges that Defendants' conspiracy violated the unfair prong of the

4  UCL. Unfair conduct is "conduct that threatens an incipient violation of an antitrust law, or violates

5  the policy or spirit of one of those laws because its effects are comparable to or the same as a

6  violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal.

7  4th at 186–87. Coverage of the UCL is "sweeping." *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F.

8  Supp. 3d 1156, 1174 (N.D. Cal. 2015); *see also De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 986–

9  87 (2018) (An action is not barred "merely because some other statute on the subject does not, itself,

10  provide for the action or prohibit the challenged conduct."). In *Luxul*, for example, the Court found

11  the "unfair" prong met where the plaintiff alleged the defendant "wrongfully and unfairly

12  represented to third parties that [Plaintiff's] business and/or products are affected by legal issues

13  that do not exist" and which "resulted in lost customers and damaged the value of Plaintiff's brand."

14  78 F. Supp. 3d at 1174. Realtek has adequately alleged that Defendants engaged in anticompetitive

15  conduct, which includes Defendants' entering into an Anticompetitive Litigation Bounty, pursuant

16  to which PAE Defendants filed a series of patent litigation ███████████████

17                                                                                         Compl.

18  ¶¶ 4-7. And, as in *Luxul*, MediaTek was thereafter able to capitalize on the false perception of

19  uncertainty surrounding Realtek's ability to compete to disparage Realtek and convince at least one

20  of its customers not to use Realtek products. Compl. ¶ 8. The FTC policy statement further

21  confirms the adequacy of Realtek's unfairness allegations, as this conduct "tends to cause potential

22  harm similar to an antitrust violation." The unfair prong of the UCL is thus met.

23                                    **c.    Realtek Has Plausibly Alleged Its Injury under the UCL**

24          Realtek has adequately alleged its injury under the UCL. Realtek alleges an ongoing

25  conspiracy between Defendants, pursuant to which Realtek continues to suffer harm in the form of

26  unnecessary attorney's fees, and in the loss of customers and goodwill based on MediaTek's

27  strategic use of its co-conspirators anticompetitive litigation to disparage Realtek in order to

28  increase its market power. *See* Compl. ¶¶ 77-79. This is sufficient to state an injury under the UCL.

PLAINTIFF'S OPPOSITION TO PAE
                                                                    DEFENDANTS' MOTION TO DISMISS

*See Robinson v. U-Haul Co. of Cal.*, 4 Cal. App. 5th 304, 318 (2016) (former franchisee, who was previously sued by franchisor to enforce an illegal contractual provision, and had incurred fees and costs as a result, was sufficiently injured to have standing to bring a UCL claim for injunctive relief); *See also W. Air Charter, Inc. v. Schembari*, No. 2:17-cv-00420-AB (KSx), 2017 WL 7240775, at *5 (C.D. Cal. Dec. 14, 2017) (employee who incurred costs in defending against former-employer's enforcement of unlawful contractual provision had standing to bring UCL claim).

Realtek has been harmed and continues to be harmed by Defendants' conspiracy. PAE Defendants instituted a series of lawsuits against Realtek ███████ pursuant to their Anticompetitive Litigation Bounty with Mediatek. Realtek has incurred and continues to incur costs from PAE Defendants' meritless litigation,[19] which MediaTek continues to benefit from, as a means to disparage Realtek and steal Realtek's customers by creating a false sense of uncertainty around Realtek's business. MediaTek has already utilized PAE Defendants' meritless litigation for this purpose at least once before.[20] *See* Compl. ¶¶ 8, 42, 84. Realtek, accordingly, has standing to seek injunctive relief. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 13-cv-6001 SI, 2014 WL 2527221, at *2 (N.D. Cal. June 4, 2014) (standing to pursue injunctive relief met where there was "the possibility of a continuing anticompetitive conspiracy" given the past price-fixing agreement between competitors in an industry with high barriers to entry).

PAE Defendants continue to defend their conduct as not "uncommon or improper." *See* Dkt. 51 at 15. It is clear that they will not stop their behavior unless sanctioned by a court. Realtek has adequately alleged its injury and need for injunctive relief.

### 4. Realtek Has Plausibly Alleged Its Tortious Interference Claim

Realtek sufficiently alleges claims for both intentional and negligent interference with prospective economic advantage. The Complaint specifies that at least one buyer of Realtek TV

---

[19] Realtek continues to be harmed by PAE Defendants' litigation campaign, with litigation ongoing in Japan, and the need for appeal(s) to recover attorneys' fees from the cases that were dropped.

[20] Moreover, the depth of misconduct is not yet fully known. For example, the bounty agreement could have been altered or extended, or other bounty agreements may exist. PAE Defendants also rapidly disposed of a dozen other lawsuits shortly after the Anticompetitive Litigation Bounty was discovered, further indicating that their unlawful conduct is likely much wider ranging than presently known. It is also unknown whether the bounty has been paid out yet.

Chips, but for Defendants' conduct, would have purchased from Realtek "additional TV Chips during the pendency of PAE Defendants' meritless lawsuits." Compl. ¶ 84. Contrary to PAE Defendants' suggestion, Realtek is not required to name specific customers in the Complaint; it is enough to allege "a limited group of customers whose identities should be in [a defendant]'s possession, or could be obtained through discovery." *Oracle Am., Inc. v. CedarCrestone, Inc.*, No. 12-CV-04626 NC, 2013 WL 3243885, at *4 (N.D. Cal. June 26, 2013).

The Complaint also sufficiently pleads disruption to these relationships. Among other things, the Complaint describes (1) competition to supply TV Chips for use in smart TVs; (2) TV Chip buyers' sensitivities to the supply-chain uncertainties implied by patent litigation, as previously expressed; (3) that MediaTek "sought to create doubt regarding the availability of TV Chips from Realtek" which "unfairly limited customers' and end users' ability to rely on Realtek for TV Chips and thus harmed competition for TV Chips"; (4) that "MediaTek used Realtek's involvement in patent litigation as a basis to coerce at least one customer, and perhaps more, not to use Realtek products"; (5) MediaTek's highlighting litigation against Realtek to "a large TV brand" to convince that brand "to stop designing Realtek products into their TVs"; (6) Realtek's belief that it has lost business in the past due to concerns about patent cases involving Realtek's TV Chips; and (7) MediaTek's agreement to pay PAE Defendants to bring meritless litigation against Realtek. *Id.* ¶¶ 8, 37-38, 48-49, 51, 64, 69, 78, 84. Realtek does not need to allege a decrease in sales, as PAE Defendants suggest. Dkt. 51 at 24. The Complaint alleges that Realtek lost out on prospective sales even if its overall sales numbers did not decrease. *See, e.g.*, Compl. ¶ 84 ("Realtek would have sold additional TV Chips during the pendency of Future Link's meritless lawsuits.").

The Complaint also pleads PAE Defendants' knowledge of Realtek's relationships with its TV Chip customers, and such knowledge can reasonably be inferred from Defendants' litigation and attempts to seek license agreements from participants in that market. Compl. ¶¶ 15-16, 21, 26-28, 31, 33-35, 37, 75 n.24, 84. "[G]eneral knowledge that [the plaintiff] had economic relationships with it customers is sufficient to satisfy this element." *Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148, 1162-63 (C.D. Cal. 2010). Moreover, negligent interference requires even less—requiring only that a defendant knew *or should have known* of the disrupted relationship. *See Nelson v.*

*Tucker Ellis, LLP*, 48 Cal. App. 5th 827, 844 (2020).  In any event, as MediaTek's co-conspirators, PAE Defendants would still be liable even if they did not individually have the requisite knowledge.  *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994).

Realtek alleges that Defendants engaged in a multi-faceted scheme, whereby Mediatek hired PAE Defendants as its henchmen to file a campaign of litigation (regardless of its success or merits) against ████████████████████████████████████████████████████████, among other anticompetitive acts, in violation of federal antitrust and California unfair competition law.  Compl. ¶¶ 26-37, 72-97.  This conduct is independently wrongful. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003) ("[A]n act is independently wrongful . . . if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard"); *see also Reid-Ashman Mfg, Inc. v. Swanson Semiconductor Serv., L.L.C.*, No. C-06-4693 JCS, 2007 WL 1394427, at *12 (N.D. Cal. May 10, 2007).[21]

### E.    Realtek Is Entitled to Amend Its Complaint

"Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 541 (9th Cir. 2022).  There is no basis for PAE Defendants move to seek dismissal of Realtek's complaint with prejudice.  Indeed, PAE Defendants' selective inclusion of sealed filings from prior proceedings has provided the Court with an incomplete and distorted record.  Namely, due to the operative protective order, PAE Defendants can attach confidential documents when doing so would be favorable, while simultaneously preventing Realtek from attaching confidential documents that may be harmful.  If the Court dismisses the Complaint, Realtek should be granted leave to amend, and the Court should issue an order permitting cross use of all documents that are part of the prior patent proceedings involving PAE Defendants, to prevent prejudice to Realtek.

## IV.    CONCLUSION

For the foregoing reasons, PAE Defendants' Motion should be denied in its entirety.

---

[21] PAE Defendants' preferred cases are inapposite.  In *Sybersound*, plaintiff simply asserted, without more, that it "its ongoing business and economic relationships with Customers ha[d] been disrupted." 517 F.3d at 1151.  *PG&E v. Bear Stearns*, 50 Cal. 3d 1118, 1137 (1990) concerned conduct based solely on non-sham litigation; here, Realtek alleged an anticompetitive scheme.

DATED:  September 28, 2023

Respectfully submitted,

By:   /s/ Rudy Y. Kim

*Attorneys for Plaintiff Realtek Semiconductor Corp.*

RUDY Y. KIM (SB# 199426)
rudykim@paulhastings.com
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
Tel: (650) 320-1800
Fax: (650) 320-1900

MICHAEL F. MURRAY *(pro hac vice)*
michaelmurray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700
Fax: (202) 551-0460

NOAH B. PINEGAR *(pro hac vice)*
noahpinegar@paulhastings.com
ERIC W. LIN *(pro hac vice)*
ericlin@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6000
Fax: (212) 319-4090

ABIGAIL H. WALD (SB# 309110)
abigailwald@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA  94111
Tel: (415) 856-7000
Fax: (415) 856-7100