UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALTEK SEMICONDUCTOR CORP., <br><br> Plaintiff, <br><br> v. <br><br> MEDIATEK, INC., et al., <br><br> Defendants. | Case No. 23-cv-02774-PCP <br><br> **ORDER GRANTING MOTIONS TO DISMISS AND TO STAY, GRANTING MOTION TO SEAL IN PART, AND DENYING MOTION TO STRIKE** <br><br> Re: Dkt. Nos. 48, 51, 77, 78, 94 |

In this antitrust action, plaintiff Realtek Semiconductor Corp. alleges that defendants MediaTek, Inc., IPValue Management Inc., and Future Link Systems, LLC entered into a patent licensing agreement that included a provision incentivizing Future Link to pursue meritless patent litigation against Realtek. According to Realtek that conduct, together with MediaTek's communications with at least one of Realtek's customers to prevent them from incorporating Realtek's TV chips into its products, caused anticompetitive harm in violation of state and federal law.

Defendants move to dismiss Realtek's claims under Rule 12(b)(6), contending that Realtek's complaint fails to state any valid causes of action. IPValue and Future Link also move to strike Realtek's state law claims under California Code of Civil Procedure § 425.16. For the following reasons, the Court grants defendants' motions to dismiss with leave to amend and denies, without prejudice, IPValue and Future Link's motion to strike. The Court grants defendants' consolidated motion to seal in part and grants defendants' motions to stay discovery pending the filing an answer to any amended complaint Realtek might file.

# Background

### A.    Facts[1]

Realtek is a corporation organized under the laws of Taiwan and "the eighth largest integrated [semiconductor c]hip design house" in the semiconductor industry. Compl., Dkt. No. 1 ¶¶ 1, 3, 11. MediaTek is another Taiwanese organization, with two U.S. subsidiaries headquartered in San Jose, CA. *Id.* ¶ 12. Mediatek is "one of the largest companies in the world" within the semiconductor industry and "the fourth largest designer of integrated circuits … in the world, and for some types, the largest." *Id.* ¶ 2. MediaTek possesses roughly sixty percent share in the global market for television chips. *Id.* ¶ 48.

Defendant IPValue is a Delaware corporation headquartered in Santa Clara, California. Compl. ¶ 13. Defendant Future Link, a wholly owned subsidiary of IPValue, is a Delaware limited liability company headquartered in Santa Clara County, California. *Id.* ¶¶ 14, 16. Realtek alleges that Future Link is a patent assertion entity (PAE) that "acquire[s] patents that are often abandoned by their original assignees because the technology is outdated or they otherwise lack value" and then "tr[ies] to exploit such patents to pursue royalties or extortionary litigation." *Id.* ¶¶ 4, 15.

Realtek's complaint alleges that in May 2019, Future Link entered into a patent license agreement with MediaTek that included a litigation bounty provision incentivizing Future Link to pursue meritless patent litigation against Realtek. Compl. ¶¶ 36–38. In particular, the May 2019 licensing agreement included the following provision:

> In addition to the above 3 payments, [MediaTek] shall pay an additional $1.0 million U.S. dollars on 15 February 2022 if [FutureLink], prior to 01 January 2022, either executes a patent license agreement with or institutes litigation against one or more of the following companies: (a) Realtek Semiconductor Corporation, or (b) Amlogic.

Dkt. No. 47-3, at 30 (Schedule B).[2] Realtek alleges that, after entering into the licensing agreement

---

[1] For purposes of defendants' Rule 12(b)(6) motion, the Court assumes the truth of the allegations in Realtek's complaint.

[2] Although Realtek did not include the specific text of this provision in its complaint, the complaint references and relies upon the licensing agreement, which is thus incorporated therein and properly considered on defendants' Rule 12(b)(6) motions. *Khoja v. Orexigen Therapeutics,*

2

with MediaTek and due to the incentive to litigate created thereby, Future Link and IPValue pursued four lawsuits against Realtek.

First, Future Link sued Realtek in the Western District of Texas in April 2021 accusing Realtek of infringing its '680 patent and seeking an injunction removing Realtek products from the market. Compl. ¶¶ 26–28. Realtek asserts that there were multiple "fatal defects" in that litigation and that Future Link failed to cure those deficits in amending its complaint. *Id.* ¶¶ 29–30. After the filing of Future Link's lawsuit, Realtek sought *inter partes* review of the '680 patent by the Patent Trial and Appeal Board. In January 2023, the PTAB found claim 1 and several other claims of the '680 patent unpatentable. *Id.* ¶ 33.

Second, Future Link filed another lawsuit in the Western District of Texas in December 2021 alleging infringement of two other patents (the '439 Patent and '614 patent). Compl. ¶ 31. According to Realtek, this litigation was also meritless and "disregarded the patentees' actual and constructive knowledge that the patents were invalid." *Id.* ¶¶ 32–33. The '439 patent, Realtek alleges, was previously subject to an IPR petition instituted by Intel prior to Future Link's commencement of the lawsuit. According to Realtek, Future Link only avoided a finding of unpatentability in that IPR proceeding by entering into a settlement with Intel prior to a final determination. *Id.* ¶ 34. In June 2022, Realtek filed an IPR petition challenging the '614 patent, and Future Link thereafter voluntarily cancelled all claims of that patent, resulting in the PTAB denying institution of IPR. *Id.* ¶ 34.

Future Link subsequently voluntarily dismissed the Western District litigation on the basis of a third-party settlement. Dkt. 49-5, at 9. The court denied Realtek's subsequent motion for sanctions and attorneys' fees but converted the dismissal from a dismissal without prejudice to a dismissal with prejudice. Dkt. 49-7, at 18.

Third, Future Link alleged infringement of the same two patents at issue in the second

---

*Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). At the hearing on defendants' motions, the Court orally denied defendants' request to maintain the terms of this provision under seal based on the provision's centrality to the issues presented in this lawsuit. *See, e.g.*, *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*, at *8 (C.D. Cal. Mar. 30, 2017) (declining to seal information that formed "the core of [plaintiff's] antitrust claims … and [was] therefore essential to enable the public to understand these proceedings").

Western District of Texas lawsuit (the '439 Patent and '614 patent) in a complaint filed with the International Trade Commission in late December 2021. Compl. ¶ 31. Future Link sought an order excluding Realtek products, including those products identified in the first lawsuit, from the U.S. market. *Id.*.

Fourth, Realtek alleges that IPValue recently initiated "what appears to be yet another meritless litigation in Japan, accusing some of the same Realtek products of infringement, this time through another one of its PAE subsidiaries, Monterey Research, LLC." Compl. ¶ 40.

Realtek alleges that in addition to these four proceedings involving Realtek, Future Link in 2021 brought costly patent claims against Amlogic Holdings, another MediaTek competitor. Compl. ¶ 35 & n.13. Realtek asserts that after an ITC ALJ issued an April 2022 order describing the litigation incentive in its agreement with MediaTek, Future Link "hurriedly resolved more than a dozen pending patent infringement claims against ten different technology companies, including its claims against Amlogic." *Id.* ¶ 39 (citing *Certain Integrated Circuit Products and Devices Containing the Same*, ITC Inv. No. 337-TA-1295).

According to Realtek, "Future Link's insistence on pursuing meritless patent claims, on information and belief, was driven by MediaTek's commercial imperative—to harm its Chip rivals." Compl. ¶ 38. Realtek notes that the ALJ at the ITC described the license agreement's provision rewarding Future Link for pursuing litigation as "untoward and actionable," and that the Western District of Texas agreed with assertions by Realtek's counsel that the contract was "improper" and "should be discouraged as a matter of public policy." *Id.* ¶ 37.

Realtek premises its claims on both this litigation and other purportedly anticompetitive conduct by MediaTek. It alleges on information and belief that MediaTek "coerced at least one TV Chip customer not to incorporate Realtek TV Chips into its products due to Realtek's involvement in patent litigation" Compl. ¶ 42. Realtek further alleges that "Mediatek has used illegal bundling to maintain or grow its market share in one or more Chip market segments, including through its dominance in the TV chip market." *Id.* ¶ 43. According to Realtek, these acts were undertaken "with the specific aim of restricting the growth of its rivals, including Realtek, to the detriment of customers and the public." *Id.* ¶ 44.

According to Realtek, defendants' alleged conduct was a "multifaceted scheme" by MediaTek that caused anticompetitive harm. Compl. ¶ 63. Realtek contends that Future Link "sought to extract money from Realtek through threats of never-ending litigation, by harassing customers and end users, and by creating the harmful illusion of supply chain uncertainties in an already constrained industry. *Id.* ¶ 68. It also alleges that Future Link sought to use litigation "to bar Realtek from selling its TV Chips and in essence shut Realtek out of the TV Chip market, presumably at the behest of MediaTek." *Id.* ¶ 67

### B. Procedural History

Realtek filed this antitrust lawsuit against the three defendants on June 6, 2023. It asserted three causes of action against all defendants: (1) unfair competition under Cal. Bus. & Prof. Code §§ 17200 (Count I); (2) tortious interference with prospective economic advantage under California common law (Count II); and (3) conspiracy to monopolize the market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count III). Realtek asserted against MediaTek alone a fourth cause of action for attempted monopolization in violation of Section 2 of the Sherman Act. Realtek sought treble damages as well as declaratory and injunctive relief.

All defendants now move to dismiss Realtek's complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Future Link and IPValue additionally move to strike Realtek's state law claims pursuant to California Code of Civil Procedure § 425.16. Defendants also move the Court to stay discovery in these proceedings pending a decision on the motion to dismiss. At the hearing on defendants' motion, the Court orally granted a stay of discovery through the issuance of a written decision and informed the parties that it would address whether any further stay of discovery was appropriate in its decision.

## Legal Standard

A complaint that does not state a plausible claim upon which relief can be granted can be dismissed under Federal Rule of Civil Procedure 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "can provide the framework of a complaint" but "must be supported by factual allegations." *Id.* at 679. The

Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). But there are two exceptions.

First, Federal Rule of Evidence 201 permits judicial notice of "a fact that is not subject to reasonable dispute" because the fact is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A court may take notice of "*undisputed* matters of public record," but not of "disputed facts stated in public records." *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001) (emphasis in original). Thus, "when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion." *Id.* (cleaned up).

Second, the doctrine of incorporation by reference permits a court to treat an extrinsic document as if it were part of the complaint if the pleading "refers extensively to the document" or if "the document forms the basis" of a claim. *Khoja*, 899 F.3d at 1002. Incorporation can be proper "when assessing the sufficiency of a claim requires that the document at issue be reviewed," but is not warranted when "the document merely creates a defense to the well-pled allegations." *Id.* Incorporation by reference "is designed to prevent artful pleading by plaintiffs" but should not be used as a "tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.* at 1003.

**Analysis**

**I.     Defendants' Requests for Judicial Notice Are Granted.**

In support of their motions to dismiss, the defendants have requested judicial notice of various documents. All three defendants ask the Court to take judicial notice of the proceedings in the Western District of Texas and ITC, including various dockets and filings therein. MediaTek additionally asks the Court to take judicial notice of its licensing agreement with Future Link and of a Federal Trade Commission (FTC) policy statement. The Court grants defendants' requests for judicial notice because each of the documents at issue is either incorporated by reference into

1  Realtek's complaint or available from a source whose accuracy cannot reasonably be questioned.

2  Fed. R. Evid. 201(b). While the Court takes judicial notice of the existence and content of the

3  documents at issue, it will not take judicial notice of the underlying truth of any factual assertions

4  therein.

## II.     *Noerr-Pennington* Immunity Bars Realtek's Claims.

In moving to dismiss Realtek's Sherman Act claims, defendants primarily argue that the conduct on which those claims are premised involved First Amendment-protected petitioning that cannot form a basis for federal antitrust claims or related state-law claims under the so-called "*Noerr-Pennington*" doctrine. *See, e.g.*, *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70 (1965); *Eastern R. R. Presidents Conf. v. Noerr Motor Freight Inc.*, 365 U.S. 127, 135–40 (1961). The Court agrees.[3]

The *Noerr-Pennington* doctrine "allows private citizens to exercise their First Amendment rights to petition the government without fear of antitrust liability." *Kaiser Found. Health Plan, Inc. v. Abbott Lab'ys, Inc.*, 552 F.3d 1033 (9th Cir. 2009). Under *Noerr-Pennington*, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). Courts must "construe federal statutes so as to avoid burdening the conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise." *Id.* This immunity can extend to state law claims as well. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) ("*Noerr–Pennington* doctrine applies to … state law tortious interference with prospective economic advantage claims.").

"In determining whether the burdened conduct falls under the protection of the Petition Clause," courts must "give adequate 'breathing space' to the right to petition." *Sosa*, 437 F.3d at 931–32. The alleged conduct that forms the basis for Realtek's claims here includes Future Link's

---

[3] Defendants also challenge the plausibility of Realtek's allegations regarding attempted monopolization and conspiracy to monopolize and contend that Realtek failed to plead antitrust injury. Although their arguments appear compelling in certain respects, the Court will not address them given that *Noerr-Pennington* provides an independent basis for dismissing all claims.

7

actual patent litigation, the license agreement provision requiring MediaTek to pay an additional one million dollars upon the initiation of a lawsuit against Realtek or another of MediaTek's competitors, and MediaTek's alleged statements to a customer about that litigation. *See* Dkt. No. 47-2, at 15–21 (MediaTek); Dkt. No. 57-10, 14–22 (Future Link).[4] Because initiating and participating in litigation is one method of petitioning the government, litigation-related conduct falls within the scope of *Noerr-Pennington*.

Crucially, the protection afforded by *Noerr-Pennington* is not limited to active litigation. Instead, both the Supreme Court and the Ninth Circuit have "reject[ed] burdens on the right to petition the courts even where no actual litigation was pending." *Sosa*, 437 F.3d at 937. In *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), for example, the Ninth Circuit held that *Noerr-Pennington* immunity extended to a defendant who had funded anticompetitive litigation but was not a party to that litigation and therefore had not petitioned the courts directly. Similarly, in *Sosa v. DIRECTV*, the Ninth Circuit held that *Noerr-Pennington* immunity extends to "litigation-related activities preliminary to the formal filing of the litigation." 437 F.3d at 937.

Realtek concedes that "*Noerr-Pennington* may insulate certain pre-suit demand letters and third party funding for litigation," but argues that the non-litigation conduct at issue here was not "incidental" to litigation and therefore was not protected. Realtek instead compares the license agreement's litigation bounty to settlement agreements that courts subject to antitrust scrutiny notwithstanding their origin in litigation. Dkt. No. 64-2, 13; Dkt. No. 66-2, 14 (citing in part *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013); *United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963)). Realtek's argument, however, cannot be squared with the Ninth Circuit's decision in *Liberty Lake*. In that case a third-party major shareholder of a company that owned shopping centers "prompted and paid for" "a last-minute appeal to the Spokane Board of County Commissioners" and "litigation in the Washington state courts alleging that the Liberty Lake

---

[4] Realtek contends in passing that MediaTek has used "bundled product offerings" to "coerce" customers not to use Realtek's processors. Compl. ¶¶ 8, 43. It is unclear whether Realtek is basing any of its claims on that allegation, and its bare and conclusory allegations with respect to that issue would in any event be insufficient to state a valid claim.

8

1  zoning plan violated Washington's Environmental Policy Act." 12 F.3d at 156. In a subsequent
2  antitrust action, the plaintiff alleged that "these parties conspired to mount a frivolous
3  environmental challenge to Liberty Lake's plan to develop its tract of land …" *Id.* The Ninth
4  Circuit affirmed the district court's dismissal of the plaintiff's claim, concluding that the
5  defendant's funding for third-party litigation was "immune from antitrust liability under the
6  *Noerr-Pennington* doctrine." *Id.* at 156, 160.

7  The circumstances here are no different. MediaTek prompted and paid for litigation against Realtek by a third party by including the incentive clause in its licensing agreement with Future Link. Under *Liberty Lake*, an agreement like this that promotes and promises payment in support of litigation is "sufficiently related to petitioning activity" to be protected by *Noerr-Pennington*. *Sosa*, 437 F.3d at 935. Realtek's cited cases involving settlement agreements are inapposite, as they stand for the simple proposition that the mere fact that an agreement was reached to settle litigation will not immunize terms governing *non-petitioning* activity from antitrust scrutiny.

Realtek separately contends that MediaTek's disparaging communications with Realtek's customers are not protected because they did not affect or advance Future Value's litigation. Dkt. No. 64-2, at 14–15; Dkt. No. 66-2, 15–16 (citing *Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450_WHO, 2021 WL 4932734, at *7–9 (N.D. Cal. Sept. 14, 2021)). The Ninth Circuit has explained that "in the litigation context, not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit' is protected by the *Noerr-Pennington* doctrine." *Sosa*, 437 F.3d at 934. Accordingly, "communications between private parties are sufficiently within the protection of the Petition Clause to trigger the Noerr–Pennington doctrine, so long as they are sufficiently related to petitioning activity." *Id.* at 935.

By Realtek's own allegations, the purportedly anticompetitive communications between MediaTek and third parties all involved the ongoing patent litigation between Realtek and Future Link. The communications were thus "related" to that petitioning activity and are protected by *Noerr-Pennington* to the extent that they contributed to Future Link's litigation efforts.[5] But given

---

[5] For largely the same reasons, Realtek's state law claims may be barred by California's litigation

that MediaTek was not a party to that litigation, it is unclear how its communications could have contributed to the litigation. Even if MediaTek's communications with third parties were too peripheral to the Future Link litigation to justify application of *Noerr-Pennington*, however, Realtek's sparse allegations—which do not identify any of the specific third parties with whom MediaTek communicated or the specific contents of those communications—fail to state a plausible claim for relief or provide defendants with notice sufficient to permit their preparation of a defense.

That conduct falls within the scope of *Noerr-Pennington* does not necessarily preclude Realtek's claims. "Neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them." *Sosa*, 437 F.3d at 932; This "'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (emphasis in original).

The Ninth Circuit recognizes three situations where the sham exception applies:

> [F]irst, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of law-suits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; and third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

*Abbott Lab'ys*, 552 F.3d at 1045 (quoting *Sosa*, 437 F.3d at 938).

The Ninth Circuit applies a "a strict two-step analysis to assess whether a single action constitutes sham petitioning. This inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810–11 (9th Cir. 1994).

---

privilege. *See* Cal. Civil Code § 47. Realtek's tortious interference claim separately fails under Rule 12(b)(6) because Realtek's Complaint does not identify any specific prospective customer whose business relationship with Realtek was harmed by defendants' purported interference.

The Ninth Circuit applies a different test to evaluate the sham litigation exception involving a series of lawsuits.

> When dealing with a series of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?

*Id.* at 11.

Realtek argues that the sham series exception applies to its claim because Future Link filed "multiple lawsuits for an improper purpose regardless of merit." Dkt. No. 64-2, 15–18; Dkt. No. 66-2, at 16–18 (citing *USS-POSCO*).[6] There are three problems with Realtek's argument.

First, Realtek's allegation that the defendants conspired to monopolize the market for TV semiprocessors is premised on the litigation incentive in their license agreement. By the agreement's own terms, however, MediaTek owed Future Link the full amount of the incentive upon the filing of a *single* initial lawsuit against Realtek. The litigation incentive therefore did not provide Future Link or IPValue with any reason to pursue a series of additional lawsuits against Realtek, and Realtek has not alleged other facts plausibly explaining why or how MediaTek caused Realtek to initiate the subsequent lawsuits.

Second, it is doubtful that the number of actions here is sufficient to constitute a "series" for purposes of the sham exception. The Complaint alleges that Future Link filed two patent infringement suits against Realtek in the Western District of Texas and a related action before the International Trade Commission (ITC), and that Future Link filed an infringement action in Japan through a subsidiary, Monterey Research LLC. Compl. ¶¶ 26, 31, 40. The Ninth Circuit has held that "[t]wo sham suits cannot amount to 'a whole series of legal proceedings' or a 'pattern of baseless, repetitive claims.'" *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, 863 F.3d 1178, 1187 (9th Cir. 2017); *cf. USS-POSCO*, 31 F.3d at 811 (suggesting that sham series

---

[6] Realtek does not argue that the "single action" exemption applies to its claims. Indeed, given that MediaTek licensed the patents at issue in the four proceedings from Future Value, it seems unlikely that MediaTek itself considered them invalid or unenforceable.

1  exception was potentially applicable where union filed twenty-nine lawsuits against plaintiff in
2  many different fora). Although this matter involves four proceedings, the underlying claims arise
3  from only three patents, two of which were asserted side-by-side.

4        The purpose of the series exception is to protect parties from the "crushing burden" that a
5  sham litigation strategy can exact upon targeted business. *USS-POSCO*, 31 F.3d at 811. But the
6  four matters identified by Realtek do not appear to have imposed a "crushing burden" on the
7  company's business operations. *Cf.* Compl. ¶ 70 (alleging only that "IPValue's and Future Link's
8  demands for royalties and meritless litigation have imposed significant time and monetary burdens
9  on Realtek since April 2021") (emphasis added). Realtek does not contend, for example, that the
10 litigation directly interfered with its ability to do business. *Cf. Cal. Motor Transport Co. v.*
11 *Trucking Unlimited*, 404 U.S. 508, 509 (1972) (describing defendants' use of meritless
12 proceedings to prevent plaintiffs from "acquir[ing] operating rights or … transfer[ing] or
13 register[ing] those rights").

14       Third, the sham exception "encompasses situations in which persons use the governmental
15 *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Omni*
16 *Outdoor Advert.*, 499 U.S. at 380 (emphasis in original); *see also USS-POSCO*, 31 F.3d at 811
17 (when considering "series" version of the sham exception to *Noerr-Pennington*, courts ask if "the
18 legal filings [were] made, not out of a genuine interest in redressing grievances, but as part of a
19 pattern or practice of successive filings undertaken essentially for purposes of harassment").
20 Realtek's allegations suggest, however, that the defendants genuinely desired the relief sought in
21 the four proceedings. *See, e.g.*, Compl. ¶ 65 ("To MediaTek's benefit, Future Link sought
22 injunctions and an exclusion order limiting Realtek's ability to make and sell Chips that
23 incorporated the allegedly infringing technologies, including its TV Chips, and prohibiting
24 outright Realtek's end users from importing into the United States devices that include the accused
25 technologies within Realtek's TV Chips."). To evade *Noerr-Pennington*, Realtek must identify the
26 specific ways in which the defendants used the litigation itself—rather than the relief sought
27
28

therein—as an "anticompetitive weapon," but Realtek has not done so in the existing Complaint.[7]

For these reasons, the "sham series" exception to *Noerr-Pennington* does not apply to the defendants' litigation-related conduct, and *Noerr-Pennington* bars each of the claims asserted in Realtek's Complaint. *See Theme Promotions*, 546 F.3d at 1007 ("[B]ecause *Noerr–Pennington* protects federal constitutional rights, it applies in all contexts, even where a state law doctrine advances a similar goal.").[8] The Court therefore grants defendants' motions to dismiss with leave to amend.

### III. Future Link and IPValue's Anti-SLAPP Motion Is Denied Without Prejudice.

In addition to moving to dismiss Realtek's complaint pursuant to Rule 12(b)(6), Future Link and IPValue ask the Court to strike Realtek's Complaint under California's "anti-SLAPP" statute.[9] That law provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is "subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16. The statute facilitates "the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Club*

---

[7] Invoking *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Call. 2007), Realtek contends that even if no sham exception applies, litigation can provide a basis for antitrust liability notwithstanding *Noerr-Pennington* if it is part of a broader anticompetitive scheme. Dkt. No. 64-2, at 20–21. It is unclear that such a theory actually provides an exception to *Noerr-Pennington*. *See Hynix*, 527 F. Supp. 2d at 1096–98. Even if it does, however, the theory applies only where the core of the alleged anticompetitive scheme falls outside of *Noerr-Pennington* and litigation is simply a means of furthering that core conduct. *Id*. Here, the core of the alleged scheme is the litigation itself not some entirely distinct conduct whose consequences were furthered through litigation.

[8] Although *Theme Promotions* specifically addressed only whether *Noerr-Pennington* applied to tortious interference with prospective economic advantage claims, its holding would appear to apply with equal force to claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. In any event, Realtek premises its UCL claim on the theory that defendants' alleged conduct constituted an actual or incipient antitrust violation or violated the spirit of antitrust law. Because *Noerr-Pennington* categorically immunizes defendants' alleged conduct from antitrust scrutiny, it cannot be deemed a UCL violation for any of those reasons.

[9] "SLAPP" is an acronym for the phrase "strategic litigation against public participation."

*Members for an Honest Election v. Sierra Club*, 45 Cal. 4th 309, 315 (2008).

"Motions to strike a state law claim under California's anti-SLAPP statute may be brought in federal court." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003). To the extent that the anti-SLAPP statute's provision conflict with the Federal Rules of Civil Procedure, however, the Federal Rules apply. *See, e.g.*, *Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) (concluding that district courts can defer ruling upon an anti-SLAPP motion until after an amended complaint has been filed because "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment"); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (concluding that Cal. Code Civ. Proc. 425.16(f) does not apply in federal court proceedings because it conflicts with Rule 56(f)).

"The analysis of an anti-SLAPP motion proceeds in two steps: First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." *Barry v. State Bar of Cal.*, 2 Cal. 5th 318, 321 (2017) (citations and alterations omitted).

For the same reasons Future Link's alleged conduct is protected by *Noerr-Pennington*, the claims in this case likely arise from First Amendment-protected conduct for the purposes of the anti-SLAPP statute. And because Realtek's Complaint fails to state a valid claim, Realtek has not demonstrated a probability of succeeding on its claims. Nonetheless, given Rule 15's "policy favoring liberal amendment," the Court will defer any ruling under the anti-SLAPP statute until after Realtek has been afforded an opportunity to amend. *See Covad Commc'ns*, 377 F.3d at 1091. Should Realtek file an amended complaint, Future Link may file a renewed motion to strike the amended complaint. Should Realtek not do so, Future Link may renotice its motion and the Court will decide it without further briefing.

**IV.  Discovery Will Be Stayed Through the Filing of an Answer.**

Defendants have moved the Court to stay discovery in these proceedings while the parties

brief the legal sufficiency of Realtek's allegations. For the following reasons, the Court concludes that a stay of discovery pending the filing of an answer to any amended complaint is warranted here.[10]

"The Federal Rules of Civil Procedure do not provide for automatic or blanket stays of discovery when a potentially dispositive motion is pending." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, No. 20-CV-00363-BLF, 2020 WL 2843369, at *1 (N.D. Cal. Apr. 10, 2020). District courts nonetheless have "wide discretion in controlling discovery." *Little v. City of Seattle*, 863 F.2d 681, 685 (1988). "The district court has considerable latitude under Fed. R. Civ. Pro. 26(c) to craft protective orders during discovery. Such orders are only appropriate, however, upon a showing of 'good cause' by the party seeking the order. A party seeking a stay of discovery carries the heavy burden of making a 'strong showing' why discovery should be denied." *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990). "This often occurs where the party seeking a stay raises jurisdictional or immunity issues." *Calvary Chapel San Jose v. Cody*, No. 20-CV-03794-BLF, 2021 WL 5353883, at *1 (N.D. Cal. Nov. 12, 2021).

Courts in this district have applied a two-part test to determine whether to stay discovery pending the resolution of a dispositive motion.[11] "First, a pending motion must be potentially dispositive of the entire case, or at least dispositive on the issue at which discovery is directed. Second, the court must determine whether the pending motion can be decided absent additional discovery. If the Court answers these two questions in the affirmative, a protective order may issue. However, if either prong of this test is not established, discovery proceeds. In applying this two-factor test, the court must take a preliminary peek at the merits of the pending motion to assess whether a stay is warranted." *Reveal Chat Holdco*, 2020 WL 2843369, at *2 (cleaned up).

---

[10] As noted above, at the hearing on defendants' motions the Court orally granted a stay of discovery through the issuance of this decision.

[11] *See, e.g.*, *Calvary Chapel San Jose v. Cody*, No. 20-CV-03794-BLF, 2021 WL 5353883, at *1 (N.D. Cal. Nov. 12, 2021); *Singh v. Google, Inc.*, No. 16-CV-03734-BLF, 2016 WL 10807598, at *1 (N.D. Cal. Nov. 4, 2016); *Gibbs v. Carson*, No. C13-0860 TEH (PR), 2014 WL172187, at *3 (N.D. Cal. Jan. 15, 2014); *Hamilton v. Rhoads*, No. C 11-0227 RMW (PR), 2011 WL 5085504, at *1 (N.D. Cal. Oct. 25, 2011); *Pac. Lumber Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 220 F.R.D. 349, 351 (N.D. Cal. 2003).

Given that the Court grants defendants' motions to dismiss all of the claims asserted in Realtek's Complaint, both prongs of the test for a stay are satisfied here. There is also good cause to stay discovery until the filing of an answer to any amended complaint Realtek may file. For the reasons noted above, Realtek has not yet stated a valid claim for relief, and it is possible that Realtek may not be able to do so in any amended complaint. Moreover, the burdens of discovery in antitrust lawsuits can be substantial. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Here, those burdens include not only the usual time and expense of discovery but also the possible disclosure of sensitive business information to a competitor and the chilling of defendants' First Amendment-protected petitioning activity. Conversely, Realtek will not face any substantial prejudice if discovery is stayed until the pleadings are resolved.

Discovery in this matter is therefore stayed pending the filing of an answer to any amended complaint Realtek may file. Realtek may seek relief from this stay upon a particularized showing that specific proposed discovery is necessary for it to prepare its amended complaint. The Court is also prepared to address any privilege or sealing issues that may be raised by information in the possession of counsel that could inform the amended complaint, although any party seeking a ruling on those matters from the Court must establish the Court's authority to issue the requested ruling.

## V.     Defendants' Consolidated Motion To Seal Is Granted in Part.

Finally, defendants have asked the Court to seal various documents submitted in support of their motions to dismiss, including portions of the licensing agreement between MediaTek and Future Value and of various documents discussing either the agreement or Future Value's settlement with a third party. At the hearing on defendants' motions, the Court orally denied the motions to the extent they requested sealing of the licensing agreement's litigation incentive provision given its centrality to the litigation. The Court subsequently ordered the parties to file a joint consolidated motion to seal, which they did on April 22, 2024. Dkt. No. 94. That motion to seal is granted in part and denied in part.

The public has a longstanding and well-recognized "right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns,*

16

*Inc.*, 435 U.S. 589, 597 (1978). Public access bolsters "understanding of the judicial process" and "confidence in the administration of justice," and it provides a "measure of accountability" for courts. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). There is thus a "strong presumption in favor of access" to court records. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

  To overcome this strong presumption, a party who wishes to seal a court record must generally "articulate compelling reasons supported by specific factual findings ... that outweigh the general history of access and the public policies favoring disclosure." *Kamakana*, 447 F.3d at 1178–79 (cleaned up). Sealing may be justified when "court files ... become a vehicle for improper purposes, such as ... to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179. But without more, the "fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation" does not merit sealing. *Id.* "Under this stringent standard," the Court must "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Auto Safety*, 809 F.3d at 1096–99. Civil Local Rule 79-5(c)(1) and (f)(3) requires the party seeking to seal to provide "a specific statement" of the reasons for doing so, explaining the interests that warrant sealing and the injury that will otherwise result.

  In certain circumstances, compelling reasons may exist to seal license terms. *See, e.g.*, *Synchronoss Techs., Inc. v. Dropbox Inc.*, 2018 WL 6002319, at *3 (N.D. Cal. Nov. 15, 2018); *In re Qualcomm Litig.*, No. 3:17-cv-0108-GPC-MDD, 2017 WL 5176922, at *2 (S.D. Cal. Nov. 8, 2017). Realtek does not contest the proposed redactions to §§ 2.2, 2.3, 2.5, 3.2, 3.3 (account numbers), 3.4, 4.2, 7.4, and 7.5 of the License Agreement between Future Link and MediaTek. Dkt. No. 94, at 9–10. The defendants have provided specific statements explaining that these terms governing the scope of the License Agreement are material, "not publicly known", and "carefully kept out of the public record because of their competitive sensitivity." *Id.* at 4–7; Wolfson Decl. at 2. The Court agrees that the account numbers appearing in § 3.3 reflect "sensitive financial-account data" that is appropriate for redaction consistent with Federal Rule of Civil Procedure 5.2(a). Dkt. No. 94, at 6; Wolfson Decl. at 2–3. Further, these terms are not

17

germane to the dispute before the Court. Defendants' motion as to those terms is therefore granted.

By contrast, compelling reasons do not justify sealing the internal document number, the definitions of covered products in § 1.1 and semiconductor-based devices in § 1.4, the Standstill Period in § 7.6, MediaTek's signatory to the License Agreement, or the amount of the incentive payment or target entity names on page 29, Schedule B.[12] These terms are germane to this dispute and essential to the public's understanding of these proceedings. For the same reasons the Court previously denied the defendants' request to seal terms pertinent to the licensing agreement's litigation incentive, the Court denies the motion to seal with respect to these terms and with respect to the portions of the parties' briefing addressing those terms.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted with leave to amend. Future Link and IPValue's motion to strike is denied without prejudice. The defendants' consolidated motion to seal is granted in part and denied in part. Within 14 days, the parties shall file on the public document each of the documents previously filed under seal with only those redactions permitted by this Order.

Any amended complaint and any renewed motions to seal shall be filed within 21 days of this Order. Discovery in this matter is stayed pending the filing of an answer to any amended complaint.

**IT IS SO ORDERED.**

Dated: May 3, 2024

P. Casey Pitts
United States District Judge

---

[12] The Court grants the request to file under seal the information in the table on Schedule B.

18