1   RUDY Y. KIM (SB# 199426)                    JAMES M. PEARL (SB# 198481)
    rudykim@paulhastings.com                    jamespearl@paulhastings.com
2   PAUL HASTINGS LLP                           EMMA FARROW (SB# 347126)
    1117 S. California Avenue                    emmafarrow@paulhastings.com
3   Palo Alto, California 94304-1106            PAUL HASTINGS LLP
    Tel: (650) 320-1800                         1999 Avenue of the Stars, 27th Floor
4   Fax: (650) 320-1900                         Los Angeles, California 90067
                                                Tel: (310) 620-5700
5   MICHAEL F. MURRAY (*pro hac vice*)          Fax: (310) 620-5899
    michaelmurray@paulhastings.com
6   JAMES W. BROWN (*pro hac vice forthcoming*)
    jamesbrown@paulhastings.com
7   PAUL HASTINGS LLP
    2050 M Street NW
8   Washington, DC 20036
    Tel: (202) 551-1700
9   Fax: (202) 551-0460
    *Attorneys for Plaintiff Realtek Semiconductor Corp.*
10
11  Additional Counsel on Signature Page

12

                        UNITED STATES DISTRICT COURT

13

                       NORTHERN DISTRICT OF CALIFORNIA

14

15

16  REALTEK SEMICONDUCTOR CORP.,            Case No. 5:23-cv-02774-PCP

17              Plaintiff,                   **PLAINTIFF REALTEK
                                             SEMICONDUCTOR CORP.'S FIRST
18      vs.                                  AMENDED COMPLAINT**

19  MEDIATEK INC.; IPVALUE                   Judge: Honorable P. Casey Pitts
    MANAGEMENT, INC.; AND FUTURE LINK
20  SYSTEMS, LLC,

                                                    **PUBLIC VERSION**
21              Defendant.

22

23

24

25

26

27

28

Plaintiff Realtek Semiconductor Corp. ("Realtek"), for its complaint against defendants MediaTek Inc. ("MediaTek"), IPValue Management Inc. ("IPValue"), and Future Link Systems, LLC ("Future Link") (jointly, "Defendants"), alleges the following based upon personal knowledge, investigation, and information and belief.

## INTRODUCTION

1.    This case is about protecting consumers from the latest scheme by a monopolist to thwart competition and harm consumers:  hiring patent trolls and paying them to kneecap targeted competitors with objectively baseless lawsuits.

2.    It is widely known how patent trolls or Patent Assertion Entities ("PAEs") operate. They acquire patents that are often abandoned by their original assignees because the technology is outdated or they otherwise lack value—*i.e.*, they do not cover novel, non-obvious inventions and are invalid.  They don't invent.  They don't innovate.  They try to exploit often worthless patents through extortion then litigation.  These lawsuits are often extremely expensive to defend against, take years to resolve, and potentially end in the payment of settlements or damages to PAEs who are often funded by wealthy private equity investors.  When innovative companies such as Realtek have to incur such costs, hire outside attorneys, and pay unwarranted royalties for patents that never should have been granted, it directly and predictably increases costs to consumers.  It slows innovation.  It raises prices and harms competition.  Indeed, lawsuits brought by PAEs were associated with **half a trillion dollars** of lost value for litigation targets from 1990 to 2010.[1]

3.    This case involves a new and dangerous use of patent trolls as an anticompetitive weapon employed as third party litigation hit men to file objectively baseless suits.  It is a dangerous abuse of the litigation system that threatens competition not only in this case but in all technology industries.  If well-funded companies with monopolies or with market power can hire trolls to file meritless suits against their competitors and then use those suits to interfere with customer relationships, this will tear open a huge hole in the antitrust laws' protection of free and

---

[1] *See* Feng Chen, Yu Hou, Jiaping Qiu, and Gordon Richardson, *Chilling Effects of Patent Trolls*, 52 Research Policy, issue 3 (Apr. 2023), https://www.sciencedirect.com/science/article/abs/pii/S0048733322002232.

1  open competition.

2      4.      MediaTek is such a monopolist.  It is the dominant player in Smart TV system-on-

3  chips ("TV Chip(s)" or TV "SOC(s)").  MediaTek did not rise through innovation and

4  competition.  Instead, it bought its way through mergers to acquire a whopping "70% market

5  share and more than 2 billion MediaTek powered TVs in the market"—its own words.

6      5.      Standing apart, Realtek has earned its market share through hard work and

7  innovation.  Realtek builds and innovates.  Realtek creates.  Realtek has received more than 90

8  awards for its product innovation in the 37 years since it was founded by a small group of young,

9  devoted engineers.  Those awards include several for TV Chips, the digital brain of internet-

10  connected TVs ("Smart TVs"), which empower stunning visual display, awesome sound, and

11  internet connectivity for streaming shows or playing video games.

12      6.      As Realtek started to grow and threaten MediaTek's monopoly as a result of its

13  brisk innovation and superior product, MediaTek did not respond by coming up with a better

14  product.  MediaTek did not respond by lowering its prices or providing better service to its

15  customers.  Instead, it decided to encumber its rising competitor with meritless litigation in an

16  attempt to slow it down.  Rather than compete on the merits (or even bring its own lawsuit),

17  MediaTek instead opted to pay a patent troll to do its dirty work and file patent suits with no

18  regard to merit.  By hiding behind a patent troll, MediaTek could avoid incurring the full costs

19  and consequences of bringing meritless litigation against Realtek, while accomplishing its goal of

20  slowing its competitors down.

21      7.      MediaTek needed a partner for its scheme.  That's where IPValue and Future Link

22  come in.  IPValue and Future Link ("PAE Defendants") are what many refer to as "patent trolls"

23  or "Patent Assertion Entities."

24      8.      Prior to Defendants' anticompetitive scheme, PAE Defendants and MediaTek

25  were already acquainted.  PAE Defendants identified ███████████████████ patents

26  ███████ MediaTek during licensing ████████████████████████████

27  ██████████████████████████████ During negotiations

28  ██████████, MediaTek ██████████████████████

1    ████████████████████████████████████[2]   The

2    ████████████████████████████████████ proposed that

3    PAE Defendants start suing two of MediaTek's competitors as part of the deal, with a

4    $1,000,000.00 fee, the "Bounty" agreement.[3]

5           9.     The $1,000,000.00 would be earned simply upon filing lawsuits against

6    MediaTek's two targeted smaller competitors (or upon securing a license payment from them)

7    regardless of whether the lawsuits were meritorious or successful.  Unlike a typical third party

8    litigation funder, █████████████████████████████████████████████

9    when it agreed to pay the patent troll to file the suit.  MediaTek ████████.  MediaTek's expected

10    return on investment was entirely the anticompetitive impact of the scheme – an outcome in

11    which the merits of the patent suits played no role.  Nor did the patent troll ██████████████

12    ██████████ when it agreed in the Bounty that it would file suit.  MediaTek and the trolls did

13    not care ███████████████████.

14          10.    MediaTek would pay the patent trolls regardless of outcome or merit.  The goal

15    was to tie up a competitor with meritless litigation, not to recoup a return on its investment for

16    funding legitimate litigation.[4]  Rather than ████████████████████████████

17    ████████████████████████████, MediaTek had ██████████████████████████

18    █████████████████████████████████████████████████████████

19    ██████████.  It nonetheless ████████████ executed this scheme to have the patent troll file

20    baseless suits against Realtek.  And, as had been the plan ████████, MediaTek dishonestly used

21    the fact of the patent trolls' litigation as a weapon to interfere with Realtek's customer

22    relationships.

---

[2] Notably, ██████████████████████████, the PAE Defendants had never threatened, sued
or even contacted Realtek about any purported infringement.  Realtek's involvement in these
baseless suits was directly caused by █████████████ the Bounty.

[3] Defendants, recognizing the illegality of the scheme, ███████████████████████
█████████████████████████████████████████████████████.  PAE Defendants and MediaTek
have actively fought to prevent the disclosure of these ██████████████████

[4] Litigation funders typically ████████████████████████████████████ in an effort
to identify investment opportunities where they can realize a return on their investment that yields
a multiple (e.g., 2x, 5x, etc.) of their original invested capital.

1       11.    As is its historical practice, MediaTek went to large customers such as ▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and dishonestly used the existence of litigation

3 (which MediaTek *itself* encouraged) to sow fear, uncertainty and doubt among Realtek customers.

4 MediaTek never told these customers or the public that MediaTek itself had offered to pay the

5 PAE Defendants $1,000,000.00 to sue Realtek. Nor did MediaTek tell the customers or the

6 public that the litigation it encouraged the patent troll to bring was based on patents that

7 MediaTek ▮▮▮▮▮▮▮▮.

8       12.    These false and misleading statements to customers about baseless patent litigation

9 caused downstream customer disruption. This is because the Realtek downstream customer is not

10 only concerned by potential Realtek supply disruptions caused by patent suits, but litigation

11 against a supplier also creates a risk of litigation against the downstream customer itself. This

12 potential downstream patent litigation creates a risk of not only damages but also a potential ban

13 on its products. This is a very potent threat. Supply is the name of the game in the electronics

14 ecosystem. If supply is threatened during the bid process, the party with the more reliable supply

15 has a distinct competitive advantage. A meritless lawsuit threatening an importation ban against

16 Realtek and potentially later against customers is that perfect weapon. Key to the scheme is

17 misleading the customer that these were meritorious suits based on valid patents. Key to the

18 scheme is concealing that these suits were conceived of and paid for by MediaTek to preserve its

19 position in the market. This is not competition on the merits.

20       13.    MediaTek's disinformation in the market worked. Realtek lost business, its

21 growth was slowed by the scheme, and it had to divert internal resources to defend against

22 meritless litigation. Realtek had millions less to spend on research and development. Slowed

23 innovation is a direct harm to consumers. And, just as hoped for by any monopolist, prices for

24 TV Chips went up, causing further direct harm to consumers. Consumers suffered price increases

25 even in an industry where prices are almost always rapidly falling as a result of technological

26 innovation.

27       14.    PAE Defendants filed multiple objectively baseless suits in jurisdictions both

28 domestic and international:

1       • *Future Link Systems LLC v. Realtek Semiconductor Corp.*, Case No. 6:21-cv-

2       00363 ADA (W.D. Tex.): On April 13, 2021, Future Link launched its first suit

3       against Realtek for allegedly directly infringing U.S. Patent No. 7,917,680 (the

4       "'680 patent"). This objectively baseless case was voluntarily dismissed by

5       Future Link before any decision could be issued on the merits.

6       • *Future Link Systems LLC v. Realtek Semiconductor Corp.*, Case No. 6:21-cv-

7       01353 ADA (W.D. Tex.): On December 22, 2021, Future Link filed another

8       lawsuit in the Western District of Texas, alleging infringement of two other

9       patents Future Link purportedly purchased, United States Patent Nos.

10      7,685,439 ("'439 Patent") and 8,099,614 ("'614 Patent"). This objectively

11      baseless case was voluntarily dismissed by Future Link before any decision

12      could be issued on the merits.

13      • *In the Matter of Certain Integrated Circuit Products and Devices Containing*

14      *the Same*, Inv. No. 337-TA-1295 (ITC 2021) (the "ITC Case"): On December

15      29, 2021, Future Link again alleged infringement of the '439 Patent and the

16      '614 Patent, this time in a complaint before the United States International

17      Trade Commission ("ITC"). This objectively baseless case was voluntarily

18      dismissed by Future Link before any decision could be issued on the merits.

19      • *Monterey Research, LLC v. Realtek Semiconductor Corp.* (Tokyo District

20      court, Apr. 17, 2023): On April 17, 2023, PAE Defendants' subsidiary,

21      Monterey Research, LLC, filed yet another meritless suit accusing the same

22      Realtek products of patent infringement, including Realtek's TV SoCs

23      RTD1295 and RTD1395. Likewise, the baseless infringement theories are

24      predicated on Realtek's incorporation of some of the same ARM technologies

25      described in the dismissed U.S. suits—claims which Defendants themselves

26      assert were obviated by a purported license with ARM. This Japan litigation

27      appears ███████████████████████████████████

28      ████████████████████████████████████████

1  ███████████████████████████████████.

2      15.    Nearly simultaneously, Defendants waged the same litigation campaign against

3  another of MediaTek's key competitors—Amlogic.  By paying the patent troll to initiate meritless

4  litigation (on patents that MediaTek knew were invalid and likely not infringed) against two of its

5  primary competitors, MediaTek successfully stifled competition to the harm of customers.  PAE

6  Defendants rushed to withdraw this suit as well before any decision on the merits.

7      16.    The patents that PAE Defendants asserted against Realtek and Amlogic were

8  worthless.  MediaTek ███████████████████████.  And when Realtek filed *inter*

9  *partes* review ("IPR") petitions with the Patent Trial and Appeal Board ("PTAB"), rather than

10  defending the patentability of its patents, Future Link instead chose to quickly cancel many of its

11  asserted claims to avoid having them declared unpatentable by the Patent Office.  Others were

12  found invalid by the PTAB.  On every single challenged claim, the PAE Defendants either lost or

13  withdrew.  Again, this result is not surprising given that MediaTek ████████████████

14  ██████████████ before they were asserted against Realtek and Amlogic, and even ██████

15  ████████████████████

16      17.    Each of these suits against Realtek was itself objectively baseless.  The indicia of

17  objective baselessness are overwhelming:

18      •   The PAE Defendants █████████████████████████ before

19         agreeing to sue in the Bounty Agreement.

20      •   PAE Defendants had never made any claim or demand against Realtek for

21         these patents prior to █████████████ the Bounty.

22      •   ███████████████████████████████████████████

23         ███████████████████████████████████████████

24         therefore these patents had no value.

25      •   PAE Defendants lost on or withdrew every single claim challenged by Realtek

26         at the PTAB, further confirming the invalidity of the asserted patents.

27      •   Realtek did not even use features claimed by PAE Defendants, a fact they

28         would have known with any modicum of diligence.

- PAE Defendants hurriedly withdrew their Western District of Texas claims prior to any merits decision on a motion to dismiss, after the district court indicated that it would grant Realtek's motion to dismiss on at least one ground.
- Neither of the district court claims has survived any merits challenge.
- PAE Defendants claimed their dismissal of the Western District of Texas was driven by the ARM Settlement but have actively concealed the disclosure of the ARM Settlement.
- PAE Defendants were sanctioned by the Western District of Texas because of the illegal Bounty Agreement and the court dismissed their claims *with prejudice*.
- PAE Defendants' agreement with ARM involved a portfolio-wide license to over 300 patents. There is no specific value ascribed to the patents asserted against Realtek.
- MediaTek's agreement with the PAE Defendants involved a portfolio-wide license to over 600 patents. There is no specific value ascribed to the patents asserted against Realtek.

18.     Each suit was not only objectively baseless, the sham suits were also part of a series instituted not out of a genuine desire for legal relief, but filed without regard to the merits and to harm competition.

19.     The PAE Defendants also filed these suits under fraudulent pretenses. PAE Defendants, in filing and announcing lawsuits against MediaTek's competitors, purposely withheld from the public and the courts that the suits were incentivized by MediaTek's offer to pay $1,000,000.00 to initiate litigation, and only undertaken at ███████████.

20.     Defendants' anticompetitive scheme was not uncovered until Realtek, deciding to fight the baseless patent claims head-on, discovered the Bounty. Defendants never expected Realtek to discover those documents, as patent trolls often rely on the fact that most victims will choose to pay them off early—regardless of the merits of the lawsuit—to avoid the time and

expense of litigation.  When the Bounty was revealed, PAE Defendants rushed to dismiss their anticompetitive suits.  They did so to evade scrutiny of the merits of their patent claims.  Escaping accountability for the merits was critical because if their claims were found meritless, they faced the prospect of sanctions and attorneys' fees.

21.    Most litigants believe in the merits of their case and want an adjudication on the merits.  PAE Defendants did not.  In fact, after having many of their patent claims invalidated through IPRs, and other claims soon to be found invalid, they quickly tried to drop their patent claims and tried to voluntarily dismiss their suits (without prejudice) before the court could dismiss the suit on the merits with prejudice.

22.    In the process, however, PAE Defendants defrauded the federal court.  When filing to withdraw its suit against Realtek, PAE Defendants represented to the United States District Court for the Western District of Texas that it was only doing so pursuant to a purported settlement with Realtek's upstream supplier, ARM.  That was false.  While PAE Defendants have refused to provide an unredacted version of the so-called ARM settlement agreement, a heavily redacted copy of an agreement with RPX Corporation (presumably an intermediary for ARM) that was attached to its motion to terminate the co-pending ITC investigation, would have required PAE Defendants to dismiss their suit ***with prejudice***.  PAE Defendants, however, moved to dismiss their suit ***without prejudice***.  Thus, the attempted withdrawal of the suit was not pursuant to any agreement with Realtek's supplier.  Not surprisingly, Defendants have furiously fought to keep this settlement a secret.

23.    The judges who glimpsed Defendants' improper Bounty before the suits were hurriedly withdrawn, were unanimous in their reprobation:

- An Administrative Law Judge at the International Trade Commission ("ITC") found the agreement "alarming," and that it would be "difficult to imagine how it could possibly be lawful or enforceable."  "***At a minimum***," according to the judge, "***it would seem to warrant an action by Realtek against either Future Link or its counterparty for unfair competition.***"

- The ITC judge observed that "what the Paragraph memorializes may well be untoward and actionable."

- The U.S. District Court for the Western District of Texas opined that it was an "improper contract" that "should be discouraged as a matter of public policy."

- In sanctioning PAE Defendants, the U.S. District Court for the Western District of Texas held that the Bounty Agreement amounted to an "improper motive" to file suit, that "public policy cuts directly against an agreement of this kind," and that such conduct "should be discouraged" and "warrants sanctions."

24.     PAE Defendants also represented to the Western District of Texas that because ARM had paid a purportedly significant amount for the license, the patent suits against Realtek also had merit.  This assertion falls apart upon even the slightest inspection.  The purported ARM settlement and licensing agreement (presumably the RPX agreement attached to PAE Defendants' motion to terminate) was not focused on the three patents asserted against Realtek, but instead involved over 300 patents.  There is no way to attribute the licensing fee paid for such a pool of patents to any individual patent or subset of patents.  There is even less support to take that licensing fee—*negotiated by a third party (RPX and/or ARM) in an entirely separate factual scenario*—and apply it to the merits of a case against Realtek.  Nor does a license to a broad portfolio of hundreds of patents say anything about the merits of infringement claims brought against Realtek's specific products.  There is no evidence that the ARM settlement demonstrates any value of the three patents PAE Defendants asserted against Realtek—because they have no value.

25.     Further, the purported ARM settlement agreement was not directly with ARM.  Rather, as noted above, the settlement agreement was between PAE Defendants and RPX Corporation ("RPX"), a defensive patent aggregation membership service that acquires large portfolios of patents to provide RPX members a license to all of the patents and associated rights aggregated in the RPX portfolio.  As such, the settlement covers several parties in addition to ARM, further precluding any inference about the purported value of any of the patents, including those asserted against Realtek.

26.     Since the scheme was implemented, Realtek has spent significant amounts of dollars on legal fees to defend baseless patent lawsuits (and to prevent future baseless lawsuits against Realtek and other victim companies) by PAE defendants that could otherwise have been spent on innovation.  And since that scheme, Realtek has lost bids with customers as a result of the fear, uncertainty, and disinformation from the fraudulent lawsuits as well as from MediaTek's false and misleading communications with Realtek customers.  The scheme has caused prices to increase for both Smart TVs and the TV Chips they depend upon.  Defendants intended that result.

27.     With this action, Realtek seeks to stop a bully.  MediaTek and its hired henchmen should be held accountable in order to protect Realtek and competition itself in the critical semiconductor industry.  If large firms with market power are able to simply pay for baseless third-party patent suits against their competitors with impunity, the antitrust laws would have an enormous loophole.  Dominant firms could simply hire trolls and other professional litigants to impose massive costs on their rivals.  If a rival decides to fight, the hired henchman runs for the door before the rival can defeat the claims.  But the damage is done.  The suit has raised rivals' costs and created uncertainty around the rivals' product in the marketplace.  Meanwhile, the dominant firm is free to raise prices as its rivals wilt under the weight of the sham litigation.  Defendants' scheme harmed competition here and more broadly threatens every rival to a large firm with a new and lethal anticompetitive weapon.

**PARTIES**

28.     Plaintiff Realtek is a corporation organized under the laws of Taiwan, with its principal place of business at No. 2 Innovation Road II, Hsinchu Science Park, Hsinchu 300, Taiwan.

29.     Defendant MediaTek is a corporation organized under the laws of Taiwan, with its principal place of business at No. 1, Dusing 1st Rd., Hsinchu Science Park, Hsinchu City 300, Taiwan.  MediaTek has two U.S. subsidiaries, MediaTek USA, Inc. and MediaTek North America, Inc., which are both headquartered in San Jose, California.  Each of MediaTek's subsidiaries has its principal place of business at 2840 Junction Avenue, San Jose, California.

30.     Defendant IPValue is a Delaware corporation headquartered in Santa Clara, California.  IPValue's principal place of business is at 2880 Lakeside Dr., Ste. 320, Santa Clara, CA 95054.

31.     Defendant Future Link, is a Delaware Limited Liability Company headquartered in Santa Clara, California.  Future Link and IPValue share a common registered address as well as a common principal place of business.

32.     Future Link is a PAE.  Future Link is not an inventor.  It does not manufacture any product that requires patent protection.  Instead, Future Link acquires patents, and uses its patent portfolio to extract licensing payments from manufacturers through litigation.

33.     Future Link is a wholly owned subsidiary of IPValue, and Future Link operates under the direction and control, and for the benefit of, IPValue.  IPValue is the principal of numerous PAE subsidiaries (like Future Link and Monterey Research LLC) that operate as agents of IPValue in furtherance of IPValue's business objectives of monetizing patents through serial licensing and litigation.  Additionally, IPValue serves as an agent for its PAE subsidiaries in negotiating royalties with their targets.

## **JURISDICTION AND VENUE**

34.     This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 15 (antitrust), 15 U.S.C. § 26 (injunctive relief), and 28 U.S.C. § 1367 (state law claims).

35.     This Court has personal jurisdiction over Defendants because IPValue and Future Link are each corporations with their principal place of business in this District and each has other sufficient minimum contacts in the District.  Their co-conspirator, MediaTek, is subject to this Court's personal jurisdiction because MediaTek's conduct that forms the basis of this lawsuit occurred within this District and because MediaTek has other sufficient minimum contacts in the District.  For example, because both IPValue and Future Link operate their headquarters in the District, the improper litigation bounty agreement was likely negotiated and executed, at least in part, in the District.  Furthermore, Defendants issued press releases from Santa Clara, California,

1   about the license agreement[5] that gave rise to public court decisions that cited the secret bounty

2   provision.[6]  The meritless patent litigation that Future Link subsequently commenced against

3   Realtek following the illegal bounty agreement was also conceived and directed from Future

4   Link's and IPValue's headquarters in the District.  MediaTek conducts its business in the United

5   States through its subsidiaries headquartered in San Jose, California.

6         36.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c)

7   and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or

8   tortious act, have an agent, can be found in this District, and a substantial part of the events giving

9   rise to these civil antitrust claims occurred in this judicial district.

10        37.    The conduct complained of herein has occurred in and had a substantial effect on

11  interstate trade and commerce.

12                              **FACTUAL ALLEGATIONS**

13        38.    This lawsuit began upon the discovery of an unprecedented, illegal Bounty

14  Agreement between monopolist and patent trolls.  Although executed in 2019, for years

15  Defendants successfully kept it hidden from the public eye.  Even in 2022, after Realtek

16  discovered the Bounty Agreement amongst troves of documents PAE Defendants were forced to

17  hand over in their baseless patent suits, Defendants desperately tried to prevent the Bounty from

18  being revealed.

19

20

21

22

23

24

---

25  [5] *See*, e.g., Press Release, *MediaTek Licenses Patent Portfolio From IPValue Management*,
    Business Wire (May 21, 2019), https://www.businesswire.com/news/home/20190521005412/en/
26  MediaTek-Licenses-Patent-Portfolio-From-IPValue-Management; *see also*
    https://www.bloomberg.com/press-releases/2019-05-21/mediatek-licenses-patent-portfolio-from-i
27  pvalue-management (last visited May 24, 2023).
    [6] *See Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-0363-ADA (W.D. Tex.
28  Oct. 10, 2022), ECF No. 88 at 5.

1    39.    But on May 3, 2024, over Defendants' continued objections, this federal court

2    ordered the Bounty Agreement unsealed.  In its initial Complaint, Realtek could not disclose its

3    contents to the public.  Now, it can:

4
CONFIDENTIAL

5

6                                    **Schedule B**

7    Payment Terms

8    As consideration for the licenses and releases granted in this Agreement, COMPANY shall pay to
     FLS as follows in U.S. dollars:

9

10

11

12    In addition to the above 3 payments, COMPANY shall pay an additional $1.0 million U.S. dollars
      on 15 February 2022 if FLS, prior to 01 January 2022, either executes a patent license agreement

13    with or institutes litigation against one or more of the following companies: (a) Realtek
      Semiconductor Corporation, or (b) Amlogic.

14    40.    This agreement is anticompetitive on its face.  But it turns out that it is but the tip

15    of the iceberg.  Realtek has unearthed a broader scheme and series of agreements of which the

16    carefully-lawyered Bounty Agreement is just a part.

17    41.    That scheme was designed to harm competition by imposing burdens upon

18    MediaTek's competitors, thereby allowing MediaTek to raise prices, ultimately paid by

19    consumers.

20    42.    To fully describe the Defendants' scheme and series of agreements, Realtek must

21    start from the beginning.

22    **I.    TV Chips**

23    **A.    The Rise of System-on-Chips ("SoCs")**

24

25

26

27

28

43.    MediaTek and Realtek compete in the design of TV SoCs.  SoCs are the digital brain of modern TVs; they are, simply put, what makes a TV "smart."  SoCs combine various components and functions—like processors, memory, graphics, sound, internet connectivity, app and gaming capability, artificial intelligence, and other multimedia features—onto a single chip or board.



44.    SoCs are designed for specific types of end products to account for size, price, and technical requirements and constraints.  SoCs must include all the features required of an end product, while excluding functions that would only be relevant to another end product.

45.    For example, while most SoCs for various products might include functions for visual display, processing, and memory, those requirements will vary based on, respectively, the size of the display and emphasis on different aspects of visual fidelity; the amount and type of processing power required based on the device's use case; and likewise the amount and type of memory required for the use case.

46.    Other features required of SoCs will differ completely by product, such as the need for LTE modems in tablets and phones, touchscreen versus mouse inputs versus remote controls, and sound processing and outputs.

47. The form factor of a device, such as its size and shape, can also significantly affect which SoC may be appropriate. For example, where two devices might serve a similar end use, the larger device might be able to utilize a larger SoC, one that can forego a more expensive process to fit the same components on a smaller wafer.

48. SoCs are incorporated into consumer electronics by original equipment manufacturers (OEMs) and original device manufacturers (ODMs). OEMs and ODMs incorporate packaged SoCs with other components to create end products such as Smart TVs.[7] Then, a dedicated team at the OEM/ODM integrates TV Chips into Smart TVs. Ultimately, OEMs and ODMs and the end user TV brands distribute the end products throughout the world, including in the United States.

49. The advent of SoCs has benefited OEMs and ODMs, TV brands, and end consumers. By combining functions once relegated to boxy, standalone devices each housing numerous separately designed and manufactured chips and other components, SoCs reduce costs and complexity for both TV makers and consumers, streamline the Smart TV design and development process, and provide a more attractive and integrated end-user experience.

50. SOCs are almost all ARM based now. Access to ARM technology is crucial to maintaining competitiveness for fabless chip design companies such as Realtek and MediaTek.

**B.    Adjacent Products and Services Fueled Smart TV growth**

51. Advances in interrelated hardware, content, and infrastructure since 2010 fueled acceleration of the adoption of Smart TVs, which incorporate TV Chips. Relatedly, the improvements in TV Chips likewise fueled adoption of Smart TVs and content. A 2011 Wired article quipped that "smart TVs…were supposed to be the Next Big Thing. But so far, they're more promise than reality." By early 2013, however, a study found that roughly a quarter of participants owned at least one Smart TV, the figure having doubled over the prior year. By 2015, about 38% of participants owned at least one Smart TV; however, cable and satellite TV viewing was still dominant, accounting for nearly 80% of Americans' viewing, with nearly a

---

[7] Other products incorporating SoCs include connected media products, laptops, mini desktop computers, mobile phones, tablets, audio players, printers, video game consoles, and various other computer peripheral devices.

1    quarter of Americans not receiving TV content at home through cable or satellite.  Then, by 2020,

2    roughly two-thirds of households owned a Smart TV.  Now, *as of 2024, nearly 8 in 10*

3    *households own a Smart TV*.  The Current wrote earlier this year that "[a]ccording to Hub

4    Entertainment Research, 79% of U.S. homes now own a [S]mart TV.  That's a sharp increase

5    from just four years ago, in 2020, when 66% of American households surveyed checked that

6    box."



Source: National Telecommunications and Information Administration, U.S. Dept of Commerce.

52.    Enabling technologies also supported Smart TV adoption.[8]  Among them, internet

speed in American homes increased dramatically during the 2010s.  For example, between 2011

and 2017, the average internet connection speed in the U.S. surged by nearly 500%.

---

[8] The term "enabling technologies" is used to describe discoveries that facilitate the creation or improved performance across a wide range of product categories.  *See* Teece, D.J. (2016).  Enabling Technologies.  In: Augier, M., Teece, D. (eds) The Palgrave Encyclopedia of Strategic Management.  Palgrave Macmillan, London.  https://doi.org/10.1057/978-1-349-94848-2_78-1.



53.    Faster internet speeds and Smart TVs also fostered innovation in content.  Just as the VHS tape had given way to DVD and Blu-ray technology, streaming reached and then surpassed DVD and Blu-ray penetration.  The once-ascendant physical media was quickly overmatched by the promise of streaming.  Viewers could access endless hours of content at the touch of a button.

54.    The rise of Netflix reflects this dramatic shift.  In 2015, Netflix lamented about viewers turning on their TVs to cable programming.  Netflix sought parity, with an executive asserting: "Internet television bolted on has been the wrong way to go for a long time…It's about putting internet television on the same footing as regular TV."  A year later, Netflix announced at the CES 2016 conference that it was working with LG to extend its streaming service to 130 countries around the globe.[9]  Netflix's subscriber count has grown from roughly 17 million in

---

[9] MediaTek observed the consumer shift to streaming, telling investors, "Content-rich online video and audio streaming services gradually replace traditional DVD players…consumers are changing their ways of enjoying movies."

2010 to about 270 million today.



55.    Less than 60% of Americans received TV content at home through cable or satellite by 2021, down from roughly three-quarters in 2015.

56.    The proliferation of video streaming services, app-based content consumption, and consumers' preference for cord-cutting had continued to drive the demand for Smart TVs and the TV Chips that power them.  Smart TVs now account for over 80% of global flat panel TV sales and are in 74% of American households, including brands like Samsung, Alcatel/TCL, LG, and Vizio.

57.    Today, adoption of Smart TVs is reportedly greater than 93% and continues to rise.

**C.    TV Chips Design Process**

58.    The TV Chip manufacturing industry can be divided into design and related companies upstream, chip manufacturers midstream, and packaging and testing suppliers

downstream.  TV Chip product design occurs at the upstream level, with design houses working in consultation with customers.  Once a product design is ready, companies such as MediaTek and Realtek commission wafer foundries at the midstream level to complete manufacturing at scale.  Thus, MediaTek and Realtek are known as "fabless" TV chip design houses.  Finished wafers are subsequently sent to a downstream assembly house for packaging.  Packaged products then go through final testing before they are provided to customers, typically distributors or OEMs and ODMs.

59.     The process of initial development of a TV Chip by a design house to its adoption by OEMs or ODMs can take anywhere from 2 to 4 years, and often longer.  The process begins with system specification and design of the Integrated Circuit ("IC") architecture, which may come before or in response to a Request for Production ("RFP") from an OEM/ODM.  During that phase, which can take more than a year, the requirements of the TV Chip are defined, including: what the chip needs to do and how it will do it; what the performance metrics are; and how it will meet the requirements while minimizing cost, complexity, and power consumption.

60.     Then, the physical layout of the IC is designed, including selection of components like transistors, resistors, and capacitors.  This physical layout design can take 3-6 months.

61.     Next, the resulting TV Chip design must then be verified and validated using simulation and emulation software, as well as tested and prototyped with wafer foundries.  This process can take 3 to 4 months.[10]

62.     Finally, if an OEM or ODM is interested in the TV Chip, they will then begin their own evaluation process to ensure compatibility and interoperability with the relevant TV's apps, operating system, and components, as well as the chip's ability to meet quality and efficiency requirements.  This phase can take 3 to 12 months, but may partially overlap with the RFP process where relevant.

**D.     TV Chip Supply Stability is Critical**

63.     The process for designing a TV Chip and having it designed into production by an

---

[10] Emulation software is a program that allows testing of a device in a virtual environment.  In TV Chips, the emulator imitates the Smart TV for which the TV Chip is designed, allowing the design house to confirm the TV Chip's performance.

OEM is lengthy and requires significant investment, by both the TV Chip design house and by the OEM. Additionally, the average lifecycle of a TV Chip that has been picked up by an OEM for mass production ranges from 2 to 4 years. Because of the time and investment involved, OEMs and ODMs spend significant time and resources ensuring TV Chips are compatible with and optimized for the given Smart TV. OEMs also devote significant attention to ensuring that the TV Chip they design into their TV is "future-proof" and sufficient to sustain the planned production run of that TV. That is, an OEM seeks certainty that the TV Chip incorporated in their TV will not need changing during the production run. In light of such investment, supply instability—whether actual or merely perceived—can crush a design house's work to sell its TV Chips.

64.    Once a Smart TV has entered production, OEMs and ODMs continue to actively monitor and account for the supply stability of TV Chips. For example, OEMs and ODMs share monthly production forecasts with the design houses and fabricators and discuss, if necessary, any changes to a party's ability to meet its obligations.

65.    Design houses like MediaTek and Realtek, thus, compete not only on price and innovation, but also on supply stability. Access to essential component technologies used by the design house's chips, like those of ARM, is an important factor of supply stability.

66.    Accordingly, an actual or threatened disruption to a chip designer's supply stability can harm its standing and ability to generate business with OEMs and ODMs. It can, for example, (i) derail an ongoing RFP process; (ii) cause OEMs and ODMs to spread their risk by lowering the share of TV Chips purchased from the at-risk supplier, and in turn purchase more from a competing supplier; and/or (iii) make it more difficult for the supplier to win future business.

67.    Even just *the perception* of unstable supply can seriously damage a chip designer's commercial position with OEMs. TV Chip designers have lost such opportunities with OEMs over supply instability in the past. TV Chip designers have also lost significant sales volume when an OEM feared supply instability.

1  **II.**    **Realtek's Rise in the TV Chips Market Threatened MediaTek's Dominance**

2     **A.**    **MediaTek has Long Held a Dominant Position in the TV Chips Market**

3     68.    MediaTek is, in its own words, "the world's biggest TV SOC provider."

4  According to MediaTek's 2022 annual report, it generated more than $18 billion in revenue in

5  2021. MediaTek also states that it powers "more than 2 billion devices a year…and nearly 1 of

6  every 3 mobile phones globally."[11]

7     69.    MediaTek boasts of its dominance in TV Chips.  Far from disclaiming a market

8  share that subjects MediaTek to heightened scrutiny within antitrust law (as a monopolist),

9  MediaTek parades its 70% market share on its website to this day, as shown below.[12]  MediaTek

10  does this ***even after*** being accused of antitrust and competition violations.

11

12  ## Smart TVs

13
14  MediaTek is the world's leading chip provider
15  for smart TVs – 70% market share and more
16  than 2 billion MediaTek powered TVs in the
17  market. We support 4K or 8K displays, Wi-Fi
18  6 and industry-leading AI that creates a
19  whole new level of entertainment for our
20  customers like Samsung, Sony, VIZIO and
   more.

21     70.    In using its dominant position in marketing materials, MediaTek is telling OEMs

22  that they have no other choice.  Buying TV Chips from MediaTek is inevitable.  MediaTek has

23  behaved, and continues to behave, like a bully.

24     71.    MediaTek obtained this position through its 2012 acquisition of MStar

25  Semiconductor, rather than through innovation driving growth.

26     72.    In fact, MediaTek's 70 percent share of the global market for TV Chips

27

28  _____
[11] About MediaTek, https://www.mediatek.com/who-we-are (last visited May 24, 2023).
[12] MediaTek, Digital TV, https://i.mediatek.com/digital-tv (last visited July 15, 2024)

PLAINTIFF REALTEK SEMICONDUCTOR
                                                                  CORP.'S FIRST AMENDED COMPLAINT

*understates* MediaTek's dominance.

73.    The TV Chip market is highly concentrated, with the top three players accounting for a nearly 90% share as of 2022.  Realtek is MediaTek's closest competitor in TV Chips.  Other TV Chips makers like HiSilicon, Samsung, LG, and Novatek do not meaningfully compete with MediaTek and Realtek.

74.    HiSilicon, for example, is a fringe player outside of China, and its close relationship with China's state-owned Huawei (as its key SoC supplier) undermines its position. Many OEMs and ODMs will not work with HiSilicon.

75.    Samsung and LG also design TV Chips, but only for their own highest-end, flagship models.  Samsung and LG have not supplied TV Chips to competing OEMs or ODMs. Nor would they, as they are unable to completely fulfill their own needs.  With reputation and confidence in a stable supply being priorities for OEMs and ODMs in buying TV Chips, Samsung and LG are effectively non-existent—they have not established themselves and cannot constrain MediaTek.  Other OEMs cannot turn to Samsung or LG for TV Chips.

76.    Finally, Novatek is not a close competitor to MediaTek.  MediaTek and Novatek were both spun off from United Microelectronics in 1996.  TV Chip design houses compete on the basis of innovation, and Novatek has won far fewer awards and recognitions for its products than Realtek.  Novatek's own website, which would be expected to portray any Novatek innovation as strongly as possible, cites just three awards in its nearly 40 years of existence. None of the awards are specific to TV Chips.  Realtek won 90 awards during roughly the same time period.  As such, Novatek is not a close competitor to MediaTek.

**III.    Realtek's Rise in the TV Chip Market**

77.    Like MediaTek, Realtek is a fabless TV Chip design house that competes with MediaTek to sell TV Chips across a number of business lines, including in the market for TV Chips that are incorporated into Smart TVs that are sold in the United States.

78.    By innovating relentlessly, Realtek has grown alongside digital technology adoption in the United States and worldwide.  For example, in 2021 Realtek earned

1    approximately $3.4 billion in revenue.[13]

2        79.    Approximately 10 years ago, OEMs, ODMs, and other Smart TV industry

3    participants began taking note of Realtek's rising capabilities.  Specifically, Realtek's 2015

4    introduction of its first 4K High Dynamic Resolution ("HDR") TV Chip, the Realtek RTD2999

5    SoC, earned it attention and formal recognition.  Realtek's advancement was notable in large part

6    because the RTD2999 incorporated Dolby Vision, the first HDR format available to consumers,

7    just a year after Dolby Vision was introduced in 2014.  It also marked a significant move by

8    Realtek to target the higher-end Smart TV segment, which MediaTek had traditionally held all by

9    itself.  For the RTD2999, Realtek was awarded the 2015 Innovative Product Award by the

10   Hsinchu Science Park Administration in Taiwan.

11       80.    Realtek continued to innovate and impress in the years that followed.  In early

12   2018, having observed a demonstration of the RTD2872 single-chip solution for UltraHD

13   Android Smart TVs, the Display Daily wrote an article entitled "Realtek Entry Level Android TV

14   SoC is Impressive."  The article noted the RTD2872's "potential cost and power savings," its

15   noise reduction, and its speedy channel switching and input switching.

16       81.    In 2018, Realtek also made a breakthrough when it developed and began

17   demonstrating the RTD2983 SoC, its first 8K Ultra HD TV Chip.  Like Realtek's early move into

18   HDR in 2015, the RTD2983 was introduced shortly after the first consumer 8K TVs rolled out in

19   2018, and it likewise won awards for innovation: Realtek received the Best Choice of the Year /

20   Golden Award at Computex Taipei 2019, and the 2019 Innovative Product Award from the

21   Hsinchu Science Park Administration.

22       82.    Moreover, the RTD2983 was specifically designed to streamline the lengthy TV

23   Chip evaluation and adoption process and to lower the costs of transitioning existing Smart TV

24   platforms into the next generation.  One of the chip's expected advantages, for example, was that

25   it would allow TV makers to "upgrade a 4K TV platform to a fully functional 8K TV," and

26   Realtek publicly explained that it "expect[s] this breakthrough will lead to faster expansion of the

27

28   [13] *See* Realtek Semiconductor Corp. 2021 Annual Report at *120,
     https://www.realtek.com/en/investor-relations/financial-information/annual-reports.

8K market and allow viewers to enjoy the richness of 8K content at a lower hardware cost point."[14]  Realtek's early foray into 8K TV Chips once again publicly signaled its willingness and ability to face off against MediaTek in the higher-end TV space.

83.    In the years following, Realtek's aggressive focus on next-generation features and cost consciousness continued to gain the respect of OEMs and ODMs.  For example, in 2021, Realtek increased its share of TV Chips supplied to LG and TCL.

84.    That same year, Google rolled out its "Reference +" initiative to update and standardize its Android OS for Smart TVs, and Realtek was given turnkey access by Google to various OEMs to participate in the development and testing of SoCs.  With Google/Android OS running on an estimated 40% of all Smart TVs, this represented a significant opportunity for Realtek to increase its market penetration and validated the strides it had made in innovating and reducing the costs of TV Chips.

85.    Years earlier, MediaTek had seen its relationship with Google as an important part of maintaining its dominance on TV Chips.  MediaTek wrote that its relationship with Google "on Android TVs[,] which have been adopted by various international brands…[allows] MediaTek [to] maintain our market-leading position."

86.    However, Realtek's success disrupted MediaTek dominance.  By supplying TV Chips for an estimated three million Android TV sets, buoyed by its efforts in Google's Reference + program, Realtek's renewed growth in Android TVs posed another measurable threat to MediaTek.

**IV.    MediaTek's Initial Anticompetitive Efforts**

87.    As Realtek's campaign of disruptive innovation and cost-cutting continued to build momentum, MediaTek took note.  Realtek was advancing on multiple fronts just as MediaTek was stalling.

88.    Indeed, MediaTek had long since deprioritized competition and innovation in favor of monopolistic conduct.  In 2012, MediaTek announced its $4 billion acquisition of MStar

---

[14] *See also* Realtek Demonstrates RTD2893: A Platform for 8K Ultra HD TVs, Anandtech ("One advantage the RTD2983 has is embedded memory, which eliminates necessity to use external DRAM devices, lowering the BOM costs for finished products").

Semiconductor Inc ("MStar"). At the time, MediaTek and MStar were already the most dominant TV Chips designers in Taiwan. Industry commentators predicted that that the merger would expand MediaTek's existing share of the global TV Chips market to over 75 percent, which is virtually the same market share it boasts today. At least one semiconductor market analyst found that the resulting market share would give MediaTek "more pricing power."

89.    MediaTek's acquisition of rival MStar was scrutinized by antitrust and competition authorities in Taiwan, South Korea, Germany, the United States, and China. China's MOFCOM, after reviewing the deal for over a year (including an extended "phase 2" review), found that the combined company would have a TV Chips market share as high as 61% globally and 80% in China. MOFCOM also found that China's TV Chips designers would be unable to compete effectively with the merged company, and that substantial technical barriers to entry limited new entries. MOFCOM found that, as a result, TV makers would be restricted on their choices in procurement of TV Chips.

90.    Stated simply, MediaTek had attempted an illegal merger to harm competition.

91.    MOFCOM approved the merger only after MediaTek agreed to a range of restrictions for an initial period of three years, including that any further acquisitions of TV Chips competitor by MediaTek and MStar required MOFCOM's approval, and a "hold-separate" condition requiring the two companies' TV Chips units to operate as independent companies.

92.    As a result, MediaTek was not cleared to merge its TV Chips business with MStar's until August 2018, five years after it first attempted to. Even then, the restructuring required to integrate the businesses would not bear fruit until the following year.

93.    Faced with a 5-year disruption to its monopolistic MStar acquisition, MediaTek panicked. Instead of refocusing its efforts on innovation and pricing, MediaTek turned to hired henchmen in PAE Defendants, aiming to sow doubts about the legality of Realtek's chips and Realtek's reliability supplier.

94.    And PAE Defendants understood the assignment.

## V.    MediaTek Proposes an Illegal Bounty

### A.    Defendants' conspiracy spawned a series of objectively baseless suits, each of them individually objectively baseless and brought pursuant to a policy of anticompetitive harassment

95.    PAE Defendants had no plans to sue either Realtek or Amlogic until  the Bounty Agreement in _____ 2019.

96.    _____, PAE Defendants identified _____ patents _____ MediaTek—three of which were later asserted against Realtek (U.S. Patent Nos. 7,917,680; 7,685,439; and 8,099,614).

97.    Throughout the licensing negotiations MediaTek 

98.    After _____ negotiating with MediaTek the licensing negotiations PAE Defendants  . Apparently recognizing that their patents _____, PAE Defendants nonetheless tried to extract a payment under any means necessary.

99.    Likewise, MediaTek would not have licensed patents from PAE Defendants absent  the Bounty Provision, which _____

100.    During the negotiations, MediaTek and FL decided 

101. The plan for meritless suits—████████████████ emerged ████.

102. ████████████████████████████████████████████████████████████████████████ Monterey is another subsidiary of Future Link's parent IPValue, which sued Realtek in Japan on April 17, 2023 (after its US suits were hurriedly dismissed and PAE Defendants were sanctioned), alleging that Realtek's SoCs infringe patents in relation to an ARM technology.

103. The U.S. suits then took on a more tangible form. Around ██████████, MediaTek's ████████████ Future Link's ████████████████████████████████ Bounty, in which MediaTek would pay an additional $1,000,000.00 if Future Link, prior to January 1, 2022, either executes a patent license agreement with, or simply *institutes* litigation against, Realtek or Amlogic. The Bounty arose out of ██████████████████████. Defendants have furiously tried to conceal these ███ communications, which were carefully hidden from Plaintiff, the market, and the public.

104. The Bounty was not ████████████████████████████████████████████████████████████████████████████████████████████.

105. Future Link understood ████████ the Bounty Agreement ██████████████████.

106. ████████████████████████████████████████████████████████ Future Link's non-written response to the Bounty remains veiled.

107. That is in part because, in a ████████████████

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ██████████████████████.  That "████████" was the obligation to either license or file litigation

4  against Realtek or Amlogic.

5      108.    PAE Defendant's ████████████████████████████████████

6  ████████████████████████████ demonstrates the lack of merit to the claims.  If they believed

7  they had a legitimate claim against Realtek, they would not have had to offset their expenses and

8  risk with payments from MediaTek.

9   **B.    Future Link Knew at the Time That it Sued Realtek for Patent Infringement**

10      **That the Suits Had No Merit.**

11      109.    It is important to recognize how unusual this course of negotiation between

12  MediaTek and a patent troll in fact is.

13      110.    A company that practices many technologies, such as MediaTek does in its various

14  products, is ordinarily not friendly with a patent troll such as Future Link.  Indeed, research

15  demonstrates that practicing entities will shift their investment and development strategies to

16  escape patent trolling.[15]  One of the reasons for such strategy is because Future Link and other

17  patent trolls impose significant costs and burdens on practicing entities.  Likewise, a patent troll

18  in ordinary circumstances will not befriend its targets.

19      111.    Nonetheless, Defendants finalized the terms of their Patent License Agreement

20  ("PLA").  The final terms further prove (in addition to ████████████████████) that

21  the three patent claims PAE Defendants' later asserted against Realtek lacked any value.

22          a.    In addition to the ████ patents most at issue during Defendants' licensing

23              talks, the PLA's definition of "Licensed Patents" included ALL patents

24              licensable by Future Link at the time, including over 600 other patents

25

26

27  [15] *See* Kenneth G. Huang, Mei-Xuan Li, Carl Hsin-han Shen, Yanzhi Wang, *Escaping the Patent Trolls: The Impact of Non-Practicing Entity Litigation on Firm Innovation Strategies*, J. Strat

28  Mgmt. 2024;1–34

listed in Schedule A of the PLA.

**1.3** **"Licensed Patents"** means all patents and patent applications worldwide that are licensable by FLS as of the Effective Date (the "FLS Patents"), including, but not limited to, the exemplary list of patents and patent applications in Schedule A ("Schedule A Patents"), as well as all patents, such as divisionals, continuations, continuations-in-part, reissues, reexaminations, substitutions and foreign counterparts, that claim priority to any of the FLS Patents. .

b.   The definition of "Covered Products" was likewise expansive.  The license

covered ALL semiconductor devices, including those that Future Link had

never identified nor asserted to be infringing, nor even examined for

potential infringement.

**1.1** **"Covered Products"** means all Semiconductor-Based Devices, including all integrated circuits, MCOs, multi-chip packages and assemblies, as well as MediaTek (or its Subsidiary) branded boards, assembly and/or substrate, and inclusive of systems, subsystems, interfaces, and/or buses embodied in the foregoing products.

c.   Going even further, the PLA included a "Standstill Period" (or, "Standstill

Provision") whereby Future Link agreed not to assert against MediaTek

ANY patents against the Covered Products for a period of three years.

**7.6** FLS covenants, on behalf of itself and its Subsidiaries, that FLS and its Subsidiaries shall not assert against COMPANY any claims of patent infringement against Covered Products under any Patents that are not Licensed Patents for a period of three (3) years

112.   MediaTek paid for a license to 600 patents and, among other things, a free pass for

three years on any new patents acquired by the PAE Defendants.  They also paid a separate

amount ($1,000,000.00) for the Bounty.  What is notable is what they did not pay for.  No value

whatsoever is attributed to the specific patents that would later be asserted against Realtek.  This

is because the asserted patents *have no value*.  Critically, *nowhere* in the correspondence between

Defendants is there ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮, notwithstanding the contractual dictate to sue or get a license from Realtek.

The Bounty was agreed to by all the Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  There was accordingly no

objective basis whatsoever to the claims against Realtek.  In fact, in the correspondence

exchanged between Defendants, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). And MediaTek ▓▓▓▓▓▓▓▓

3 ▓▓▓▓▓▓▓. Future Link sued Realtek for patent infringement because it was contractually

4 obligated to, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## VI.   The Actual Agreement or Conspiracy Between MediaTek and Future Link Went Beyond the Curated, Carefully-Lawyered Bounty Agreement.

113.   As the foregoing history shows, MediaTek's conspiracy, including IPValue and its subsidiary, Future Link, included payments for IPValue subsidiaries to launch a barrage of objectively baseless patent suits against both Realtek and Amlogic. The target of these attacks was competition in the TV Chips market.

114.   For example, the Bounty Agreement provides for a press release, which IPValue featured on its website: https://www.ipvalue.com/news/mediatek-licenses-patent-portfolio-from-ipvalue-management (last visited July 3, 2024).

115.   The press release prominently featured Smart TVs. This comes as no surprise given the common component that MediaTek, Realtek, and Amlogic each supply for the production of Smart TVs is TV Chips. IPValue knew of the common connection between MediaTek, Realtek, and Amlogic—Smart TVs and TV Chips—when it entered into the Bounty Agreement, which led to PAE Defendants launching a series of objectively baseless patent suits against Realtek and Amlogic.

116.   Further, Amlogic's TV Chips are central to Amlogic's business strategy. While Amlogic has been a more distant rival to MediaTek, as compared to Realtek, Amlogic has maintained a foothold in sales of TV Chips to Chinese OEMs.

117.   Realtek has been MediaTek's most innovative and closest rival in TV Chips. Realtek has bested MediaTek at key moments, launching TV Chips integrating Dolby Vision and a TV Chip for an 8K Smart TV before MediaTek could do so. And Realtek has gained traction with Google, a large customer, as shown below.

118.   Apparent from MediaTek's and the PAE Defendants' conduct following the Bounty Agreement, the actual agreement and broader conspiracy among MediaTek and the PAE

1    Defendants provided for PAE Defendants to sue Realtek and Amlogic several times.

2        119.    This is also confirmed by Future Link's conduct when it █████████████

3    ████████████████████████████████████████████    The

4    $1,000,000.00 payment provided for in the carefully-lawyered Bounty Agreement would have

5    been seemingly due upon Future Link filing a single complaint against either Realtek or Amlogic.

6    During the ████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    the parties moved forward with the current written form of the Bounty. **Future Link nonetheless**

9    **sued both Realtek and Amlogic**, and then ████████████████████████████

10   ████████████████████████████████████████████████.

11   Moreover, the suit against Realtek in Japan ████████████████████████

12   ████████████████    Thus, while the language of the Bounty only explicitly calls for one

13   suit, the behavior of the Defendants indicates there were multiple agreements either express or

14   implied to file suits in multiple jurisdictions, including in United States District Court, the ITC,

15   and in Japan.

16       120.    The patent troll business model relies on its ability to extract royalties that

17   outweigh the costs of litigating.  Failed suits, repeated often enough, would be untenable with the

18   PAE's need to sustain threats of litigation costs that can be used to extract licensing fees.  But

19   with the Bounty and similar agreements, the costs and risks are offset by a payment conditioned

20   only on the filing of the suit.  Such agreements further explains PAE Defendants' behavior.

21   Absent the conspiracy and its anticompetitive incentives, Future Link risked damaging its ability

22   to profit from its extortionist business model without an apparent countervailing benefit.

23       121.    The existence of incentives such as those described in the Bounty Agreement

24   motivated Future Link's anticompetitive litigation conduct.  The baseless suits were not

25   conceived by Future Link's own belief in their merits; instead, they were driven by MediaTek's

26   commercial imperative—to harm its Chip rivals.

27   **VII.    FILING OF THE OBJECTIVELY BASELESS LAWSUITS**

28

**A.    U.S. District Court for the Western District of Texas, Case No. 6:21-cv-00363-ADA (W.D. Tex.) (the "363 Case")**

122.    On April 13, 2021, Future Link launched its first suit against Realtek for alleged patent infringement, in the U.S. District Court for the Western District of Texas, Case No. 6:21-cv-00363-ADA (W.D. Tex.) (the "363 Case"). In that case, Future Link accused Realtek of directly infringing U.S. Patent No. 7,917,680 (the "'680 patent"). According to Future Link's complaint, the '680 patent supposedly "relates to improvements in electronic circuitry in computing devices and processors."

123.    Future Link accused a broad swath of Realtek products of infringing that patent, including both unspecified products "that use processors supporting ARM AMBA AXI4 or newer," as well as products that "operate in substantially the same way."[16] These accusations were predicated on the same patent and infringement theories ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

124.    As Defendants intended, the mere fact of Future Link's complaint burdened Realtek's business operations with the specter of supply instability.[17] TV Chips customers are highly sensitive to such risks, real or perceived.

125.    But, true to form, Future Link's claims in the 363 Case quickly unraveled. There were multiple fatal defects with Future Link's case: (a) there was no personal jurisdiction; (b) the complaint was not properly served; (c) *Future Link failed to plausibly allege that Realtek engaged in any act of direct infringement*; and (d) Future Link relied on optional features without any showing that such features were actually included in the accused products.

126.    Confronted with these defects, Future Link attempted to amend its complaint on July 15, 2021, but failed to cure its deficiencies. The first amended complaint even expanded the scope of accused products to encompass additional Realtek products—this time even more

---

[16] *See* Compl. Ex. 2, *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-0363-ADA, (W.D. Tex. Apr. 13, 2021) ('680 patent infringement chart), ECF Nos. 1-2.
[17] *See* Compl., *Future Link Sys., LLC v. Realtek Semiconductor Corp.*, No. 6:21-cv-01353-ADA, (W.D. Tex. Dec. 22, 2021) (requesting various remedies), ECF No. 1 at 8. *See also* Compl., (Public) *In re Certain Integrated Circuit Prods. and Devices Containing the Same*, ITC Inv. No. 337-TA-1295, Dkt. 3589 at *46 (Dec. 29, 2021) (requesting a permanent limited exclusion order).

1    broadly accusing products that "use processors supporting ARM AMBA AXI4 or newer and/or

2    ARM AMBA CHI" including "without limitation" Realtek's RTD1295, RTD 1296, RTD1395,

3    RTD1315, RTD1319, and RTD1619.  However, the amended complaint, like the original

4    complaint, again wrongly accused Realtek of engaging in directly infringing acts within the

5    United States.  The amended complaint also repeated Future Link's reliance on optional features

6    without identifying any basis for believing that such features were actually present in the accused

7    products.

8        127.    On March 30, 2022, the district court granted Realtek's pending motion to stay the

9    363 Case.  In doing so, the court announced that *it would grant Realtek's motion to dismiss* the

10   suit for lack of jurisdiction and that it would enter a full opinion at a later date.

11       128.    The deficiencies were numerous and obvious.  They showed there was no adequate

12   investigation for the claims.  For example:

13       • FLS' own documents contradicted its allegations.  The very documents cited by

14          Future Link proved the falsity of the allegation that the accused products contained

15          the QoS features that Future Link accused of infringement.  Future Link

16          nevertheless filed this action in reliance on nonexistent QoS features.

17       • Without any investigation whatsoever, Future Link speculated in its complaint that

18          Realtek products might implement the "CHI" bus architecture because it was "one

19          of two possible" options.  (Dkt. No. 41 at 3-4.)  This option in fact was not

20          implemented, and Future Link never attempted to inspect or analyze any Realtek

21          products to determine which type of bus architecture they use, either prior to filing

22          suit or since.

23       • Future Link's jurisdictional allegations lacked any factual support.

24       129.    Further, where PAE Defendants' asserted patents faced validity challenges at the

25   Patent Office, they either were found invalid or were likewise withdrawn to avoid a final

26   determination.

27       130.    For example, on June 25, 2021, after Future Link asserted claim 1 of the '680

28   patent against Realtek, Realtek filed an *inter partes* review ("IPR") petition with the Patent Trial

1    and Appeal Board ("PTAB") at the U.S. Patent and Trademark Office challenging the

2    patentability of claim 1 and other claims of the '680 patent.  Future Link then asserted claims 15

3    and 20 against Realtek, and on March 14, 2022, Realtek filed a second IPR petition against the

4    '680 patent, challenging the patentability of claims 15 and 20. On September 9, 2022, to avoid a

5    finding of unpatentability, Future Link simply *cancelled claims* 3-6 and 15-20 of the '680 patent,

6    leading to the PTAB denying institution (*i.e.*, not holding a trial) of the second IPR petition on

7    September 14, 2022, on the basis that the challenged claims had been cancelled *by the patent*

8    *owner*.  Unsurprisingly, on January 4, 2023, in a final written decision, the PTAB found

9    unpatentable claim 1 and all other claims of the '680 patent challenged in Realtek's first IPR.

10        131.    The PTAB's findings on the challenged claims of the '680 patent, and Future

11   Link's own preemptive cancellation of other claims (to avoid a determination of unpatentability),

12   confirm what ███████████████████████████████████. MediaTek ████████████████

13   ████████████████████████████████████████████████████████████████████████

14   ████████

15        132.    Despite having no objective basis, Future Link nonetheless brought this meritless

16   litigation to recover the Bounty.

17        133.    Future Link's objectively baseless action relating to the '680 patent was just the

18   beginning.  As Realtek sought to dismiss Future Link's meritless suit, Future Link doubled down

19   on its meritless litigation campaign, initiating two additional actions against Realtek.

20   **B.    U.S. District Court for the Western District of Texas, Case No. 6:21-cv-01353**

21   **ADA, (W.D. Tex. Dec. 22, 2021) (the "1353 Case")**

22        134.    On December 22, 2021, Future Link filed another lawsuit in the Western District

23   of Texas, alleging infringement of two other patents Future Link purportedly purchased.  Those

24   patents were United States Patent Nos. 7,685,439 (the "'439 patent") and 8,099,614 (the "'614

25   patent").

26        135.    Despite two motions to dismiss for lack of personal jurisdiction and improper

27   service in the 363 Case, and having amended its complaint in that matter to plead additional

28   jurisdictional allegations (which remained inadequate), Future Link nonetheless filed a complaint

in the 1353 Case containing the very same fatally defective jurisdictional and service allegations. Specifically:

- Future Link pled no facts showing that Realtek held assets or did business in Texas. Nor did it allege that Realtek had any customers in Texas. Or even that Realtek directed any activities toward Texas, much less that any of Future Link's claims arose from such activities.

- Future Link again purported to serve Realtek through personal service in Taiwan, despite Realtek's demonstration in the 363 Case that personal service is unavailable under Taiwanese law, and thus equally unavailable under the Federal Rules.

136. Future Link pressed on with the 1353 Case right up to March 30, 2022, when the court granted Realtek's motion to stay the 363 Case, and simultaneously announced that it had "***decided to rule in favor of defendant on at least one issue***" in Realtek's pending motion to dismiss for lack of personal jurisdiction and improper service of process. Because Future Link's jurisdictional and service allegations in the 1353 Case suffered from precisely the same flaws (and worse), Future Link would have been confronted with the same result.

137. Four days after the district court's announcement, however, Future Link hurriedly voluntarily dismissed both the 363 Case and 1353 Case under Rule 41(a)(1)(A)(i). Future Link represented to the judge that the dismissal was pursuant to a settlement or licensing agreement with ARM. But that representation was apparently fraudulent, because Future Link attempted to dismiss the case *without prejudice*, while the RPX / "ARM" agreement appears to have required any dismissals resulting from the agreement to be made *with prejudice*.

138. Moreover, like the '680 patent, the '439 and '614 patents would fall apart under PTAB scrutiny. On December 22, 2021, Future Link accused Realtek of infringing these patents, even though the '439 patent was previously the subject of an instituted IPR petition by Intel (following a determination by the PTAB that there was a "reasonable likelihood" that Intel would prevail in showing invalidity for at least one of the challenged claims). Future Link was able to avoid a finding of unpatentability in that IPR through a settlement agreement, which ended the IPR proceedings before the PTAB could render a final written decision. As for the '614 patent,

on June 8, 2022, Realtek filed an IPR petition challenging all claims of the '614 patent. On September 9, 2022, Future Link *voluntarily cancelled all claims* of the '614 patent, and on December 19, 2022, as before, the PTAB denied institution on the basis that the challenged claims stood *cancelled by FutureLink*.

139.    Again, this result was of no surprise to Defendants, given that ███████████ ███████████████████████████████████████████████████████████████ ██████

140.    Nonetheless, PAE Defendants brought this objectively baseless litigation in order to collect a Bounty.

## C.    The W.D. Tex. Addresses the 363 Case and 1353 Case in an Omnibus Order

141.    On October 10, 2022, the U.S. District Court for the Western District of Texas publicly filed a redacted version of an order resolving certain discovery disputes in the 363 Case and 1353 Case. This court has since unsealed that order on this docket. (*See* Dkt. 102-5). That order included the following findings and observations about the improper and anticompetitive nature of the lawsuits:

a.    "The Court finds that FLS (the party, not its counsel) executed an **improper contract** that should be discouraged as a matter of public policy."

b.    "The assignment contains a provision for MediaTek to pay FLS $1 million **simply to institute litigation against Realtek, who is MediaTek's marketplace competitor**. The assignment provision **does not require said litigation to survive any particular length of time** in the litigation process."

c.    "**Nor does the assignment require the litigation against Realtek to have any merit.**"

d.    "Public policy cuts directly against an agreement of this kind, where a company **pays a third party to sue a competitor** for any reason **with or without merit**." (citing *Rodriguez v. W. Pub. Corp.*, No. CV05-3222R

(MCX), 2007 WL 2827379, at *22 (C.D. Cal. Sept. 10, 2007), aff'd in part, rev'd in part, 563 F.3d 948 (9th Cir. 2009); *Cf. Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1258-60 (11th Cir. 2020) (an incentive payment in the class-action context that amounts to a "bounty" is not lawful)).

142.   Based on its findings, the court sanctioned PAE Defendants: "Under its inherent power, the **Court ORDERS this sanction**: the voluntary dismissal of the case (ECF No. 54) is modified to be a **DISMISSAL WITH PREJUDICE**." (Emphasis in original).

**D.   In the Matter of Certain Integrated Circuit Products and Devices Containing the Same, 337-TA-1295 (ITC Dec. 29, 2021) (the "ITC Case")**

143.   On December 29, 2021, Future Link again alleged infringement of the '439 patent and '614 patent, this time in a complaint before the United States International Trade Commission ("ITC"). At the ITC, Future Link included in its filings a request for an exclusion order barring from entry into the United States certain Realtek integrated circuit products (including the same Realtek Chips identified in the prior litigation in addition to others) and devices containing the same.

144.   Following the pattern of frivolous suits in the Western District of Texas, Future Link initiated the ITC Case without evidentiary support for its claims. For example:

- Future Link provided claim charts for the '439 patent and '614 patent, but failed to identify any evidentiary basis for concluding that numerous claim limitations were found in any Realtek products or the NXP, domestic industry products.

- Twelve of the fourteen claims Future Link asserted were dependent claims. Yet, Future Link did not offer any facts to support the allegations that Realtek infringed the dependent claims and confirmed it had no other facts to support its allegations.

145.   Realtek notified Future Link that its allegations lacked requisite evidentiary support on various occasions, including in a responsive pleading, supplemental discovery responses, correspondence, and a discovery meeting. In response to these requests, Future Link failed to identify any evidentiary support for numerous, and fundamental parts, of its claims, and stated that it had no obligation to identify any such support.

146.     On April 12, 2022, an Administrative Law Judge ("ALJ") at the ITC entered an order regarding a motion for sanctions in *In re Certain Integrated Circuit Products and Devices Containing the Same*, ITC Inv. No. 337-TA-1295, in which Future Link was the complainant.  As reflected in the unredacted portion of a public order, the ALJ noted the following:

> "The complained-of provision is found in a license between Future Link and a third party: [Redacted] [¶] This provision is alarming.  **It is difficult to imagine how it could possibly be lawful or enforceable.** *At a minimum it would seem to warrant an action by Realtek against either Future Link or its counterparty for unfair competition*, and it is possible such an action would fall within the jurisdiction of the Commission."
>
> (Emphasis added.)

147.     On May 31, 2022, the ALJ entered an initial determination granting-in-part Realtek's motion to declassify documents designated as "Confidential Business Information." In reference to a paragraph of the license agreement, the ALJ observed that "what the Paragraph memorializes may well be ***untoward and actionable***," and the ALJ referenced "five words describing the triggering event" in the paragraph.  (Emphasis added.)

148.     In sum, PAE Defendants' ITC arguments were baseless for many of the same reasons as in the 1353 Case in Texas.  They knew their claims were objectively baseless, but instituted the ITC proceedings because of the unique leverage to be gained by imposing the specter of an exclusion order against Realtek and ultimately its customers.

**E.     Future Link Systems, LLC v. Amlogic Holdings**

149.     That same year, PAE Defendant also brought costly patent claims against another TV Chip competitor, Amlogic Holdings, Ltd. ("Amlogic"), asserting the same three patents as it did against Realtek: the '680, '439, and '614 patents.[18] Those claims were also objectively baseless.  Responding to PAE Defendants'     , Amlogic repeatedly informed PAE Defendants,     .  PAE

---

[18] *See* Compl., *Future Link Sys., LLC v. Amlogic Holdings, Ltd.*, No. 1-21-cv-00634-RGA (D. Del. Apr. 30, 2021), ECF No. 1; Compl., *Future Link Sys., LLC v. Amlogic Holdings, Ltd.*, No. 1-21-cv-01790-LPS (D. Del. Dec. 22, 2021), ECF No. 1.

1    Defendants proceeded to sue Amlogic anyway as required under the Bounty.  The suits had to

2    proceed regardless of merit in order to collect the payment.

3        150.    PAE Defendants' threats to Amlogic began ▬▬▬▬▬, triggered by the

4    Bounty, and similarly make clear the baselessness of the patent claims:

5    • PAE Defendants asserted *the same three patents* against Amlogic in the District of

6        Delaware and the ITC as they asserted against Realtek: the '680,'439, and '614 patents.

7        These patents, and the ARM technologies they purportedly applied to, were the same ones

8        that ▬▬▬▬▬▬▬▬ before executing the Bounty

9        Agreement.

10   • Amlogic repeatedly pointed out that ▬▬▬▬▬

11        ▬▬▬▬▬▬▬▬▬▬

12        ▬▬▬▬▬▬▬▬▬▬

13        ▬▬▬▬▬

14   • Amlogic explained that ▬▬▬▬▬

15        ▬▬▬▬▬▬▬▬▬▬

16        ▬▬▬▬

17        151.    Just as with Realtek, there was no ▬▬▬▬▬ before

18   the Bounty was agreed to.  There was ▬▬▬▬▬

19   just a seven figure agreement to sue or extract an unwarranted license fee.  Ultimately, PAE

20   Defendants dismissed their suit without a court ever even addressing the merits of the claim on a

21   motion to dismiss.

22        152.    Reeling from Amlogic's audacious refusal to bend the knee, PAE Defendants on

23   ▬▬▬ laid bare both their disregard for the merits of their claims as well as their malicious

24   intent in pursuing them.

25        153.    In response to Amlogic ▬▬▬▬▬

26   ▬▬▬▬▬▬▬▬▬▬▬

27   ▬▬▬▬▬▬▬▬▬▬

28   ▬▬▬▬▬▬▬▬

1

2

154.    Even with ███████████████████████, Amlogic found no basis to

concede the patent claims.

155.    Amlogic ████████████████████████████████████████

7

8

9

156.    In response, Amlogic ██████████████████████████████████

11

12

13

14

15

16

17

18

19

157.    Tellingly, PAE Defendants' response to AmLogic's ██████████████

21

22

23

24

25

26

27

158.    Ultimately, soon after the ITC ALJ issued its April 2022 order concerning the

1   likely illegality of the Bounty Agreement in the case against Realtek, Future Link hurriedly

2   resolved claims against Amlogic as well.[19]  The terms of that resolution have not been disclosed.

3   Future Link resolved those matters to avoid further disclosure of the illegal conspiracy, just as it

4   had done numerous times with regard to claims against Realtek before the ITC, the federal court,

5   and the PTAB.

6       **F.    Monterey Research, LLC v. Realtek**

7           159.    On April 17, 2023, PAE Defendants went halfway around the world to continue its

8   MediaTek-sponsored attack on TV Chip competition.  Through its subsidiary Monterey Research

9   LLC, PAE Defendants sued Realtek in another objectively baseless case in Japan (the "Monterey

10  suit").  There, Monterey Research accused some of the same Realtek products of patent

11  infringement, identifying specifically Realtek's TV SoCs RTD1295 and RTD1395.  To date,

12  however, Monterey Research has failed to identify any Realtek sales of the accused products in

13  Japan – a crucial element in the infringement claim.

14          160.    Moreover, PAE Defendants' purported license agreement with ARM would have

15  included provisions barring PAE Defendants from bringing further infringement suits involving

16  the ARM products covered by that license.  Typically, these are styled as "Combined Products"

17  provisions, in which infringement claims that require limitations or allegations of the products

18  licensed in the agreement are barred, as well as other similar and interacting provisions like

19  "Licensed Products" and "Covered Third Party Products."  Yet, the Monterey suit alleges

20  infringement through some of the same ARM products and technologies identified in the claims

21  that were supposedly mooted by the ARM license, including ARM's "Cortex-A53" and "Armv8-

22  A CPU."

23          161.    Those obvious and fatal deficiencies beg the question: was there another incentive

24  to bring the Monterey suit?  Defendants ███████████ indicate the answer is "yes."  In ████

25  ████████████████████████████████████████████████████████████████

26

27  [19] *See* Order Granting Joint Mot. to Dismiss with Prejudice, *Future Link Sys., LLC v. Amlogic*
    *Holdings, Ltd.*, No. 1-21-cv-00634-RGA (D. Del. May 4, 2022), ECF No. 51; Order Granting

28  Joint Mot. to Dismiss with Prejudice, *Future Link Sys., LLC v. Amlogic Holdings, Ltd.*, No.
    1-21-cv-01790-LPS (D. Del. May 4, 2022), ECF No 12.

1    ████████████████████████████████████████

2        162.    Yet again, PAE Defendants engaged in sham litigation, the sole aim of which is to

3    wound Realtek in the eyes of TV OEMs to harm competition in TV Chips.

4        163.    Future Link's apparent approach of suing numerous entities, only to dismiss all

5    except one of them, is an abrupt reversal of its claim that it follows a "'litigation last' approach to

6    patent monetization." This abrupt reversal of its behavior by Future Link is further evidence of a

7    conspiracy with MediaTek.

8    **VIII.    PAE Defendants Committed Fraud On The Texas Court**

9        164.    Defendants claim that a March 31, 2022 settlement or licensing agreement reached

10    with Realtek's supplier, ARM, and resolved PAE Defendants' patent infringement claims against

11    Realtek, Amlogic, and numerous other chipmakers. Defendants claim that this is the real reason

12    for its abrupt dismissals of all those claims.[20] Despite their heavy reliance on that document,

13    Defendants refuse to reveal it. Realtek, the courts, and the public have never seen it.

14        165.    However, PAE Defendants did file, as an attachment to its motion to terminate the

15    ITC investigation, a heavily redacted copy of a license between PAE Defendants and RPX

16    Corporation, executed on the same exact day of Defendants' purported ARM license, which

17    appears to be that license.

18        166.    However, Realtek has uncovered a heavily redacted copy of a license between

19    PAE Defendants and RPX Corporation, executed on the same exact day of Defendants' purported

20    ARM license, that appears to be that license.

21        167.    Realtek now knows why Defendants kept it secret. Not only does its secrecy

22    preserve the anticompetitive burdens on Realtek, but Defendants breached the purported ARM

23    licenses in two ways: **(1) breach of the "Release and Dismissal Obligations,"** and **(2) breach of**

24    **the "Combined Licensed Product and Service" and related downstream licensing**

25    ────────────────

26    [20] In just one example, MediaTek, in its Motion to Dismiss Realtek's initial Complaint,
brandished the purported ARM settlement to counter what it framed as Realtek "bemoan[ing]

27    Future Link's litigations as 'meritless'." Dkt. 47 at 4:5-6. PAE Defendants likewise claimed
numerous times that its "confidential settlement" with ARM proves that its multiple lawsuits

28    against Realtek were somehow also "non-frivolous" and not "sham." *See, e.g.*, Dkt. 51 at 12:18-
21..

1    provisions.

2              a.   **Breach of the Release and Dismissal Obligations**

3        168.    The purported license agreement includes provisions **requiring** PAE Defendants,

4    the "Licensor," to dismiss *with prejudice* their suits against chipmakers like Realtek:

5              "Release and Dismissal Obligations" shall mean Licensor, on behalf of itself and its
6         Affiliates (i) executing a release agreement substantially similar to the Release Terms, and (ii) with
          respect to any Licensor Litigation Defendant, taking all actions and making all necessary filings
          to resolve all disputes with respect to such Licensor Litigation Defendant "with prejudice"
7         substantially similar to the Form of Dismissal (or, any other form of dismissal "with prejudice" in
          as is appropriate for any non-U.S. jurisdiction).

8              "Licensor Litigations" shall mean any and all lawsuits relating to any Patent filed at any
9         time by Licensor or its Affiliates in any state or federal court in the United States, in any court or
          tribunal in any foreign country, or before the United States International Trade Commission. Any
10        one of the Licensor Litigations is a "Licensor Litigation".

11             "Licensor Litigation Defendants" shall mean the parties adverse to Licensor or its Affiliates
          in any Licensor Litigation. Any one of the Licensor Litigation Defendants is a "Licensor Litigation
12        Defendant".

13       169.    Yet, PAE Defendants, after fraudulently representing to a Texas federal judge that

14   it was dismissing it's claims against Realtek pursuant to that license agreement, expressly chose

15   to do so *without prejudice*:

16
17              **NOTICE OF DISMISSAL WITHOUT COURT ORDER PURUSANT TO RULE**
                                        **41(a)(1)(A)(i)**

18              Plaintiff Future Link Systems, LLC ("Future Link") respectfully notifies the Court that,

19        pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), Future Link dismisses this action WITHOUT

20        PREJUDICE.

21       170.    By doing so, in violation of its own express contractual obligations, **PAE**

22   **Defendants sought to ensure the anticompetitive aims of its illegal scheme with MediaTek.**

23       171.    For example, by dismissing without prejudice, PAE Defendants would avoid

24   paying attorney's fees to Realtek, sticking Realtek with the full bill of the Bounty—and

25   conspiracy—driven sham suits.

26       172.    By dismissing without prejudice, PAE Defendants preserved the crushing burden

27   that the Defendants' scheme was designed to impose: the ever looming threat of the patent

28   thicket, comprised of legions of questionable, stale, and outright worthless patents that PAE

1    Defendants had acquired and continue to acquire.

2        173.    By dismissing without prejudice, PAE Defendants never lifted the "Damocles

3    sword" imposed on Realtek,[21] sapping Realtek of the ability to fully clear its name with its

4    customers and the semiconductor industry more broadly.

5        174.    According to the express language of the purported ARM license, and Defendants'

6    own representations about it, the license and its dismissal provisions were negotiated by ARM to

7    the benefit of its customers, and specifically those named as alleged infringers in PAE

8    Defendants' suits, including Realtek.  In other words, Realtek is a third-party beneficiary of the

9    rights conveyed by PAE defendants to ARM under that contract.

10        **b.  Breach of the "Combined Licensed Product and Service" and related**

11            **provisions**

12        175.    In addition to the express obligations requiring dismissal with prejudice against

13    third-party beneficiaries, there were other express provisions negotiated for the benefit of ARM's

14    customers.  These include, e.g.: protection for third parties, protection for downstream licensed

15    products and services, protection for combined licensed products and services, and release from

16    liability.  Specific provisions to those ends include, e.g.:

17                    • "Covered Third Party"

18                    • "Licensed Product and Service"

19                    • "Combined Licensed Product and Service"

20        176.    PAE Defendants breached these provisions when their subsidiary Monterey filed

21    another patent suit against Realtek in Japan on April 17, 2023.  That suit specifically named

22    Realtek's TV SoCs, RTD1295 and RTD1395, as infringing products.  But under the purported

23    ARM license, PAE Defendants covenanted to release such products from liability.  Indeed,

24    RTD1295 and RTD1395 were the same SoCs identified by PAE Defendants in the U.S. suits that

25    PAE Defendants claimed to have been obviated by the ARM license.

26        177.    Moreover, in the Monterey suit, PAE Defendants' infringement theory is

27    predicated upon RTD1295's and RTD 1395's incorporation of some of the same ARM products

28    ───────────────
     [21] *See infra* Section X.

1  named in the U.S. suits, including ARM's "Cortex-A53" and "Armv8-A CPU." It is those ARM

2  products, according to PAE Defendants, that implement the allegedly infringing processes. Such

3  an infringement claim would have been precluded under the ARM agreement's various and

4  overlapping "licensed products" provisions and release covenants.

5    178.    The "Combined Licensed Products and Services," "Licensed Products," and

6  "Covered Third Party Products" provisions are exemplary of the types of provisions that,

7  independently or in combination, would preclude PAE Defendants' right to bring the Monterey

8  Suit.

9    179.    The Monterey suit, because it relies on allegations of infringement via Realtek's

10  downstream incorporation of the specified ARM technologies, likewise breached the RPX/ARM

11  license under which Realtek is a third-party beneficiary.

12  **IX.    Defendants' Scheme Materially Differs from Litigation Finance Arrangements**

13    180.    The multi-faceted scheme carried out by the Defendants is significantly different

14  than litigation funding arrangements.

15    181.    Litigation funders treat a case as an investment, and typically carefully evaluate

16  the merits of a claim and the possibility of recouping a multiple return on the investment (either

17  through prevailing in the litigation or through settlement) before deciding to invest in the

18  litigation. There is no evidence MediaTek did anything of the sort here. MediaTek ▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

21    182.    Instead, the only way in which MediaTek treated the bounty as an investment is

22  through the anticompetitive and tortious gains from its illegal scheme. PAE Defendants' filing

23  their baseless suit against Realtek and the near-immediate weaponization by MediaTek through

24  misleading and disparaging statements to OEMs, *was the return* for MediaTek's payments to

25  PAE Defendants. Defendants conduct evidences as much.

26    183.    A prospective plaintiff seeking litigation funding will usually shop its case to

27  multiple potential funders. After all, the plaintiff wants the best terms from a funding deal,

28  including the largest share of the recovery from the suit. There is no evidence that PAE

1  Defendants shopped its suits against Realtek to a different potential buyer. Indeed, IPValue ███

2  ████████████████████████████████ what became the Bounty Agreement.

3      184.    Similarly, a prospective plaintiff seeking litigation funding will also present to

4  funders information about the merits of the claims to provide the funders with visibility about the

5  probability of obtaining a recovery in the case should they invest. ████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████.

9  *No rational investor makes an investment without regard to the prospects of gains*. Unless, that

10  is, that the gains were to come from the very fact of the suits being filed against Realtek—as

11  happened here.

12      185.    The eventual written Bounty Agreement—the carefully crafted, lawyered version

13  of the larger scheme among the Defendants—itself suggests the MediaTek payments to Future

14  Link are not conditioned on Future Link suits achieving any milestone, let alone a recovery.

15      186.    The scheme also represented an abrupt departure from MediaTek's stated

16  investment strategy. MediaTek tells investors that it focuses investments on "long-term strategy

17  and financial return…" and that MediaTek "will continue to evaluate investment plans prudently

18  under the aforementioned policy." The Defendants' anticompetitive and malicious scheme was

19  no litigation financing arrangement.

20  **X.    PAE Defendants Were Hired to Do What They Do Best: Impose and Leverage the**

21      **Crushing Burden of Litigation**

22      187.    Defendants' scheme—as well as each Defendant's respective components of that

23  scheme—burdened Realtek on at least two levels.

24      188.    The first is more obvious: Realtek spent time, money, and capacity defending the

25  suits that otherwise would have been spent on innovation and business activity; Realtek also lost

26  customer goodwill and sales opportunities from Defendants' imposition and leveraging of the

27  specter of supply instability. And these burdens continue to accrue with no end in sight, as PAE

28  Defendants continue to execute on their policy of merits-agnostic harassment through their

1    subsidiary, Monterey.

2        189.    But there is also a second, more sinister burden that requires a closer examination

3    of PAE Defendants' modus operandi.

4        190.    PAE Defendants, like other patent trolls, generate leverage by acquiring vast

5    troves of patents of purported relevance to certain industries, sub-industries, or even narrower

6    ranges of products.  This is sometimes referred to as a "patent thicket," which at least one study

7    explained as a "dense web of overlapping [IP] rights that a company must hack its way through

8    … to actually commercialize new technology." PAE Defendants understand that dynamic;

9    indeed, their entire patent acquisition and assertion strategy depends upon it.

10        191.    The Congressional Research Service ("CRS") and various experts have observed

11    that such thickets "make it economically and/or practically infeasible or irrational for

12    manufacturers to find and clear all patents incorporated in a given product." Patent trolls leverage

13    that dynamic with uncanny precision by (1) identifying an industry whose successful products

14    incorporate numerous incremental and overlapping technologies, (2) acquiring a patchwork of

15    questionable patents at least superficially related to those technologies and which haven't been

16    asserted in years, (3) continue to lurk in the shadows as potential victims continue to spend

17    resources innovating and winning adoption of their products, before finally (4) springing forth to

18    assert those patents against victims who now have much to lose and little to gain in fighting a

19    prolonged infringement battle, merited or not.  That is precisely the pattern PAE Defendants

20    followed, and continue to follow, in their infringement campaign against Realtek, Amlogic,

21    ARM, and almost a dozen other semiconductor companies.

22        192.    PAE Defendants are able to employ that pattern of conduct to sustain their

23    parasitic existence because of the crushing burden that such a thicket of amorphous claims

24    presents to makers and innovators.  By waiting until their prospective hosts have achieved a

25    critical mass in terms of size and success, and sunk costs in innovation, PAE Defendants expect

26    that alleged infringers are highly incentivized to pay them off before more damage can be done to

27    their business, even when the claims are baseless.  Indeed, the CRS observed that when patent

28    trolls assert claims in such a manner, "***it is too late [for victims] to design around the technology***

1   ***or negotiate a reasonable royalty rate because the producer has become locked in.***" That

2   dynamic allows patent trolls to bring "weak or baseless suits brought only to extract a settlement

3   from the defendant." That is precisely the burden that Defendants have wielded against Realtek.

4   193.    Relatedly, the CRS described the "Damocles sword" that exists when patent trolls

5   can threaten the mere possibility of an injunction—even during license discussions and before

6   filing suit—without any testing of the merits. That "Damocles sword" or "holdup" practice,

7   according to the CRS and other studies, is "particularly acute in the IT sector" (which includes

8   semiconductors), "because products incorporate dozens or even thousands of patented features or

9   components, and the owner of any one of them can keep the entire product off the market." And

10  while the CRS observed that *eBay v. MercExchange* enacted a positive change by enabling

11  federal courts to issue monetary damages instead of automatic injunctive relief, patent trolls have

12  responded by "shift[ing] their holdup efforts to the [ITC], a quasi-judicial federal agency," to seek

13  "'exclusion orders' that stop the import of infringing products into the United States." Once

14  again, PAE Defendants followed exactly that playbook when they followed their federal court

15  suits against Realtek with an ITC action seeking an exclusion order.

16  194.    That "Damocles sword" is yet another example of the crushing burden that

17  Defendants' litigation campaign imposed and continues to impose on Realtek.

18  195.    For example, even as Defendants claim that a purported 2022 settlement with

19  Realtek's supplier ARM absolved Realtek of any further burden, PAE Defendants (through

20  subsidiary Monterey) launched yet another suit against Realtek for infringement in 2023. That

21  suit, despite the purported ARM settlement, again claimed that Realtek's TV SoCs infringed PAE

22  Defendants' patents based on their incorporation of an ARM technology. Critically, those new

23  claims target ***the same Realtek SoCs (such as RTD1295 and RTD1395) identified in the***

24  ***original infringement suits,*** and are predicated on the SoCs' incorporation of some of ***the same***

25  ***ARM processors*** alleged to be the source of infringement in the original suits.

26  196.    Thus, it is clear that PAE Defendants are imposing on Realtek exactly the crushing

27  burden identified by the CRS and numerous experts: the choice between paying illegitimate

28  royalties that sap resources from competition and innovation, or facing a practically limitless

thicket of meritless patent claims that is "too late to design around" because Realtek and the industry have become "locked in."  Indeed, absent that crushing burden, PAE Defendants would not be able to assert just a few patents against a party, and then leverage that into an agreement covering hundreds of other patents, numerous products never alleged to be infringing, and sweeping downstream licensing provisions.

**A.      Patent Trolls Provide No Value and Merely Impose Costs on Innovators That in Turn Raise Costs to Consumers.**

197.    MediaTek and PAE Defendants knew exactly the type of impact their scheme would have on competition and innovation.

198.    PAEs such as Defendants IPValue and Future Link operate in what the Supreme Court has observed is "an industry [that] has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 646 (2015) (internal quotation marks omitted). IPValue and Future Link do not produce or sell goods.  Instead, they operate by acquiring patents solely to obtain licensing fees, by engaging in what are known as "ex post" patent transactions, *i.e.*, they purchase and enforce patent rights after practicing entities have heavily invested in creating, developing, and commercializing technologies.[22]  IPValue's and Future Link's "ex post" transactions occur after all major market players have invested billions of dollars in the design and fabrication of semiconductors that are manufactured and incorporated into downstream products.

199.    As the U.S. Federal Trade Commission ("FTC") stated in a March 2011 report, "ex post licensing" by PAEs like IPValue and Future Link can "distort competition in technology markets and deter innovation." According to the FTC, the activities of PAEs in the information technology industry have "amplified concerns about the effects of ex post patent transactions on innovation and competition." Furthermore, as the FTC points out, even if in some cases "PAEs

---

[22] IPValue and Future Link have reportedly acquired a very large portfolio of roughly 600 patents.  *See, e.g.*, *IPValue Management Subsidiary Future Link Systems Filed ITC Patent Infringement Complaint*, Business Wire (Dec. 30, 2021), https://www.businesswire.com/news/home/20211230005016/en/IPValue-Management-Subsidiary-Future-Link-Systems-Files-ITC-Patent-Infringement-Complaint (last visited on May 23, 2023).

arguably encourage invention, they can deter innovation by raising costs and risks without making a technological contribution."

200.    In 2016, a FTC report about patent troll activity identified three harms: (1) litigation and licensing costs not commensurate with the value of the technology at issue; (2) hindering entrepreneurship and investment by disproportionately focusing on growing firms; and (3) diverting talent and other corporate resources away from developing new products and engaging in R&D.  FTC termed the last of these "***socially wasteful and inconsistent with the fundamental goals of the patent system***."

201.    While some non-practicing entities do innovate the technologies for which they receive and assert patents, "patent trolls" like IPValue and Future Link do not.  Studies have shown the extraordinary toll that such PAEs take on innovation.  One study showed PAEs create $29 billion in direct, out-of-pocket costs from their targets.[23]  Additional researchers found that targets of PAE enforcement suffer ***three times*** the average market value loss as a tech peer sued for enforcement by a practicing entity.[24]  The same researchers observed that "[p]atent troll litigation has a chilling effect on at-risk firms," citing the expense involved in research and development specifically to "work around" patents held by PAEs, the potential need to exit product lines, or paying royalties to PAEs.[25]

202.    The risks that a PAE's actions will distort competition and deter innovation are particularly acute with respect to PAEs that the FTC has termed "patent aggregators," that is, entities that "build very large portfolios of purchased patents and implement a licensing strategy to earn returns for investors."  Even when their patents individually have no material value, by aggregating hundreds of patents directed to a particular technology, PAEs can credibly threaten to impose substantial costs on innovators through serial litigation.  PAEs can drive up costs for industry participants, raising prices to the end consumer.

203.    As a 2013 Congressional Research Service study found:

---

[23] *See* James Bessen, *The Evidence Is In: Patent Trolls Do Hurt Innovation*, Harv. Bus. Rev. (Nov. 2014), https://hbr.org/2014/07/the-evidence-is-in-patent-trolls-do-hurt-innovation.
[24] *See* Alan Morantz, *Patent Trolls Are Worse Than You Think*, Smith Bus. Insight (July 8, 2019), https://smith.queensu.ca/insight/content/patent_trolls_are_worse_than_you_think.php.
[25] *See id.*

PLAINTIFF REALTEK SEMICONDUCTOR
                                                                                            CORP.'S FIRST AMENDED COMPLAINT

Investment decisions must factor in the likelihood that PAEs will later emerge and demand royalties or bring costly litigation, directly reducing returns on investment.  Faced with lower profit margins and uncertain but potentially significant risk, manufacturers may find that some R&D projects, features, and product improvements are simply not worth doing, even if beneficial to consumers….
There are also opportunity costs as productive entities divert funds from R&D to deal with PAEs.

204.    In short, aggregation of patents by IPValue and Future Link leaves innovators like Realtek with a choice between two undesirable alternatives: either paying unwarranted royalties that raise innovators' costs and undermine their competitiveness, or defending against burdensome litigation.[26]

205.    In a purported attempt to distance themselves from PAEs, IPValue and Future Link have claimed in Court filings that they are simply *not like the other trolls*, and that they operate more honorably and employ litigation only as a last resort.[27]  The facts uncovered by Realtek demonstrate that PAE Defendants abruptly departed from this at the behest of MediaTek.

206.    Additionally, as a 2022 TechDirt post observed that IPValue "has a history of getting big, lumbering, no longer innovative companies to sell off useless patent portfolios for the sake of 'licensing' them.  Of course, when no one wants to license totally useless patents, the company has been known to engage in litigation."  It continued:

"[T]he reality is that ***they're classic trolls, collecting tons of patents to then seek to shake down actual operating companies***, not for copying ideas and infringing, but for doing something obvious with the technology that some vague, forgotten patent sorta kinda, maybe could describe if you squint and ignore the fact that patents are only to supposed to cover 'non-obvious' ideas."

**B.    PAEs Exact Their Toll on Innovation By Leveraging the *Process* of Litigation, Without Regard to the Merits of the Alleged Infringement**

207.    Numerous sources have documented and explained the perverse economics and

---

[26] *See, e.g.*, Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition*, (March 2011), www.ftc.gov/sites/default/files/documents/reports/evolving-ip-marketplace-aligning-patent-notice-and-remedies-competition-report-federal-trade/110307patentreport.pdf at 9 ("[PAEs] can deter innovation by raising costs and risks without making a technological contribution.").

[27] *See, e.g.* Future Link and IPValue's Motion to Dismiss, Dkt. No. 51, at 2:15-17 (claiming that "IPValue's 'litigation last' approach to patent monetization 'differs significantly from many others n the same line of business'").

1    legal realities at play when PAEs sue alleged infringers.

2          208.    Justice Kennedy noted the tendency of NPEs to "use patents not as a basis for

3    producing and selling goods, but, instead, [as a] bargaining tool to charge exorbitant fees …"

4    *Ebay v. MercExchange*, 547 U.S. 388, 396 (2006) (Kennedy, J. concurring).

5          209.    A 2009 analysis of the economics of litigation described the "systematic gaming of

6    the patent system by a patentee or assignee using the threat of patent litigation to force

7    unnecessary or inefficient licenses upon accused infringers."  That dynamic, the study found, was

8    carried out by the PAEs "suing large numbers of defendants, **with or without regard to the**

9    **merits** of the underlying infringement case, **in anticipation that the majority will settle and**

10   **purchase licenses if only to minimize their own litigation costs**."  The study explained that

11   "whether or not the accused defendant in such an infringement suit is actually infringing, the

12   threat of litigation is a strong incentive to take a license from a patentee," and that PAEs can

13   "seek[] to license even clearly bad patents for [settlements] small enough that licensees decide it

14   is not worth going to trial."  And because of the burdens and uncertainties of litigation,

15   unnecessary licensing costs are "imposed whether the underlying patent in question is a 'bad'

16   patent or not."

17         210.    Similarly, "bad patents" impose costs.  "[B]ad patents that are litigated impose

18   social costs … bad patents that are licensed impose legal fees on licensees…some licensees may

19   pay a royalty rather than fight even a bad patent in court … [such] royalty payments are a social

20   cost to bad patents … [f]inally, it is possible that the mere existence of bad patents that aren't

21   litigated or licensed may nonetheless deter some lawful competitive conduct."  Mark Lemley,

22   Rational Ignorance at the Patent Office, UC Berkeley School of Law Public Law and Legal

23   Theory Working Paper No. 46 (Feb. 2001).

24         211.    A 2001 journal article likewise described the practice of "Holdup Licensing,"

25   observing the frequency with which "[i]nnocent competitors that are not infringing a valid patent

26   nonetheless pay money to the owners of an invalid patent." Victims of "Holdup Licensing" often

27   pay licensing fees to make a "'nuisance value' claim" go away.  Similar practices occur in various

28   industries, but when it "occurs in the patent system…the result is inefficiency in society's

allocation of resources," and it "discourages competition to a greater extent than is socially optimal."

212.    A 2013 journal article recognized that "independent of the merits of a case, most customer defendants will take whatever option results in less cost—including a license priced less than the expected cost of litigation."  And when the actual value of the patents "are worth relatively little compared to the costs of litigation—roughly one to three million dollars even for suits of modest complexity—serial nuisance filings against resellers or users quickly become more profitable than litigation on the merits against the original manufacturer."  And when manufacturers higher up in the supply chain are sued, they likewise face pressure to settle and take broad licenses to cover their customers: **Manufacturers also legitimately fear losing goodwill with existing customers as well as business in the future if they fail to stand up for customers accused of infringement.**"  (https://www.wsgr.com/a/web/52/yoon-1013.pdf). Defendants' tortious, misleading, and anticompetitive conduct preyed upon precisely that fear— first with SoC suppliers like Realtek and Amlogic, and then with their upstream supplier, ARM.

213.    None of this is particularly new or contested.  In 1967, the United States Senate heard testimony that, "The businessman can be subjected to considerable harassment as an alleged infringer.  **Even in cases where he feels strongly that the patent would ultimately be held invalid, when he considers the hundreds of thousands of dollars in complex cases that could be involved in defending a suit, he may conclude that the best course of action is to settle for less to get rid of the problem**.  These nuisance settlements, although distasteful, are often, under the present system, justified on pure economics." *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, XXX (1971) (quoting 1967 Senate Hearings 103, S. 1042, 90th Cong., 1st Sess., §294 (1967)).  Courts have similarly recognized for decades that a license fee "negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation."  *See, e.g.*, *Panduit Corp.v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1164 n.11 (6th Cir. 1978) (quoting *Tights, Inc. v. Kayser-Roth Corp.*, 442 F. Supp. 159, 166 (M.D.N.C. 1977)).

214.    Legal realities help explain why PAEs can use the mere process of litigation to

PLAINTIFF REALTEK SEMICONDUCTOR
                                                                                                                            CORP.'S FIRST AMENDED COMPLAINT

extract unmerited fees from their victims.  Under § 271(a) of the Patent Act, for example, any entity that "makes, uses, offers to sell, or sells" subject matter covered by a patent claim is a viable target for an infringement suit.  PAEs can, thus, target victims at any level of the supply chain, from the manufacturer of the smallest allegedly infringing component itself, to an end-user who incorporates that component into a more complex product, all the way down to the retailer that sells the completed product.

215.    And because patent law does not permit infringers to implead other parties who might otherwise be jointly or severally liable for the alleged infringement, PAEs know that each defendant, sued separately, must alone bear the costs and uncertainties of litigation.

216.    Moreover, the allocation of those costs and risks, as between PAE and victim, are asymmetric.  An alleged infringer considering a legal defense must consider not only the **hypothetical** costs of damages and injunctions (if ultimately found liable), but also the **immediately accruing** burden of legal fees and damage to the marketability of its products (that are imposed regardless of the merits).  On the other hand, while a PAE must also consider the costs of litigation, it can thumb the risk scale of its target with a threatened patent claim and then simply withdraw the suit if and when unfavorable factual, legal, or economic circumstances arise.  PAEs also do not share the same legal and business risks as would one manufacturer suing another for infringement, as PAEs produce no products or innovations that could themselves be subject to a countersuit of infringement.

217.    Thus, it is no accident when PAEs target entities like Realtek whose component technologies are incorporated into significant dollars' worth of downstream customers' products.  The mere specter of infringement jeopardizes the manufacturer's customer relationships, goodwill, and marketability, and PAEs know this.  PAEs count on the fact that settling or paying a license, regardless of the merits of the underlying claim, can be vastly cheaper than defending a lawsuit.  And when an entity with downstream customers is the target, PAEs can further leverage that cost-benefit equation, predating on the fact that the target needs its customers protected from suit as well, allowing the PAE to demand even higher "licensing" fees.

218.    The final value of a license agreement conceived under such conditions is, thus,

1   inextricable from the broader, downstream protections negotiated by the accused supplier. Those

2   contractual protections can take many forms, but frequently include, e.g.: releases from liability;

3   dismissals of ongoing suits against customers; sub-licensing for downstream products; and

4   "combined products" provisions. Ultimately, those higher licensing fees still make their way

5   downstream in the form of higher costs and burdened innovation.

6   **XI.    Defendants Weaponized the Baseless Patent Suits Against Realtek to Sow Doubts**

7   **about Realtek's Supply Stability**

8          219.    MediaTek leveraged the existence of Future Link's lawsuits and the burdens they

9   imposed to disparage Realtek among Realtek's customer base. As it has done before, MediaTek

10  contacted TV ODMs and OEMs to sow doubts about Realtek's reliability and warned them to

11  reduce their use of Realtek TV Chips into their products because of the risks posed by patent

12  litigation.

13         220.    ███ has sourced TV Chips from Realtek, and also from MediaTek, for use in

14  Smart TVs. MediaTek approached ███ and told ███ false and misleading information about

15  Realtek TV Chips.

16         221.    MediaTek knowingly communicated clearly false and misleading statements about

17  Realtek's SoCs and the legitimacy of Future Link's claims. These statements were not pursuant

18  to or incident to *any litigation where MediaTek was a party.*

19         222.    MediaTek's communications, for example, portrayed the patent claims as

20  legitimate, despite MediaTek knowing the patents were invalid and that the infringement claims

21  were the sham result of the Bounty Agreement. MediaTek never disclosed that the various

22  litigations were concocted by MediaTek, secretly funded by MediaTek and agreed to without any

23  diligence whatsoever as to whether Realtek actually infringed any valid patents.

24         223.    These misstatements and omissions are clearly material in this industry. Supply

25  certainty is important to Realtek's customers and MediaTek used the fact of litigation (to which it

26  was not a party) to sew doubts among customers.

27         224.    These statements also were clearly likely to induce reasonable reliance by their

28  recipients, for several reasons. *First,* the sheer novelty of Defendants' scheme means that it was

unlikely that recipients would suspect MediaTek had caused the filing of the lawsuits. *Second*, the litigation itself was publicly available and was amplified by agreed upon press releases. This was intended to damage Realtek goodwill, reduce customer confidence, and raise serious questions about Realtek. Finally, Defendants *knew* the statements would induce reliance amongst its intended audience, and indeed *depended* on that being true to execute their scheme. PAE Defendants' business model relies on imposing threats to victim's business continuity and supply instability, a fact that PAE Defendants themselves embraced in their public communications and private threats to alleged infringers.

225.    The recipients of these statements lacked knowledge of the bounty agreement and did not have a readily available way to verify the truth of the infringement allegations by Defendants. That is because of the technical nature of the patent allegations, which involve inaccessible technical details. Even ████████████████ to Realtek and Amlogic, PAE Defendants used the fact that ██████████████████████████████████ to induce a license or settlement. In none ███████████████ did PAE Defendants disclose ████████████████████████████████████ the anticompetitive Bounty Agreement. Instead, ███████████████████, PAE Defendants routinely proclaim that their licenses are based on ascertaining a "fair market value." Indeed, when Amlogic ███████████ ████████████████████████████████████████ ████████████████████████████

226.    Realtek was not readily able to neutralize or offset these statements. That is because Realtek did not learn of some of them until after the business was lost. It also is because the Bounty Agreement was hidden by Defendants until recently. And it is because it took significant time and resources to defeat the litigation instigated by Defendants.

227.    MediaTek's conduct, undertaken in conjunction with the broader anticompetitive scheme, resulted in lost sales for Realtek and the erosion of its goodwill at a key moment for Realtek's TV Chips business. Realtek had invested significantly to develop its technology and prove its capability with higher-end TV Chips. Instead, Realtek faced questions about the case allegations and its ability to reliably supply Chips free of potential legal impediments.

228.    MediaTek undertook these acts with the specific aim of eliminating competition provided by its closest rival, Realtek, to the detriment of customers and the public.

229.    After MediaTek weaponized the baseless suits against Realtek, Realtek lost large bidding opportunities for TV Chips during 2022, 2023, and 2024, respectively.  All told, Realtek lost several bids worth millions of dollars.  In all of these losses, MediaTek was the winning supplier of TV Chips.  MediaTek's anticompetitive scheme had achieved its intended results. Realtek's monthly revenues had been growing rapidly year over year.  After the Defendants' executed their scheme, Realtek experienced significant declines in its monthly revenues during the second half of 2022 and in 2023.

230.    As a result of MediaTek's anticompetitive scheme, Realtek's revenue growth has declined relative to MediaTek and the global semiconductor industry.  For example, in the 24 months leading up to PAE Defendants' lawsuit against Realtek in April 2021, Realtek's average monthly growth rate was 2.8%, which was similar to MediaTek's growth rate of 3.2%.  However, in the 24 months following the lawsuit (April 2021 – March 2023), Realtek's average monthly growth rate was just 0.5% compared to MediaTek's growth rate of 2.9%.

231.    PAE Defendants, like MediaTek, did their part in imposing the "Damocles sword" on Realtek.  After initiating the ITC action against Realtek, PAE Defendants issued a press release publicizing to the world that it had done so. [28]  The communication specifically identified Amlogic and Realtek among other "semiconductor vendors" as the alleged infringers in the suits. The communication also stated that the alleged infringing products "designed and sold" by Realtek were incorporated into the products of Realtek's customers, the "end-device manufacturers of mobile phones, tablets, personal computers, smart home devices, and other devices."  The purpose of the press release was to further leverage the baseless suits against Realtek's customer relationships and to harm competition.  Indeed, the press release implied that the targets of PAE Defendants' meritless campaign should "step up on behalf of themselves and their end-device vendor customers." This is the same type of thinly veiled threat PAE Defendants

---

[28] https://www.businesswire.com/news/home/20211230005016/en/IPValue-Management-Subsidiary-Future-Link-Systems-Files-ITC-Patent-Infringement-Complaint

1  ███████████████████████████████████████ asserting sham claims against them, and

2  once again belies the meritless nature and improper purpose of the suits.

3      232.    PAE Defendants' press release was also false and misleading.  Despite using the

4  words "alleged" or "allegedly," PAE Defendants represented that the claims and underlying

5  allegations in each suit were merited and not brought for an improper purpose.  But PAE

6  Defendants knew that was not true.  Defendants also knew the suits against were brought with the

7  purpose of harming Realtek, Amlogic, and competition, and without regard to the merits.

8  **XII.    The Relevant Antitrust Market is TV Chips**

9      233.    For millions of Americans, the TV is a central feature of our home.  Modern

10 so-called "smart" TVs provide stunning video featuring millions of pixels, crystal-clear sound,

11 and internet connectivity allowing for digital streaming and interactive content.  In many ways,

12 today's Smart TVs have more in common with smartphones or computers than with their legacy

13 cathode ray tube TV predecessors.

14     234.    Smart TVs today derive much of their capability from TV Chips.  TV Chips are

15 integrated circuits that incorporate a processor, memory, audio and video decoding, internet

16 connectivity, and other functions in a single, integrated circuit that receives and processes digital

17 information and delivers TV content to the viewer.

18     235.    TV Chips comprise a distinct relevant product market.

19     236.    TV Chips are optimized for a particular purpose: to perform critical functions of

20 Smart TVs.  TV Chips enable decoding of audio and video, offer Internet Protocol connectivity,

21 and support some software applications.  TV Chips require advanced processing capabilities.

22 They are specialized to be very fast for the particular purpose of receiving and displaying a video

23 and audio signal while avoiding latency.  Ultra-high efficiency processors are thus critical.

24     237.    The processor speed of TV Chips is typically lower than that of personal

25 computers, and TV Chips also feature (or are paired with) much less storage, as the apps available

26 for usage on a Smart TV are limited in comparison.  To illustrate, the memory available for

27 storage in a TV Chip is often a fraction of that within the average smartphone.  TV Chips thus

28 incorporate the features particularly important to Smart TVs, while omitting some unnecessary

1    features in order to manage cost.

2        238.    Other types of chips are not functional or economic substitutes for TV Chips.  As a

3    result, a small but significant sustained increase in the price of TV Chips would not cause any

4    significant number of customers to purchase other types of Chips in place of TV Chips.  Thus,

5    such a price increase for TV Chips would result in higher profits.

6        239.    OEMs and ODMs typically have a separate team that works to integrate TV Chips

7    into Smart TVs, i.e., TV Chips have a distinct supply chain.

8        240.    Additionally, industry players and observers view TV Chips (sometimes

9    alternatively referred to as TV system-on-chips or SoCs) as distinct from other types of chips.

10        241.    Even MediaTek views TV Chips as distinct from other chips.  For example,

11    MediaTek acquired MStar to create a new TV Chips business group, separate from other chips

12    made by both companies including mobile phone chips.  MediaTek's restructuring plan for that

13    merger also divided MStar into three separate parts: TV Chips, set-top box chips, and touch

14    sensor design.

15        242.    China's MOFCOM found that the MediaTek-MStar merger would improperly

16    restrict competition in TV Chips, to the exclusion of other types of chips.  Moreover, after

17    examining the characteristics of different TV-related chip—including set-top box chips, LCT

18    monitor chips, and TV SoCs—MOFCOM defined TV SoCs as an independent product market.

19        243.    The relevant geographic market is worldwide.

20        244.    Monopoly power is the power to control prices or exclude competition.  At all

21    relevant times, MediaTek held a market share of over 70 percent in the worldwide market for TV

22    Chips.  As such, MediaTek possesses monopoly power in the market for TV Chips.

23        245.    There are high barriers to entry in the TV Chip market, including sophisticated

24    technology design expertise that is expensive and time-consuming to develop; experience

25    designing Chips that must meet the exacting specifications of makers of Smart TVs; meeting

26    technological standards; and intellectual property and trade secrets.

27        246.    Because of the lengthy and resource-intensive process for designing a particular

28    TV Chip into a Smart TV, TV Chip makers do not manufacture (or commission to have

manufactured) surplus TV Chips to hold in inventory.  Rather, TV Chip makers communicate regularly with OEMs that have incorporated their TV Chips into Smart TV models to gauge the OEM's planned output and needs for TV Chips.  And because of the expense and time to design TV Chips into a Smart TV, once an OEM has completed the design-in work for a given TV Chip or two, it would almost never undertake a process to design a different TV Chip into its Smart TV model.

**XIII.    Defendants' Scheme Harmed Competition in the TV Chips Market**

247.    Defendants' anticompetitive scheme harmed competition in TV Chips.  Specifically, the scheme caused a rise in prices.  The anticompetitive effects are seen specifically in MediaTek price increases on TV Chips.  For example, MediaTek first raised prices for its TV Chips after it entered the Bounty Agreement with IPValue.  Then, after Future Link sued Realtek in a series of baseless, sham patent infringement cases, and MediaTek spread lies about those cases to OEMs, MediaTek again raised its prices for TV Chips.

248.    One hallmark of the semiconductor industry is that chip prices rapidly fall over time, as more manufacturers adopt the technology and develop more cost-effective ways of producing chips, even as innovation in chips continued to occur.  For example, since 1995, semiconductor prices have fallen by nearly half.  However, the recent trend in prices of TV Chips has not followed that expected pattern.  Since the Defendants' baseless lawsuits against Realtek began in 2021, the prices of the TV Chips, in which MediaTek and Realtek compete, have increased.  In particular, the prices of TV Chips in the 4K 120 Hz TV (mainstream) segment increased from an average of $37.33 in the first half of 2022 to an average of $38.09 in the first half of 2023 and was forecasted to further increase to $40.81 by the second half of 2024.  Similarly, the prices of TV Chips in the 4K 120 Hz OLED TV segment increased from an average of $44.82 in the first half of 2022 to an average of $45.72 in the first half of 2023 and was forecasted to increase to an average of $49.96 in the second half of 2024, an 11.5% increase over prices in 2022.

249.    Price increases could be seen in the overall price of Smart TVs as well.  Future Link first sued Realtek in April 2021.  That same spring, certain Smart TVs were observed to

have increased in price by roughly 30% from the previous year.  In October of 2021, a Digital Trends article reported that "[m]any TVs (and other electronics) have seen big price increases over the past six months.  In fact, we've had to that the unusual step of revising several of our Best TVs lists to remove models that no longer fall under our price categories, like Best 4K TVs under $500 and Best 4K TVs under $1,000."  That is, the publication that follows Smart TVs as part of its day-to-day business was surprised by the increases in price for Smart TVs.  Products such as semiconductors go down in price over time as a result of technological innovation.  After MediaTek's anticompetitive scheme, the prices bucked this historic trend.

250.    The same article, under the heading "No relief any time soon," noted that MediaTek is the third largest customer of the world's largest semiconductor manufacturer, TSMC, and "produces the chips that power 70% of the [S]mart TVs sold globally."

251.    The article posited, notably, "***That could be part of the reason [cited for] a less-than-rosy outlook for prices dropping anytime soon***."  The publication highlighted MediaTek's monopoly position, and its position in Smart TVs from Samsung, TCL, Sony, and Hisense, as source of the increasing price of Smart TVs.

252.    Meanwhile, other components of Smart TVs were declining in price were following the normal historic trend.  Prices for display modules for Smart TVs were flat to slightly down.  Quantum dot solution—nanoparticles used to enhance displays—declined in price.  Even prices for shipping Smart TVs declined.

253.    MediaTek, on the other hand, increased its dominance through the anticompetitive scheme with PAE Defendants, won several key bidding opportunities, and during the same period, TV Chip prices increased.

254.    In the absence of Defendants' anticompetitive scheme, TV Chips would have been less expensive.  Smart TVs would have been less expensive as a result.

255.    Additionally, Defendants' scheme imposed significant costs on Realtek.  Realtek does not have an unlimited legal budget.  Instead, expenses from defending against Future Link's patent suits redirected money that Realtek would have invested in the research, development, and marketing of its TV Chips, and blunted Realtek's proven ability to compete on innovation and

1  pricing.

2       256.    Moreover, consumer electronics like Smart TVs are built in a carefully

3  choreographed global supply chain where all parts need to come together on time and on

4  specification.  Because TV Chips are a high-technology product, one aspect of supply certainty is

5  the ability to sell products clear of intellectual property claims that could jeopardize the right to

6  sell or import into major markets like the United States.

7       257.    And, because of the strenuous process that ODMS and OEMs undertake to

8  evaluate, validate, and adopt chips for a TV platform that ultimately must be manufactured at

9  scale, a chip whose supply certainty is threatened with regard to one major market is unlikely to

10  be selected for any market.  To remain competitive, Realtek's customers need TV Chips that can

11  reliably be supplied platform-wide and for the entire production run.

12       258.    Under patent laws, the false allegations that Realtek infringed Future Link's

13  worthless patents caused OEMs hesitation to buy TV Chips from Realtek.  That is because, had

14  Realtek infringed Future Link patents, the OEM could be sued for using an infringing product in

15  its TVs.

16       259.    The mere existence of such a patent enforcement action poses the type of risk to an

17  OEM that can alter their behavior in selecting a supplier.  ODMs and OEMs already keep

18  themselves apprised of such risks to ensure reliable access to key inputs, but MediaTek went even

19  further to directly disparage Realtek's reliability to customers.  All MediaTek needed was

20  ammunition, and Future Link provided it.  Defendants' scheme caused Realtek to lose growth

21  opportunities with ████ and other OEMs and ODMs.

22       260.    Smart TV manufacturers rely on stability of the supply of TV Chips designed into

23  their TVs.  MediaTek warned Smart TV makers that Realtek's supply would be interrupted

24  because of the Future Link suits.  MediaTek at no time explained to the OEMs that ***MediaTek***

25  ***had paid Future Link*** to create the appearance of risk to Realtek's supply.  That is, MediaTek

26  deliberately lied about Realtek.

27       261.    MediaTek's campaign to ruin its closest rival allowed MediaTek to insulate its

28  dominance against an innovative and growing player, Realtek.

1    262.    Before the Defendants' campaign of baseless patent suits and spreading lies to

2    OEMs, Realtek's sales to OEM ████ were estimated to be roughly 15% of Sony's TV Chip

3    needs.  After the Defendants' conspiracy took hold and, as a result of it, Realtek's TV Chip sales

4    to ████ fell precipitously to an estimated 4% of ████ TV Chip needs.

5    263.    Defendants knew what their actions would bring about and acted upon that

6    knowledge.  Future Link's patent infringement allegations were focused on the high efficiency

7    processors in Realtek's TV Chips.  The claims threated not only Realtek, but Realtek customers,

8    who might reasonably fear an infringement suit just for incorporating Realtek TV Chips into their

9    Smart TV.

10    264.    Defendants' scheme also threatened, and likely resulted in, long-term reputational

11    damage to Realtek's TV Chips business and its ability to build upon the string of successes it had

12    carefully sustained since 2015.  Indeed, the TV Chips development, evaluation, and adoption

13    process can last several years, and design houses that win a supply contract for a TV platform

14    have a significant advantage in competing for future contracts with the same OEM or ODM.

15    Because of these market realities, Realtek may never regain the competitive momentum and

16    opportunities it lost as a result of Defendant's targeted scheme.  The effect of Defendants'

17    anticompetitive conduct can be seen in the following chart showing Realtek monthly revenues,

18    which was forever harmed.

19

20

21

22

23

24

25

26

27

28

265. Consistent with these market realities, Amlogic was similarly harmed by Defendants' scheme. Indeed, PAE Defendants ███████████████████████████ ████████████████████████ patent claims against Amlogic.



266. Because of Defendants' scheme, key TV Chips competitors lost growth and sales opportunities that they otherwise would have invested back into continued innovation, marketing, and aggressive pricing. MediaTek positioned itself to capture those lost opportunities which, in the absence of legitimate competition, resulted in MediaTek pricing above the competitive level. Consumers were also harmed by the lost innovation directly caused as a result of Defendants' scheme. Every dollar spent to litigation is one less dollar that can be spent for improving the Realtek products, improving its customer service or lowering its prices.

267. Defendants' conspiracy had no conceivable consumer benefit. The Defendants' conspiracy harmed not only Realtek and Amlogic, but also competition in the market for TV Chips.

**<u>COUNT I</u>**
**<u>CONSPIRACY IN RESTRAINT OF TRADE IN THE MARKET FOR TV CHIPS</u>**
**<u>IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1</u>**
**<u>(ASSERTED AGAINST ALL DEFENDANTS)</u>**

268.    Realtek incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

269.    On May 2, 2019, Defendants IPValue, Future Link, and MediaTek entered and engaged in a conspiracy to unreasonably restrain trade in the market for TV Chips in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

270.    The conspiracy consisted of the Bounty agreement and related express or implied agreements among the Defendants whereby the PAE Defendants would assert serial objectively baseless (*i.e.* sham) patent infringement claims against Realtek and another TV Chip competitor, Amlogic.  The conspiracy allowed Defendant MediaTek to weaponize the suits against Realtek by using the existence of the litigation (rather than its merits) to harm Realtek's relationships with actual and prospective customers by calling into doubt the stability of Realtek's provision of TV Chips and raising the potential risk for Realtek customers to face infringement suits themselves, as well as imposing legal costs and expenses upon Realtek.  MediaTek never disclosed to customers or the public that it had surreptitiously financed the cases against Realtek.

271.    The Bounty was agreed to ███████████████████████████████ that Realtek ███████████ the patents that would later be asserted.  Defendants only targeted Realtek as part of the Bounty.  Prior to the beginning of the conspiracy, PAE Defendants have never even made a demand (much less sued) Realtek for the patents at issue.

272.    The conspiracy is directly evidenced by the Bounty Agreement conceived and entered into by Defendants between ██████████ 2019, and is further evidenced by:

    a.    Defendants' ████████████████████████████ subsequent baseless infringement suit brought by Monterey against Realtek in April 2023.

    b.    Defendants' coordinated anticompetitive conduct, including the filing of successive, meritless lawsuits which were paired with false and misleading

1    communications to disrupt Realtek's customer relationships, all of which

2    occurred only after the Bounty Agreement was executed.

3    c.    The anticompetitive results of Defendants' conduct, including raising

4    prices for TV chips after the suits were filed, when prices should have

5    otherwise been falling; and the harm to consumers in the form of higher

6    prices and reduced innovation.

7    d.    PAE Defendants' own recognizance of the meritless nature of the suits,

8    including by withdrawing their suits before any decision could issue on the

9    merits, and after at least one court announced its intention to rule in favor

10    of Realtek; ████████████████████████████

11    ████████████████████████████████

12    ████    i.e., that they had no plans to assert patents against Realtek and

13    Amlogic but for the Bounty Agreement; and by the fact that they had no

14    plans to do so at that point despite spending years asserting detailed claims

15    ████████████████████████████████

16    ████████████████.

17    e.    MediaTek's own recognizance of the meritless nature of the suits,

18    ████████████████████████████████████

19    ████████████████████████, positions

20    from which they have never departed.

21    f.    The fact, as recognized by Defendants, that the Bounty Agreement was a

22    directive ████████████████████████████

23    ████████████████████ not grounded in any objective

24    basis.

25    g.    PAE Defendants' fraudulent representations to the courts when describing

26    the purported ARM settlement as the basis for withdrawing their suits

27    shortly after the Bounty Agreement was uncovered.

28    h.    The fact that PAE Defendants, in breach of that purported ARM settlement,

withdrew their W.D. Tex. case against Realtek without prejudice, thus avoiding award of attorneys' fees to Realtek and making it more difficult for Realtek to clear its reputation and products from the specter of supply instability.

      i.     The fact that the ITC and W.D. Tex. courts expressed unanimous disapproval of the Bounty upon its discovery, with the latter sanctioning PAE Defendants.

273.    Pursuant to the conspiracy, PAE Defendants filed a series of sham patent infringement suits against Realtek and another TV Chip competitor, Amlogic, without regard to the merits of such suits and imposed a crushing burden upon Realtek, Amlogic, and competition in TV Chips.

274.    The crushing burden of Defendants' serial litigation scheme included:

    a.     The millions spent defending meritless suits that otherwise would have been spent on innovation and business activity.

    b.     The loss of customer goodwill and sales opportunities from Defendants' imposition and leveraging of the specter of supply instability, the effects of which reverberate beyond any single tortious action due to the TV Chip development, marketing, sales process.

    c.     The abuse of PAE Defendants' "patent thicket," by which Defendants imposed on their victims the choice between paying an illegitimate tax on competition and innovation, or fighting off a practically limitless series of meritless patent claims that is "too late to design around" because Realtek and the industry have become "locked in" to using the targeted essential technologies.

    d.     The continued accrual of those burdens with no end in sight, as PAE Defendants continue to execute on the conspiracy's merits-agnostic policy of harassment, currently through their subsidiary, Monterey.

275.    The conspiracy allowed Defendant MediaTek to fix, stabilize, or maintain

artificially high levels of pricing and reduce output for TV Chips, including in investment, development, and innovation.

276.    The contract, combination, or conspiracy caused anticompetitive effects in the market for TV Chips and is without any procompetitive justification.  For example:

      a.    The conspiracy allowed Defendant MediaTek to raise its prices and continue to charge artificially high prices for TV Chips when prices in this industry are typically rapidly declining.

      b.    The conspiracy harmed innovation in the market by forcing MediaTek's competition to spend millions defend and defeat against meritless litigation and litigation threats.

      c.    The filing and withdrawal of numerous objectively baseless lawsuits has no conceivable competitive benefit.

      d.    There was no procompetitive benefit to imposing a tax on MediaTek's competitors based on patents ███████████.

      e.    There is no procompetitive benefit to making false and/or misleading statements in the market about Realtek's products or regarding litigation MediaTek surreptitiously ██████ paid for and which PAE Defendants had no intention to bring but for the conspiracy.

277.    Realtek has been injured by Defendants' conspiracy through lost bids costing millions in revenue, lost customer trust in its products, and legal fees spent defeating objectively baseless claims.  This conduct is unlawful under the per se standard.  Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications.  Moreover, even if there were valid procompetitive justifications (which there were not), such justifications could have been reasonably achieved through means less restrictive of competition.

278.    Realtek is entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

**COUNT II**
**ILLEGAL AGREEMENT IN RESTRAINT OF TRADE IN THE MARKET FOR TV CHIPS**
**IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(ASSERTED AGAINST ALL DEFENDANTS)**

279.    Realtek incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

280.    Defendants IPValue, Future Link, and MediaTek entered into an agreement or agreements to unreasonably restrain trade in the market for TV Chips in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by carrying out an objectively baseless sham patent infringement suit against Realtek on April 13, 2021, in the U.S. District Court for the Western District of Texas: Case No. 6:21-cv-00363-ADA (W.D. Tex. Apr. 13, 2021) (363 Case).

281.    The illegal agreement consisted of the Bounty and/or related express or implied agreements.  This illegal agreement allowed Defendant MediaTek to weaponize the 363 Case against Realtek by using the existence of the litigation (rather than its merits) to harm Realtek's relationships with actual and prospective customers—by calling into doubt the stability of Realtek's provision of TV Chips and raising the potential risk for Realtek customers to face infringement suits themselves—as well as imposing legal costs and expenses upon Realtek.  MediaTek never disclosed to customers or the public that it had surreptitiously triggered and financed the 363 Case.

282.    The objective baselessness and anticompetitive purpose of the 363 Case is evidenced as described above.  Such indicia of objective and subjective baselessness include, for example:

> a.    Multiple fatal defects with Future Link's case: (a) there was no personal jurisdiction; (b) the complaint was not properly served; (c) ***Future Link failed to plausibly allege that Realtek engaged in any act of direct infringement***; and (d) Future Link relied on optional features without any showing that such features were actually included in the accused products.

> b.    After confronted with those defects, Future Link failed to cure them.  In an amended complaint, Future Link wrongly accused Realtek's products of

1      infringement through use of optional features without identifying any basis

2      for that accusation.

3      c.    On March 30, 2022, the district court granted Realtek's pending motion to

4            stay the 363 Case.  In doing so, the court also announced that it would

5            grant Realtek's motion to dismiss the suit for lack of jurisdiction and that it

6            would enter a full opinion at a later date.  Future Link avoided that

7            dismissal by voluntarily withdrawing the suit before a formal order could

8            issue.

9      d.    Later, in an Omnibus Order addressing both the 363 Case and 1353 Case

10           after discovery of the Bounty Agreement, the court sanctioned PAE

11           Defendants' by converting their withdrawal to a dismissal *with prejudice*.

12     e.    When Realtek challenged PAE Defendants' asserted patents with the

13           PTAB, the patents either were found invalid or were withdrawn by PAE

14           Defendants to avoid a negative merits determination.

15     283.  The illegal agreement caused anticompetitive effects in the market for TV Chips

16     and is without any procompetitive justification.  For example:

17     a.    The illegal agreement allowed Defendant MediaTek to raise its prices and

18           continue to charge artificially high prices for TV Chips when prices in this

19           industry are typically rapidly declining.

20     b.    The illegal agreement harmed innovation in the market by forcing

21           MediaTek's competition to spend millions to defend and defeat against

22           meritless litigation and litigation threats.

23     c.    The filing and withdrawal of numerous objectively baseless lawsuits has no

24           conceivable competitive benefit.

25     d.    There was no procompetitive benefit to imposing a tax on MediaTek's

26           competitors based on patents ████████████████.

27     e.    There is no procompetitive benefit to making false and/or misleading

28           statements in the market about Realtek's products or regarding litigation

1

MediaTek surreptitiously ██████ financed.

2

284.    Realtek has been injured by Defendants' illegal agreement through lost bids

3

costing millions in revenue, lost customer trust in its products, and legal fees spent defeating

4

objectively baseless claims.  This conduct is unlawful under the per se standard.  Defendants'

5

conduct is also unlawful under either a "quick look" or rule of reason analysis because the

6

agreement is factually anticompetitive with no valid procompetitive justifications.  Moreover,

7

even if there were valid procompetitive justifications (which there were not), such justifications

8

could have been reasonably achieved through means less restrictive of competition.

9

285.    Realtek is entitled to treble damages, attorneys' fees and costs, and an injunction

10

against Defendants to end the ongoing violations alleged herein.

11

## COUNT III
## ILLEGAL AGREEMENT IN RESTRAINT OF TRADE IN THE MARKET FOR TV
## CHIPS
## IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
## (ASSERTED AGAINST ALL DEFENDANTS)

12

13

14

286.    Realtek incorporates by reference and re-alleges the preceding allegations as

15

though fully set forth herein.

16

287.    Defendants IPValue, Future Link, and MediaTek entered into an agreement or

17

agreements to unreasonably restrain trade in the market for TV Chips in violation of Section 1 of

18

the Sherman Act (15 U.S.C. § 1) by carrying out an objectively baseless sham patent

19

infringement suit against Realtek on December 22, 2021, in the U.S. District Court for the

20

Western District of Texas: Case No. 6:21-cv-01353 ADA, (W.D. Tex. Dec. 22, 2021) ("1353

21

Case").

22

288.    The illegal agreement consisted of the Bounty and/or related express or implied

23

agreements.  This illegal agreement allowed Defendant MediaTek to weaponize the 1353 Case

24

against Realtek by using the existence of the litigation (rather than its merits) to harm Realtek's

25

relationships with actual and prospective customers—by calling into doubt the stability of

26

Realtek's provision of TV Chips and raising the potential risk for Realtek customers to face

27

infringement suits themselves—as well as imposing legal costs and expenses upon Realtek.

28

MediaTek never disclosed to customers or the public that it had surreptitiously triggered and

1  financed the 1353 Case.

2      289.    The objective baselessness and anticompetitive purpose of the 1353 Case is

3  evidenced as described above.  Such indicia of objective and subjective baselessness include, for

4  example:

5          a.    Filing and refiling of the complaint with fatally defective jurisdictional and

6                service allegations, despite two motions to dismiss by Realtek that pointed

7                out those defects.

8          b.    Future Link pled no facts showing that Realtek held assets or did business

9                in Texas, no allegations that Realtek had any customers in Texas, and no

10               allegations that Realtek directed any activities toward Texas, much less that

11               any of Future Link's claims arose from such activities.

12         c.    Despite Realtek's demonstration in the preceding 363 Case that personal

13               service is unavailable under Taiwanese law, and thus equally unavailable

14               under the Federal Rules, Future Link again purported to serve Realtek

15               through personal service in Taiwan.

16         d.    Future Link pressed on with the 1353 Case right up to March 30, 2022,

17               when the court granted Realtek's motion to stay the 363 Case, and

18               simultaneously announced that it had "decided to rule in favor of defendant

19               on at least one issue" in Realtek's pending motion to dismiss for lack of

20               personal jurisdiction and improper service of process.  Because Future

21               Link's jurisdictional and service allegations in the 1353 Case suffered from

22               precisely the same flaws (and worse), Future Link would have been

23               confronted with the same result.

24         e.    Four days after the district court's announcement, however, Future Link

25               voluntarily dismissed both the 363 Case and 1353 Case under Rule

26               41(a)(1)(A)(i).  Future Link represented to the judge that the dismissal was

27               pursuant to a settlement or licensing agreement with ARM.  But that

28               representation was apparently fraudulent, because Future Link moved to

1    dismiss the case without prejudice, while the purported ARM agreement

2    appears to have required any dismissals resulting from the agreement to be

3    made with prejudice.

4    f.    Later, in an Omnibus Order addressing both the 363 Case and 1353 Case

5    after discovery of the Bounty Agreement, the court sanctioned PAE

6    Defendants' by converting their withdrawal to a dismissal *with prejudice*.

7    g.    The '439 and '614 patents asserted in the ITC case fell apart under PTAB

8    scrutiny.  The '439 patent was previously the subject of an instituted IPR

9    petition by Intel (following a determination by the PTAB that there was a

10    "reasonable likelihood" that Intel would prevail in showing invalidity for at

11    least one of the challenged claims).  Future Link was able to avoid a

12    finding of unpatentability in that IPR through a settlement agreement,

13    which ended the IPR proceedings before the PTAB could render a final

14    determination.  And after Realtek filed an IPR petition challenging all

15    claims of the '614 patent, Future Link voluntarily cancelled all of those

16    claims and avoided any negative IPR findings.

17    h.    Despite twelve of the fourteen asserted claims being dependent, Future

18    Link did not offer any facts to support the allegations that Realtek infringed

19    the dependent claims and confirmed it had no other facts to support its

20    allegations

21    290.    The illegal agreement caused anticompetitive effects in the market for TV Chips

22    and is without any procompetitive justification.  For example:

23    a.    The illegal agreement allowed Defendant MediaTek to raise its prices and

24    continue to charge artificially high prices for TV Chips when prices in this

25    industry are typically rapidly declining.

26    b.    The illegal agreement harmed innovation in the market by forcing

27    MediaTek's competition to spend millions defend and defeat against

28    meritless litigation and litigation threats.

1          c.      The filing and withdrawal of numerous objectively baseless lawsuits has no

2                  conceivable competitive benefit.

3          d.      There was no procompetitive benefit to imposing a tax on MediaTek's

4                  competitors based on patents ███████████.

5          e.      There is no procompetitive benefit to making false and/or misleading

6                  statements in the market about Realtek's products or regarding litigation

7                  MediaTek surreptitiously initiated and financed.

8          291.    Realtek has been injured by Defendants' illegal agreement through lost bids

9   costing millions in revenue, lost customer trust in its products, and legal fees spent defeating

10  objectively baseless claims.  This conduct is unlawful under the per se standard.  Defendants'

11  conduct is also unlawful under either a "quick look" or rule of reason analysis because the

12  agreement is factually anticompetitive with no valid procompetitive justifications.  Moreover,

13  even if there were valid procompetitive justifications (which there were not), such justifications

14  could have been reasonably achieved through means less restrictive of competition.

15         292.    Realtek is entitled to treble damages, attorneys' fees and costs, and an injunction

16  against Defendants to end the ongoing violations alleged herein.

17                                  **COUNT IV**
18  **ILLEGAL AGREEMENT IN RESTRAINT OF TRADE IN THE MARKET FOR TV**
                                    **CHIPS**
19  **IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
    **(ASSERTED AGAINST ALL DEFENDANTS)**

20         293.    Realtek incorporates by reference and re-alleges the preceding allegations as

21  though fully set forth herein.

22         294.    Defendants IPValue, Future Link, and MediaTek entered into an agreement or

23  agreements to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C.

24  § 1) by carrying out an objectively baseless sham patent infringement suit against Realtek on

25  December 29, 2021 before the ITC: *In the Matter of Certain Integrated Circuit Products and*

26  *Devices Containing the Same, 337-TA-1295 (ITC Dec. 29, 2021).*  (ITC Case).

27         295.    The illegal agreement consisted of the Bounty and/or related express or implied

28  agreements.  This illegal agreement allowed Defendant MediaTek to weaponize the ITC Case

against Realtek by using the existence of the litigation (rather than its merits) to harm Realtek's relationships with actual and prospective customers—by calling into doubt the stability of Realtek's provision of TV Chips and raising the potential risk for Realtek customers to face infringement suits themselves—as well as imposing legal costs and expenses upon Realtek. MediaTek never disclosed to customers or the public that it had surreptitiously triggered and financed the ITC Case.

296.    The objective baselessness and anticompetitive purpose of the ITC Case is evidenced as described above.  Such indicia of objective and subjective baselessness include, for example:

a.    Failure to identify any evidentiary basis for concluding that numerous claim limitations were found in any Realtek products or the NXP, domestic industry products.

b.    Despite twelve of the fourteen asserted claims being dependent, Future Link did not offer any facts to support the allegations that Realtek infringed the dependent claims and confirmed it had no other facts to support its allegations.

c.    Despite Realtek notifying Future Link that its allegations lacked requisite evidentiary support on various occasions, including in a responsive pleading, supplemental discovery responses, correspondence, and a discovery meeting, Future Link failed to identify any evidentiary support for fundamental parts of its claims and stated that it had no obligation to identify any such support.

d.    Like those asserted against Realtek in other cases, the patents asserted here were the same as those ███████████████ MediaTek.

297.    The illegal agreement caused anticompetitive effects in the market for TV Chips and is without any procompetitive justification.  For example:

a.    The illegal agreement allowed Defendant MediaTek to raise its prices and continue to charge artificially high prices for TV Chips when prices in this

1               industry are typically rapidly declining.

2        b.     The illegal agreement harmed innovation in the market by forcing

3              MediaTek's competition to spend millions defend and defeat against

4              meritless litigation and litigation threats.

5        c.     The filing and withdrawal of numerous objectively baseless lawsuits has no

6              conceivable competitive benefit.

7        d.     There was no procompetitive benefit to imposing a tax on MediaTek's

8              competitors based on patents ███████████████

9        e.     There is no procompetitive benefit to making false and/or misleading

10            statements in the market about Realtek's products or regarding litigation

11            MediaTek surreptitiously initiated and financed.

12     298.    Realtek has been injured by Defendants' conspiracy through lost bids costing

13 millions in revenue, lost customer trust in its products, and legal fees spent defeating objectively

14 baseless claims.  This conduct is unlawful under the per se standard.  Defendants' conduct is also

15 unlawful under either a "quick look" or rule of reason analysis because the agreement is factually

16 anticompetitive with no valid procompetitive justifications.  Moreover, even if there were valid

17 procompetitive justifications (which there were not), such justifications could have been

18 reasonably achieved through means less restrictive of competition.

19     299.    Realtek is entitled to treble damages, attorneys' fees and costs, and an injunction

20 against Defendants to end the ongoing violations alleged herein.

21
**COUNT V**
**CONSPIRACY TO MONOPOLIZE THE MARKET FOR TV CHIPS**
22
**IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**
23
**(ASSERTED AGAINST ALL DEFENDANTS)**

24     300.    Realtek incorporates by reference and re-alleges the preceding allegations as

25 though fully set forth herein.

26     301.    MediaTek is a monopolist with 70 percent marketshare by its own admission.

27     302.    Defendants IPValue and Future Link conspired with Defendant MediaTek for

28 MediaTek to gain or unlawfully maintain a monopoly over the TV Chip market.  MediaTek,

IPValue, and Future Link entered into an illegal conspiracy containing an improper litigation bounty and other anticompetitive incentives, which appear to have motivated IPValue and Future Link to initiate a series of objectively baseless sham lawsuits to harm Realtek and destroy competition in the market for TV Chips.

303.    MediaTek, IPValue, and Future Link engaged in the conspiracy willfully, knowingly, and with the specific intent for MediaTek to gain a monopoly over TV Chips so as to collect monopoly profits for Defendants by ensuring MediaTek could price TV Chips above the competitive level.

304.    Defendants actions caused anticompetitive effects in the market for TV Chips and is without any procompetitive justification.  For example:

a.    The illegal agreement allowed Defendant MediaTek to raise its prices and continue to charge artificially high prices for TV Chips when prices in this industry are typically rapidly declining.

b.    The illegal agreement harmed innovation in the market by forcing MediaTek's competition to spend millions to defend and defeat against meritless litigation and litigation threats.

c.    The filing and withdrawal of numerous objectively baseless lawsuits has no conceivable competitive benefit.

d.    There was no procompetitive benefit to imposing a tax on MediaTek's competitors based on patents ███████████.

e.    There is no procompetitive benefit to making false and/or misleading statements in the market about Realtek's products or regarding litigation MediaTek surreptitiously initiated and financed.

305.    As a direct, foreseeable, and proximate result of the conspiracy to monopolize, Realtek has been harmed by having to pay to defend meritless litigation, and by lost sales and the harm to its business due to the uncertainty that such meritless litigation nevertheless creates.

306.    Realtek is entitled to damages and an injunction that terminates the Defendants' violations alleged.

1

2

3

**COUNT VI**
**MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF THE MARKET FOR**
**TV CHIPS IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(ASSERTED AGAINST MEDIATEK)**

4

5

307.    Realtek incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

6

7

308.    MediaTek hired PAE Defendants IPValue and Future Link to attack its closest rival, Realtek, with a series of objectively baseless sham patent suits.

8

9

10

309.    While Future Link attacked Realtek with its sham patent suits, MediaTek weaponized the cases against Realtek by spreading lies about Realtek to TV OEMs, including ████████████.

11

12

13

14

310.    In its campaign to disparage Realtek, MediaTek lied to TV OEMs when MediaTek made independently actionable false and/or misleading statements about the sham patent suits by failing to disclose to the customers and to the public that MediaTek had paid Future Link to bring the sham cases.

15

16

17

311.    MediaTek acted willfully, knowingly, and with the specific intent to gain a monopoly over TV Chips in order to collect monopoly profits by ensuring that MediaTek could price TV Chips above the competitive level.

18

19

20

21

312.    MediaTek is a monopolist with 70 percent market share by its own admission. There is a dangerous probability that, if Defendants' conduct is not enjoined, MediaTek will succeed in its attempt to monopolize or unlawfully maintain its monopoly in the market for TV Chips.

22

313.    There is no legitimate business justification for MediaTek's conduct.

23

24

314.    Defendants actions caused anticompetitive effects in the market for TV Chips and is without any procompetitive justification.  For example:

25

26

27

a.    The illegal agreement allowed Defendant MediaTek to raise its prices and continue to charge artificially high prices for TV Chips when prices in this industry are typically rapidly declining.

28

b.    The illegal agreement harmed innovation in the market by forcing

1    MediaTek's competition to spend millions to defend and defeat against

2    meritless litigation and litigation threats.

3    c.    The filing and withdrawal of numerous objectively baseless lawsuits has no

4    conceivable competitive benefit.

5    d.    There was no procompetitive benefit to imposing a tax on MediaTek's

6    competitors based on patents ███████████████.

7    e.    There is no procompetitive benefit to making false and/or misleading

8    statements in the market about Realtek's products or regarding litigation

9    MediaTek surreptitiously initiated and financed.

10    315.    As a direct, foreseeable, and proximate result of MediaTek's anticompetitive

11    conduct, Realtek has been harmed, including by having to pay to defend meritless litigation, and

12    by lost sales and the harm to its business due to the uncertainty that such meritless litigation

13    nevertheless creates.

14    316.    Realtek is entitled to damages and an injunction that terminates MediaTek's

15    violations alleged.

16    **COUNT VII**
**UNFAIR COMPETITION**
17    **IN VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE §§ 17200 _et seq._**
18    **(ASSERTED AGAINST MEDIATEK)**

19    317.    Realtek incorporates by reference and re-alleges the preceding allegations as

20    though fully set forth herein.

21    318.    California Business & Professions Code § 17200 prohibits any "unlawful, unfair

22    or fraudulent business act or practice."

23    319.    MediaTek's conduct as alleged herein constitutes unlawful, unfair, and fraudulent

24    activity in violation of California's Unfair Competition Law ("UCL"), as codified in California

25    Business and Professions Code §§ 17200 _et seq_.

26    320.    MediaTek is subject to the UCL because it conducts business in the United States

27    through its subsidiaries headquartered in California, and the Bounty was likely negotiated and

28    executed in California.

1    321.    MediaTek's conduct is unlawful in violation of the UCL because it violates federal

2    antitrust law, including the laws cited in this Complaint.

3    322.    MediaTek's conduct also violates the UCL because it constitutes unlawful and

4    unfair activity under section 5 of the Federal Trade Commission Act.  15 U.S.C. § 45; *see* FTC

5    Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the

6    Federal Trade Commission Act, Commission File No. P221202 (Nov. 10, 2022),

7    https://www.ftc.gov/system/files/ftc_gov/pdf/p221202sec5enforcementpolicystatement_002.pdf

8    ("FTC Policy Statement").  As reflected in the FTC Policy Statement (p. 1), Section 5

9    encompasses "various types of unfair conduct that tend to negatively affect competitive

10    conditions."  The "most significant general principles concerning whether conduct is an unfair

11    method of competition under Section 5 of the FTC Act" are: (1) the conduct "must be a method

12    of competition" (2) that is "unfair." *Id.* at 8.  MediaTek's agreement to a litigation bounty with

13    IPValue and Future Link is a method of competition.  It has been called unfair by multiple judges.

14    The methods of competition are unfair because they go beyond competition on the merits.  The

15    methods of competition go beyond competition on the merits because they are deceptive and rely

16    on fraudulent conduct.  The conduct negatively affected competition by jeopardizing Realtek's

17    participation in the TV Chip market and reducing the likelihood of potential or nascent

18    competition in this and other market segments.  MediaTek's conduct in ████████ executing

19    the illegal Bounty was not incident to any litigation MediaTek was a party to (or even itself

20    considering) and is therefore unprivileged.

21    323.    MediaTek's conduct additionally violates the UCL because it threatens an

22    incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because

23    its effects are comparable to or the same as a violation of the law or otherwise significantly

24    threatens or harms competition.   MediaTek unfairly and unlawfully entered into a secret bounty

25    agreement with IPValue and Future Link, to prevent Realtek from allocating resources to

26    innovation, research and development, and actively competing in the TV Chip Market.

27    324.    MediaTek's conduct is also unfair and unlawful because it relied on

28    independently actionable false and/or misleading statements that intended to and created doubt

regarding the availability of TV Chips from Realtek that could be imported into, and sold, in the United States.  MediaTek made false and/or misleading statements about Realtek (including, at a minimum, ███) by failing to disclose to customers that it had surreptitiously financed sham litigation against Realtek.  This conduct unfairly limited customers' and end users' ability to rely on Realtek for TV Chips and thus harmed competition for TV Chips.  MediaTek's unlawful disparagement to Realtek customers was not incident to any litigation MediaTek was a party to (or was itself considering) and is therefore unprivileged.

325.    Realtek has been harmed as a result of MediaTek's unlawful, unfair, and fraudulent conduct.  For example, after MediaTek's disparagement of Realtek, Realtek lost large bidding opportunities for TV Chips during 2022, 2023, and 2024, respectively.  Realtek lost several bids worth millions dollars which went to MediaTek.  Further, Realtek's monthly revenues had been growing rapidly year over year.  After the MediaTek executed the bounty agreement and disparaged Realtek to customers, Realtek experienced significant declines in its monthly revenues during the second half of 2022 and in 2023.  MediaTek's unfair competition foreseeably arose out of Defendants' conspiracy.

326.    Realtek continues to be threatened by MediaTek's unlawful, unfair, and fraudulent conduct.  MediaTek has not indicated that it will refrain from further disparagement of Realtek. Continued disparagement of Realtek will further reduce and harm competition for TV Chips and further undermine customers' and end users' confidence in Realtek's ability to reliably supply such products for importation into the United States.  Money damages are inadequate to address this continuing risk of future harm to Realtek.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (ASSERTED AGAINST MEDIATEK)

327.    MediaTek was aware of Realtek's relationships and prospective relationships with buyers of TV Chips.  For example, MediaTek is aware of these relationships at least because MediaTek attempts to sell its TV Chips to those same buyers in competition with Realtek.  The two companies regularly bid against each other.

328.     In a successful attempt to interfere with Realtek's prospective customer relationships, MediaTek made false and/or misleading statements about Realtek (including, at a minimum, TCL) by failing to disclose to customers that it had surreptitiously financed sham litigation against Realtek.  This false and/or misleading statement deceived customers and caused the intended uncertainty about Realtek product supply.  After MediaTek's disparagement of Realtek, Realtek lost large bidding opportunities for TV Chips during 2022, 2023, and 2024, respectively.  Realtek lost several bids worth millions dollars which went to MediaTek. MediaTek's foregoing actions had the predictable and intended effect of straining and disrupting Realtek's relationships and prospective relationships.

329.     These tortious and independently actionable statements were not incident to any litigation MediaTek was a party to (or was even contemplating) and are therefore unprivileged.  MediaTek's tortious commercial interference with customers foreseeably arose directly out of the conspiracy all Defendants participated in.  PAE Defendants also aided and abetted in this commercial interference with Realtek customers.

330.     Realtek is therefore entitled to compensation for damages it suffered as a result, including for lost sales.

**COUNT IX**
**FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)**
**(ASSERTED AGAINST ALL DEFENDANTS)**

331.     Plaintiff re-alleges and incorporates by reference each and every allegation of this Complaint as if fully set forth herein.

332.     The "classic Lanham Act false-advertising claim" has been described as one where "one competito[r] directly injur[es] another by making false statements about his own goods or the competitor's goods and thus inducing customers to switch." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–38 (2014) (citing Harold H. Huggins Realty, 634 F.3d, at 799, n. 24) (cleaned up).  But, "although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable" under the Lanham Act. Id.  The Act also covers where "a defendant harms a plaintiff's reputation by casting aspersions on its business," and "the plaintiff's injury flows directly from the

audience's belief in the disparaging statements." Id. at 138 (claim was actionable where Lexmark falsely advertised that Static Control's business was illegal and that its products "infringed Lexmark's patents").

333. As alleged above, Defendants have purposefully made false and misleading statements of facts through commercial statements concerning Realtek's reputation and Realtek's products with regard to claims of infringement. Defendants also falsely advertised PAE Defendants' patents and licensing practices as valid, based on "fair market value," and conducted in good faith.

334. Defendant's deception is material, in that it is likely to—and in many cases, did in fact—influence the purchasing decision of the public for whom it was intended.

335. Defendants introduced their false and misleading statements into interstate commerce via press releases, other online communications, and communications with Realtek's potential and actual customers.

336. Realtek has been injured as a result of Defendant's false statements.

337. Realtek has suffered a commercial injury based upon Defendant's misrepresentations.

338. Realtek's injury is competitive, i.e., harmful to Realtek's ability to compete.

339. Defendant's conduct as alleged is willful and exceptional, such that Realtek is entitled to an award of treble damages and its attorneys' fees.

**COUNT X**
**BREACH OF CONTRACT**
**(ASSERTED AGAINST ALL DEFENDANTS)**

340. Plaintiff re-alleges and incorporates by reference each and every allegation of this Complaint as if fully set forth herein.

341. As described above, PAE Defendants and RPX/ARM entered into a Patent License Agreement, in which PAE Defendants agreed to grant a license and release to RPX/ARM and its customers, including Realtek, for any Licensed Products, Covered Third Party products, and Combined Licensed Product(s) and Service(s), among other related provisions.

342. As part of that Agreement, PAE Defendants covenanted not to assert any patent

claims, in or out of court, with respect to the products and entities covered by the license and release provisions.

343.    PAE defendants further covenanted not to rely on any Licensed Product (such as ARM technologies identified in the infringement suits leading up to the Agreement) to satisfy any element of any claim asserted against Realtek and other covered third parties.

344.    Realtek is a third-party beneficiary of the Agreement, as it was specifically negotiated to give downstream protections to ARM's customers.  Several key provisions of the Agreement, including dismissal, release, and licensing provisions, are directed entirely at third-party beneficiaries.

345.    PAE Defendants breached the Agreement by dismissing its suits against Realtek without prejudice, when the Agreement obligated it to do so with prejudice.

346.    PAE Defendants also breached the Agreement by filing the Monterey Suit, when it had covenanted not to do so by virtue of various independent and overlapping licensing provisions.

347.    As a result of these contractual breaches, Realtek has been and continues to be injured in its business or property, including without limitation potential and actual loss of profits, revenue, customers and potential customers, goodwill and product image, and expense incurred through its continued need to defend against PAE Defendants' improper and baseless infringement claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby respectfully requests:

A.    The unlawful conduct and conspiracy alleged herein be adjudged and decreed in violation of Section One of the Sherman Act;

B.    The unlawful conduct and conspiracy alleged herein be adjudged and decreed in violation of Section Two of the Sherman Act;

C.    A declaration that the Defendants violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

1      D.    A declaration that the Defendants' conduct constituted tortious interference with

2           prospective economic advantage;

3      E.    A declaration that Defendants' conduct in violation of the purported ARM and/or

4           RPX agreement constituted breach of contract;

5      F.    An award of damages as compensation in an amount to be proven at trial;

6      G.    Punitive and exemplary damages;

7      H.    Disgorgement of all amounts of money wrongfully obtained by Defendants;

8      I.    Restitution of all amounts of money wrongfully taken from Realtek as a result of

9           Defendants' unlawful conduct;

10      J.    Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from the

11           Defendants' conspiracy to monopolize;

12      K.    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing the Defendants

13           from continuing their conspiracy to monopolize;

14      L.    Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from

15           MediaTek's attempted monopolization of the TV Chip market;

16      M.    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing MediaTek from

17           continuing its attempt to monopolize the TV Chip market;

18      N.    A permanent injunction enjoining and restraining MediaTek from disparaging

19           Realtek to any third party;

20      O.    A permanent injunction enjoining and restraining Defendants, individually and

21           collectively, from engaging in exclusionary, anticompetitive conduct, including,

22           but not limited to, the inclusion of any monetary incentives in any intellectual

23           property agreement to bring legal action against a third party;

24      P.    Appointment of a monitor for each Defendant to ensure compliance with the

25           foregoing permanent injunctions;

26      Q.    Pre-judgment and post-judgment interest at the maximum legal rate;

27      R.    Plaintiff's costs, expenses, and reasonable attorneys' fees in bringing this action,

28           as provided by law; and

1   S.  Such further relief, in law or in equity, as the Court may deem just and proper.

2            **<u>REQUEST FOR JURY TRIAL</u>**

3   348.  Realtek demands a trial by jury for all issues so triable.

1    DATED:  July 15, 2024                    Respectfully submitted,

2

3                                             By:    *Rudy Y. Kim*
                                                  _____

4

5                                             *Attorneys for Plaintiff Realtek Semiconductor*
                                              *Corp.*

6                                             RUDY Y. KIM (SB# 199426)
                                              rudykim@paulhastings.com
7                                             PAUL HASTINGS LLP
                                              1117 S. California Avenue
8                                             Palo Alto, CA 94304
                                              Tel: (650) 320-1800
9                                             Fax: (650) 320-1900

10                                            JAMES M. PEARL
                                              jamespearl@paulhastings.com
11                                            EMMA FARROW
                                              emmafarrow@paulhastings.com
12                                            PAUL HASTINGS LLP
                                              1999 Avenue of the Stars, 27th Floor
13                                            Los Angeles, California 90067
                                              Tel: (310) 620-5700
14                                            Fax: (310) 620-5899

15                                            MICHAEL F. MURRAY (*pro hac vice*)
                                              michaelmurray@paulhastings.com
16                                            JAMES W. BROWN (*pro hac vice forthcoming*)
                                              jamesbrown@paulhastings.com
17                                            PAUL HASTINGS LLP
                                              2050 M Street NW
18                                            Washington, DC 20036
                                              Tel: (202) 551-1700
19                                            Fax: (202) 551-0460

20                                            NOAH B. PINEGAR (*pro hac vice*)
                                              noahpinegar@paulhastings.com
21                                            ERIC W. LIN (*pro hac vice*)
                                              ericlin@paulhastings.com
22                                            PAUL HASTINGS LLP
                                              200 Park Avenue
23                                            New York, NY 10166
                                              Tel: (212) 318-6000
24                                            Fax: (212) 319-4090

25

26

27

28