UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALTEK SEMICONDUCTOR CORP., | Case No.  23-cv-02774-PCP |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS IN PART, GRANTING MOTION TO STRIKE IN PART, AND GRANTING MOTION TO SEAL IN PART** |
| MEDIATEK, INC., et al., | |
| Defendants. | Re: Dkt. Nos. 138, 140, 199 |

In this antitrust action, plaintiff Realtek Semiconductor Corp. alleges that defendant MediaTek, Inc. entered into a patent licensing agreement with defendants IPValue Management Inc. and Future Link Systems, LLC (the "PAE defendants") that included a provision incentivizing the latter two defendants to pursue meritless patent litigation against MediaTek's competitors Realtek and Amlogic Holdings, Ltd. According to Realtek that conduct, together with defendants' publicizing of the litigation and MediaTek's communications with at least one of Realtek's customers, caused anticompetitive harm in violation of state and federal law. Realtek also alleges Lanham Act and breach of contract claims.

Defendants move to dismiss Realtek's claims under Rule 12(b)(6), contending that Realtek's complaint fails to state any valid causes of action. The PAE defendants also move to strike Realtek's state law claims under California Code of Civil Procedure § 425.16, that state's "anti-SLAPP" statute. For the following reasons, the Court grants defendants' motions to dismiss in part and grants the PAE defendants' motion to strike in part. The Court grants defendants' consolidated motion to seal in part.

United States District Court
Northern District of California

# BACKGROUND

## I.    Facts

Realtek and defendant MediaTek are competitors in the "highly concentrated" TV Chip market. FAC ¶ 73.[1] The top three TV Chip market players account for a nearly 90% share of the market as of 2022. *Id.* MediaTek is the "world's leading" TV Chip provider, holding a 70% market share. *Id.* ¶¶ 68–69. Realtek is MediaTek's closest competitor in the TV Chip market. *Id.* ¶ 73. Amlogic is "a more distant rival to MediaTek, as compared to Realtek," but has maintained a foothold in sales of TV Chips to Chinese original equipment manufacturers. *Id.* ¶ 116.

Defendants IPValue and Future Link (IPValue's wholly owned subsidiary) are patent assertion entities (PAEs) that "acquire patents that are often abandoned by their original assignees because the technology is outdated or they otherwise lack value" and "exploit [these] often worthless patents" "through serial licensing and litigation." FAC ¶¶ 2, 7, 33.

Realtek's complaint alleges that in 2019 the PAE defendants entered into a patent license agreement with MediaTek that included a litigation bounty provision incentivizing Future Link to pursue meritless patent litigation against Realtek and Amlogic. *Id.* ¶¶ 1–19, 38. The bounty provision provided that MediaTek would pay an additional $1,000,000 if Future Link, prior to January 1, 2022, either executed a patent license agreement with, or instituted litigation against, Realtek or Amlogic. *Id.* ¶ 103. Realtek alleges that this was but one of multiple express or implied agreements between defendants pursuant to which the PAE defendants would file multiple suits against Realtek or Amlogic. *Id.* ¶ 119. Although Realtek has not identified the terms of any agreement other than the 2019 patent licensing agreement, Realtek contends that the existence of those agreements can be inferred because (1) Future Link "sued both Realtek and Amlogic and then informed MediaTek multiple times that it had sued both competitors while requesting payment per the 'payment terms' of the [b]ounty [agreement]"; (2) during negotiations, the parties considered revising the bounty provision to target both Realtek and Amlogic for $500,000 each; and (3) during the 2019 negotiations, the parties appeared to discuss a 2023 suit filed against

---

[1] The Court assumes the truth of the allegations in the first amended complaint for the purposes of defendants' Rule 12(b)(6) motion.

Realtek in Japan by another entity affiliated with IPValue. *Id.* ¶¶ 119, 161.

Since the 2019 patent licensing agreement was signed, the PAE defendants have sued Realtek four times and Amlogic twice.

In the first proceeding, Future Link sued Realtek in the Western District of Texas in April 2021 accusing Realtek of infringing its '680 patent. FAC ¶ 122. Realtek asserts that there were multiple "fatal defects" in that litigation: (a) there was no personal jurisdiction; (b) the complaint was not properly served; (c) Future Link failed to plausibly allege that Realtek engaged in any act of direct infringement; and (d) Future Link relied on optional features without any showing that such features were actually included in the accused products. *Id.* ¶ 125. After Future Link failed to cure those deficits in amending its complaint, the court orally announced that it would grant Realtek's motion to dismiss the suit and that it would enter a full opinion at a later date. *Id.* ¶¶ 126–28. That written opinion never issued because Future Link voluntarily dismissed the case.

After the filing of Future Link's first Western District of Texas lawsuit, Realtek sought inter partes review of the '680 patent before the Patent Trial and Appeal Board. In January 2023, the PTAB found claim 1 and several other claims of the '680 patent unpatentable. *Id.* ¶ 130. On March 14, 2022, Realtek filed a second inter partes review petition involving the '680 patent, this time challenging the patentability of claims 15 and 20. FAC ¶ 130. On September 9, 2022, Future Link cancelled claims 3–6 and 15–20, which Realtek alleges Future Link did to avoid a finding of unpatentability on those claims. *Id.*

In the second proceeding, Future Link filed another lawsuit in the Western District of Texas in December 2021 alleging infringement of two other patents (the '439 Patent and '614 patent). *Id.* ¶ 134. According to Realtek, this litigation contained the very same jurisdictional and service defects as the prior lawsuit. *Id.* ¶ 135. The '439 patent had been subject to an inter partes review petition instituted by Intel prior to Future Link's commencement of the lawsuit. According to Realtek, Future Link avoided a finding of unpatentability in that inter partes review proceeding by entering into a settlement with Intel prior to a final determination. *Id.* ¶ 138. In June 2022, Realtek filed an inter partes review petition challenging the '614 patent, and Future Link thereafter voluntarily cancelled all claims of that patent, resulting in the PTAB denying institution of inter

partes review. FAC ¶ 138.

Future Link voluntarily dismissed both Western District of Texas lawsuits, telling the court that it was doing so on the basis of a third-party licensing/settlement agreement between Future Link and RPX Corporation under which Realtek's supplier ARM was a licensee. *Id.* ¶¶ 137, 164. *See also* Dkt. No. 146-2. The Western District of Texas court denied Realtek's subsequent motion for sanctions and attorneys' fees but converted Future Link's dismissals of the lawsuits from dismissals without prejudice to dismissals with prejudice. *See* Dkt. 140-5, at 19.

In the third proceeding, Future Link alleged infringement of the same two patents at issue in the second Western District of Texas lawsuit (the '439 Patent and '614 patent) in a complaint filed with the International Trade Commission in late December 2021. FAC ¶ 143. Future Link sought an order excluding Realtek products, including those products identified in the first lawsuit, from the U.S. market. *Id.* Future Link withdrew its complaint and moved to terminate the ITC investigation. *See id.* ¶ 22. Realtek sought sanctions in the ITC action, *id.* ¶ 146, but the ITC denied Realtek's request. Dkt. No. 140-8.

In the fourth proceeding, IPValue—through its subsidiary Monterey Research LLC—initiated another case against Realtek in Japan (the "Monterey litigation") in April 2023, accusing some of the same Realtek products of infringement. FAC ¶ 159. Realtek alleges that the Monterey litigation is objectively baseless.

Realtek alleges that in addition to these four proceedings involving Realtek, Future Link in 2021 brought costly patent claims against Amlogic Holdings alleging infringement of the same three patents at issue in the suits against Realtek. *Id.* ¶ 149. Realtek asserts that after an ITC administrative law judge issued an April 2022 order describing the litigation incentive in its agreement with MediaTek, Future Link "hurriedly resolved [its] claims against Amlogic." *Id.* ¶ 158.

## II.    Procedural History

Realtek filed this antitrust lawsuit against the three defendants on June 6, 2023. It asserted three causes of action against all defendants: (1) unfair competition under Cal. Bus. & Prof. Code §§ 17200 (Count I); (2) tortious interference with prospective economic advantage under

United States District Court
Northern District of California

1    California common law (Count II); and (3) conspiracy to monopolize the market in violation of

2    Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count III). Realtek asserted against MediaTek alone

3    a fourth cause of action for attempted monopolization in violation of Section 2 of the Sherman

4    Act. Realtek sought treble damages as well as declaratory and injunctive relief. The Court

5    dismissed Realtek's first complaint with leave to amend, finding that all of the claims asserted

6    therein were barred by *Noerr-Pennington* immunity.

7            Realtek thereafter filed a first amended complaint alleging several more detailed and

8    specific causes of action. It now asserts the following claims against all defendants: (1) conspiracy

9    in restraint of trade in the market for TV chips in violation of the Sherman Act, 15 U.S.C. § 1

10   (Count I), based on the allegation that "[p]ursuant to the conspiracy, PAE defendants filed a series

11   of sham patent infringement suits against Realtek" and Amlogic, FAC ¶ 273; (2) illegal agreement

12   in restraint of trade in the market for TV chips in violation of the Sherman Act, 15 U.S.C. § 1

13   (Count II), based on the allegation that defendants' agreed to unreasonably restrain trade in the

14   market for TV Chips by carrying out the sham April 2021 Western District of Texas suit and using

15   it to harm Realtek's relationships with actual and prospective customers and to impose legal costs

16   and expenses on Realtek, *id.* ¶ 281; (3) illegal agreement in restraint of trade in the market for TV

17   chips in violation of the Sherman Act, 15 U.S.C. § 1 (Count III), based on allegations similar to

18   those in Count II but with respect to December 2021 Western District of Texas suit; (4) illegal

19   agreement in restraint of trade in the market for TV chips in violation of the Sherman Act, 15

20   U.S.C. § 1 (Count IV), based on allegations similar to those in Count II but with respect to the ITC

21   suit; (5) conspiracy to monopolize the market for TV chips in violation of the Sherman act, 15

22   U.S.C. § 2 (Count V); (6) unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

23   (Count VII); (7) tortious interference with prospective economic advantage under California

24   common law (Count VIII); and (8) false advertising in violation of the Lanham Act, 15 U.S.C.

25   § 1125(a) (Count IX).[2] Realtek also asserts a cause of action for attempted monopolization in

26

27   _____

     [2] The PAE defendants argue that Counts VII and VIII are asserted only against MediaTek because
     the title of each claim states it is "asserted against MediaTek", not all defendants. Realtek
28   responds that the title is legally irrelevant and that Realtek intended to and does assert these claims
     against all defendants. Because Counts VII and VIII provided "fair notice" to the PAE defendants

1  violation of Section 2 of the Sherman Act against MediaTek alone (Count VI) and a cause of

2  action for breach of contract against the PAE defendants alone (Count X).

3      Defendants again move to dismiss Realtek's complaint for failure to state a claim. *See* Fed.

4  R. Civ. P. 12(b)(6). The PAE defendants additionally move to strike Realtek's state law claims

5  pursuant to California Code of Civil Procedure § 425.16. The United States filed a statement of

6  interest pursuant to 28 U.S.C. § 517.

7                                    **LEGAL STANDARDS**

8  **I.    Rule 12(b)(6)**

9      Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain

10  statement of the claim showing that the pleader is entitled to relief." If the complaint does not do

11  so, the defendant may move to dismiss the complaint under Federal Rule of Civil Procedure

12  12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the court to "draw the

13  reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

14  U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint

15  lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

16  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule

17  12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible

18  on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

19      In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the

20  complaint as true and construe the pleadings in the light most favorable" to the non-moving party.

21  *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal

22  conclusions "can provide the [complaint's] framework," the Court will not assume they are correct

23  unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept

24  as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

25  inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell*

26

27  _____
   of their alleged liability by mentioning them explicitly, the Court will interpret the pleadings
   liberally and conclude that both counts are properly asserted against all defendants. *See Lynn v.*

28  *Sheet Metal Workers' Int'l Ass'n*, 804 F.2d 1472, 1482 (9th Cir. 1986); FAC ¶¶ 323, 329.

United States District Court
Northern District of California

1  *v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

2      Materials outside the complaint can be considered on a Rule 12(b)(6) motion if they are

3  incorporated by reference therein or otherwise judicially noticeable. *See United States v. Ritchie*,

4  342 F.3d 903, 908 (9th Cir. 2003) ("A [district] court may [ ] consider certain materials—

5  documents attached to the complaint, documents incorporated by reference in the complaint, or

6  matters of judicial notice—without converting the motion to dismiss into a motion for summary

7  judgment."). The Court may consider documents which are "not physically attached to the

8  complaint" "if the [ ] 'authenticity ... is not contested' and 'the plaintiff's complaint necessarily

9  relies' on them." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Parrino v.

10  FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998)). Federal Rule of Evidence 201 permits judicial

11  notice of "a fact that is not subject to reasonable dispute" because it is "generally known."

12  **II.    *Noerr-Pennington* Immunity**

13      The *Noerr-Pennington* doctrine "allows private citizens to exercise their First Amendment

14  rights to petition the government without fear of antitrust liability." *Kaiser Found. Health Plan,*

15  *Inc. v. Abbott Lab'ys, Inc.*, 552 F.3d 1033 (9th Cir. 2009). Under *Noerr-Pennington*, "those who

16  petition any department of the government for redress are generally immune from statutory

17  liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

18  Courts must "construe federal statutes so as to avoid burdening conduct that implicates the

19  protections afforded by the Petition Clause unless the statute clearly provides otherwise." *Id.* This

20  immunity can extend to state law claims as well. *Theme Promotions, Inc. v. News Am. Mktg. FSI*,

21  546 F.3d 991, 1007 (9th Cir. 2008) ("*Noerr–Pennington* doctrine applies to … state law tortious

22  interference with prospective economic advantage claims.").

23      "In determining whether the burdened conduct falls under the protection of the Petition

24  Clause," courts must "give adequate 'breathing space' to the right of petition." *Sosa*, 437 F.3d at

25  931–32. Because initiating and participating in litigation is one method of petitioning the

26  government, litigation-related conduct falls within the scope of *Noerr-Pennington*. But the

27  protection afforded by *Noerr-Pennington* is not limited to active litigation. Both the Supreme

28  Court and the Ninth Circuit have "reject[ed] burdens on the right to petition the courts even where

United States District Court
Northern District of California

no actual litigation was pending." *Sosa*, 437 F.3d at 937. In *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), for example, the Ninth Circuit held that *Noerr-Pennington* immunity extended to a defendant who had funded anticompetitive litigation but was not a party to that litigation and therefore had not petitioned the courts directly. Similarly, in *Sosa v. DIRECTV*, the Ninth Circuit held that *Noerr-Pennington* immunity extends to "litigation-related activities preliminary to the formal filing of the litigation." 437 F.3d at 937.

"Neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them." *Sosa*, 437 F.3d at 932. This "'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (emphasis in original).

The Ninth Circuit recognizes three situations where the sham exception applies:

> [F]irst, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; and third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

*Abbott Lab'ys*, 552 F.3d at 1045 (quoting *Sosa*, 437 F.3d at 938).

The Ninth Circuit applies a "a strict two-step analysis to assess whether a single action constitutes sham petitioning." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO* ("*POSCO*"), 31 F.3d 800, 810–11 (9th Cir. 1994). "First, the suit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits; second, the baseless lawsuit must conceal an attempt to interfere directly with the business relationships of a competitor." *Id.* at 810 (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* ("*PREI*"), 508 U.S. 49, 60 (1993)).[3] "The two parts of the test operate in

---

[3] "This inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham." *POSCO*, 31 F.3d at 811. "On the other hand, when the antitrust defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in post hoc reasoning by concluding

1    succession: Only if the suit is found to be objectively baseless does the court proceed to examine

2    the litigant's subjective intent." *Id.* at 810.

3        The Ninth Circuit applies a different test to evaluate the sham litigation exception

4    involving a series of lawsuits.

5            When dealing with a series of lawsuits, the question is not whether

6            any one of them has merit—some may turn out to, just as a matter of
         chance—but whether they are brought pursuant to a policy of starting

7            legal proceedings without regard to the merits and for the purpose of
         injuring a market rival. The inquiry in such cases is prospective: Were

8            the legal filings made, not out of a genuine interest in redressing
         grievances, but as part of a pattern or practice of successive filings

9            undertaken essentially for purposes of harassment?

10    *POSCO*, 31 F.3d at 811. In establishing its "series" framework, the Ninth Circuit "relied on a fact

11    pattern that involved twenty-nine lawsuits. Perhaps due to the rarity of that number, its infrequent

12    application in [the Circuit's] case law is a feature rather than a bug." *Relevant Grp., LLC v.*

13    *Nourmand*, 116 F.4th 917, 931 (9th Cir. 2024) (citing *POSCO*, 31 F.3d at 810–11).

14                              **ANALYSIS**

15    **I.    Defendants' requests for judicial notice are granted in part.**

16        In support of their motion to dismiss, the PAE defendants have requested judicial notice of

17    various documents. They ask the Court to take judicial notice of the proceedings in the Western

18    District of Texas and the ITC, including various dockets and filings therein of which the Court

19    took judicial notice in deciding the first motion to dismiss in this case. They also request that the

20    Court take judicial notice of several U.S. patent infringement lawsuits and an ITC investigation

21    brought against Realtek in the four years preceding the FAC. They additionally request the Court

22    take judicial notice of several documents referenced in the complaint, including the RPX

23    agreement, the license between Future Link and MediaTek, a press release, and a news article.

24        The Court grants these requests for judicial notice because each of the documents at issue

25    is either incorporated by reference into Realtek's complaint or available from a source whose

26

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     that an ultimately unsuccessful action must have been unreasonable or without foundation." *White*

28    *v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000) (quoting *PREI*, 508 U.S. at 60 n.5 (internal quotations
     omitted)).

United States District Court
Northern District of California

1    accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). While the Court takes judicial

2    notice of the existence and content of the documents at issue, it will not take judicial notice of the

3    underlying truth of any factual assertions therein.

4         The PAE defendants also request that the Court take judicial notice of the "worldwide

5    COVID-19 pandemic and its impacts on the global economy, including major disruptions in the

6    supply chain for electronics, particularly regarding semiconductors." Dkt. No. 140-1, at 7. The

7    Court rejects this request for judicial notice because it goes to the merits of this case and is not

8    comparably indisputable to the judicially noticed market examples that the PAE defendants cite.

9    *See, e.g.*, *Eclectic Prop. v. Marcus & Millichap Co.*, 751 F.3d 990, 998 n.6 (9th Cir. 2014) ("We

10   take judicial notice of the recession in the U.S. economy from December 2007 to June 2009.")

11   **II.    *Noerr-Pennington* immunity bars Count I.**

12        Count I focuses on defendants' conspiracy to file "a *series* of sham patent infringement

13   suits." FAC ¶ 273 (emphasis added). Defendants argue that the first amended complaint does not

14   plausibly allege that there was any conspiracy to file a series of sham suits because the bounty

15   agreement specifies that payment was triggered by the filing of only one suit. But Realtek's

16   amended complaint alleges that there were other express or implied agreements between the

17   defendants regarding other litigation. To support this allegation, Realtek alleges several facts,

18   including that the suit against Realtek in Japan appears to have been discussed by defendants

19   during negotiations of the bounty agreement in March 2019; that during negotiations the parties

20   contemplated providing separate bounties for lawsuits against Realtek and Amlogic; and that the

21   PAE defendants informed MediaTek multiple times about the suits against both competitors.

22   These facts, when coupled with the known bounty agreement, plausibly suggest that the PAE

23   defendants and MediaTek entered into one or more other express or implied agreements to bring

24   litigation against MediaTek's competitors.

25        Defendants also argue that the conduct on which this claim is premised involves First

26   Amendment-protected petitioning that cannot form a basis for federal antitrust claims under the

27

28

United States District Court
Northern District of California

*Noerr-Pennington* doctrine. The Court agrees.[4]

The Ninth Circuit recently reemphasized that the series exception is limited to situations involving voluminous legal challenges. *Relevant Grp.*, 116 F.4th at 931 (holding that the series exception did not apply to a case involving four lawsuits and noting that the series exception is "infrequent" and "rare" given the sheer number of lawsuits needed to constitute a series). Realtek complains of six lawsuits—four against Realtek and two against Amlogic—and argues that six lawsuits can constitute a series. But even assuming that all six lawsuits can be considered notwithstanding that two were filed against a different company, the six lawsuits are insufficiently numerous to constitute a "series."  *See, e.g.*, *Plouviez v. Duel*, No. 2:21-cv-8934, 2022 WL 18278581, at *10 (C.D. Cal. Nov. 23, 2022) (finding five or six lawsuits not a series).

This conclusion reflects the series exception's underlying purpose. The exception addresses circumstances in which *the litigation process itself* "serve[s] as a very effective restraint on trade." *POSCO*, 31 F.3d at 811. This occurs, for example, where "having to defend a whole series of such proceedings [ ] inflict[s] a crushing burden on a business." *Id.* Similarly, the exception may apply where the series of lawsuits directly prevents a competitor from entering the market. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 509 (1972) (concluding that *Noerr-Pennington* immunity did not protect defendants' conspiracy "to institute state and federal proceedings to resist and defeat applications by respondents to acquire operating rights or to transfer or register those rights"). In these circumstances, the series directly restrains trade either through interim court orders or the "crushing burden" imposed on a competitor forced to defend a voluminous number of lawsuits.

Realtek has not shown that the six lawsuits at issue here directly restrained trade in a manner comparable to the circumstances presented in prior cases recognizing the series exception. With respect to the burden posed by those lawsuits, Realtek merely had to respond to four patent

---

[4] Although Realtek and the United States contend that the payment made by MediaTek to the PAE defendants in exchange for their pursuit of litigation does not constitute protected petitioning for the purposes of *Noerr-Pennington*, the Court sees no principled distinction between a litigation "award" (as Realtek and the United States characterize the payment here) and the litigation funding that the Ninth Circuit in *Liberty Lake* found to be within the scope of potential *Noerr-Pennington* immunity.

lawsuits.[5] Notably, in its amended complaint Realtek cites to its own 2021 Annual Report (which is thus incorporated therein), and that report shows both that Realtek faced multiple patent lawsuits besides those at issue here during the year and that its reported general and administrative expenses for that year (which presumably include its legal expenses) were miniscule in comparison to its research and development expenses. Given that patent litigation is an ongoing reality of Realtek's business, it is simply not plausible to conclude that the four lawsuits Realtek faced imposed upon it the kind of crushing burden that the series exemption was adopted to redress. Nor did any of the four lawsuits result in court orders or other rulings that directly interfered with Realtek's ability to continue competing with MediaTek.[6]

Rather than pleading facts plausibly suggesting that the litigation at issue here directly restrained competition, Realtek instead contends that MediaTek invoked the lawsuits in conversations with customers in order to create uncertainty regarding the reliability of Realtek's supply chain. The problem with applying the series exception to such a theory is that it would risk punishing not only protected petitioning activity (to the extent one or more of the lawsuits had merit and thus could not be deemed a sham) but also First Amendment-protected conversations with customers about those non-sham petitions—effectively doubling the conflict between federal antitrust law and the First Amendment. Because the sham exception provides sufficient protection against such litigation abuses without creating the same degree of conflict with protected petitioning and speech rights, and given the substantial precedent suggesting that far more than six lawsuits are required to invoke the series exception, the Court cannot apply the exception to the allegations in this case.

Accordingly, Count I is dismissed without leave to amend and with prejudice.

---

[5] The two suits against third-party Amlogic cannot be said to have posed any burden on Realtek.

[6] Although Future Link sought injunctive relief in the ITC proceedings, it never procured such an order. The proceedings here did not involve the kind of lawsuit or administrative challenge in which its mere filing *automatically* interferes with the plaintiff's ability to compete. *Cf., e.g.*, *POSCO*, 31 F.3d at 804 (noting plaintiff's allegation that defendants "filed automatic protests to [plaintiff]'s permits in order to cause it gratuitous expense and delay").

United States District Court
Northern District of California

**III.    Counts II and III state valid claims, but *Noerr-Pennington* immunity bars Count IV.**

**1.    Realtek pleads a valid sham exception to *Noerr-Pennington* for Counts II and III but not IV.**

In its original complaint, Realtek's federal antitrust claim was limited to the "series" theory asserted in Count I. In its amended complaint, Realtek now brings three additional claims focused on the individual lawsuits that were a part of that series, alleging that the defendants "entered into an agreement or agreements to unreasonably restrain trade in the market for TV Chips in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by carrying out an objectively baseless sham patent infringement suit." FAC ¶¶ 280, 287, 294. Count II arises from the April 2021 Western District of Texas litigation against Realtek. *Id.* ¶ 280. Count III arises from the December 2021 Western District of Texas litigation against Realtek. *Id.* ¶ 287. Count IV arises from the ITC litigation against Realtek. *Id.* ¶ 294.

Defendants again argue that the conduct on which these claims are premised involved First Amendment-protected petitioning that cannot form a basis for federal antitrust claims under the *Noerr-Pennington* doctrine. Because the litigation at issue involves petitioning, these Counts can avoid dismissal only if Realtek's allegations satisfy the single-action sham exception to *Noerr-Pennington* immunity. First, each lawsuit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *POSCO*, 31 F.3d at 810. Second, the baseless lawsuit must conceal "'an attempt to interfere directly with the business relationships of a competitor.'" *Id.* "Conduct prohibited under antitrust law includes bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed.... In such events the antitrust immunity of *Noerr-Pennington* does not apply to those who seek redress through judicial process." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368–69 (Fed. Cir. 1998) (cleaned up).

Defendants argue that the allegations of the complaint and judicially noticeable materials establish the objective non-baselessness of the litigation at issue in Counts II, III, and IV.

Defendants first contend that the RPX agreement demonstrates the objective merit of each of the lawsuits. Specifically, they contend that that the RPX agreement was a settlement which caused Future Link to dismiss the Western District of Texas lawsuits and the ITC litigation against

Realtek, and that technology companies including ARM (an upstream supplier of Realtek) paid a great deal of money to license the patents at issue via the RPX agreement. In defendants view, this demonstrates the potential merit of Future Link's patents and claims. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008) ("The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless.").[7]

This argument fails for multiple reasons. First, the RPX agreement is not a traditional settlement between the parties to pending litigation. Instead, it involves a third party and the licensing of hundreds of patents (most of which have nothing to do with the litigation at issue in Counts II, III, and IV) to six large multinational entities for a fee. The agreement does not suggest that ARM paid any specific consideration to settle the claims at issue in Counts II, III, and IV. *See* Dkt. No. 173-3, at 27. In the context of a motion to dismiss, the Court cannot conclude that the RPX agreement is dispositive as to the non-baselessness of the PAE defendants' litigation against Realtek. The Court must therefore consider whether the other allegations and judicially noticeable materials demonstrate the potential validity of the claims asserted therein.

Realtek argues that "the patents underlying the PAE defendants' claims were invalid in the first place and the PAE defendants knew it." In support of that contention, Realtek alleges that MediaTek took this position in its licensing negotiations with Future Link and communicated to the PAE defendants that the patents at issue were invalid. Realtek also points to the fact that PTAB found the patent at issue in the April 2021 Western District of Texas litigation (the '680 patent) invalid in part when it was challenged by Realtek, and that Future Link voluntarily cancelled all other claims in the '680 patent that Realtek challenged. In response to another Realtek challenge, Future Link likewise voluntarily cancelled all claims of the '614 patent, one of the two patents at issue in the December 2021 Western District of Texas litigation and in the ITC litigation against Realtek. The second patent at issue in December 2021 Western District of Texas

---

[7] As Realtek points out, *Theme Promotions* was a post-trial decision that found the settlement at issue probative on the basis of a complete factual record. No such record is before this Court on defendants' Rule 12(b)(6) motion.

litigation and the ITC litigation, the '439 patent, has never been invalidated or cancelled.[8]

"Given the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence, it will be a rare case in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1345 (Fed. Cir. 2014). Realtek's complaint nonetheless plausibly alleges that the April 2021 Western District of Texas litigation was brought with knowledge that the '680 patent was invalid. The fact that all of the patent claims under which that litigation was brought were either invalidated or cancelled voluntarily by Future Link in response to Realtek's challenges plausibly suggests that Future Link did not see any merit in the patent involved in the first Western District of Texas lawsuit. *See* ANTICOMPETITIVE LITIGATION CLAIMS, IP ANTITRUST ANAL. 9447714 § 11.03, n.153. The truth of that allegation must be determined in subsequent proceedings on the basis of an evidentiary record.[9]

The same cannot be said with respect to the patents involved in Counts III and IV. In both the December 2021 Western District of Texas litigation and the ITC litigation, Future Link brought claims under a currently valid patent. The presumption of patent validity does not allow a court to take as true bare allegations that this issued patent is invalid. *See* 35 U.S.C. § 282.

Realtek alleges several other facts in support of its claim that the December 2021 Western District of Texas case was objectively baseless, including that the case contained obvious defects such as (a) a lack of personal jurisdiction; (b) a lack of proper service; (c) Future Link's failure to plausibly allege infringement; and (d) Future Link's reliance on optional features without any

---

[8] Although this patent has never been challenged by Realtek, it was subject to inter partes review after Intel challenged it. In those proceedings, PTAB issued an initial finding of "a reasonable likelihood that [Intel] would prevail in establishing the unpatentability of claims 1 and 4 of the '439 patent" as required to permit institution of inter partes review pursuant to 35 U.S.C. § 314(a). This institution order made no "final determination with respect to the patentability of these challenged claims." The parties settled prior to a final decision by PTAB, leaving the '439 patent intact.

[9] The Court places minimal weight on the positions taken by MediaTek during licensing negotiations given that the parties in such proceedings have a strong incentive to emphasize any weakness in the other party's position in order to strengthen their negotiating leverage.

United States District Court
Northern District of California

showing that the accused products had those features. FAC ¶ 289. These allegations might be sufficient to survive a motion to dismiss in the ordinary case.  But Realtek has already argued these same issues in the Western District of Texas without success. Following Future Link's dismissal of the second Western District of Texas lawsuit, Realtek moved for attorneys' fees and sanctions under Rule 11, which "sets forth a standard very similar to that applied by the [Supreme] Court" in the *PREI* single-action sham exception two-step inquiry. ANTICOMPETITIVE LITIGATION CLAIMS, IP ANTITRUST ANAL. 9447714 § 11.03, n.147. In denying Realtek's motions, the Western District of Texas court considered if "the claims, defenses, and other legal contentions therein [were] warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law," Dkt. No. 140-5, at 6 (quoting Fed. R. Civ. P. 11(b)), and held that Future Link's infringement allegations were "plausible and not objectively unreasonable," *id.* at 8.

Because "[c]ourts can assess the sham litigation exception at the motion to dismiss stage where past proceedings or judicially noticeable facts make it clear that the sham litigation exception does not apply," *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 981 (N.D. Cal. 2019), the Western District of Texas court's order would ordinarily be highly probative and make clear that the December 2021 lawsuit in that forum was not a sham proceeding. As Realtek points out, however, the Western District of Texas court premised its decision in part on the existence of the RPX agreement, which was never disclosed to that court. *See* Dkt. No. 140-5, at 13 ("ARM's non-frivolous settlement payment shows that another serious party believed the case be non-frivolous."). Specifically, the Western District of Texas court concluded that Future Link had "settled with ARM for an amount sufficient to convince the Court that ARM did not find [Future Link's] allegations against [Realtek's] ARM chips to be completely meritless." *Id.* at 18.

In the posture of this motion to dismiss, the Court cannot determine whether the outcome of the sanctions motion would have been different if the Western District of Texas court had reviewed the RPX agreement and learned that ARM paid no specific amount of consideration to license the patents at issue in the December 2021 lawsuit. Given the reduced probative value of the Western District of Texas court's order under these circumstances and the other allegations supporting Realtek's claim that Future Link could not have reasonably expected to succeed, Count

III adequately pleads that the December 2021 Western District of Texas litigation was objectively baseless. Whether the outcome of the sanctions motion would have been different if the Western District of Texas court had reviewed the RPX agreement and whether defendants were aware of the alleged invalidity of the '439 patent or Realtek's non-infringement of that patent are matters that must be addressed in subsequent proceedings involving an evidentiary record.

As with the December 2021 Western District of Texas lawsuit, Realtek identifies reasons why the ITC case was objectively baseless beyond its bare allegations of patent invalidity (which, as noted, are insufficient to overcome the '439 patent's presumed validity). Realtek asserts, for example, that Future Link failed to "identify any evidentiary basis for concluding that numerous claim limitations were found in any Realtek products or the NXP domestic industry products" and "did not offer any facts to support the allegations that Realtek infringed the dependent claims and confirmed it had no other facts to support its allegations." FAC ¶ 296.

As with the Western District of Texas litigation, Realtek sought sanctions before the ITC on the basis of these arguments and, like the Western District of Texas court, the ITC rejected them. The ITC administrative law judge held that "[t]he Commission reviewed Future Link's proposed Complaint and supporting materials, and found them sufficient to initiate the investigation. … Moreover, it is not clear that the Complaint is defective at all or that [Future Link] violated any pre-filing investigative duties." Dkt. No. 140-8, at 2–3.

This decision is highly probative and demonstrates that the ITC litigation cannot be deemed a "sham." *See UCP Int'l Co. Ltd.*, 420 F. Supp. 3d at 981. Crucially, Realtek does not argue that the ITC's opinion relied on an agreement not before the court or suffers from any other shortcomings that would undermine its probative value.[10] Because the ITC has already rejected Realtek's argument that the ITC proceeding lacked any reasonable basis, the ITC litigation involved protected petitioning conduct subject to *Noerr-Pennington* immunity. The Court therefore grants defendants' motions to dismiss Claim IV.

---

[10] Realtek notes that it did not present any invalidity arguments to the ITC but given the presumed validity of the '439 patent, it is not plausible that the ITC would have deemed the proceedings therein baseless on the basis of such arguments.

Claims II and III also sufficiently allege the sham exception's second requirement: "an attempt to interfere directly" with a competitor's business relationships through the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *PREI*, 508 U.S. at 61 (emphasis in original). Realtek alleges that the "the sole aim of [the litigation was] to wound Realtek in the eyes of TV [original equipment manufacturers] to harm competition in TV Chips." FAC ¶ 162. Realtek details how the meritless suits were weaponized and used "to interfere with customer relationships." *Id.* ¶ 10; *see also, e.g.*, ¶¶ 219–32. Specifically, Realtek alleges that the PAE Defendants amplified the litigation through "agreed upon press releases," and that MediaTek directly contacted TV original device manufacturers and original equipment manufacturers to sow doubts about Realtek's reliability by informing them about the patent litigation. MediaTek allegedly warned the customers "to reduce their use of Realtek TV Chips into their products because of the risks posed by patent litigation" and suggested that Realtek's supply would be interrupted because of the Future Link suits. These allegations adequately plead the use of the process of litigation—as opposed to its outcome—as an anticompetitive weapon.

### 2.    Realtek plausibly alleges antitrust injury.

The Sherman Act seeks "'to preserve competition for the benefit of consumers,' not competitors." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022) (quoting *Am. Ad Mgmt. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Nonetheless, "harm to a competitor also harms competition which, in turn, harms consumers." *Id.* Congress has allowed competitors to enforce the antitrust laws when they have experienced an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A competitor thus has standing to assert a Sherman Act claim "only when the claimed injury flows from acts harmful to consumers." *PLS.Com*, 32 F.4th at 832 (quoting *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1445 (9th Cir. 1995)). To plead antitrust injury, the plaintiff must allege "(1) unlawful conduct, (2) causing an injury to [the plaintiff], (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* at 833.

In arguing that it suffered an antitrust injury, Realtek alleges that MediaTek and the PAE defendants used baseless lawsuits to cause market harm and restrain trade. Specifically, Realtek alleges that the fees and costs it incurred in litigation and the pallor created by existence of patent litigation harmed competition by reducing Realtek's ability to drive and innovate in market. Realtek also alleges that MediaTek used the existence of the litigation to drive customers away from Realtek and to further MediaTek's monopoly, allowing MediaTek to increase prices to supracompetitive levels in a manner that harmed consumers.

Defendants argue that Realtek has not pleaded a valid antitrust injury, but their factual challenges to Realtek's allegations do not provide a basis for dismissal given that the Court must accept as true all well-pleaded factual allegations. Defendants argue, for example, that there are obvious alternative explanation for the increase in prices that Realtek alleges, including COVID-19. But Realtek's allegation that the defendants' behavior contributed to the rising costs is plausible, especially given MediaTek's alleged market share (around 70%). *See* FAC ¶¶ 247–67. Realtek alleges that it lost money and time for research and development because of the lawsuits, and that this directly harmed consumers by causing raised prices and a disruption in innovation. *See Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 956 (N.D. Cal. 2018) ("[L]itigation costs may constitute antitrust injury in some cases."). Even if it were implausible that these litigation costs alone would have a meaningful market impact for a company of Realtek's size and nature (as the 2021 Annual Report that Realtek references in its complaint documents), Realtek also alleges that the defendants weaponized the litigation to drive customers away from Realtek by calling "into doubt the stability of Realtek's provision of TV Chips" and "raising the potential risk for Realtek customers to face infringement suits themselves." FAC ¶ 288. Again, given MediaTek's market share and Realtek's allegation that it is MediaTek's largest competitor in the relevant market, Realtek's allegation that this behavior allowed MediaTek to harm consumers by raising its prices to supracompetitive levels is plausible. Contrary to defendants' arguments, the fact that the pricing effects were not realized until after Future Link's litigation ended is consistent with Realtek's allegation that the litigation triggered a lasting disruption in its perceived supply-chain stability, which caused it to lose bids and resulted

in a subsequent increase in consumer prices as MediaTek gained even greater market share. *See* FAC ¶¶ 63–67.

*   *   *

Because Counts II and III allege facts plausibly suggesting that the Western District of Texas litigation falls within the "sham" exception to *Noerr-Pennington* immunity, and because those Counts also adequately allege antitrust injury, the Court denies defendants' motions to dismiss Counts II and III. The Court grants defendants' motion to dismiss Count IV. That Count is dismissed without leave to amend and with prejudice.

## IV.    Count V states a valid claim.

Count V alleges that MediaTek and the PAE defendants conspired to monopolize the market for TV chips. "To prove a conspiracy to monopolize in violation of § 2, [the plaintiff] must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

MediaTek argues that this claim fails because the conduct alleged in this claim is protected by *Noerr-Pennington*. For the reasons discussed above, this argument succeeds to the extent Count V is premised on the ITC proceedings but fails to the extent it is premised on the Western District of Texas litigation. Likewise, Realtek has alleged antitrust injury and that MediaTek possessed the requisite specific intent to monopolize for the reasons already discussed. MediaTek does not otherwise challenge the sufficiency of Realtek's allegations with respect to Count V.

The PAE defendants separately argue that they are not Realtek's competitors and thus cannot be subject to a Section 2 claim by Realtek, citing *Mercy-Peninsula Ambulance, Inc. v. San Mateo Cnty.*, 791 F.2d 755 (9th Cir. 1986). But *Mercy-Peninsula Ambulance, Inc.* was an actual monopolization claim, not a conspiracy to monopolize claim. As demonstrated by the Ninth Circuit's omission of such a requirement from the enumeration of claim elements in *Paladin Assocs.*, there is no requirement that each defendant facing a Section 2 conspiracy to monopolize claim participate in the relevant market. *Cf. Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.6 (9th Cir. 2015); *City of Columbia v. Omni Outdoor*

*Advertising, Inc.*, 499 U.S. 365 (1991) (considering conspiracy to monopolize billboard market claim against municipal government and billboard company and concluding that state-action immunity barred claim against municipality without suggesting that the noncompetitor municipal government was an improper defendant); *see also Petrochem Insulation, Inc. v. N. California & N. Nevada Pipe Trades Council*, No. C-90-3628 EFL, 1992 WL 131162, at *9–10 (N.D. Cal. Mar. 19, 1992) (noting that while the defendant need not be a competitor in the relevant market, it must have conspired with a party in that market). Here, Realtek alleges that the PAE defendants conspired with Realtek's TV chip market competitor MediaTek. The fact that PAE defendants themselves are not TV chip market participants poses no bar to Realtek's Section 2 conspiracy claim against the PAE defendants.

Finally, Realtek adequately alleges that the PAE defendants possessed the requisite specific intent to monopolize. "[T]he existence of specific intent may be established not only by direct evidence of unlawful design, but by circumstantial evidence, principally of illegal conduct." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981). "Actions taken by a firm without market power may support the inference of intent if those actions are of a kind clearly threatening to competition or clearly exclusionary." *Id.* at 1028. This "inference may be drawn from conduct ... with an unreasonable restraint of trade in violation of section 1 of the Sherman Act*." Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 483 (9th Cir. 2021) (quoting *William Inglis*, 668 F.2d at 1028).

Here, Realtek plausibly alleges Section 1 claims against the PAE defendants involving illegal agreements in restraint of trade. Taking Realtek's allegations as true, this illegal conduct allows a plausible inference of the PAE defendants' specific intent to assist MediaTek in monopolizing the relevant market for the purposes of Rule 12(b)(6).

Accordingly, Realtek has plausibly pleaded a Section 2 conspiracy to monopolize claim against both MediaTek and the PAE defendants.

**V.      Count VI states a valid claim.**

Count VI of the first amended complaint asserts against MediaTek alone a claim for monopolization or attempted monopolization of the market for TV chips in violation of the

Sherman Act. To state such a claim the plaintiff must allege that the defendant: (1) possessed monopoly power in the relevant market, (2) willfully acquired or maintained that power, and (3) caused antitrust harm. *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.* ("*Harcourt Brace*"), 108 F.3d 1147, 1151 (9th Cir. 1997).

MediaTek argues that Realtek does not adequately plead its claim because *Noerr-Pennington* protects MediaTek's litigation funding conduct and MediaTek's statements to competitors are insufficient as pleaded. But *Noerr-Pennington* immunity poses no bar to the extent MediaTek paid for the filing of sham litigation, as the complaint adequately alleges. And Realtek alleges that in addition to incentivizing the sham litigation MediaTek used the existence of the sham litigation to create uncertainty about Realtek's supply-chain stability and patent risks to gain an advantage when competing with Realtek for bids in an effort to control prices and exclude Realtek's competition.[11] These allegations collectively state a viable Section 2 monopolization or attempted monopolization claim against MediaTek.

## VI.    Count IX states a valid Lanham Act claim against the PAE Defendants.

Realtek alleges that MediaTek made false statements to Realtek's customers by, for example, portraying the Future Link litigation against Realtek "as legitimate, despite MediaTek knowing the patents were invalid and that the infringement claims were the sham result of the Bounty Agreement." Realtek also alleges that the PAE Defendants issued press releases that were false and misleading by representing that its patent licenses and the litigation against Realtek "were merited and not brought for an improper purpose." Realtek alleges that these statements constitute Lanham Act violations.

The substantive elements of a Lanham Act false advertising claim are: "(1) a false

---

[11] The Court agrees with defendants that, as pleaded, MediaTek's alleged statements to Realtek's customers would not be enough to plead antitrust injury on their own. Realtek does not allege that these misstatements took place over a prolonged period, and therefore has not overcome the presumption that alleged misstatements to customers do not have a significant effect on competition (and therefore cannot cause antitrust injury) even when they "impair the opportunities of a rival." *Harcourt Brace*, 108 F.3d at 1151–52. The Court concludes, however, that allegations of funding and/or incentivizing sham litigation against a competitor and then using statements about that litigation to create uncertainty about a competitor are sufficient to suggest antitrust injury resulting from actual or attempted monopolization.

United States District Court
Northern District of California

statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). A false advertising claim only applies to "commercial advertising or promotion," 15 U.S.C. § 1125(a)(1)(B), which is defined by the Ninth Circuit as (1) commercial speech by the defendant; (2) for the purpose of influencing consumers to buy defendant's goods or services; and (3) that is disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Coastal Abstract Serv. v. First Am. Title*, 173 F.3d 725, 735 (9th Cir. 1999).[12]

"While the Ninth Circuit has yet to decide whether Rule 9(b) applies to Lanham Act claims, several district courts in the Ninth Circuit have applied Rule 9(b) to false advertising claims brought under the Lanham Act because such claims are grounded in fraud." *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 827 (N.D. Cal. 2019) (citing *Bobbleheads.com, LLC v. Wright Bros., Inc.*, 259 F. Supp. 3d 1087, 1094 (S.D. Cal. 2017)). Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Thus, a plaintiff must allege the "who, what, when, where, and how" of each alleged misrepresentation. *Id.*

Realtek states a valid Lanham Act claim against the PAE defendants based on their press release. Contrary to the PAE defendants' assertions, press releases can constitute commercial speech. *See, e.g.*, *Nichia Am. Corp. v. Seoul Semiconductor Co.*, No. CV 07-8354 PA (CWX),

---

[12] The Ninth Circuit has suggested that a fourth requirement previously identified in its decisions—that the defendant be a commercial competitor of the plaintiff's—has been abrogated by intervening Supreme Court authority. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1120 (9th Cir. 2021). The PAE defendants do not contend that Realtek must satisfy this requirement to state a valid Lanham Act claim.

2008 WL 11342571, at *5 (C.D. Cal. Oct. 7, 2008); *DNA Sports Performance Lab, Inc. v. Major League Baseball*, No. C 20-00546 WHA, 2020 WL 4430793, at *4 (N.D. Cal. Aug. 1, 2020). And the Ninth Circuit has made clear that "speech that does no more than propose a commercial transaction" is just "the starting point" for commercial speech. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021). Here, in addition to discussing the litigation against Realtek, the press release referred to a specific product of PAE defendants: its patent licenses.[13] "[S]peech that does not propose a commercial transaction on its face can still be commercial speech" so long as "the speaker acted primarily out of economic motivation." *Id.* at 1115–16. Realtek plausibly alleges that the press release primarily sought to influence consumers to license the PAE

---

[13] The press release states in relevant part:

> [Future Link] acquired a portfolio of over 600 computer architecture related patents. Since that time [Future Link] has successfully licensed several of the world's largest semiconductor companies, including some with significant semiconductor design and manufacturing operations in the U.S. These licensees collectively supply a large percentage of the worldwide market for microprocessors, microcontrollers, and application processors.

> "IPValue brings renowned portfolios to market, using rigorous and detailed technical presentations and business negotiations to conclude fair-value patent licensing deals. Abiding by our 'litigate last' approach, [Future Link] has engaged in business discussions to license major semiconductor vendors willing to step up on behalf of themselves and their end-device vendor customers," said Boaz Brickman, Senior Vice President, Legal at IPValue. "No entity is entitled to take a free-ride off the research and development costs that went into the innovations represented by FLS' patent portfolio. Our licensees, and the public in general, are not well-served if we allow companies to sell infringing products without a license while others pay their fair share," said Mr. Brickman

> The patents at issue in the action are U.S. Patents 7,685,439 and 8,099,614.

*IPValue Management Subsidiary Future Link Systems Files ITC Patent Infringement Complaint*, BUSINESS WIRE (Dec. 30, 2021), https://www.businesswire.com/news/home/20211230005016/en/IPValue-Management-Subsidiary-Future-Link-Systems-Files-ITC-Patent-Infringement-Complaint.

United States District Court
Northern District of California

defendants' patents and thus qualifies as commercial speech.

That alone is not enough to state a claim, however, because "'federal patent law bars the imposition of liability [under federal or state law] for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith.'" *Golan v. Pingel Enters., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002) (alteration in original). *See also Fisher Tool Co. v. Gillet Outillage*, 530 F.3d 1063, 1068 (9th Cir. 2008) (adopting the Federal Circuit's holding and noting that for Lanham Act claims "based on a defendant's representation that someone infringed his patent, plaintiff must show that defendant's representation was made in bad faith"). Since the ITC proceedings were not objectively baseless, as the ITC itself held, the majority of the press release was not publicity undertaken in bad faith and thus cannot provide a basis for Lanham Act liability. *See Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008). But the press release also notes that Future Link "filed related complaints in the U.S. District Court for the Western District of Texas." *IPValue Management Subsidiary Future Link Systems Files ITC Patent Infringement Complaint*, Business Wire (Dec. 30, 2021), https://www.businesswire.com/news/home/20211230005016/en/IPValue-Management-Subsidiary-Future-Link-Systems-Files-ITC-Patent-Infringement-Complaint. As to this limited statement about the alleged sham litigation, Realtek pleads a Lanham Act claim sufficient to survive a motion to dismiss. Realtek also pleads facts sufficient to allege that the misstatement was material. *See* FAC ¶¶ 231–32.

Conversely, Realtek does not state a valid Lanham Act claim against MediaTek. Realtek alleges that MediaTek made at most a handful of private statements to Realtek's actual or prospective customers. *See* FAC ¶ 309. Realtek's allegations approach the specificity required to satisfy Rule 9(b) only with respect to MediaTek's alleged statements to one customer. *See id.* ¶¶ 219–20. And whether or not Rule 9(b) applies, "[t]o be sufficiently disseminated" to constitute advertising or promotion for the purposes of the Lanham Act, "the actions must be part of an organized campaign to penetrate the relevant market, which typically involves widespread dissemination within the relevant industry." *Ariix*, 985 F.3d at 1121 (internal quotations omitted). Realtek has not pleaded facts sufficient to plausibly suggest that MediaTek's misstatements were

1  disseminated widely to the relevant purchasing public or within the industry.

2       The Court therefore dismisses Realtek's Lanham Act claim against MediaTek. Dismissal is

3  without leave to amend but without prejudice. Should discovery reveal additional evidence that

4  Realtek believes would support a Lanham Act claim against MediaTek, Realtek may seek leave to

5  file an amended complaint including such a claim and the allegations necessary to state a valid

6  claim.

7  **VII.    Count VII states a valid UCL claim.**

8       The UCL prohibits any "unlawful, unfair, or fraudulent" business practices. Cal Bus. &

9  Prof. Code § 17200. The "unlawful" prong requires a predicate violation of another law. Because

10  Realtek has adequately pleaded that both MediaTek and the PAE defendants violated federal law,

11  Realtek's complaint states a valid UCL claim against all defendants.[14]

12  **VIII.    Count VIII states a valid claim only against MediaTek.**

13       "The elements of intentional interference with prospective economic advantage have been

14  stated as follows: '(1) an economic relationship between the plaintiff and some third party, with

15  the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the

16  relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship;

17

18  _____

[14] Because the California litigation privilege applies to UCL claims, *see People v. Potter Handy,*
19  *LLP*, 97 Cal. App. 5th 938 (2023), the claims against litigant Future Link premised on the sham
litigation itself are likely not cognizable under California law. *See Kearney v. Foley & Lardner,*
20  *LLP*, 590 F.3d 638, 650 (9th Cir. 2009) (asserting that the California litigation privilege would bar
a state claim based on a litigant's litigation conduct even where the *Noerr-Pennington* sham
21  exception applied). But the press release which undergirds the Lanham Act claim against Future
Link is not privileged and the UCL claim can move forward with respect to that alleged unlawful
22  conduct. *See GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 152 (2013) (holding that
a party's publication to the general public through the press is not subject to the litigation
privilege). As to MediaTek, the California litigation privilege only extends to "litigants or other
23  participants authorized by law." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990). MediaTek was
not a litigant in the PAE defendants' patent lawsuits. And even if MediaTek could be deemed a
24  "participant" in the litigation (which is unclear, *see, e.g.*, *Costa v. Superior Court*, 157 Cal. App.
3d 673, 678 (1984) (concluding that nonlitigants with a "substantial interest in the outcome of the
25  pending litigation" are "authorized participants"); *GetFugu, Inc.*, 220 Cal. App. 4th at 152; *Adams
v. Superior Court*, 2 Cal. App. 4th 521, 529 (1992) (finding that the privilege applies to
26  individuals "merely [ ] connected or related to the proceedings" where those individuals filed a
motion but lacked standing)), Realtek's complaint adequately alleges that MediaTek was not a
27  participant *authorized by law* because the bounty agreement and MediaTek's resulting interest in
the PAE defendants' litigation violated federal antitrust law. Accordingly, the California litigation
28  privilege poses no bar to the state law claims against MediaTek at this motion to dismiss stage.

United States District Court
Northern District of California

1  (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused

2  by the acts of the defendant.'" *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 339 (1997) (quoting

3  *Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal.App.4th 507, 521–22 (1996)).[15]

4  Realtek states a valid claim against MediaTek for tortious interference of prospective

5  advantage. "[A] plaintiff seeking to state a claim for intentional interference with prospective

6  economic advantage because defendant induced another to undertake litigation, must allege that

7  the litigation was brought without probable cause and that the litigation concluded in plaintiff's

8  favor." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1137 (1990) (cleaned up).

9  Here, Realtek plausibly alleges that MediaTek induced the PAE defendants to bring litigation

10  against Realtek without probable cause as previously described herein and that litigation resulted

11  in dismissals with prejudice and the invalidation or cancellation of PAE defendants' '680 and '614

12  patents. Realtek also alleges that MediaTek knew Realtek's prospective customers and

13  successfully disrupted those relationships, causing Realtek economic harm. Specifically, Realtek

14  alleges that

> MediaTek was aware of Realtek's relationships and prospective
> relationships with buyers of TV Chips. For example, MediaTek is
> aware of these relationships at least because MediaTek attempts to
> sell its TV Chips to those same buyers in competition with Realtek.
> The two companies regularly bid against each other.
>
> MediaTek made false and/or misleading statements about [the
> litigation against] Realtek [to prospective customers] (including, at a
> minimum, TCL) by failing to disclose [ ] that it had surreptitiously
> financed sham litigation against Realtek. This false and/or misleading
> statement deceived customers and caused the intended uncertainty
> about Realtek product supply. After MediaTek's disparagement of
> Realtek, Realtek lost large bidding opportunities for TV Chips during
> 2022, 2023, and 2024, respectively. Realtek lost several bids worth
> millions dollars which went to MediaTek. MediaTek's foregoing
> actions had the predictable and intended effect of straining and
> disrupting Realtek's relationships and prospective relationships.

---

[15] The tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care. *Stolz v. Wong Commc'ns Ltd. P'ship*, 25 Cal. App. 4th 1811, 1825 (1994). The complaint does not allege such a duty, and the Court therefore focuses only on the intentional interference elements.

United States District Court
Northern District of California

1    FAC ¶¶ 327–28. Realtek further alleges that the "scheme caused Realtek to lose growth

2    opportunities with TCL" and other original device manufacturers and original equipment

3    manufacturers. *Id.* at ¶ 259. These allegations state a plausible claim, and the Court therefore

4    denies MediaTek's motion to dismiss the tortious interference claim.

5            Realtek implicitly concedes that its first amended complaint does not contain allegations

6    that the PAE defendants had any knowledge of Realtek's prospective economic relationships. As

7    such, Realtek's tortious interference claim against the PAE defendants fails.

8            The Court correspondingly grants PAE defendants' motion to strike the tortious

9    interference claim pursuant to California Code of Civil Procedure § 425.16.

10               Th[is] anti-SLAPP statute was enacted to allow early dismissal of
11               meritless first amendment cases aimed at chilling expression through
                 costly, time-consuming litigation. Under the statute, a civil defendant
12               may move to strike a cause of action based on an "act in furtherance
                 of [the] right to petition or free speech."
13

14    *Metabolife Int'l, Inc. v. Wornick,* 264 F.3d 832, 839–40 (9th Cir. 2001) (quoting Cal. Civ. Proc.

15    Code § 425.16(b)). The analysis of an anti-SLAPP motion proceeds in two steps: "'First, the court

16    decides whether the defendant has made a threshold showing that the challenged cause of action is

17    one "arising from" protected activity. [ ] If the court finds such a showing has been made, it then

18    must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.'"

19    *Barry v. State Bar of California,* 2 Cal. 5th 318, 321, (2017).

20            Realtek acknowledges that its tortious interference claim is premised on the PAE

21    defendants' litigation conduct. This is petitioning conduct protected under the anti-SLAPP statute.

22    For the reasons stated above, Realtek also has not demonstrated the probability of success

23    necessary to overcome the PAE defendants' anti-SLAPP motion.

24    **IX.    Count X states a valid breach of contract against Future Link.**

25            Realtek alleges a breach of contract claim against the PAE defendants, contending that

26    they breached the RPX agreement by not voluntarily dismissing Future Link's claims in the

27    Western District of Texas litigation with prejudice and by bringing the Monterey litigation.

28

**1.    Realtek's breach of contract claim against IPValue fails.**

Realtek's claim against IPValue fails because IPValue is not a party to the RPX contract. "It is a general principle of contract law that only a party to a contract may be sued for breach of that contract." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999).[16] "Delaware law recognizes no theory under which a principal can be vicariously liable for its agent's non-tortious breach of contract." *Wenske v. Blue Bell Creameries, Inc.*, No. CV 2017-0699-JRS, 2018 WL 3337531, at *16 (Del. Ch. July 6, 2018). And "[p]iercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (internal quotations omitted).

Because Realtek has not pleaded that the corporate structure of IPValue and Future Link has caused fraud or similar injustice, it cannot state a breach of contract claim against IPValue, which is not a party to the contract.

The Court correspondingly grants Future Link's motion to strike the breach of contract claim against it pursuant to California's anti-SLAPP statute. Realtek acknowledges that its breach of contract claim is premised on Future Link's litigation conduct. This is petitioning conduct protected under the anti-SLAPP statute. For the reasons stated above, Realtek has not demonstrated the probability of success necessary to overcome Future Link's anti-SLAPP motion.

**2.    Realtek states a claim that Future Link's dismissal of the case without prejudice was a breach of contract.**

Conversely, Realtek states a breach of contract claim against Future Link based on Future Link's failure to dismiss the Western District of Texas litigation with prejudice. The RPX agreement provided that, upon payment, Future Link would "immediately complete the Release and Dismissal Obligations with respect to any Initial Licensees and their Affiliates that are Licensor Litigation Defendants." Dkt. No. 142-3, at 6. The release and dismissal obligations are defined as

---

[16] Because the RPX agreement contains a Delaware choice-of-law provision and no party contends that a different state's law should apply, the Court applies Delaware law for the purposes of Realtek's 12(b)(6) motion challenging Count X.

> [Future Link], on behalf of itself and its Affiliates (i) executing a release agreement substantially similar to the Release Terms, and (ii) with respect to any Licensor Litigation Defendant, taking all actions and making all necessary filings to resolve all disputes with respect to such Licensor Litigation Defendant "with prejudice" substantially similar to the Form of Dismissal (or, any other form of dismissal "with prejudice" in as is appropriate for any non-U.S. jurisdiction).

Whether Realtek was an affiliate of initial licensee of ARM and therefore qualified as a "Licensor Litigation Defendant" presents a question of fact that cannot be resolved on the basis of the matters before the Court on this motion. Realtek's claim that it was a Licensor Litigation Defendant is at least plausible given Future Link's representations to the Western District of Texas court that it was dismissing the actions due to the RPX agreement. It is additionally a question of fact whether Future Link met its obligations pursuant to this clause. The Court therefore denies Future Link's motion to dismiss this claim.

### 3. Realtek does not state a claim for breach of contract on the basis of the Monterey litigation.

Realtek alleges that the PAE defendants also breached the RPX agreement by pursuing the Monterey litigation against Realtek. The contract provides that:

> neither Licensor [Future Link] nor any of its Affiliates shall knowingly sue or threaten to sue or maintain an already-filed suit against (or instruct, encourage, or aid a third party to sue or threaten to sue) RPX, any RPX Affiliate, any RPX Licensee, or any RPX Licensee Affiliate or any Covered Third Party for direct or indirect infringement (including, without limitation, inducement, or contributory infringement) *under any Patent* with respect to any Licensed Product and Service and/or Combined Licensed Product and Service.

Dkt. No. 142-3, at 9 (emphasis added). "Patent" has a specific and contained definition. *Id.* at 4.[17]

---

[17] The definition provides that:

> "Patents" shall mean: (i) any and all patents and patent applications that are owned, controlled or licensable as of the Effective Date or later by Licensor and/or its Affiliates, and any and all foreign counterparts of any of the foregoing of which Exhibit B is a list of the patents and patent applications that are owned by Licensor to the best of its knowledge; (ii) any and all patents that have issued or may issue from any of the patents or patent applications described in (i) of this definition; (iii) any and all patents and patent applications that, in

1    Realtek does not allege that the patents at issue in the Monterey ligation are covered by the RPX

2    license agreement. Dkt. No. 173-3, at 45. Because the RPX agreement is limited to suits involving

3    the specified patents, the Court dismisses the breach of contract claim against Future Link to the

4    extent it is premised on the Monterey litigation regarding other patents.

5    **X.    Defendants' consolidated motion to seal is granted in part.**

6        Finally, defendants have asked the Court to seal various documents submitted in support of

7    their motions to dismiss, including portions of the RPX agreement and various documents

8    discussing either the agreement or the license between MediaTek and Future Link.

9        The public has a longstanding and well-recognized "right to inspect and copy public

10   records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns,*

11   *Inc.*, 435 U.S. 589, 597 (1978). Public access bolsters "understanding of the judicial process" and

12   "confidence in the administration of justice," and it provides a "measure of accountability" for

13   courts. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). There is

14   thus a "strong presumption in favor of access" to court records. *Kamakana v. City & Cnty. of*

15   *Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

16       To overcome this strong presumption, a party who wishes to seal a court record must

17   generally "articulate compelling reasons supported by specific factual findings ... that outweigh

18   _____

19           whole or in part, claim priority to (directly or indirectly), or the benefit
20       of the filing date of, any of the patents or patent applications described
         in (i) or (ii) of this definition, including any and all child,
21       continuation, continuation-in-part, continuing prosecution,
         divisional, provisional, non-provisional, reissue, reexamination,
22       substitution, extension and counterpart patents and patent
         applications of any of the patents or patents applications described in
23       (i) or (ii) of this definition; (iv) any and all patents and patent
         applications (provided they are, as of the Effective Date or later,
24       owned or licensable by Licensor) from which any of the patents or
         patent applications described in (i) or (ii) of this definition, in whole
25       or in part, claim the benefit of priority (directly or indirectly) or
         otherwise claim the benefit of the filing date, including any and all
26       parent patents or patent applications of any of the patents or patent
         applications described in (i) or (ii) of this definition; and (v) any and
27       all extensions or renewals of any of the patent or patent applications
         described in this definition. Any one of the foregoing is a "Patent".

28

United States District Court
Northern District of California

31

the general history of access and the public policies favoring disclosure." *Kamakana*, 447 F.3d at

1178–79 (cleaned up). Sealing may be justified when "court files ... become a vehicle for improper

purposes, such as ... to gratify private spite, promote public scandal, circulate libelous statements,

or release trade secrets." *Id.* at 1179. But without more, the "fact that the production of records

may lead to a litigant's embarrassment, incrimination, or exposure to further litigation" does not

merit sealing. *Id.* "Under this stringent standard," the Court must "conscientiously balance the

competing interests of the public and the party who seeks to keep certain judicial records

secret." *Auto Safety*, 809 F.3d at 1096–99. Civil Local Rule 79-5(c)(1) and (f)(3) requires the party

seeking to seal to provide "a specific statement" of the reasons for doing so, explaining the

interests that warrant sealing and the injury that will otherwise result.

  The Court grants in part the motion to seal portions of the RPX agreement. Dkt. No. 142-3.

Specifically, the Court finds that the specific fee amount and wire information can be redacted in

Section 1.1, as this information is not germane to the dispute and contains "sensitive financial-

account data" that is appropriate for redaction consistent with Federal Rule of Civil Procedure

5.2(a). With respect to the rest of the license, the PAE Defendants' sealing request is woefully

overbroad, including all definitions, signatory lines, and more. The overbreadth of the sealing

request on its own provides sufficient justification for denying the request to seal. But the parties

also have not provided an adequate reason to seal those matters. Although the PAE defendants and

third-party RPX, Corp. argue that "[d]isclosure of this information would reveal highly

confidential business and negotiation strategy to competitors and other business entities, who

could thereby gain an unfair advantage in future dealings," Dkt. No. 143, such generalized

assertions of competitive harm are inadequate to overcome the public's interest in accessing

portions of an agreement, including the rest of Section 1.1, that are highly germane to this dispute

and essential to the public's understanding of these proceedings. The Court therefore denies the

motion to seal any other portions of the RPX agreement. If the PAE defendants wish to submit a

far more narrowly tailored request to seal limited portions of the RPX agreement, they must file a

renewed motion to seal within 7 days of this order and identify the specific compelling reasons

that justify each request to seal a portion of the agreement.

Defendants' requests to seal Dkt. No. 164-3, at 8:9–10, and Dkt. No. 178-3, at 7:1–4, are rejected as they disclose licensing terms that are not particularly sensitive. The other pending sealing motions are granted in part as set forth below:

- Dkt. No. 153-3, at 5:5.
- Dkt. No. 153-4, at 1 (only as to price information).
- Dkt. No. 173-3, at 18:21, 22:3.
- Dkt. No. 178-3, at 4 n.2.
- Dkt. No. 180-2, at 5:1–2.
- Dkt. No. 185-1, at 3:11, 10:10.
- Dkt. No. 190-3, at 1 (only as to price information).
- Dkt. No. 190-4, at 1 (only as to price information).
- Dkt. No. 194-1, at 5:3.

## CONCLUSION

For the foregoing reasons, MediaTek's motion to dismiss Counts I and IV is granted with prejudice and without leave to amend. MediaTek's motion to dismiss Count IX is granted without prejudice but without leave to amend. Future Link and IPValue's motion to dismiss Counts I, IV, and VIII is granted with prejudice and without leave to amend. IPValue's motion to dismiss Count X is granted with prejudice and without leave to amend. The motions to dismiss are otherwise denied. Future Link and IP Value's motion to strike is granted as to Count VIII. IPValue's motion to strike Count X is granted. Future Link and IP Value's motion to strike is otherwise denied. The defendants' consolidated motion to seal is granted in part and denied in part. Within 14 days, the parties shall file on the public docket each of the documents previously filed under seal with only those redactions permitted by this Order.

**IT IS SO ORDERED.**

Dated: March 7, 2025

P. Casey Pitts
United States District Judge